# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIRST CIRCUIT

NEW HAMPSHIRE INDONESIAN COMMUNITY SUPPORT; LEAGUE OF UNITED LATIN AMERICAN CITIZENS; MAKE THE ROAD NEW YORK,

*Plaintiffs-Appellees,*

v.

DONALD J. TRUMP, President of the United States, in their official capacity; U.S. DEPARTMENT OF HOMELAND SECURITY; KRISTI NOEM, in their official capacity as Secretary of the U.S. Department of Homeland Security; U.S. DEPARTMENT OF STATE; MARCO RUBIO, in their official capacity as Secretary of the U.S. Department of State; U.S. DEPARTMENT OF AGRICULTURE; BROOKE L. ROLLINS, in their official capacity as Secretary of the U.S. Department of Agriculture; CENTERS FOR MEDICARE AND MEDICAID SERVICES; MEHMET OZ, in their official capacity as Administrator of the Centers for Medicare and Medicaid Services,

*Defendants-Appellants.*

On Appeal from the United States District Court
for the District of New Hampshire

## BRIEF FOR APPELLANTS

YAAKOV M. ROTH
  *Acting Assistant Attorney General*

ERIC D. McARTHUR
  *Deputy Assistant Attorney General*

MARK R. FREEMAN
SHARON SWINGLE
BRAD HINSHELWOOD
DEREK WEISS
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7230*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 616-5365*

# TABLE OF CONTENTS

**Page**

INTRODUCTION.................................................................................................. 1

STATEMENT OF JURISDICTION ..................................................................... 3

STATEMENT OF ISSUES .................................................................................. 3

STATEMENT OF THE CASE ............................................................................. 3

    A.    Constitutional and Statutory Background ................................................. 3

    B.    Factual Background................................................................................... 4

    C.    Prior Proceedings .................................................................................... 5

SUMMARY OF ARGUMENT ............................................................................ 8

STANDARD OF REVIEW.................................................................................. 10

ARGUMENT........................................................................................................ 11

I.    Plaintiffs Are Not Likely to Succeed on the Merits............................................ 11

    A.    The Executive Order Is Consistent with the Original Meaning of
        the Citizenship Clause............................................................................. 12

        1.    Persons Are "Subject to the Jurisdiction" of the United
            States if They Owe Primary Allegiance to the United States. ...... 12

        2.    Persons Temporarily or Unlawfully Present Do Not Owe
            the Requisite Allegiance to the United States................................ 22

    B.    The District Court's Contrary Holding Is Mistaken. ............................... 35

    C.    Plaintiffs' Statutory Claim Fails for the Same Reasons............................ 41

II.    The District Court's Injunctive Relief Is Substantially Overbroad.................... 42

    A.      Members Who Lack Standing Are Not Entitled to Relief. ...................... 43

    B.      The Court Lacked Jurisdiction to Enjoin the President. .......................... 46

    C.      The Remaining Equitable Factors Do Not Support the
            Preliminary Injunction. ................................................................................ 47

CONCLUSION ............................................................................................................ 48

CERTIFICATE OF COMPLIANCE

ADDENDUM

# TABLE OF AUTHORITIES

**Cases:**                                                                      **Page(s)**

*Afroyim v. Rusk,*
   387 U.S. 253 (1967) ................................................................ 41

*Benny v. O'Brien,*
   58 N.J.L. 36, 32 A. 696 (N.J. 1895) ....................................... 26, 27

*Berenyi v. District Dir., INS,*
   385 U.S. 630 (1967) ................................................................ 35

*Carlson v. Reed,*
   249 F.3d 876 (9th Cir. 2001) .................................................. 30

*CASA, Inc. v. Trump,*
   Civ. No. DLB-25-201, 2025 WL 408636 (D. Md. Feb. 5, 2025),
   *appeal docketed,* No. 25-1153 (4th Cir. Feb. 18, 2025) .................... 7

*Cherokee Nation v. Georgia,*
   30 U.S. (5 Pet.) 1 (1831) ........................................................ 25

*Chin Bak Kan v. United States,*
   186 U.S. 193 (1902) ................................................................ 38

*Cochise Consultancy, Inc. v. United States ex rel. Hunt,*
   587 U.S. 262 (2019) ................................................................ 41

*DaimlerChrysler Corp. v. Cuno,*
   547 U.S. 332 (2006) ................................................................ 43

*Dred Scott v. Sandford,*
   60 U.S. (19 How.) 393 (1857) ............................................... 1, 3

*Elk v. Wilkins,*
   112 U.S. 94 (1884) ....................... 1, 8, 9, 14, 15, 16, 24, 24-25

*Fong Yue Ting v. United States,*
   149 U.S. 698 (1893) ........................... 17, 23, 24, 30, 37, 38

*Franchise Tax Bd. of Cal. v. Hyatt,*
  587 U.S. 230 (2019) ................................................................ 21

*Franklin v. Massachusetts,*
  505 U.S. 788 (1992) ................................................................ 46

*General Bldg. Contractors Ass'n v. Pennsylvania,*
  458 U.S. 375 (1982) .............................................................18-19

*Haaland v. Brackeen,*
  599 U.S. 255 (2023) ..........................................................15, 25

*Harisiades v. Shaughnessy,*
  342 U.S. 580 (1952) ................................................................ 33

*Hodgson v. De Beauchesne*
  [1858] 14 Eng. Rep. 920 (Privy Council) ........................... 23

*Hunt v. Washington State Apple Advert. Comm'n,*
  432 U.S. 333 (1977) ................................................................ 43

*Inglis v. Trustees of the Sailor's Snug Harbour in N.Y.C.,*
  28 U.S. (3 Pet.) 99 (1830) ..................................................... 36

*INS v. Legalization Assistance Project of the L.A. Cty. Fed'n of Labor,*
  510 U.S. 1301 (1993) ............................................................. 47

*International Union v. Brock,*
  477 U.S. 274 (1986) ..........................................................44, 46

*Kaplan v. Tod,*
  267 U.S. 228 (1925) ................................................................ 30

*Kawakita v. United States,*
  343 U.S. 717 (1952) ................................................................ 32

*Kemp v. United States,*
  596 U.S. 528 (2022) ................................................................ 41

*Kwock Jan Fat v. White,*
  253 U.S. 454 (1920) ................................................................ 38

iv

*Lac du Flambeau Band of Lake Superior Chippewa Indians v. Coughlin,*
599 U.S. 382 (2023) .............................................................................. 25

*Lamar v. Micou,*
112 U.S. 452 (1884) .......................................................................... 18, 30

*Lau Ow Bew v. United States,*
144 U.S. 47 (1892) ........................................................ 9, 17, 23, 37, 38

*Lem Moon Sing v. United States,*
158 U.S. 538 (1895) ................................................................................ 37

*Lone Wolf v. Hitchcock,*
187 U.S. 553 (1903) ................................................................................ 15

*Marbury v. Madison,*
5 U.S. (1 Cranch) 137 (1803) .............................................................. 13

*Martinez v. Bynum,*
461 U.S. 321 (1983) ................................................................................ 24

*McDonald v. City of Chicago,*
561 U.S. 742 (2010) ................................................................................ 19

*Mississippi v. Johnson,*
71 U.S. (4 Wall.) 475 (1866) ................................................................ 46

*Mississippi Band of Choctaw Indians v. Holyfield,*
490 U.S. 30 (1989) .................................................................................. 18

*Moody v. NetChoice, LLC,*
603 U.S. 707 (2024) .......................................................................... 11, 31

*Murray v. Schooner Charming Betsy,*
6 U.S. (2 Cranch) 64 (1804) ................................................................ 17

*Murthy v. Missouri,*
603 U.S. 43 (2024) .................................................................................. 10

*Nexium Antitrust Litig., In re,*
777 F.3d 9 (1st Cir. 2015) .................................................................... 43

v

*Nken v. Holder,*
    556 U.S. 418 (2009) ........................................................................ 47

*NYSRPA v. Bruen,*
    597 U.S. 1 (2022) ............................................................................ 40

*Park v. Barr,*
    946 F.3d 1096 (9th Cir. 2020) ...................................................... 31

*Plyler v. Doe,*
    457 U.S. 202 (1982) ....................................................................... 30

*Quirin, Ex parte,*
    317 U.S. 1 (1942) ........................................................................... 16

*Rogers v. Bellei,*
    401 U.S. 815 (1971) .................................................................. 32, 33

*Rojas-Tapia v. United States,*
    130 F.4th 241 (1st Cir. 2025) ........................................................ 39

*Sacerdote v. Cammack Larhette Advisors, LLC,*
    939 F.3d 498 (2d Cir. 2019) .......................................................... 46

*Savorgnan v. United States,*
    338 U.S. 491 (1950) ....................................................................... 32

*Schooner Exch. v. McFaddon,*
    11 U.S. (7 Cranch) 116 (1812) .................................................. 13, 16

*Slaughter-House Cases,*
    83 U.S. (16 Wall.) 36 (1873) ...................................................... 13-14

*Steel Co. v. Citizens for a Better Env't,*
    523 U.S. 83 (1998) ......................................................................... 13

*Summers v. Earth Island Inst.,*
    555 U.S. 488 (2009) ....................................................................... 44

*The Pizarro,*
    15 U.S. (2 Wheat.) 227 (1817) ...................................................... 17

*The Venus,*
   12 U.S. (8 Cranch) 253 (1814) ............................................ 17

*Tilghman v. Proctor,*
   125 U.S. 136 (1888) ...................................................... 31

*Toll v. Moreno,*
   458 U.S. 1 (1982) .................................................... 24, 30

*Town of Chester v. Laroe Estates, Inc.,*
   581 U.S. 433 (2017) ................................................... 43-44

*TransUnion LLC v. Ramirez,*
   594 U.S. 413 (2021) ...................................................... 43

*Trump v. Hawaii,*
   585 U.S. 667 (2018) ...................................................... 33

*United States v. Holliday,*
   70 U.S. (3 Wall.) 407 (1866) ............................................. 15

*United States v. Kagama,*
   118 U.S. 375 (1886) ...................................................... 15

*United States v. Manzi,*
   276 U.S. 463 (1928) ...................................................... 35

*United States v. Mrs. Gue Lim,*
   176 U.S. 459 (1900) ................................................... 37-38

*United States v. Rogers,*
   45 U.S. (4 How.) 567 (1846) .............................................. 15

*United States v. Verdugo-Urquidez,*
   494 U.S. 259 (1990) ...................................................... 24

*United States v. Wong Kim Ark,*
   169 U.S. 649 (1898) ................ 1, 2, 8, 9, 11, 14, 16, 18, 21, 23, 32, 36, 37, 39, 40

*Verlinden B.V. v. Central Bank of Nigeria,*
   461 U.S. 480 (1983) ...................................................... 16

*Warth v. Seldin,*
  422 U.S. 490 (1975). .................................................................................................... 44

*Washington v. Trump,*
  No. C25-0127-JCC, 2025 WL 415165 (W.D. Wash. Feb. 6, 2025),
  *appeal docketed,* No. 25-807 (9th Cir. Feb. 7, 2025) ......................................................... 7

*Water Keeper All. v. U.S. Dep't of Def.,*
  271 F.3d 21 (1st Cir. 2001) ........................................................................................... 10

*Winter v. Natural Res. Def. Council, Inc.,*
  555 U.S. 7 (2008) ......................................................................................................... 10

*Winton v. Amos,*
  255 U.S. 373 (1921) ..................................................................................................... 15

**U.S. Constitution:**

Art. I, § 8, cl. 4 ............................................................................................................... 34

Amend. XIV, § 1 .......................................................................................... 1, 4, 11, 12, 21

**Statutes:**

Civil Rights Act of 1866,
  ch. 31, § 1, 14 Stat. 27, 27 ........................................................................................ 4, 19

Civil Rights Act of 1870,
  ch. 114, § 18, 16 Stat. 140, 144 ..................................................................................... 19

Expatriation Act of 1868,
  ch. 249, 15 Stat. 223 ....................................................................................................... 33

Immigration and Nationality Act,
  ch. 477, § 301, 66 Stat. 163, 235-36 (1952) ..................................................................... 4

Nationality Act of 1940,
  ch. 876, § 201(a), 54 Stat. 1137, 1138 ........................................................................ 4, 19

Naturalization Act of 1790,
  ch. 3, 1 Stat. 103, 104 .................................................................................................... 32

8 U.S.C. § 1101(a)(15)(B) ........................................................... 24

8 U.S.C. § 1101(a)(15)(F)(i) ........................................................ 24

8 U.S.C. § 1101(a)(15)(H)(ii)(a)-(b) ............................................ 24

8 U.S.C. § 1101(a)(15)(H)(iii) ..................................................... 24

8 U.S.C. § 1101(a)(15)(J) ............................................................ 24

8 U.S.C. § 1101(a)(15)(M)(i) ....................................................... 24

8 U.S.C. § 1101(a)(15)(M)(iii) ..................................................... 24

8 U.S.C. § 1101(a)(15)(O)(ii)(IV) ............................................... 24

8 U.S.C. § 1101(a)(15)(P) ............................................................ 24

8 U.S.C. § 1101(a)(15)(Q) ........................................................... 24

8 U.S.C. § 1401 ............................................................................ 7

8 U.S.C. § 1401(a) ............................................................3, 4, 6, 41

8 U.S.C. § 1401(b) ..................................................................... 14

8 U.S.C. § 1401(c) ..................................................................... 32

28 U.S.C. § 1292(a)(1) ................................................................. 3

28 U.S.C. § 1331 .......................................................................... 3

Cal. Political Code § 51(1) (1872) ............................................. 27

Mont. Political Code § 71(1) (1895) .......................................... 28

N.D. Political Code § 11(1) (1895) ............................................ 28

**Regulatory Materials:**

Exec. Order No. 14,159,
    90 Fed. Reg. 8443 (Jan. 29, 2025) ....................................................4, 35, 47

Exec. Order No. 14,160,
    90 Fed. Reg. 8449 (Jan. 29, 2025) ................................................................. 4

Exec. Order No. 14,165,
    90 Fed. Reg. 8467 (Jan. 30, 2025) ..........................................................4, 47

Proclamation No. 10,886,
    90 Fed. Reg. 8327 (Jan. 29, 2025) ..........................................................4, 47

85 Fed. Reg. 4219 (Jan. 24, 2020) ................................................................. 34

**Legislative Materials:**

Cong. Globe, 39th Cong., 1st Sess. (1866):
    p. 572 .................................................................................................. 20
    p. 1117 ................................................................................................ 26
    p. 1262 ................................................................................................ 20
    pp. 2768-69 ........................................................................................ 26
    p. 2769 ................................................................................................ 26
    p. 2893 ................................................................................................ 20
    p. 2894 ................................................................................................ 20

Cong. Globe, 40th Cong., 2nd Sess. (1868):
    p. 868 .................................................................................................. 41
    p. 967 .................................................................................................. 41
    pp. 1130-31 ........................................................................................ 41

2 Cong. Rec. 3279 (1874) ............................................................................. 28

Minority Staff of S. Comm. on Homeland Sec. & Governmental Affairs,
    *Report on Birth Tourism in the United States* (2015),
    https://perma.cc/C8SA-ZG8X ........................................................... 34

*Report of H. Comm. on Foreign Affairs Concerning the Rights of American Citizens in Foreign*
    *States*, *in* Cong. Globe, 40th Cong., 2nd Sess. app. at 94 (1868) ............................40-41

**Other Authorities:**

2 *A Digest of the International Law of the United States*
(Francis Wharton ed., 2d. ed. 1887) ........................................................29, 41

Clement L. Bouvé,
*A Treatise on the Laws Governing the Exclusion and Expulsion of Aliens in the United States*
(1912) ..............................................................................................38, 42

Henry Brannon,
*A Treatise on the Rights and Privileges Guaranteed by the Fourteenth Amendment to the*
*Constitution of the United States* (1901) ...........................................27

Frederick A. Cleveland,
*American Citizenship as Distinguished from Alien Status* (1927) .........................18

Alex Cockburn,
*Nationality or the Law Relating to Subjects and Aliens* (1869) .......................17, 33

A. V. Dicey,
*A Digest of the Law of England* (1896) ...........................................23

Dig. 50.1.31 (Marcellus, Digest 1)
(4 *The Digest of Justinian* 906a (Alan Watson trans., 1985)) ...........................31

1 William Edward Hall,
*A Treatise on International Law* (4th ed. 1895).....................................25

M.W. Jacobs,
*A Treatise on the Law of Domicile* (1887)......................................30, 41

Sidney Kansas,
*Immigration and Nationality Act Annotated* (4th ed. 1953).................................42

2 James Kent,
*Commentaries on American Law* (6th ed. 1848) ..................................21

Kurt T. Lash,
*Prima Facie Citizenship* (Apr. 17, 2025), https://perma.cc/ARN2-5CSJ.................25-26

Letter from Sen. Lyman Trumbull to President Andrew Johnson
(in Andrew Johnson Papers, Reel 45, Manuscript Div., Library of Cong.)) .............20

Letter from William Marcy to Austrian Charge d'Affaires at Washington
(reprinted in 44 *British and Foreign State Papers* 997 (1865)) .......................................... 18

Justin Lollman,
Note, *The Significance of Parental Domicile Under the Citizenship Clause*,
101 Va. L. Rev. 455 (2015) ............................................................................. 28

Robert E. Mensel,
*Jurisdiction in Nineteenth Century International Law and Its Meaning in the Citizenship Clause*
*of the Fourteenth Amendment*, 32 St. Louis U. Pub. L. Rev. 329 (2013) .......................... 33

Samuel Freeman Miller,
*Lectures on the Constitution of the United States* (1891) ........................................ 27

Alexander Porter Morse,
*A Treatise on Citizenship* (1881) .................................................................... 27

Michelle J.K. Osterman et al.,
*Births: Final Data for* 2022, 73 Nat'l Vital Stat. Rep. 1 (2024),
https://perma.cc/HXN9-EXA4 ........................................................................ 44

4 Robert Phillimore,
*Commentaries upon International Law* (2d ed. 1874) .............................................. 38

Robert Phillimore,
*The Law of Domicil* (1847) ............................................................................ 31

*Regulations Governing the Admission of Chinese* r. 2 (Feb. 26, 1907),
*in* Bureau of Immigration & Naturalization, Dep't of Commerce & Labor,
Doc. No. 54, *Treaty, Laws, and Regulations Governing the Admission of Chinese* 34
(June 1908) .............................................................................................. 39

Mark Shawhan,
Comment, *The Significance of Domicile in Lyman Trumbull's Conception of Citizenship*,
119 Yale L.J. 1351 (2010) .............................................................................. 20

Spanish Treaty Claims Comm'n, U.S. Dep't of Justice,
*Final Report of William Wallace Brown, Assistant Attorney-General* (1910) ................ 29, 39

Joseph Story,
*Commentaries on the Conflict of Laws, Foreign and Domestic* (1834) ...................... 22, 24

Hannis Taylor,
*A Treatise on International Public Law* (1901) ................................................. 27

1 Travers Twiss,
*The Law of Nations Considered as Independent Political Communities* (1861) ................ 18, 38

Emmerich de Vattel,
*The Law of Nations* (1797 ed.) ................................................................21, 22, 31

John Westlake,
*International Law* (1904) ........................................................................ 27

J.J.S. Wharton,
*Law Lexicon, or Dictionary of Jurisprudence* (Edward Hopper ed., 2d ed. 1860) ............ 29

Ilan Wurman,
*Jurisdiction and Citizenship* (May 26, 2025), https://perma.cc/D259-864C ................. 38

**INTRODUCTION**

The Citizenship Clause of the Fourteenth Amendment rightly repudiated the Supreme Court's shameful decision in *Dred Scott v. Sandford*, 60 U.S. (19 How.) 393 (1857), which misinterpreted the Constitution as excluding people of African descent from United States citizenship based on their race.  Simply put, the Citizenship Clause was concerned with rectifying a grave injustice to the recently freed slaves, not extending citizenship to birth tourists and other transient visitors or those who enter the country in violation of our laws.

While extending citizenship to all races, the Clause refrained from conferring citizenship on "[a]ll persons born … in the United States," instead limiting the privilege of citizenship to those who were also born "subject to the jurisdiction thereof."  U.S. Const. amend. XIV, § 1.  To be "subject to the jurisdiction," the Clause requires the person be "not merely subject in some respect or degree … but completely subject to" the "political jurisdiction" of the United States. *Elk v. Wilkins*, 112 U.S. 94, 102 (1884).  A country has political jurisdiction over those persons who owe it "direct and immediate allegiance," *id.*, and to whom the country owes the "reciprocal obligatio[n]" of "protection," *United States v. Wong Kim Ark*, 169 U.S. 649, 679 (1898) (quotation marks omitted).  Citizens, of course, have this reciprocal relationship of allegiance and protection.  So too, the Supreme Court has recognized that aliens "domiciled here" are "within the allegiance and the protection … of the

United States" such that their children are subject to its jurisdiction for purposes of the Citizenship Clause. *Id.* at 693.

But these principles—and the text, history, and precedent from which they derive—demonstrate that children born to aliens in the United States temporarily or illegally do not come within the Clause. Such children lack the reciprocal relationship of allegiance and protection that would bring them within the political jurisdiction of the United States. To conclude otherwise, the district court refrained from attributing any coherent meaning to the phrase "subject to the jurisdiction thereof," instead concluding that all people born in the United States were subject to its jurisdiction unless their parents came within one of the exceptions listed in *Wong Kim Ark*. Add. 13-14. But *Wong Kim Ark*'s list of exceptions does not foreclose other exceptions that were neither presented to nor considered by the Court. The question here—which the district court avoided—is whether the reason that children born to parents within the exceptions listed in *Wong Kim Ark* are not subject to the United States's jurisdiction also applies to children born to aliens here temporarily or illegally. And the district court's mistaken understanding leaves Congress and the Executive Branch powerless to address concerns about individuals manipulating or flouting the nation's immigration laws to obtain the privileges of citizenship for their children. The Executive Order's interpretation of the Citizenship Clause is correct, and the preliminary injunctions should be reversed.

## STATEMENT OF JURISDICTION

The district court had jurisdiction under 28 U.S.C. § 1331. JA31. It entered a preliminary injunction on February 10, 2025, and a lengthier order the following day. Add. 6, 8. The United States filed a notice of appeal on April 10, 2025. JA136. This court has jurisdiction under 28 U.S.C. § 1292(a)(1).

## STATEMENT OF ISSUES

1. Whether the district court erred in holding that plaintiffs are likely to succeed on their claims that the Citizenship Clause and 8 U.S.C. § 1401(a) confer birthright citizenship on the children of aliens who are temporarily or unlawfully present in the United States.

2. Whether the district court erred in issuing an overbroad injunction that covers uninjured members of the plaintiff organizations and enjoins the President.

## STATEMENT OF THE CASE

### A. Constitutional and Statutory Background

Until 1866, federal law did not expressly provide for citizenship by birth in the United States. In *Dred Scott v. Sandford*, 60 U.S. (19 How.) 393 (1857), the Supreme Court misinterpreted the Constitution as excluding people of African descent from citizenship. In response, Congress enacted the Civil Rights Act of 1866 and, months later, proposed the Citizenship Clause of the Fourteenth Amendment.

The Act provided that "all persons born in the United States and not subject to any foreign power, excluding Indians not taxed, are hereby declared to be citizens of

the United States."  Civil Rights Act of 1866, ch. 31, § 1, 14 Stat. 27, 27.  The Clause, as ratified in 1868, provides that "[a]ll persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside."  U.S. Const. amend. XIV, § 1.

The 1866 Act's statutory definition of citizenship by birth remained in place until 1940, when Congress replaced it with a statute copying the text of the Citizenship Clause.  That statute provided that any "person born in the United States, and subject to the jurisdiction thereof," is a citizen.  *See* Nationality Act of 1940, ch. 876, § 201(a), 54 Stat. 1137, 1138.  That provision was reenacted in the Immigration and Nationality Act, ch. 477, § 301, 66 Stat. 163, 235-36 (1952), and remains the governing statute, *see* 8 U.S.C. § 1401(a).

### B.    Factual Background

On January 20, 2025, President Trump issued an Executive Order addressing what it means to be "subject to the jurisdiction" of the United States.  *See* Exec. Order No. 14,160, § 1, 90 Fed. Reg. 8449 (Jan. 29, 2025); Add. 1-2.  The order is an integral part of President Trump's broader effort to repair the United States' immigration system and to address the ongoing crisis at the southern border.  *See, e.g.*, Exec. Order No. 14,165, 90 Fed. Reg. 8467 (Jan. 30, 2025); Proclamation No. 10,886, 90 Fed. Reg. 8327 (Jan. 29, 2025); Exec. Order No. 14,159, 90 Fed. Reg. 8443 (Jan. 29, 2025).

The Executive Order recognizes that the Constitution and corresponding statutory provision extend citizenship at birth to most people born in the United

States but do not extend the privilege of U.S. citizenship where neither parent has a sufficient relationship with the United States, specifically when the father was not a citizen or lawful permanent resident and the mother was either: (1) unlawfully present or (2) lawfully but temporarily present (such as visiting through the Visa Waiver Program or on a student, work, or tourist visa). Add. 1, § 1.

The Executive Order directs the federal Executive Branch (1) not to issue documents recognizing U.S. citizenship to persons in these two categories and (2) not to accept documents issued by state, local, or other governments purporting to recognize the U.S. citizenship of such persons. Add. 1-2, § 2(a). The order specifies, however, that those directives "apply only to persons who are born within the United States after" February 19, 2025. Add. 2, § 2(b).

The Executive Order directs the Secretary of State, Attorney General, Secretary of Homeland Security, and Commissioner of Social Security to take "all appropriate measures to ensure that the regulations and policies of their respective departments and agencies are consistent with this order" and not to "act, or forbear from acting, in any manner inconsistent with this order." Add. 2, § 3(a). It further directs the heads of all federal agencies to issue public guidance "regarding this order's implementation with respect to their operations and activities." *Id.* § 3(b).

### C.    Prior Proceedings

**1.** The day the Executive Order issued, three organizations—New Hampshire Indonesian Community Support (NHICS), League of United Latin American Citizens

(LULAC), and Make the Road New York—filed suit challenging the order. JA29. The organizations argue that the order is unlawful in all of its applications because it violates the Citizenship Clause and 8 U.S.C. § 1401(a). JA42-43. They also argue that the actions the administration will take to implement the Executive Order will violate the Administrative Procedure Act. JA43-44. In the complaint and their declarations, NHICS and LULAC each identify a single, pregnant member with standing,[1] JA37-38; JA47-49; JA52, and Make the Road N.Y. identifies four pregnant members with standing, JA37-38; JA58-59.

**2.** The district court granted a preliminary injunction. Add. 6, 8. On the merits, the district court concluded that plaintiffs "demonstrated a likelihood of success" on their "facial challenge here." Add. 13, 16 n.18. The court also held that the plaintiffs had established a likelihood of success "as applied" to the allegations "in their complaint." Add. 16 n.18. It held that the Executive Order applied to "groups not listed in the Fourteenth Amendment or recognized in *Wong Kim Ark*." Add. 14. In the district court's view, the phrase "subject to the jurisdiction thereof" "*unambiguously*" refers to children of "foreign sovereigns or their ministers" and "members of the Indian tribes" as well as children born "on foreign public ships" or "during a hostile occupation." Add. 13-14 (quotation marks omitted). The court

---

[1] NHICS's pregnant member is married to another identified NHICS member with whom she would share a claim.

"interpret[ed 8 U.S.C. § 1401] to incorporate the public meaning of the reasoning and holding in *Wong Kim Ark*." Add. 14-15.

The district court concluded that the temporary denial of citizenship was an irreparable injury, Add. 16-17, and that the remaining equitable factors favored an injunction, Add. 17-19.

The district court "enjoin[ed] the defendants from enforcing the Executive Order in any manner with respect to the plaintiffs, and with respect to any individual or entity in any other matter or instance within the jurisdiction of [that] court, during the pendency of this litigation." Add. 18; *see* Add. 7.

The government moved to clarify the injunction. Dkt. 81. At a hearing, the district court confirmed that it "was not … a nationwide nor a universal injunction" but that it did "appl[y] to all members of the plaintiff organizations, not just those referred to in the papers." JA130. The government appealed. JA136.

**3.** Three other district courts have also enjoined the Executive Order in four different suits, and in three of those cases courts issued nationwide injunctions. The government has appealed in all four cases, all of which remain pending. *See Doe v. Trump*, No. 25-1169 (1st Cir. filed Feb. 19, 2025); *New Jersey v. Trump*, No. 25-1170 (1st Cir. filed Feb. 19, 2025); *Washington v. Trump*, No. C25-0127-JCC, 2025 WL 415165 (W.D. Wash. Feb. 6, 2025), *appeal docketed*, No. 25-807 (9th Cir. Feb. 7, 2025); *CASA, Inc. v. Trump*, Civ. No. DLB-25-201, 2025 WL 408636 (D. Md. Feb. 5, 2025), *appeal docketed*, No. 25-1153 (4th Cir. Feb. 18, 2025). In addition, the government has sought

stays or partial stays from the Supreme Court of the three nationwide injunctions insofar as they apply beyond the named individual plaintiffs or identified members of organizational plaintiffs. The Supreme Court heard oral argument on the applications for stays on May 15, 2025. *See, e.g.*, *Trump v. CASA Inc.*, No. 24A884 (U.S.).

## SUMMARY OF ARGUMENT

The Citizenship Clause of the Fourteenth Amendment provides that "[a]ll persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside." As was apparent from the time of its enactment, the Clause's use of the phrase "subject to the jurisdiction" of the United States contemplates something more than being subject to regulatory power. It conveys that persons must be "completely subject to [the] political jurisdiction" of the United States, *i.e.*, they must have a "direct and immediate allegiance" to this country. *Elk v. Wilkins*, 112 U.S. 94, 102 (1884). Just as that does not hold for certain tribal Indians, diplomats, or occupying enemies, it similarly does not hold for foreigners here temporarily or illegally. "[N]o one can become a citizen of a nation without its consent …." *Id.* at 103. And if the United States has not consented to someone's enduring presence, it follows that it has not consented to making citizens of that person's children.

The district court construed *United States v. Wong Kim Ark*, 169 U.S. 649 (1898), to hold that the phrase "subject to the jurisdiction thereof" adopted the traditional English common-law exceptions from citizenship at birth for children of diplomats

8

and occupying enemies while adding one—and only one—new exception for tribal Indians. Such a reading conflicts with the interpretation of the Citizenship Clause that prevailed in Supreme Court decisions, Executive Branch practice, and the legal community's understanding in the decades following the decision in *Wong Kim Ark*. It also ignores how the Court carefully cabined its holding to the children of those with a "permanent domicil[e] and residence in the United States," *id.* at 652-53, a limitation that made sense in light of the Court's contemporaneous cases explaining the close relationship between domicile and the rights and duties of citizenship. *See, e.g., Lau Ow Bew v. United States*, 144 U.S. 47, 61 (1892).

That understanding of "subject to the jurisdiction" leaves "jurisdiction" without a coherent meaning. The district court never said what the phrase meant, beyond describing the meaning as "unambiguous." Add. 13-15. It may have adopted plaintiffs' argument that "subject to the jurisdiction" encompasses anyone within the United States's regulatory jurisdiction, *see* Dkt. 24-1, at 6, but that approach reads that language out of the Citizenship Clause, since everyone born or present on U.S. soil is subject to U.S. regulatory jurisdiction. That interpretation cannot explain the exclusion of children born to tribal Indians, *see Elk*, 112 U.S. at 102, or the other exclusions the Supreme Court has recognized. It also would have made the Civil Rights Act of 1866—which served as the blueprint for the Citizenship Clause and defined citizenship by birth as including persons "not subject to any foreign power"—inconsistent with the Clause, even though it was enacted just months before

the same Congress proposed the Fourteenth Amendment, was reenacted just two years after ratification, and was the statutory counterpart to the Citizenship Clause for over 70 years.

In any event, the injunctions are inappropriate and overbroad. Membership-wide relief to organizations' members who lack Article III standing based on a tiny fraction of members whose standing was established misconceives associational standing and exceeds a court's Article III power. The injunction also impermissibly extends to the President.

## STANDARD OF REVIEW

A grant of a preliminary injunction is reviewed for "abuse of discretion," with questions of law reviewed "de novo and findings of fact for clear error." *Water Keeper All. v. U.S. Dep't of Def.*, 271 F.3d 21, 30 (1st Cir. 2001).

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). Where standing is at issue, "the plaintiff must make a 'clear showing' that [it] is 'likely' to establish each element of standing. *Murthy v. Missouri*, 603 U.S. 43, 58 (2024).

For a facial challenge to succeed, plaintiffs must "establis[h] that no set of circumstances exists under which the [Executive Order] would be valid, or … sho[w]

that the [Executive Order] lacks a plainly legitimate sweep." *Moody v. NetChoice, LLC*, 603 U.S. 707, 723 (2024) (quotation marks omitted).

## ARGUMENT

### I. Plaintiffs Are Not Likely to Succeed on the Merits.

"All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside." U.S. Const. amend. XIV, § 1. Section 1401(a) of Title 8 similarly grants citizenship to any "person born in the United States, and subject to the jurisdiction thereof." Text, history, and precedent show that in overturning the Supreme Court's odious *Dred Scott* decision and ensuring citizenship for freed slaves and their children, Congress employed the phrase "subject to the jurisdiction" of the United States to denote *political* jurisdiction (a concept rooted in allegiance and protection), not—as plaintiffs argue—*regulatory* jurisdiction (to which all persons in the United States are subject).

The Supreme Court has identified multiple categories of persons who, despite birth in the United States, are not constitutionally entitled to citizenship because they are not "subject to the jurisdiction" of the United States: children of foreign sovereigns or their diplomats, children of alien enemies in hostile occupation, children born on foreign public ships, and children of certain members of Indian tribes. *United States v. Wong Kim Ark*, 169 U.S. 649, 682, 693 (1898). Individuals in these categories all lack the requisite allegiance to the United States because of their primary allegiance

11

to another sovereign.  The Executive Order identifies two additional categories of

persons that similarly lack the requisite allegiance: children born to aliens present

temporarily and children born to aliens illegally in the United States.  Because the

injunction is based on a facial challenge,[2] plaintiffs bear the especially heavy burden of

demonstrating that the Executive Order would be unlawful in *all* its applications.

Plaintiffs cannot demonstrate any unlawful application, much less meet that imposing

standard.

### A.    The Executive Order Is Consistent with the Original Meaning of the Citizenship Clause.

#### 1.    Persons Are "Subject to the Jurisdiction" of the United States if They Owe Primary Allegiance to the United States.

The text and structure of the Fourteenth Amendment, as well as its drafting

history and background principles of law, demonstrate that "subject to the

jurisdiction" refers to persons who owe primary allegiance to the United States.  The

text imposes two requirements for citizenship by birth: a person must be "born … in

the United States" and must separately be "subject to the jurisdiction thereof."  U.S.

Const. amend. XIV, § 1.  The Clause's separate requirements make clear that some

---

[2] The district court alternatively held that the plaintiffs had established a likelihood of success "as applied" to the allegations "in their complaint."  Add. 16 n.18.  The district court did not specify how plaintiffs' as-applied allegations would support relief, much less how they would differ from the facial claims the district court accepted.  And in any event, as-applied claims related to six individuals could not justify an injunction extending to the other 355,000 members of the organizations about whom no information is provided.

persons born "in the United States" are not "subject to" its "jurisdiction." This "jurisdiction," therefore, cannot simply be the power to regulate. The Supreme Court has explained that the regulatory "jurisdiction of the nation within its own territory is necessarily exclusive and absolute." *Schooner Exch. v. McFaddon*, 11 U.S. (7 Cranch) 116, 136 (1812). As explained in detail below, that regulatory power extends to all persons born on U.S. soil, even to classes of persons—such as members of Indian tribes—that have always been understood to fall outside the Citizenship Clause. If "jurisdiction" means regulatory power, then the Clause's independent textual requirement would be redundant. *See Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 174 (1803) ("It cannot be presumed that any clause in the [C]onstitution is intended to be without effect …."); *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 90 (1998) ("Jurisdiction, it has been observed, is a word of many, too many, meanings." (quotation marks omitted)).

The Supreme Court's cases identifying categories of persons not "subject to the jurisdiction" of the United States for purposes of the Citizenship Clause thus have not turned on the general power to regulate those persons. Instead, the Court has emphasized whether those persons owe allegiance to a different sovereign and thus are not regarded as owing the requisite allegiance to—or being entitled to protection from other sovereigns by—the United States.

That was the interpretation the Supreme Court adopted in its first encounter with the Citizenship Clause. In the *Slaughter-House Cases*, the Court explained that

13

"[t]he phrase, 'subject to its jurisdiction,'" operated to "exclude" from the Citizenship Clause "children of ministers, consuls, and citizens or subjects of foreign States born within the United States." 83 U.S. (16 Wall.) 36, 73 (1873).

Subsequently, in *Elk v. Wilkins*, 112 U.S. 94 (1884), the Supreme Court addressed whether children of members of Indian tribes acquire citizenship at birth under the Citizenship Clause. The Court explained that the "evident meaning" of "subject to the jurisdiction" "is, not merely subject in some respect or degree to the jurisdiction of the United States, but completely subject to their political jurisdiction, and owing them direct and immediate allegiance." *Id.* at 102. This political jurisdiction is a "reciprocal" relationship: the United States receives allegiance from the individual and provides that individual protection from other sovereigns. *Wong Kim Ark*, 169 U.S. at 679 (quotation marks omitted). Indian tribes did not meet this definition, the Court held, because the tribes were "alien nations" and "distinct political communities," and "[t]he members of those tribes owed immediate allegiance to their several tribes, and were not part of the people of the United States." *Elk*, 112 U.S. at 99.[3]

Notably, the Supreme Court in *Elk* reached this conclusion even as it acknowledged that Indian tribes within U.S. territory are subject to the regulatory

---

[3] Congress has since by statute extended U.S. citizenship to any "person born in the United States to a member of an Indian, Eskimo, Aleutian, or other aboriginal tribe." 8 U.S.C. § 1401(b).

power of the United States. *Elk* noted that Indian tribes were "within the territorial limits of the United States" and that Congress could deal with such tribes "either through treaties made by the president and senate, or through acts of congress." 112 U.S. at 99. More than two decades before the Citizenship Clause was adopted, the Supreme Court had thought:

> it too firmly and clearly established to admit of dispute, that the Indian tribes residing within the territorial limits of the United States are subject to [the United States'] authority, and where the country occupied by them is not within the limits of one of the States, Congress may by law punish any offen[s]e committed there, no matter whether the offender be a white man or an Indian.

*United States v. Rogers*, 45 U.S. (4 How.) 567, 572 (1846). And in the years before and after *Elk*, the Court "thoroughly established that Congress has plenary authority over the Indians and all their tribal relations," *Winton v. Amos*, 255 U.S. 373, 391 (1921); *see Haaland v. Brackeen*, 599 U.S. 255, 272-73 (2023), as Congress may regulate Indian commercial activities, *see United States v. Holliday*, 70 U.S. (3 Wall.) 407, 416-18 (1866), Indian property; *see Lone Wolf v. Hitchcock*, 187 U.S. 553, 565 (1903), and Indian adoptions, *see Brackeen*, 599 U.S. at 276-80; while punishing Indians for crimes, *see United States v. Kagama*, 118 U.S. 375, 379-85 (1886).

The same is true of other categories of persons the Supreme Court has identified as outside the scope of the Citizenship Clause. In particular, the Supreme Court has observed that "children of diplomatic representatives of a foreign state," "children born of alien enemies in hostile occupation," and children born "on foreign

public ships" in our ports are not "subject to the jurisdiction" of the United States. *Wong Kim Ark*, 169 U.S. at 682, 693. Here, too, the issue is not a lack of regulatory jurisdiction. The immunity diplomatic officials enjoy from state and federal law, for example, was historically a product of "the consent of the nation itself," *Schooner Exch.*, 11 U.S. (7 Cranch) at 136, not some inherent inability to exercise regulatory jurisdiction over such individuals. *See id.* at 146 (explaining that the immunity granted to foreign public ships could be "destroy[ed]" if the sovereign wished to "claim and exercise jurisdiction either by employing force, or by subjecting such vessels to the ordinary tribunals"); *Verlinden B.V. v. Central Bank of Nigeria*, 461 U.S. 480, 486 (1983) ("[F]oreign sovereign immunity is a matter of grace and comity …."). Invading forces illustrate the same point: though the United States may exercise jurisdiction to punish "enemy invaders" for violations of the laws of war, *Ex parte Quirin*, 317 U.S. 1, 47 (1942), their children are not citizens by birth. Instead, the central point is that such individuals—and their children—owe primary allegiance to a foreign sovereign. That makes them not "completely subject" to the "political jurisdiction" of the United States because they do not owe "direct and immediate allegiance." *Elk*, 112 U.S. at 102.

The children of citizens born in the United States, by contrast, plainly owe "direct and immediate allegiance" to the United States and are undoubtedly subject to its political jurisdiction. And the Supreme Court has made clear that under some circumstances aliens may establish sufficient ties of allegiance so as to come within the

Citizenship Clause's scope. In particular, a person "owes allegiance" to the country in which he is "domiciled." *The Pizarro*, 15 U.S. (2 Wheat.) 227, 246 (1817) (Story, J.). Such an individual "places him[self] out of the protection" of his former country, *Murray v. Schooner Charming Betsy*, 6 U.S. (2 Cranch) 64, 120 (1804), and "becomes a member of the new society, at least as a permanent inhabitant, and is a kind of citizen of an inferior order … but is, nevertheless, united and subject to the society." *The Venus*, 12 U.S. (8 Cranch) 253, 278 (1814).

Thus, "foreigners who have become domiciled in a country other than their own acquire rights and must discharge duties in many respects the same as possessed by and imposed upon the citizens of that country." *Lau Ow Bew v. United States*, 144 U.S. 47, 61-62 (1892). As the Supreme Court explained, "aliens residing in a country, with the intention of making it a permanent place of abode, acquire, in one sense, a domicil there, and, while they are permitted by the nation to retain such a residence and domicil, are subject to its laws, and may invoke its protection against other nations." *Fong Yue Ting v. United States*, 149 U.S. 698, 724 (1893); *accord id.* at 734 (Brewer, J., dissenting). For example, in 1853, the United States intervened to protect an unnaturalized U.S. domiciliary who had been seized by Austrian government officials while travelling in Turkey. *See* Alex Cockburn, *Nationality or the Law Relating to Subjects and Aliens* 118-22 (1869). As Secretary of State William Marcy protested, "[t]he establishment of his domicil" in America "invested him with the national character of this country, and with that character he acquired the right to claim protection from

the United States." Letter from William Marcy to Austrian Charge d'Affaires at Washington (reprinted in 44 *British and Foreign State Papers* 997 (1865)).

"Domicil [was] thus under the Law of Nations the foundation of jurisdiction over persons ...." 1 Travers Twiss, *The Law of Nations Considered as Independent Political Communities* § 164, at 239 (1861); *cf.* Frederick A. Cleveland, *American Citizenship as Distinguished from Alien Status* 34 (1927) ("In dealing with domicil we are dealing with the question of jurisdiction—the right of the government to exercise control over the social population, and the rights of individuals to claim protection or to enjoy the benefits which are attached to residence.").

The Supreme Court has thus explained that "[e]very citizen or subject of another country, *while domiciled here*, is within the allegiance ... of the United States" and subject to its political jurisdiction. *Wong Kim Ark*, 169 U.S. at 693 (emphasis added). Their children are therefore born "subject to the jurisdiction" of the United States for purposes of the Citizenship Clause: the Supreme Court has repeatedly explained that a child's domicile "follow[s] the independent domicil of his parent." *Lamar v. Micou*, 112 U.S. 452, 470 (1884); *accord Mississippi Band of Choctaw Indians v. Holyfield*, 490 U.S. 30, 48 (1989).

Other interpretive principles confirm that the Citizenship Clause's reference to "jurisdiction" refers to political jurisdiction and obligations of allegiance. Months before Congress proposed the Fourteenth Amendment, it enacted the Civil Rights Act of 1866. That Act served as the "initial blueprint" for the Amendment, *General*

*Bldg. Contractors Ass'n v. Pennsylvania*, 458 U.S. 375, 389 (1982), and the Amendment in turn "provide[d] a constitutional basis for protecting the rights set out" in the Act, *McDonald v. City of Chicago*, 561 U.S. 742, 775 (2010). And the principal aim of both the Act and the Amendment was to repudiate *Dred Scott* and secure citizenship for the newly freed slaves—not to grant citizenship to illegal aliens (a group that did not yet exist, given the absence of federal laws restricting immigration). In fact, both the Act and the Amendment were written to ensure that the grant of citizenship to the newly freed slaves would not inadvertently extend citizenship to persons whose primary allegiance was not to the United States. The Act stated that "all persons born in the United States and *not subject to any foreign power*, excluding Indians not taxed, are hereby declared to be citizens of the United States." Civil Rights Act of 1866, ch. 31, § 1, 14 Stat. at 27 (emphasis added). Congress "reenacted" the Civil Rights Act of 1866 shortly after ratification of the Fourteenth Amendment, Civil Rights Act of 1870, ch. 114, § 18, 16 Stat. 140, 144, and its citizenship language remained unchanged until revised by the Nationality Act of 1940, ch. 876, § 201(a), 54 Stat. at 1138. As this illustrates, Congress in the immediate wake of the Fourteenth Amendment regarded the Act's "not subject to any foreign power" requirement as consistent with the Amendment's "subject to the jurisdiction thereof" requirement.

Debates and correspondence about the Act and the Amendment show that members of Congress shared that understanding. Senator Lyman Trumbull, the Act's principal sponsor in the Senate, explained that its purpose was "to make citizens of

everybody born in the United States who owe[d] allegiance to the United States."
Cong. Globe, 39th Cong., 1st Sess. 572 (1866). He summarized the Act to President
Johnson as making citizens of "'all persons' born of parents domiciled in the United
States, except untaxed Indians."[4] Representative John Broomall explained that the
freed slaves—the primary focus of the Act and Amendment—were properly regarded
as U.S. citizens by birth because they owed no allegiance to any foreign sovereign:
"[U]ntil the opponents of this measure can point to the foreign Power to which he is
subject, the African potentate to whom after five generations of absence he still owes
allegiance, I will assume him to be, what the bill calls him, a citizen of the country in
which he was born." *Id.* at 1262. Similarly, during debates on the Amendment,
Trumbull explained: "What do we mean by 'subject to the jurisdiction of the United
States?' Not owing allegiance to anybody else. … It cannot be said of any Indian who
owes allegiance, partial allegiance if you please, to some other Government that he is
'subject to the jurisdiction of the United States.'" *Id.* at 2893. Trumbull went on to
equate being "subject to our jurisdiction" with "owing allegiance solely to the United
States." *Id.* at 2894. Senator Reverdy Johnson agreed that "all that this amendment
provides is, that all persons born in the United States and not subject to some foreign
Power … shall be considered as citizens." *Id.* at 2893.

---

[4] Mark Shawhan, Comment, *The Significance of Domicile in Lyman Trumbull's Conception of Citizenship*, 119 Yale L.J. 1351, 1352-53 (2010) (quoting Letter from Sen. Lyman Trumbull to President Andrew Johnson (in Andrew Johnson Papers, Reel 45, Manuscript Div., Library of Cong.)).

Common-law and other sources reflected the same understanding. Under the common law, "[t]wo things usually concur to create citizenship: [f]irst, birth locally within the dominions of the sovereign; and, secondly, birth … within the ligeance of the sovereign." *Wong Kim Ark*, 169 U.S. at 659 (quotation marks omitted); *see also* 2 James Kent, *Commentaries on American Law* 42 (6th ed. 1848). The phrase "born … in the United States," U.S. Const. amend. XIV, § 1, corresponds to the traditional requirement of "birth within the territory," *Wong Kim Ark*, 169 U.S. at 693, and the phrase "subject to the jurisdiction thereof," U.S. Const. amend. XIV, § 1, corresponds to the traditional requirement of birth "in the allegiance" of the country, *Wong Kim Ark*, 169 U.S. at 693.

Similarly, Emmerich de Vattel—"the founding era's foremost expert on the law of nations," *Franchise Tax Bd. of Cal. v. Hyatt*, 587 U.S. 230, 239 (2019)—explained that citizenship under the law of nations depended not only on the child's place of birth, but also on the parents' political status. "[N]atural-born citizens," Vattel wrote, include "those born in the country, of parents who are citizens." Emmerich de Vattel, *The Law of Nations* § 212, at 101 (1797 ed.). Citizenship by virtue of birth in the country also extends to the children of "perpetual inhabitants," whom Vattel regarded as "a kind of citize[n]." *Id.* § 213, at 102; *see id.* § 215, at 102. Citizenship does not extend, however, to children of foreigners who lack "the right of perpetual residence" in the country. *Id.* § 213, at 102. Such persons would instead owe allegiance to their parents' home countries, in accord with the principle that "children follow the

condition of their fathers." *Id.* § 215, at 102. Vattel then identified several additional exceptions to citizenship by birth in a country—children born "in the armies of the state," "in the house of its minister at a foreign court," or "in [its] vessels"—that track exceptions already recognized by the Supreme Court. *Id.* §§ 216-217, at 102-03.

American jurists acknowledged a similar distinction. As Justice Story explained, citizenship at birth required more than temporary physical presence:

> Persons, who are born in a country, are generally deemed citizens and subjects of that country. A reasonable qualification of this rule would seem to be, that it should not apply to the children of parents, who were *in itinere* in the country, or abiding there for temporary purposes, as for health, or occasional business.

Joseph Story, *Commentaries on the Conflict of Laws, Foreign and Domestic* § 48 (1834).

### 2. Persons Temporarily or Unlawfully Present Do Not Owe the Requisite Allegiance to the United States.

As discussed, the text and structure of the Citizenship Clause, its history, and Supreme Court precedent all make clear that a person is "subject to the jurisdiction" of the United States only if they owe primary allegiance to the United States and not some other power. To determine whether a person is within the political jurisdiction of the United States, the Supreme Court has looked to the relationship between the person and the country, and the degree of allegiance and protection exchanged, under the background principles of the common law and the law of nations at the time of ratification of the Fourteenth Amendment. Under those principles, both classes of persons covered by the Executive Order are not subject to the complete political

jurisdiction of the United States.  A child born of parents here temporarily is domiciled in, and owes primary allegiance to, his parents' home country.  A child born to parents here unlawfully, who lack primary allegiance to the United States, similarly owes primary allegiance to his parents' home country.  Neither child is subject to the jurisdiction of the United States within the meaning of the Citizenship Clause.

    **a.**  Persons lawfully but temporarily present in the United States retain their primary allegiance to their home countries.  While they must respect U.S. law and are protected by U.S. law while temporarily present here, they have not established the requisite allegiance to the United States or received the necessary protection to come within the complete political jurisdiction of the United States.  Although English and international law sources sometimes referred to all aliens as owing a "'temporary' allegiance," *Wong Kim Ark*, 169 U.S. at 657 (quoting A. V. Dicey, *A Digest of the Law of England* (1896)), those sources also understood that "[a] settled domicile in a country, imports an allegiance to the country, very different from a mere obedience to its laws during a temporary residence." *Hodgson v. De Beauchesne* [1858] 14 Eng. Rep. 920, 932 (Privy Council).  "[T]he law of nations" "recognized" "[t]hat those who have become domiciled in a country are entitled to a more distinct and larger measure of protection than those who are simply passing through, or temporarily in, it." *Fong Yue Ting*, 149 U.S. at 734 (Brewer, J., dissenting) (collecting sources).  Because aliens present temporarily have not established domicile, they have not accepted those "rights and … duties" similar to "citizens," *Lau Ow Bew*, 144 U.S. at 61-62, which would form the

necessary "direct and immediate allegiance" to make them "completely subject to [the] political jurisdiction" of the United States, *Elk*, 112 U.S. at 102. *Cf. United States v. Verdugo-Urquidez*, 494 U.S. 259, 265 (1990) (explaining how constitutional rights often attach to people who "develo[p] sufficient connection with this country to be considered part of that community.").

Domicile is, "[i]n general," an individual's "true, fixed and permanent home," *Martinez v. Bynum*, 461 U.S. 321, 331 (1983) (quotation marks omitted), and formed when "[t]wo things … concur": "residence" in a place and the "intention of making it the home of the party." Story, *supra*, § 44. Temporarily present aliens plainly do not establish domicile; indeed, under the immigration laws, many classes of aliens— including tourists, students, and temporary workers—are admitted only on the express requirement that they have "a residence in a foreign country" they have "no intention of abandoning." 8 U.S.C. § 1101(a)(15)(B), (F)(i), (H)(ii)(a)-(b), (H)(iii), (J), (M)(i), (M)(iii), (O)(ii)(IV), (P), (Q); *see Toll v. Moreno*, 458 U.S. 1, 14 (1982) (describing how "Congress has precluded" aliens covered by provisions of this type "from establishing domicile in the United States"). And such individuals are not entitled to diplomatic protection from the United States when they travel abroad. *Fong Yue Ting*, 149 U.S. at 724 (explaining that domiciliaries "may invoke" diplomatic protection).

The United States' political connection to children of aliens present temporarily is far weaker than its relationship with children of "members of the Indian tribes," who fall outside the "jurisdiction" necessary under the Citizenship Clause. *Elk*, 112

U.S. at 99, 101-02.  Indian tribes form "an intermediate category between foreign and domestic states."  *Lac du Flambeau Band of Lake Superior Chippewa Indians v. Coughlin*, 599 U.S. 382, 396 n.7 (2023) (quotation marks omitted).  The Supreme Court long ago determined that Indian tribes are not "foreign nations," instead describing them as "domestic dependent nations."  *Cherokee Nation v. Georgia*, 30 U.S. (5 Pet.) 1, 17 (1831) (Marshall, C.J.).  Despite the "enduring place" the Constitution "reserves for the Tribes … in the structure of American life," *Brackeen*, 599 U.S. at 333 (Gorsuch, J., concurring), that link does not suffice as a constitutional matter for citizenship at birth, and the weaker link of aliens present temporarily even more obviously does not establish political jurisdiction or sufficient allegiance.  *See, e.g.*, 1 William Edward Hall, *A Treatise on International Law* 237 n.1 (4th ed. 1895) ("[A] fortiori the children of foreigners in transient residence are not citizens, their fathers being subject to the jurisdiction less completely than Indians.").

Here, too, the Fourteenth Amendment's historical background supports the conclusion that children born of parents temporarily present in the United States are not "subject to the jurisdiction" of the United States under the Citizenship Clause. Congressional debates over the Civil Rights Act and Fourteenth Amendment specifically addressed temporarily present foreigners.  For instance, Representative Bingham, the main drafter of the Fourteenth Amendment, said in public speeches that citizens were "all free persons born and domiciled within the United States." Kurt T. Lash, *Prima Facie Citizenship* 18 (Apr. 17, 2025) (quotation marks omitted),

https://perma.cc/ARN2-5CSJ. Representative James Wilson explained during a debate over the Civil Rights Act that, under "the general law relating to subjects and citizens recognized by all nations," a "person born in the United States" ordinarily "is a natural-born citizen." Cong. Globe, 39th Cong., 1st Sess. at 1117. But he recognized "except[ions]" for "children born on our soil to temporary sojourners or representatives of foreign Governments." *Id.* And during a debate over the Fourteenth Amendment, Senator Benjamin Wade proposed a version of the Amendment that would have referred to "persons born in the United States" (without the qualification of being "subject to" its "jurisdiction"). *Id.* at 2768-69. One of his colleagues objected that "person[s] may be born in the United States and yet not be … citizen[s]," giving the example of "a person [who] is born here of parents from abroad temporarily in this country." *Id.* at 2769. Senator Wade acknowledged that the unadorned phrase "born in the United States" would indeed encompass those individuals, but he argued that the situation would arise so infrequently that "it would be best not to alter the law for that case." *Id.* at 2768-69. Wade's broader version of the Citizenship Clause did not carry the day.

Similarly, the legal community's understanding following ratification accords with that understanding of the Fourteenth Amendment. In a passage later quoted in *Wong Kim Ark*, the Supreme Court of New Jersey interpreted the Citizenship Clause to establish "the general rule that, *when the parents are domiciled here*, birth establishes the right to citizenship." *Benny v. O'Brien*, 58 N.J.L. 36, 32 A. 696, 698 (N.J. 1895)

(emphasis added).  And it explained that the Citizenship Clause's jurisdictional element excludes "those born in this country of foreign parents who are temporarily traveling here" because "[s]uch children are, in theory, born within the allegiance of [a foreign] sovereign."  *Id.*

Commentators likewise regularly recognized that the children of temporarily present aliens were not citizens.  *See, e.g.*, Alexander Porter Morse, *A Treatise on Citizenship* 248 (1881) ("The words 'subject to the jurisdiction thereof' exclude the children of foreigners transiently within the United States …."); Samuel Freeman Miller, *Lectures on the Constitution of the United States* 279 (1891) (similar); Hannis Taylor, *A Treatise on International Public Law* 220 (1901) ("[C]hildren born in the United States to foreigners here on transient residence are not citizens, because by the law of nations they were not at the time of their birth 'subject to the jurisdiction.'"); Henry Brannon, *A Treatise on the Rights and Privileges Guaranteed by the Fourteenth Amendment to the Constitution of the United States* 25 (1901) (recognizing an exception to American citizenship at birth for "children of aliens born here while their parents are traveling or only temporarily resident"); John Westlake, *International Law* 220 (1904) ("[W]hen the father at the time of the birth is in the Union for a transient purpose his children born within it have his nationality ….").

States adopted a similar understanding.  In 1872, California adopted a statute declaring that "the children of transient aliens and of alien public Ministers and Consuls" were not citizens.  Cal. Political Code § 51(1) (1872).  North Dakota and

Montana both similarly excluded from citizenship "the children of transient aliens." N.D. Political Code § 11(1) (1895); Mont. Political Code § 71(1) (1895).

The federal political branches operated from the same understanding following the Fourteenth Amendment's enactment. Six years after ratification, Representative Ebenezer Hoar proposed a bill "to carry into execution the provisions of the [F]ourteenth [A]mendment … concerning citizenship." 2 Cong. Rec. 3279 (1874). The bill would have provided that "a child born within the United States of parents who are not citizens, and who do not reside within the United States, … shall not be regarded as a citizen thereof." *Id.* Although the bill ultimately failed because of "opposition to its expatriation provisions," its "parental domicile requirement" generated little meaningful "debate or controversy." Justin Lollman, Note, *The Significance of Parental Domicile Under the Citizenship Clause*, 101 Va. L. Rev. 455, 475 (2015). It thus appears that members of Congress accepted that children born of non-resident alien parents were not subject to the United States' jurisdiction under the Citizenship Clause.

The Executive Branch, too, has taken the position at times that the Citizenship Clause did not confer citizenship upon children born in the United States to non-resident alien parents. In 1885, Secretary of State Frederick T. Frelinghuysen denied a passport to an applicant who was "born of Saxon subjects, temporarily in the United States" because the applicant was "subject to [a] foreign power," and "the fact of birth, under circumstances implying alien subjection, establishes of itself no right of

citizenship." 2 *A Digest of the International Law of the United States* § 183, at 397-98 (Francis Wharton ed., 2d. ed. 1887) (Wharton's Digest). Later the same year, Secretary Frelinghuysen's successor, Thomas F. Bayard, denied a passport to an applicant born "in the State of Ohio" to "a German subject" "domiciled in Germany," explaining that the applicant "was on his birth 'subject to a foreign power' and 'not subject to the jurisdiction of the United States.'" *Id.* at 399-400. And in 1910, a Department of Justice report explained that "it has never been held, and it is very doubtful whether it will ever be held, that the mere act of birth of a child on American soil, to parents who are accidentally or temporarily in the United States, operates to invest such child with all the rights of American citizenship." Spanish Treaty Claims Comm'n, U.S. Dep't of Justice, *Final Report of William Wallace Brown, Assistant Attorney-General* 124 (1910).

**b.** The same principles apply to aliens illegally present in the United States—like aliens whose presence is temporary, they lack both the requisite allegiance to the United States and the legal capacity to establish domicile here. Illegal aliens have never renounced their allegiance to a foreign power and are by definition within the United States in defiance of U.S. law. That defiance is inconsistent with establishing the requisite "allegiance" to the United States necessary to be completely subject to its political jurisdiction. *See* J.J.S. Wharton, *Law Lexicon, or Dictionary of Jurisprudence* 40 (Edward Hopper ed., 2d ed. 1860) (defining "allegiance" as "natural, lawful, and faithful obedience"). And, like temporary visitors, such illegally present aliens are not

entitled to the reciprocal benefit of "protection against other nations" when they travel abroad. *Fong Yue Ting*, 149 U.S. at 724.

Illegal aliens are also incapable of establishing allegiance through domicile in the United States. Domicile, recall, requires residence and an intent to remain indefinitely. Even if some illegal aliens may meet those requirements factually for purposes of state law, *see Plyler v. Doe*, 457 U.S. 202, 227 n.22 (1982), domicile, "being a creation of the law, contains within it certain legal fictions." M.W. Jacobs, *A Treatise on the Law of Domicile* § 71, at 119 (1887). Two such rules have already been discussed. One is that a child's domicile follows its parents. *E.g.*, *Lamar*, 112 U.S. at 470. Second, and equally relevant, is that Congress may "preclud[e]" classes of aliens "from establishing domicile in the United States." *Toll*, 458 U.S. at 14. Provisions of the immigration laws that bar individuals from relinquishing their former domicile leave them without "the legal capacity to establish domicile in the United States," by precluding, as a legal matter, the intent necessary to establish domicile, regardless of the subjective desires or intentions of the alien. *Carlson v. Reed*, 249 F.3d 876, 881 (9th Cir. 2001); *see also Kaplan v. Tod*, 267 U.S. 228, 230 (1925) (holding statute prohibiting entry legally precluded immigrant from "dwel[ling] within the United States" even while physically present).

Individuals whose very presence in the United States is unlawful have even less claim to allegiance established by domicile. They have no lawful basis to establish a residence in the United States, much less to assert an intent to remain indefinitely in

defiance of immigration laws. "It would be inconsistent to conclude that Congress sought to preclude [those] who *comply* with federal immigration law" from establishing domicile while "permitting [those] who *violate*" it to do so. *Park v. Barr*, 946 F.3d 1096, 1099 (9th Cir. 2020) (per curiam).

Their unlawful presence cannot be a basis on which to claim allegiance to the United States. That, too, has a pedigree in the law of domicile. *See* Robert Phillimore, *The Law of Domicil* 63 (1847) (explaining that persons could not form a domicile in a place from which they were exiled); Dig. 50.1.31 (Marcellus, Digest 1) (4 *The Digest of Justinian* 906a (Alan Watson trans., 1985)) (stating that a person could not establish domicile somewhere "forbidden to him"); *cf.* Vattel, *supra*, § 213, at 102 (explaining that "inhabitants" are those "permitted to settle and stay in the country"). And it accords with the general equitable principle that no wrongdoer should "profit by his own wrong," *Tilghman v. Proctor*, 125 U.S. 136, 145 (1888), by allowing foreigners to secure U.S. citizenship for their children (and, potentially, later immigration benefits for themselves) by entering the United States in violation of its laws.

In any event, even if some illegal aliens were capable of establishing allegiance through domicile in defiance of federal law, that would not support the facial claim here. Many illegal aliens do not intend to remain here indefinitely and thus have not formed the intent necessary to establish domicile even as a factual matter. Plaintiffs cannot "establis[h] that no set of circumstances exists under which the [Executive Order] would be valid." *NetChoice, LLC*, 603 U.S. at 723 (quotation marks omitted).

Indeed, it is not even clear what category the identified individuals fall into, as the complaint and declarations do not include allegations about their intent to remain here indefinitely, their continued connections to their home countries, and whether they would return if conditions in those countries changed.  *See* JA37-38; JA47-49; JA52; JA58-59.

**c.**  If any doubt remained about the proper application of the Citizenship Clause to children of aliens temporarily or unlawfully in the United States, related principles of interpretation would compel resolving that doubt in favor of the Executive Order's construction.

Countries have for centuries extended citizenship to the foreign-born children of their citizens, *see, e.g.*, *Wong Kim Ark*, 169 U.S. at 668-71 (discussing English history); Naturalization Act of 1790, ch. 3, 1 Stat. 103, 104; *cf.* 8 U.S.C. § 1401(c).  The Supreme Court has resisted reading the Citizenship Clause in a manner that would inhibit the political branches' ability to address "problems attendant on dual nationality." *Rogers v. Bellei*, 401 U.S. 815, 831 (1971).  The individual "who has a dual nationality will be subject to claims" of allegiance "from both nations, claims which at times may be competing or conflicting," and "[c]ircumstances may compel one who has a dual nationality to do acts which otherwise would not be compatible with the obligations of American citizenship." *Kawakita v. United States*, 343 U.S. 717, 733, 736 (1952); *cf. Savorgnan v. United States*, 338 U.S. 491, 500 (1950) ("The United States has long recognized the general undesirability of dual allegiances.").

Recognizing citizenship for the children of temporarily and illegally present aliens—thereby imposing a duty of protection on the United States—could also conflict with the other nation's claims of allegiance, creating "problems for the governments involved." *Bellei*, 401 U.S. at 832. For instance, the War of 1812 resulted in part from the Royal Navy's impressment of sailors whom the United Kingdom viewed as British subjects, but whom the United States viewed as U.S. citizens. Cockburn, *supra*, at 70-79. In the 1860s, Congress and the Executive Branch were taking steps to reduce the frequency of dual allegiance, enacting the Expatriation Act of 1868, ch. 249, 15 Stat. 223, and entering into the Bancroft treaties to coordinate the rights of an immigrant's former and adopted country, *see* Robert E. Mensel, *Jurisdiction in Nineteenth Century International Law and Its Meaning in the Citizenship Clause of the Fourteenth Amendment*, 32 St. Louis U. Pub. L. Rev. 329, 376-79 (2013). The Citizenship Clause was ratified at a time when the focus was on avoiding dual nationality.

In addition, "any policy toward aliens is vitally and intricately interwoven with … the conduct of foreign relations." *Harisiades v. Shaughnessy*, 342 U.S. 580, 588-89 (1952). "Any rule of constitutional law that would inhibit the flexibility" of Congress or the President "to respond to changing world conditions should be adopted only with the greatest caution." *Trump v. Hawaii*, 585 U.S. 667, 704 (2018) (quotation marks omitted). Although Congress may not deny citizenship to those protected by the Citizenship Clause, it may, through its power to "establish an uniform Rule of

Naturalization," extend citizenship to those who lack a constitutional right to it. U.S. Const. art. I, § 8, cl. 4. Congress would retain the power to extend citizenship to the children of aliens present illegally or temporarily, just as it has extended citizenship to the children of members of Indian tribes. Reading the Citizenship Clause to compel that result, however, would deprive the political branches of the power to address serious problems caused by near-universal citizenship at birth.

Nor are these idle concerns. Technological advances have allowed foreigners to come to the United States and give birth on a scale without precedent in earlier centuries. A "birth tourism" industry has developed to help expectant mothers travel to the United States to secure U.S. citizenship for their children. *See* Minority Staff of S. Comm. on Homeland Sec. & Governmental Affairs, *Report on Birth Tourism in the United States* 1 (2015), https://perma.cc/C8SA-ZG8X. "[B]irth tourism companies" have even collected hefty fees to facilitate such travel. *Id.* at 25. One such company charged between $22,000 and $38,000 for a full package including assistance in securing a visa, airfare, and housing and healthcare in the United States. *Id.* at 26; *see id.* at 25-31. That practice "demeans the naturalization process by monetizing the privilege of U.S. citizenship." *Id.* at 39. It also defies U.S. law, under which "obtaining United States citizenship for a child … is an impermissible basis" for a tourist visa. 85 Fed. Reg. 4219, 4223 (Jan. 24, 2020). The Constitution does not grant citizenship in such circumstances.

Similarly, some illegal aliens enter the United States to engage in "hostile activities, including espionage, economic espionage, and preparations for terror-related activities," and these and other aliens "present significant threats to national security and public safety." Exec. Order No. 14,159, § 1, 90 Fed. Reg. at 8443. On the district court's view, Congress and the Executive Branch are powerless to prevent the children of such individuals from becoming citizens. But again, the Constitution does not grant citizenship in such circumstances.

Finally, "[c]itizenship is a high privilege, and when doubts exist concerning a grant of it, generally at least, they should be resolved in favor of the United States and against the claimant." *United States v. Manzi*, 276 U.S. 463, 467 (1928); *see Berenyi v. District Dir., INS*, 385 U.S. 630, 637 (1967). While the Citizenship Clause is best read not to extend citizenship to children born in the U.S. of aliens present temporarily or illegally, any ambiguity should be resolved against extending citizenship. Congress may extend citizenship in such circumstances if it wishes to do so.

## B. The District Court's Contrary Holding Is Mistaken.

The district court held that the plain meaning of "subject to the jurisdiction thereof" encompasses every person born in this country except the classes of persons listed in *Wong Kim Ark*. Add. 13-14. That holding does not bear scrutiny.

At the outset, the district court failed to explain a coherent meaning of the phrase "subject to the jurisdiction thereof" that would include these classes but exclude the classes covered by the Executive Order. Instead, the court effectively

35

treated *Wong Kim Ark* as resolving whether the children of aliens present temporarily

or illegally are citizens under the Citizenship Clause. In *Wong Kim Ark*, however, the

Supreme Court precisely identified the narrow question presented:

> whether a child born in the United States, of parents of Chinese descent,
> who, at the time of his birth, are subjects of the Emperor of China, but
> *have a permanent domicil and residence in the United States*, and are there
> carrying on business, and are not employed in any diplomatic or official
> capacity under the Emperor of China, becomes at the time of his birth a
> citizen of the United States.

169 U.S. at 653 (emphasis added).

In analyzing that question, the Supreme Court repeatedly relied on the parents'

domicile and permanent residence. For example, it quoted an opinion in which

Justice Story recognized that "the children, even of aliens, born in a country, *while the*

*parents are resident there* under the protection of the government, … are subjects by

birth." *Id.* at 660 (emphasis added) (quoting *Inglis v. Trustees of the Sailor's Snug Harbour*

*in N.Y.C.*, 28 U.S. (3 Pet.) 99, 164 (1830) (Story, J., dissenting)). It quoted the New

Jersey Supreme Court's observation that the Fourteenth Amendment codifies "the

general rule, that *when the parents are domiciled here* birth establishes the right to

citizenship." *Id.* at 692 (emphasis added) (quotation marks omitted). It explained that

"[e]very citizen or subject of another country, *while domiciled here*, is within the

allegiance and the protection, and consequently subject to the jurisdiction, of the

United States." *Id.* at 693 (emphasis added). And it noted that "persons … owe

allegiance to the United States, *so long as they are permitted by the United States to reside here*;

and are 'subject to the jurisdiction thereof,' in the same sense as *all other aliens residing in the United States.*" *Id.* at 694 (emphases added).

After reviewing the relevant history, the Court concluded that the Amendment extends citizenship to "children born, within the territory of the United States, of all other persons, of whatever race or color, *domiciled within the United States.*" *Id.* (emphasis added). The Court then summed up its holding:

> [A] child born in the United States, of parents of Chinese descent, who, at the time of his birth, are subjects of the Emperor of China, but *have a permanent domicil and residence in the United States,* … and are not employed in any diplomatic or official capacity under the Emperor of China, becomes at the time of his birth a citizen of the United States.

*Id.* at 705 (emphasis added).

The Court's emphasis on domicile was not accidental. The Supreme Court in the years before and after *Wong Kim Ark* repeatedly addressed the rights of Chinese immigrants, which frequently turned on whether they were domiciled in the United States. Before *Wong Kim Ark*, the Court had held in *Lau Ow Bew* that "Chinese merchants domiciled in the United States" were exempt from the requirement to obtain a certificate of entry, 144 U.S. at 61, while in *Fong Yue Ting* it had noted that a domiciled Chinese resident could "invoke [America's] protection against other nations," 149 U.S. at 724. In *Lem Moon Sing v. United States*, the Court held that the domiciliary status of a Chinese resident did not entitle him to judicial review of his exclusion. 158 U.S. 538, 546 (1895). After *Wong Kim Ark*, the Court continued to treat domiciled Chinese residents differently, *see, e.g.*, *United States v. Mrs. Gue Lim*, 176

U.S. 459, 468 (1900), and described and applied *Wong Kim Ark* as addressing

domiciled permanent residents, *see Chin Bak Kan v. United States*, 186 U.S. 193, 200

(1902); *Kwock Jan Fat v. White*, 253 U.S. 454, 457 (1920). The domiciliary status of

Chinese residents was significant because of the relationship between domicile,

allegiance, and protection in international law, *see, e.g., Lau Ow Bew*, 144 U.S. at 61-62;

*Fong Yue Ting*, 149 U.S. at 724; *accord id.* at 734 (Brewer, J., dissenting), a relationship

which was understood in jurisdictional terms, with treatises describing "[d]omicil" as

"the foundation of jurisdiction over persons" "under the Law of Nations," 1 Twiss,

*supra*, § 164, at 239, and a "ti[e] which bind[s], or … [a] caus[e] which subject[s], the

individual to the jurisdiction of a particular territory," 4 Robert Phillimore,

*Commentaries upon International Law* 32 (2d ed. 1874); *see* Ilan Wurman, *Jurisdiction and*

*Citizenship* 87 (May 26, 2025) ("[T]he United States did not exercise a complete

legislative jurisdiction over nondomiciled foreigners."), https://perma.cc/D259-864C.

Domicile's relationship to allegiance and jurisdiction and its implications for the

Citizenship Clause was well understood at the time. *Cf.* Clement L. Bouvé, *A Treatise*

*on the Laws Governing the Exclusion and Expulsion of Aliens in the United States* 423 (1912)

("It is of interest to note the frequency [in *Wong Kim Ark*] with which the terms

'residence' and 'domicile' are used in connection with 'allegiance' and 'subject to the

jurisdiction.'").

     Executive Branch practice recognized the limitations of *Wong Kim Ark*'s

holding. The official regulations governing the administration of the Chinese

Exclusion Acts exempted any person who had "been born in the United States, of parents who at the time of his birth have a permanent domicile and residence in the United States." *Regulations Governing the Admission of Chinese* r. 2 (Feb. 26, 1907), *in* Bureau of Immigration & Naturalization, Dep't of Commerce & Labor, Doc. No. 54, *Treaty, Laws, and Regulations Governing the Admission of Chinese* 34, 34 (June 1908). The Department of Justice, likewise, explained in 1910 that *Wong Kim Ark* "goes no further" than addressing children of foreigners "domiciled in the United States," and did not address the status of children of "parents who are accidentally or temporarily in the United States." Spanish Treaty Claims Comm'n, U.S. Dep't of Justice, *supra*, at 121, 124; *see also supra* p. 27-29 (collecting post-*Wong Kim Ark* commentary).

In short, the only question presented, investigated, and resolved in *Wong Kim Ark* concerned children of parents with "a permanent domicil and residence in the United States." 169 U.S. at 653; *see id.* at 705. The Court itself warned that "general expressions, in every opinion, are to be taken in connection with the case in which those expressions are used." *Id.* at 679 (quotation marks omitted); *see Rojas-Tapia v. United States*, 130 F.4th 241, 256 (1st Cir. 2025) ("[T]he language of an opinion … must be read with a careful eye to context in light of the discrete case or controversy to which the opinion was addressed." (quotation marks omitted)).

More generally, *Wong Kim Ark*'s historical discussion of English common law *jus soli* principles—which undergird many of the district court's broad statements—is not particularly instructive here. Children born to domiciled foreigners were treated

39

identically under English common law and the Citizenship Clause because they were regarded as owing sufficient allegiance to the sovereign. But that does not mean that the Citizenship Clause matched the English common law in every detail. The Supreme Court "has long cautioned that the English common law 'is not to be taken in all respects to be that of America.'" *NYSRPA v. Bruen*, 597 U.S. 1, 39 (2022). That admonition holds particular force here. The Supreme Court had already held—and *Wong Kim Ark* acknowledged—that the Citizenship Clause departs in important respects from English common law. The Clause's exception for children of members of Indian tribes was "unknown to the [English] common law," *Wong Kim Ark*, 169 U.S. at 682.

The district court offered no definition of "subject to the jurisdiction," instead simply implying that Indians were the sole departure from the English common law. Add. 13-14. But the reasons undergirding that exception—like all others the Supreme Court has recognized—underscore that being subject to the political jurisdiction of the United States is the determining factor, and aliens here temporarily or unlawfully are similarly outside the operation of the Citizenship Clause.

Moreover, the English *jus soli* tradition was premised on unalterable allegiance to the King (which was conferred via birth on his soil). But this nation was founded on breaking from that idea, and grounded citizenship in the social contract, premised on mutual consent between person and polity. *See, e.g.*, *Report of H. Comm. on Foreign Affairs Concerning the Rights of American Citizens in Foreign States*, *in* Cong. Globe, 40th

Cong., 2nd Sess. app. at 94, 95 (1868) (explaining that "the American Constitution is itself proof that Blackstone's [English] theory of allegiance was not accepted by the American governments"); Cong. Globe, 40th Cong., 2nd Sess. 868, 967, 1130-31 (1868) (statements objecting to English doctrine). The Citizenship Clause thus permits voluntary renunciation of citizenship, even though English common law did not. *See Afroyim v. Rusk*, 387 U.S. 253, 257-62 (1967). And more generally, "[n]o country ha[d] carried" the idea that establishing "domicil[e]" "stamp[ed]" an immigrant with his new home's "national character" "further than that of the United States." Wharton's Digest § 198, at 482 (quotation marks omitted); *see* Jacobs, *supra*, § 26, at 36 n.12 ("There has … from the first been a stronger disposition in the American cases to put national character upon the general principles of domicil than is apparent in the English cases.").

### C. Plaintiffs' Statutory Claim Fails for the Same Reasons.

Plaintiffs also bring claims under 8 U.S.C. § 1401(a), which provides that "a person born in the United States, and subject to the jurisdiction thereof" is a citizen. As the district court explained, "the statute tracks the Fourteenth Amendment" and so the "claims" are "parallel," a point on which the "parties agreed … at oral argument." Add. 13. Absent a "well-settled" meaning to the contrary, *Kemp v. United States*, 596 U.S. 528, 539 (2022) (quotation marks omitted), texts adopting identical wording generally convey the same meaning. *Cf. Cochise Consultancy, Inc. v. United States ex rel. Hunt*, 587 U.S. 262, 268 (2019).

As discussed above, the Citizenship Clause does not cover the children of aliens temporarily or unlawfully present in the United States. Treatises and other sources long after the *Wong Kim Ark* decision continued to recognize that citizenship at birth required more than mere presence. *See, e.g.*, Sidney Kansas, *Immigration and Nationality Act Annotated* 183 (4th ed. 1953) (explaining that the INA's statutory provision excluded "transients or visitors"); Bouvé, *supra*, at 423.

Plaintiffs' statutory claim thus fails for the same reasons as their constitutional claim.

## II. The District Court's Injunctive Relief Is Substantially Overbroad.

Even if plaintiffs were likely to succeed on the merits and otherwise entitled to an injunction, *but see infra* pp. 11-42, the district court's injunction was substantially overbroad in multiple respects. Plaintiffs are three organizations claiming collectively over 355,000 members. But plaintiffs never suggest—and could not plausibly claim—that all of those members have standing or are injured by the Executive Order in any way. The district court erred in granting injunctive relief to hundreds of thousands of unidentified members, the vast majority of whom lack standing in the first instance. Separately, the district court erred in extending injunctive relief to the President in addition to other defendants.

## A. Members Who Lack Standing Are Not Entitled to Relief.

The associations have no claims of their own; they instead bring suit to "assert the claims of [their] members." *Hunt v. Washington State Apple Advert. Comm'n*, 432 U.S. 333, 342 (1977). Both Article III and traditional principles of equity required that the district court limit its relief to those identified claims for which the members' standing had been established.

**1.** "[S]tanding is not dispensed in gross …." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021). A plaintiff must "demonstrate standing for each claim he seeks to press" because Article III requires courts to determine whether "the particular plaintiff is entitled to an adjudication of the *particular claims* asserted." *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006).

These foundational Article III limits apply regardless of the representational or procedural device employed. "Article III does not give federal courts the power to order relief to any uninjured plaintiff, class action or not." *TransUnion LLC*, 594 U.S. at 431 (quotation marks omitted); *cf. In re Nexium Antitrust Litig.*, 777 F.3d 9, 19 (1st Cir. 2015) (holding that before certifying a class, "the court must be satisfied that, prior to judgment, it will be possible to establish a mechanism for distinguishing the injured from the uninjured class members"). "For all relief sought, there must be a litigant with standing, whether that litigant joins the lawsuit as a plaintiff, a coplaintiff, or an intervenor of right." *Town of Chester v. Laroe Estates, Inc.*, 581 U.S. 433, 439

(2017).  "[R]epresentational standing … does not eliminate or attenuate" this "constitutional requirement."  *Warth v. Seldin*, 422 U.S. 490, 511 (1975).

Thus, organizations must identify a member or members with standing whose claims they press.  *Summers v. Earth Island Inst.*, 555 U.S. 488, 498 (2009).  Courts can remedy only those claims for which the association has established Article III standing.  *See International Union v. Brock*, 477 U.S. 274, 281 (1986) (holding labor union had standing to represent "those of its members injured by the [challenged] policy").

The organizations here satisfied that burden for six identified members' claims—four from Make the Road N.Y. and one each from LULAC and NHICS—by providing a declaration explaining that member's standing, JA47; JA52; JA58-59, and describing the claims in the complaint, JA37-38.  Rather than granting relief for these six individuals, however, the district court granted relief to more than 355,000 members of these organizations.  *See* JA130.  Plaintiffs do not claim—and could not plausibly claim—that all or even most of those members are pregnant or plan to become pregnant.  On average, 11 babies are born annually for every 1,000 people in the United States.  Michelle J.K. Osterman et al., *Births: Final Data for* 2022, 73 Nat'l Vital Stat. Rep. 1, 13 tbl.1 (2024), https://perma.cc/HXN9-EXA4.  Applied to the plaintiff organizations, this average suggests that fewer than 4,000 babies would be born in 2025 to the 355,000 members who were granted injunctive relief—in other words, that roughly 1% of the organizations' membership could possibly claim standing based on the birth of a child.  And that number is likely an overstatement:

44

plaintiffs state that their membership includes both citizens and lawful permanent residents—categories of persons whose children would be unaffected by the Executive Order. *See* JA47; JA52; JA57. And even members who do fall into a category covered by the Executive Order may have a spouse or partner who is a citizen or lawful permanent resident, meaning those children would likewise be unaffected by the Executive Order.

Article III required the court to limit its remedy to what was necessary to provide relief to the claims for which Article III standing was established, rather than extending the injunction to hundreds of thousands of individuals who plainly lack standing. Here, the only claims for which plaintiffs alleged standing were the six identified pregnant individuals. The organizations cannot obtain an injunction covering their mostly uninjured members for whom they have made no claim of standing.

**2.** Granting relief to a vast number of unidentified members is also fundamentally inequitable. It is impossible to tell whether these members are also members of other organizations suing over the Executive Order. *See* Complaint at 8, 11, *CASA, Inc. v. Trump*, No. 8:25-cv-201 (D. Md. Jan. 21, 2025), Dkt. 1 (two organizations claiming more than 855,000 members); Complaint at 4-5, *Doe v. Trump*, No. 1:25-cv-10135 (D. Mass. Jan. 20, 2025), Dkt. 1 (two organizations with an undisclosed number of members). Overlapping members may have their claims simultaneously litigated in two courts, despite the fundamental rule against duplicative

litigation.  *See, e.g.*, *Sacerdote v. Cammack Larhette Advisors, LLC*, 939 F.3d 498, 504 (2d Cir. 2019).

Similarly, the government does not know to whom a judgment would run, rendering it unclear to whom *res judicata* would apply.  *Cf. Brock*, 477 U.S. at 290 (explaining that preclusion "might not" apply to "subsequent claims by the association's members").

The associations here cannot forgo pleading or joining specific claims or available class-action procedures for litigating those claims; assert that they have large, dispersed, and anonymous memberships; claim only a tiny fraction have standing; but still demand relief for all members.  Any relief should be limited to those identified members whose standing is established and who undoubtedly would be bound by the judgment.  That approach would respect both Article III principles and basic rules of equity.

## B.    The Court Lacked Jurisdiction to Enjoin the President.

The injunction applies to all defendants, including the President.  But the Supreme Court has made clear that there is "no jurisdiction" "to enjoin the President in the performance of his official duties."  *Franklin v. Massachusetts*, 505 U.S. 788, 802-03 (1992) (quotation marks omitted); *Mississippi v. Johnson*, 71 U.S. (4 Wall.) 475, 501 (1866).  The district court failed to address this argument.

**C.  The Remaining Equitable Factors Do Not Support the Preliminary Injunction.**

Finally, the preliminary injunction inflicts irreparable injuries on the government and the public, whose interests "merge" in this context. *Nken v. Holder*, 556 U.S. 418, 435 (2009).

As discussed above, plaintiffs are unlikely to succeed on the merits, and the injunction should be reversed on that basis. But the equities and public interest also favor denying preliminary injunctive relief. An injunction that prevents the President from carrying out his broad authority and constitutional responsibility is "an improper intrusion by a federal court into the workings of a coordinate branch of the Government." *INS v. Legalization Assistance Project of the L.A. Cty. Fed'n of Labor*, 510 U.S. 1301, 1305-06 (1993) (O'Connor, J., in chambers). The challenged Executive Order is an integral part of President Trump's broader effort to repair the United States' immigration system and to address the ongoing crisis at the southern border. That immigration policy is designed to combat the "significant threats to national security and public safety" posed by unlawful immigration. *See* Exec. Order No. 14,159, § 1, 90 Fed. Reg. at 8443; *see also* Exec. Order No. 14,165, 90 Fed. Reg. 8467; Proclamation No. 10,886, 90 Fed. Reg. 8327. Addressing the Executive Branch's prior misinterpretation of the Citizenship Clause is one component of that broader effort, removing incentives to unlawful immigration and closing exploitable loopholes.

# CONCLUSION

For the foregoing reasons, the preliminary injunctions should be reversed, or at a minimum narrowed.

Respectfully submitted,

YAAKOV M. ROTH
*Acting Assistant Attorney General*

ERIC D. McARTHUR
*Deputy Assistant Attorney General*

MARK R. FREEMAN
SHARON SWINGLE
BRAD HINSHELWOOD

*s/ Derek Weiss*

DEREK WEISS
*Attorneys, Appellate Staff*
*Civil Division, Room 7230*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 616-5365*
*derek.l.weiss@usdoj.gov*

MAY 2025

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 12,245 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in Garamond 14-point font, a proportionally spaced typeface.

*s/ Derek Weiss*
Derek Weiss

**ADDENDUM**

# TABLE OF CONTENTS

**Executive Order:**

Protecting the Meaning and Value of American Citizenship, Exec. Order No.
14,160, 90 Fed. Reg. 8449 (Jan. 29, 2025)......................................................Add. 1


**Constitutional and Statutory Provisions:**

Fourteenth Amendment, Section 1 ..........................................................................Add. 3

8 U.S.C. § 1401......................................................................................................Add. 4


**Local Rule 28.0 District Court Materials:**

Preliminary Injunction (Feb. 10, 2025) (Dkt. 77) ..................................................Add. 6

Preliminary Injunction Order (Feb. 11, 2025) (Dkt. 79) ........................................Add. 8

**Protecting the Meaning and Value of American Citizenship**

**Exec. Order No. 14,160, 90 Fed. Reg. 8449 (Jan. 29, 2025)**

By the authority vested in me as President by the Constitution and the laws of the United States of America, it is hereby ordered:

**Section 1.** *Purpose.* The privilege of United States citizenship is a priceless and profound gift. The Fourteenth Amendment states: "All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside." That provision rightly repudiated the Supreme Court of the United States's shameful decision in *Dred Scott* v. *Sandford*, 60 U.S. (19 How.) 393 (1857), which misinterpreted the Constitution as permanently excluding people of African descent from eligibility for United States citizenship solely based on their race.

But the Fourteenth Amendment has never been interpreted to extend citizenship universally to everyone born within the United States. The Fourteenth Amendment has always excluded from birthright citizenship persons who were born in the United States but not "subject to the jurisdiction thereof." Consistent with this understanding, the Congress has further specified through legislation that "a person born in the United States, and subject to the jurisdiction thereof" is a national and citizen of the United States at birth, 8 U.S.C. 1401, generally mirroring the Fourteenth Amendment's text.

Among the categories of individuals born in the United States and not subject to the jurisdiction thereof, the privilege of United States citizenship does not automatically extend to persons born in the United States: (1) when that person's mother was unlawfully present in the United States and the father was not a United States citizen or lawful permanent resident at the time of said person's birth, or (2) when that person's mother's presence in the United States at the time of said person's birth was lawful but temporary (such as, but not limited to, visiting the United States under the auspices of the Visa Waiver Program or visiting on a student, work, or tourist visa) and the father was not a United States citizen or lawful permanent resident at the time of said person's birth.

**Sec. 2.** *Policy.* (a) It is the policy of the United States that no department or agency of the United States government shall issue documents recognizing United States citizenship, or accept documents issued by State, local, or other governments or authorities purporting to recognize United States citizenship, to persons: (1) when that person's mother was unlawfully present in the United States and the person's father was not a United States citizen or lawful permanent resident at the time of said person's birth, or (2) when that person's mother's presence in the United States was

lawful but temporary, and the person's father was not a United States citizen or lawful permanent resident at the time of said person's birth.

(b) Subsection (a) of this section shall apply only to persons who are born within the United States after 30 days from the date of this order.

(c) Nothing in this order shall be construed to affect the entitlement of other individuals, including children of lawful permanent residents, to obtain documentation of their United States citizenship.

**Sec. 3.** *Enforcement.* (a) The Secretary of State, the Attorney General, the Secretary of Homeland Security, and the Commissioner of Social Security shall take all appropriate measures to ensure that the regulations and policies of their respective departments and agencies are consistent with this order, and that no officers, employees, or agents of their respective departments and agencies act, or forbear from acting, in any manner inconsistent with this order.

(b) The heads of all executive departments and agencies shall issue public guidance within 30 days of the date of this order regarding this order's implementation with respect to their operations and activities.

**Sec. 4.** *Definitions.* As used in this order:

(a) "Mother" means the immediate female biological progenitor.

(b) "Father" means the immediate male biological progenitor.

**Sec. 5.** *General Provisions.* (a) Nothing in this order shall be construed to impair or otherwise affect:

(i) the authority granted by law to an executive department or agency, or the head thereof; or

(ii) the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

(b) This order shall be implemented consistent with applicable law and subject to the availability of appropriations.

(c) This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

**Fourteenth Amendment, Section 1**

    Section 1.  All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside.  No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

**8 U.S.C. § 1401**

## § 1401. Nationals and citizens of United States at birth

The following shall be nationals and citizens of the United States at birth:

(a) a person born in the United States, and subject to the jurisdiction thereof;

(b) a person born in the United States to a member of an Indian, Eskimo, Aleutian, or other aboriginal tribe: Provided, That the granting of citizenship under this subsection shall not in any manner impair or otherwise affect the right of such person to tribal or other property;

(c) a person born outside of the United States and its outlying possessions of parents both of whom are citizens of the United States and one of whom has had a residence in the United States or one of its outlying possessions, prior to the birth of such person;

(d) a person born outside of the United States and its outlying possessions of parents one of whom is a citizen of the United States who has been physically present in the United States or one of its outlying possessions for a continuous period of one year prior to the birth of such person, and the other of whom is a national, but not a citizen of the United States;

(e) a person born in an outlying possession of the United States of parents one of whom is a citizen of the United States who has been physically present in the United States or one of its outlying possessions for a continuous period of one year at any time prior to the birth of such person;

(f) a person of unknown parentage found in the United States while under the age of five years, until shown, prior to his attaining the age of twenty-one years, not to have been born in the United States;

(g) a person born outside the geographical limits of the United States and its outlying possessions of parents one of whom is an alien, and the other a citizen of the United States who, prior to the birth of such person, was physically present in the United States or its outlying possessions for a period or periods totaling not less than five years, at least two of which were after attaining the age of fourteen years: Provided, That any periods of honorable service in the Armed Forces of the United States, or periods of employment with the United States Government or with an international organization as that term is defined in section 288 of title 22 by such citizen parent, or any periods during which such citizen parent is physically present abroad as the dependent unmarried son or daughter and a member of the household of a person (A) honorably serving with the Armed Forces of the United States, or (B) employed by the United States Government or an international organization as defined in section 288 of title 22, may be included in order to satisfy the physical-presence

requirement of this paragraph. This proviso shall be applicable to persons born on or after December 24, 1952, to the same extent as if it had become effective in its present form on that date; and

(h) a person born before noon (Eastern Standard Time) May 24, 1934, outside the limits and jurisdiction of the United States of an alien father and a mother who is a citizen of the United States who, prior to the birth of such person, had resided in the United States.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW HAMPSHIRE**

NEW HAMPSHIRE INDONESIAN
COMMUNITY SUPPORT, et al.,

        *Plaintiffs*,

        v.

DONALD J. TRUMP, President of the United
States, in his official capacity, et al.,

        *Defendants*.

Case No. 1:25-cv-38-JL-TSM

**PRELIMINARY INJUNCTION**

After careful consideration of the parties' submissions, the supporting declarations, the applicable law, and the filings and record in this case, the court GRANTS Plaintiffs' Motion for Preliminary Injunction.

The court hereby finds that Plaintiffs have demonstrated a likelihood of success on the merits of their claims; that Plaintiffs are likely to suffer irreparable harm if the order is not granted; that the potential harm to the Plaintiffs if the order is not granted outweighs the potential harm to Defendants if the order is granted; and that the issuance of this order is in the public interest.

Pursuant to Federal Rule of Civil Procedure 65(a), this court orders that all Defendants are enjoined from enforcing Executive Order 14160, "Protecting the Meaning and Value of American Citizenship," in any manner with respect to the plaintiffs, and with respect to any individual or entity in any matter or instance within the jurisdiction of this court, during the pendency of this litigation.

No security is warranted or required under Fed. R. Civ. P. 65(c).

This preliminary injunction shall take effect immediately upon entry of this Order and

shall remain in effect until the entry of judgment in this matter or by further order of the court.

It is so ordered.

2/10/2025
Date

Joseph N. Laplante
United States District Judge

UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

New Hampshire Indonesian
Community Support, et al.

  v.              Civil No. 25-cv-38-JL-TSM
                  Opinion No. 2025 DNH 014 P

Donald J. Trump, President of the
United States, in his official capacity, et al.

### **PRELIMINARY INJUNCTION ORDER**

   Plaintiff nonprofit groups—New Hampshire Indonesian Community Support, League of United Latin American Citizens, and Make the Road New York—ask this court to enjoin the enforcement of an executive order that would exclude certain groups of individuals from receiving birthright citizenship.  They sue the President, the Secretary and Department of Homeland Security, the Secretary and Department of State, the Secretary and Department of Agriculture, and the Administrator of and Centers for Medicare and Medicaid Services (the persons in their official capacities).[1]  The plaintiffs allege that a recent executive order involving birthright citizenship violates the Fourteenth Amendment of the United States Constitution, the Immigration and Nationality Act, and the Administrative Procedure Act.  *See* U.S. Const. amend. XIV, § 1; Immigration and Nationality Act, 8 U.S.C. § 1401; Administrative Procedure Act, 5 U.S.C. § 706(B).[2]

---

[1] *See* Compl. (doc. no. 1).
[2] *Id.* at ¶¶ 86-97.

After reviewing the parties' submissions and holding oral argument, the court grants the preliminary injunction. The court enjoins the defendants from enforcing the Executive Order in any manner with respect to the plaintiffs, and with respect to any individual or entity in any other matter or instance within the jurisdiction of this court, during the pendency of this litigation.

**Applicable legal standard.** "A preliminary injunction is an extraordinary equitable remedy that is never awarded as of right." *Starbucks Corp. v. McKinney*, 602 U.S. 339, 345 (2024) (citing *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008) (quotations omitted)).

> "When a party seeks a preliminary injunction, the district court considers four long-established elements: (1) the probability of the movant's success on the merits of their claim(s); (2) the prospect of irreparable harm absent the injunction; (3) the balance of the relevant equities (focusing upon the hardship to the movant if an injunction does not issue as contrasted with the hardship to the nonmovant if it does); and (4) the effect of the court's action on the public interest."

*Santiago v. Mun. of Utuado*, 114 F.4th 25, 34–35 (1st Cir. 2024) (quoting *Rosario-Urdaz v. Rivera-Hernandez*, 350 F.3d 219, 221 (1st Cir. 2003) (quotations omitted)). "The movant's likelihood of success on the merits weighs most heavily in the preliminary injunction calculus." *Ryan v. U.S. Immigr. & Customs Enf't*, 974 F.3d 9, 18 (1st Cir. 2020). The third and fourth factors "merge when the [g]overnment is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009).

**The Executive Order.**  On January 20th, 2025, the President issued Executive Order No. 14160, titled "Protecting the Meaning and Value of American Citizenship."[3]  It provides that the Fourteenth Amendment of the Constitution "has never been interpreted to extend citizenship universally to everyone born within the United States" and that it "has always excluded from birthright citizenship persons who were born in the United States but not 'subject to the jurisdiction thereof.'"[4]

It then orders that "no department or agency of the United States government shall issue documents recognizing United States citizenship, or accept documents issued by State, local, or other governments or authorities purporting to recognize United States citizenship, to persons" in two circumstances:

> "(1) when that person's mother was unlawfully present in the United States and the person's father was not a United States citizen or lawful permanent resident at the time of said person's birth, or (2) when that person's mother's presence in the United States was lawful but temporary, and the person's father was not a United States citizen or lawful permanent resident at the time of said person's birth."[5]

By its terms, the Executive Order takes effect on February 19th, 2025.[6]

**Procedural history.**  The plaintiff organizations include pregnant members who will give birth after the Executive Order becomes operative.[7]  For various reasons, the

---

[3] Protecting the Meaning and Value of American Citizenship, Executive Order No. 14160, 90 Fed. Reg. 8449 (Jan. 20, 2025).

[4] *Id.*

[5] *Id.*

[6] *Id.*  In similar suits in other federal district courts, at least two other courts have preliminarily enjoined the order nationwide.  *See State v. Trump*, No. C25-0127-JCC, 2025 WL 415165, at *7 (W.D. Wash. Feb. 6, 2025); *CASA, Inc. v. Trump*, No. CV DLB-25-201, 2025 WL 408636, at *17 (D. Md. Feb. 2, 2025).

[7] *See* Decl. of Rev. Sandra Pontoh, Director of the New Hampshire Indonesian Community Support (doc. no. 24-2) at ¶¶ 8-10; Decl. of Juan Proaño, Chief Executive Officer of League of

plaintiffs' members' children born on or after that date risk deprivation of birthright citizenship under the Executive Order.[8]  The parties jointly submitted a briefing and hearing schedule at the outset of the litigation and requested oral argument only, as opposed to an evidentiary hearing.  Counsel for both parties confirmed at oral argument that their disputes in the litigation are legal rather than factual.

The plaintiffs allege that the Executive Order violates the Fourteenth Amendment and § 1401 of the INA because it "denies citizenship to children of noncitizens who are born in the United States and subject to the jurisdiction of the United States."[9]  They also claim that the Executive Order violates the APA.[10]

The defendants disagree.  They do not challenge the plaintiffs' standing to sue, but argue that they lack a cause of action.[11]  They also argue that the plaintiffs are unlikely to succeed on the merits primarily because the phrase "subject to the jurisdiction of the United States" in the Fourteenth Amendment does not refer to the groups affected by the Executive Order, the plaintiffs have misinterpreted Supreme Court precedent regarding the phrase, and the defendants have offered a better interpretation of the phrase.[12]  In addition, the defendants contend that illegal immigration to the United States justifies invoking the exception to birthright citizenship for "children born of alien enemies in

_____

United Latin American Citizens (doc. no. 24-3) at ¶¶ 11-14; Decl. of Sienna Fontaine, General Counsel, Make the Road New York (doc. no. 24-4) at ¶¶ 10-20.
[8] *Id.*  The court uses the term "deprivation" here in the sense that, currently and for many generations leading up to the issuance of the Executive Order, the United States government has conferred birthright citizenship on children born under the same circumstances.
[9] *See* Compl. (doc. no. 1) at ¶¶ 86-93.
[10] *Id.* at ¶¶ 94-97.
[11] *See* Defs.' Obj. to Mot. for Prelim. Inj. (doc. no. 58-1) at 15.
[12] *See generally id.*

hostile occupation."[13]  *See United States v. Wong Kim Ark*, 169 U.S. 649, 682 (1898).

The defendants finally assert that because § 1401 has the same scope as the same phrase

in the Fourteenth Amendment, the plaintiffs' argument based on § 1401 should also fail.[14]

As to irreparable harm, the defendants argue that the plaintiffs' claimed harm would be

hypothetical and speculative.[15]

**Analysis.**  The court grants the motion because the plaintiffs have satisfied the

requirements for preliminary injunctive relief.

First, the plaintiffs have a cause of action to seek injunctive relief to redress certain

governmental actions that contravene the Constitution or a federal statute.  *See, e.g.,*

*Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 582 (1952) ("decid[ing] whether

the President was acting within his constitutional power when he issued an executive

order directing the Secretary of Commerce to take possession of and operate most of the

Nation's steel mills"); *Chamber of Com. of U.S. v. Reich*, 74 F.3d 1322, 1332 (D.C. Cir.

1996) (adjudicating a "claim that [an] Executive Order is in conflict with the [National

Labor Relations Act]").[16]  "The ability to sue to enjoin unconstitutional actions by state

and federal officers is the creation of courts of equity, and reflects a long history of

---

[13] *Id.* at 29.
[14] *Id.* at 36-37.
[15] *Id.* at 38-39.
[16] Again, the defendants do not challenge the plaintiffs' standing.  Much of the defendants' argument about § 1401 refers to challenging the statute under the APA.  Because the court does not assess the APA claims for the purpose of this motion, it does not address the defendants' arguments.

judicial review of illegal executive action, tracing back to England." *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327 (2015).

### 1. Likelihood of success on the merits

The plaintiffs have demonstrated a likelihood of success on the merits of their constitutional claim and at least one statutory claim. The Fourteenth Amendment and § 1401 both state that "[a]ll persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States." U.S. Const. amend. XIV, § 1; 8 U.S.C. § 1401. As the statute tracks the Fourteenth Amendment, the court views the claims as parallel, and the parties agreed as much at oral argument.

The court need not presume the Executive Order's constitutionality. "A legislative enactment carries with it a presumption of constitutionality." *Dutra v. Trs. of Bos. Univ.*, 96 F.4th 15, 20 (1st Cir. 2024) (citations and quotations omitted). The defense has not argued, or cited binding or persuasive authority, that executive orders enjoy a similar presumption, and the court does not know of any.

As to plaintiffs' constitutional claim, the Executive Order contradicts the text of the Fourteenth Amendment and the century-old untouched precedent that interprets it. The Supreme Court in *United States v. Wong Kim Ark* enumerated specific exceptions to the constitutional grant of birthright citizenship: "children of foreign sovereigns or their ministers, or born on foreign public ships, or of enemies within and during a hostile occupation of part of our territory, and with the single additional exception of children of members of the Indian tribes owing direct allegiance to their several tribes." *Wong Kim*

*Ark*, 169 U.S. at 693.[17]  The categories of people affected by the Executive Order do not fit into those exceptions.

The Executive Order adds two other groups of people excluded from birthright citizenship, groups not listed in the Fourteenth Amendment or recognized in *Wong Kim Ark*.  As the defendants offer no First Circuit Court of Appeals or Supreme Court authority to support their reasoning, the plaintiffs have a high likelihood of success on the merits.  There is no reason to delve into the amendment's enactment history (or as explained below, § 1401's legislative history) or employ other tools of interpretation to discern that "subject to the jurisdiction thereof" refers to all babies born on U.S. soil, aside from the enumerated exceptions because the amendment and statute do so *unambiguously*.  Finally, the defendants have not established, and court does not find or rule, that the plaintiffs' members' children born on or after February 19 subject to this Executive Order are "enemies within and during a hostile occupation." *Id.*

The Executive Order also likely violates § 1401, which codified the pertinent language from the Fourteenth Amendment.  A court "normally interprets a statute in accord with the ordinary public meaning of its terms at the time of its enactment" because "only the words on the page constitute the law adopted by Congress and approved by the President." *Bostock v. Clayton Cnty.*, 590 U.S. 644, 654 (2020).  Congress passed § 1401 fifty years after *Wong Kim Ark*.  *See* 8 U.S.C. § 1401 (original version at ch. 1, § 301, 66 Stat. 235 (1952)).  The court interprets the statute to incorporate the public meaning of

---

[17] A "person born in the United States to a member of an Indian, Eskimo, Aleutian, or other aboriginal tribe" is now a United States citizen at birth. 8 § U.S.C. 1401(b).

the reasoning and holding in *Wong Kim Ark*, which provided the public meaning of the

same language in the Fourteenth Amendment.

> "Where Congress borrows terms of art in which are accumulated the legal
> tradition and meaning of centuries of practice, it presumably knows and
> adopts the cluster of ideas that were attached to each borrowed word in the
> body of learning from which it was taken and the meaning its use will
> convey to the judicial mind unless otherwise instructed."

*Morissette v. United States*, 342 U.S. 246, 263 (1952).  In other words, "[w]here

Congress employs a term of art obviously transplanted from another legal source, it

brings the old soil with it."  *George v. McDonough*, 596 U.S. 740, 746 (2022) (cleaned

up).

The plaintiffs advocate for the most natural reading of the phrase "subject to the

jurisdiction thereof" employed by the Fourteenth Amendment and § 1401.  "[I]t's a

fundamental canon of statutory construction that words generally should be interpreted as

taking their ordinary ... meaning ... at the time Congress enacted the statute."  *New Prime

Inc. v. Oliveira*, 586 U.S. 105, 113 (2019) (citations and quotations omitted).  The

amendment and statute are unambiguous, and the plaintiffs argue for the ordinary

meaning of the phrase as understood by reasonable American English speakers at the

time of enactment.

The defendants advance nonfrivolous arguments in support of a different meaning,

primarily focusing on the concepts of "allegiance" and "domicile," the scope of the

government's regulatory "jurisdiction," the status of Native Americans under the

Fourteenth Amendment, and the precedent of *Elk v. Wilkins*, 112 U.S. 94 (1884), but in

the face of an unambiguous constitutional amendment and unambiguous statute, they do

8

not persuade.[18]  "As our Court of Appeals has stated, 'genuine ambiguity requires more than a possible alternative construction.'"  *United States v. Potter*, 610 F. Supp. 3d 402, 415 (D.N.H. 2022), *aff'd*, 78 F.4th 486 (1st Cir. 2023) (quoting *United States v. Jimenez*, 507 F.3d 13, 21 (1st Cir. 2007)).

Nothing in the text, precedent, history, or tradition of the Fourteenth Amendment or § 1401 persuasively suggests any other interpretation than the unambiguous ordinary meaning of "subject to the jurisdiction" of the United States advanced by the plaintiffs.

> "In any event, canons of construction are no more than rules of thumb that help courts determine the meaning of legislation, and in interpreting a statute a court should always turn first to one, cardinal canon before all others. We have stated time and again that courts must presume that a legislature says in a statute what it means and means in a statute what it says there. When the words of a statute are unambiguous, then, this first canon is also the last: judicial inquiry is complete."

*Connecticut Nat. Bank v. Germain*, 503 U.S. 249, 253–54 (1992) (internal citations and quotations omitted).  The plaintiffs have demonstrated a likelihood of success on the merits.

### 2.  Irreparable harm

"'Irreparable injury' in the preliminary injunction context means an injury that cannot adequately be compensated for either by a later-issued permanent injunction, after

---

[18]  The defendants also argue that courts should determine the Executive Order's constitutionality in individual, as-applied challenges, rather than the facial challenge here.  "A facial challenge to a legislative [a]ct is, of course, the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which [an act] would be valid."  *United States v. Salerno*, 481 U.S. 739, 745 (1987).  The plaintiffs have demonstrated a likelihood of success, whether the Executive Order is analyzed on its face or as applied to the plaintiffs as alleged in their complaint.

a full adjudication on the merits, or by a later-issued damages remedy." *Rio Grande Cmty. Health Ctr., Inc. v. Rullan*, 397 F.3d 56, 76 (1st Cir. 2005). The court has little difficulty concluding that the denial of citizenship status to newborns, even temporarily, constitutes irreparable harm. The denial of citizenship to the plaintiffs' members' children would render the children either undocumented noncitizens or stateless entirely.[19] Their families would have more trouble obtaining early-life benefits especially critical for newborns, such as healthcare and food assistance.[20] The children would risk deportation to countries they have never visited.[21] Although the defendants argue that the harm would be hypothetical and speculative, the court disagrees.

### 3. Equities and public interest

These final merged factors—*see Nken*, 556 U.S. at 435, *supra*—weigh in favor of granting the requested injunction. A preliminary injunction's "purpose 'is merely to preserve the relative positions of the parties until a trial on the merits can be held.'" *Starbucks*, 602 U.S. at 346 (quoting *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395, (1981)). A continuation of the status quo during the pendency of this litigation will only shortly prolong the longstanding practice and policy of the United States government, while imposition of the Executive Order would impact the plaintiffs and similarly

---

[19] *See* Pontoh Decl. (doc. no. 24-2) at ¶¶ 12-13; Proaño Decl. (doc. no. 24-3) at ¶¶ 14-15; Fontaine Decl. (doc. no. 24-4) at ¶ 27.
[20] *See* Pontoh Decl. (doc. no. 24-2) at ¶¶ 14-16; Proaño Decl. (doc. no. 24-3) at ¶¶ 17-19; Fontaine Decl. (doc. no. 24-4) at ¶¶ 24-26.
[21] *See* Pontoh Decl. (doc. no. 24-2) at ¶¶ 12; Proaño Decl. (doc. no. 24-3) at ¶ 15; Fontaine Decl. (doc. no. 24-4) at ¶ 28.

situated individuals and families in numerous ways, some of which—in the context of balancing equities and the public interest—are unnecessarily destabilizing and disruptive.

The defendants have "no interest in enforcing an unconstitutional law, [and] the public interest is harmed by the enforcement of laws repugnant to the United States Constitution." *Tirrell v. Edelblut*, No. 24-CV-251-LM-TSM, 2024 WL 3898544, at *6 (D.N.H. Aug. 22, 2024) (McCafferty, C.J.) (quotations omitted) (quoting *Siembra Finca Carmen, LLC v. Sec'y of Dep't of Agric. of P.R.*, 437 F. Supp. 3d 119, 137 (D.P.R. 2020)).

"When the President takes measures incompatible with the expressed or implied will of Congress, his power is at its lowest ebb, for then he can rely only upon his own constitutional powers minus any constitutional powers of Congress over the matter." *Youngstown*, 343 U.S. at 637-38 (Jackson, J., concurring). The ultimate lawfulness of the Executive Order will surely be determined by the Supreme Court. This is as it should be. As the Executive Order appears to this court to violate both constitutional and statutory law, the defendants have no interest in executing it during the resolution of the litigation.

**Conclusion**. The motion is granted. The court enjoins the defendants from enforcing the Executive Order in any manner with respect to the plaintiffs, and with respect to any individual or entity in any other matter or instance within the jurisdiction of this court, during the pendency of this litigation.

**SO ORDERED.**

_____
Joseph N. Laplante
United States District Judge

Dated: February 11, 2025
cc: Counsel of Record

11