No. 25-1348

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIRST CIRCUIT

NEW HAMPSHIRE INDONESIAN COMMUNITY SUPPORT; LEAGUE OF UNITED LATIN AMERICAN CITIZENS; MAKE THE ROAD NEW YORK,

*Plaintiffs-Appellees*,

v.

DONALD J. TRUMP, President of the United States, in their official capacity; U.S. DEPARTMENT OF HOMELAND SECURITY; KRISTI NOEM, in their official capacity as Secretary of the U.S. Department of Homeland Security; U.S. DEPARTMENT OF STATE; MARCO RUBIO, in their official capacity as Secretary of the U.S. Department of State; U.S. DEPARTMENT OF AGRICULTURE; BROOKE L. ROLLINS, in their official capacity as Secretary of the U.S. Department of Agriculture; CENTERS FOR MEDICARE AND MEDICAID SERVICES; MEHMET OZ, in their official capacity as Administrator of the Centers for Medicare and Medicaid Services,

*Defendants-Appellants*.

On Appeal from the United States District Court
for the District of New Hampshire

## BRIEF OF HISTORIANS MARTHA S. JONES AND KATE MASUR AS *AMICI CURIAE* IN SUPPORT OF APPELLEES AND AFFIRMANCE

RICHARD B. KENDALL (1217642)
*Counsel of Record*
KENDALL BRILL & KELLY LLP
10100 Santa Monica Blvd., Suite 2500
Los Angeles, CA 90067
(310) 556-2700
rkendall@kbkfirm.com
Counsel for *Amici Curiae*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES.……………………………………………………ii

INTERESTS OF *AMICI CURIAE* ........................................................................1

INTRODUCTION AND SUMMARY OF ARGUMENT…………………….....2

ARGUMENT ……………………………………………………………..5

I.  In The Antebellum Era, Free Black Activists Promoted A Broad
    Vision Of Birthright Citizenship In Response To Anti-Black Laws
    And Threats of Expulsion.................................................................5

    A.  Black Americans drew upon the nation's founding documents
        and the common law for their view of birthright citizenship,
        contesting attempts to denigrate and marginalize them........................5

    B.  Black Americans pushed back against the African Colonization
        Society and Black Laws by asserting their status as citizens by
        birthright.......................................................................... 10

II. Taney's Attempt In *Dred Scott* To Undermine The Citizenship By
    Birthright Interpretation Of Black Activists Is Maligned By His
    Contemporaries..............................................................................16

III. The Citizenship Clause Of The Fourteenth Amendment
     Constitutionalized The Universal View Of Birthright Citizenship That
     Free Black Americans Advanced And The Common Law Guaranteed. ......20

    A.  Black activists, and the Republicans animated by their
        advocacy, restore the longstanding principle of universal
        birthright citizenship. .........................................................21

    B.  The Framers of the Fourteenth Amendment constitutionalized
        the inclusive birthright principle advocated by free Black
        Americans..............................................................................24

CONCLUSION…...……………………………………………………..28

CERTIFICATE OF COMPLIANCE…...……………………………………29

i

# TABLE OF AUTHORITIES

**Cases**                                                                 **Page**

*Calvin's Case*,
    77 Eng. Rep. 377 (1608)..…………………………………………………5

*Dred Scott v. Sandford*,
    60 U.S. 393 (19 How. 393) (1857)…..……………………………17, 18, 19, 20

*Gamble v. United States*,
    587 U.S. 678 (2019)…………………………………………………………2

**U.S. Constitution**

Art. II, § 1, cl. 5…………………………………………………………..5

**Statutes**

Fugitive Slave Act, 1 Stat. 302 (1793) …………………………………………..6

Ohio Black Codes § 1 (1804)..……………………………………………………8

South Carolina Negro Seaman Act (1822)…………………………………………8

**Legislative Materials**

Cong. Globe, 33rd Cong., 1st Sess., 1744 (1854)………...…………………………15

Cong. Globe, 39th Cong., 1st Sess., 158 (1866)…………………………….......23

Cong. Globe, 39th Cong., 1st Sess., 475 (1866)…………………………..….…24

Cong. Globe, 39th Cong., 1st Sess., 2769 (1866)…………………..…….…..26

Cong. Globe, 39th Cong., 1st Sess., 2890 (1866)…………………………….…25

Cong. Globe, 39th Cong., 1st Sess., 2891 (1866)…………………………….…26

Cong. Globe, 39th Cong., 1st Sess., 3031–32 (1866)……………………..….…25

**Additional Historical Sources**

### Publications and Speeches by Black Activists:

Martin Robinson Delany, *The Condition, Elevation, Emigration, and Destiny of the Colored People of the United States* (1852)……………………………………….15

Frederick Douglass, "Composite Nation," Address to the Parker Fraternity Course (Boston 1867), https://www.loc.gov/item/mss1187900407/...................................27

John Jones, *The Black Laws of Illinois, and a Few Reasons Why They Should be Repealed* (1864), http://chsmedia.org//media/fa/fa/LIB/The-Black-Laws-of-Illinois-booklet-1864.html..................................................................................................23

### Meeting Minutes of the Colored Conventions Movement:

Constitution of the American Society of Free Persons of Colour (Philadelphia, Pa. 1830), *in Minutes and Proceedings of the National Negro Conventions, 1830–1864* (Howard H. Bell ed., 1969), https://omeka.coloredconventions.org/items/show/70. ………………………………………………………………………………..11

"Memorial of John Mercer Langston for Colored People of Ohio to General Assembly of the State of Ohio" (June 1854), *in 1 The Proceedings of the Black State Conventions, 1840-1865* (Philip S. Foner & George E. Walker eds., 1979), https://omeka.coloredconventions.org/items/show/251.........................................16

Minutes of the Fifth Annual Convention for the Improvement of the Free People of Colour in the United States (Philadelphia, Pa., June 1-5, 1835), *in Minutes and Proceedings of the National Negro Conventions, 1830–1864* (Howard H. Bell ed., 1969), https://omeka.coloredconventions.org/items/show/277...............................12

Minutes of the State Convention, of the Colored Citizens of the State of Michigan, Held in Detroit (Oct. 26-27, 1843), *in 1 The Proceedings of the Black State Conventions, 1840-1865* (Philip S. Foner & George E. Walker eds., 1979), https://omeka.coloredconventions.org/items/show/245.........................................13

Minutes of the State Convention of Colored Citizens of Pennsylvania, Convened at Harrisburg (Philadelphia, Pa., Dec. 13-14, 1848), *in 1 The Proceedings of the Black State Conventions, 1840-1865* (Philip S. Foner & George E. Walker eds., 1979), https://omeka.coloredconventions.org/items/show/241...............................13

Minutes from Proceedings of the National Convention of Colored Men, Held I Syracuse (Syracuse, N.Y., Oct. 4-7, 1864), *in Minutes and Proceedings of the National Negro Conventions, 1830–1864* (Howard H. Bell, ed., 1969), https://omeka.coloredconventions.org/items/show/282..........................................23

**Historical Newspapers:**

*Report*, The Liberator, Mar. 12, 1831………………………………………....12

*An Address to the Citizens of New York*, The Liberator, Feb. 12, 1831……………12

*Important Decision in the U.S. Circuit Court*, Chicago Daily Tribune, July 15, 1857. …………………………………………………………………………………….20

*Official Injustice—No Protection for Colored Men*, National Era, July 5, 1849…..14

**Additional Authorities:**

Opinion of Attorney General Edward Bates on Citizenship (1863), https://quod.lib.umich.edu/cgi/t/text/text-idx?c=moa;idno=AEW6575.0001.001 …………………………………………………………………………………….22

Fourth Annual Report of the American Society for Colonizing the Free People of Color of The United States (Davis & Force 1821), https://www.loc.gov/item/91898252/....................................................................7

**Secondary Sources**

Christopher James Bonner, *Remaking the Republic: Black Politics and the Creation of American Citizenship* (2020)……………………………………………………11

P. Gabrielle Foreman, Jim Casey, and Sarah Lynn Patterson, eds., *Colored Conventions Movement: Black Organizing in the Nineteenth Century* (2021)……………………………………………………………………………...11

Martha S. Jones, *Birthright Citizens: A History of Race and Rights in Antebellum America* (2018)………………………………………………………………*passim*

Martha S. Jones, *Citizenship, in : A New Origin Story* (Nikole Hannah-Jones, *et al.* eds., 2021)……………………………………………….……………6, 15, 22, 23

Martha S. Jones, *Response to Professor Blight's Frederick Douglass and the Two Constitutions*, 111 CAL. L. REV. 1929 (2023)………………………………………...27

Kate Masur, *Until Justice Be Done: America's First Civil Rights Movement, from the Revolution to Reconstruction* (2021)……………………….……………*passim*

Ousmane K. Power-Greene, *Against Wind and Tide: The African American Struggle against the Colonization Movement* (2014)…………………………………………...7

Elizabeth Stordeur Pryor, *Colored Travelers: Mobility and the Fight for Citizenship Before the Civil War* (2016)……………………………...………………………....14

Michael A. Schoeppner, *Moral Contagion: Black Atlantic Sailors, Citizenship, and Diplomacy in Antebellum America* (2020)…………………………………………….8

# INTERESTS OF *AMICI CURIAE*[1]

Professor Martha S. Jones, JD, PhD, and Professor Kate Masur, PhD, are United States historians and professors of legal history who are experts on the legal and cultural history of the United States, including free Black Americans' concerted advocacy for birthright citizenship throughout the Antebellum and Reconstruction eras. *Amici* submit this brief to provide the Court with historical insight into the degradations that free Black Americans endured when denied citizenship and how their vision of inclusive, birthright citizenship was constitutionalized by the Citizenship Clause of the Fourteenth Amendment.

---

[1] *Amici* state that no counsel for a party authored this brief in whole or in part, and no person other than *amici* or its counsel made a monetary contribution to the brief's preparation or submission. All parties have consented to this brief.

# INTRODUCTION AND SUMMARY OF ARGUMENT

"[C]onstitutional cases" permit no room for "spotty," "equivocal," and "ambiguous historical evidence."[2]  To overcome *stare decisis*, Appellants' "historical evidence must, at a minimum, be better than middling."[3]  But Appellants' "historical" account is worse than middling:  it omits, and thus misrepresents, the historical forces that led the Framers to enshrine birthright citizenship in the Fourteenth Amendment.

Appellants insist that the Citizenship Clause of the Fourteenth Amendment served one purpose:  "to ensure … the grant of citizenship to the newly freed slaves."[4]  When the Framers wrote birthright citizenship into the Constitution, however, they were not addressing only the status of former slaves.  They were also remedying the eight decades of injustice imposed upon *free* Black people born in the United States—including those who had never been enslaved.  This brief provides the history of how free Black American activists—and their supporters— fought for birthright citizenship, from the nation's founding through adoption of the Fourteenth Amendment.

In the decades preceding the Amendment's ratification in 1868, some 500,000 free Black Americans endured uncertain standing before the federal Constitution.

---

[2] *Gamble v. United States*, 587 U.S. 678, 691 (2019).
[3] *See id*.
[4] Appellants' Br. 37; *see also id.* at 18, 30, 38.

Though native-born and not enslaved, free Black Americans, in many states north and south, were not recognized as citizens. They were subjected to expressly anti-Black laws and threatened with removal from the nation through a scheme termed "colonization." They endured denigration, mob violence, and prohibitions against interstate travel. They feared arrest and imprisonment but had limited access to the nation's courts. With growing intensity from the 1830s to the 1860s, free Black Americans responded to these unsettled, conflicting, and threatening circumstances by insisting that they were citizens. In newspapers, pamphlets, political conventions, speeches, and courtrooms, they claimed that, as persons born in the United States, they were entitled to the Constitutional privileges and immunities belonging to all United States citizens.

Today, Appellants overlook the essential role that free Black Americans played in constitutionalizing birthright citizenship. As a result, Appellants misunderstand the origin, purpose, and scope of the Fourteenth Amendment's Citizenship Clause. The Fourteenth Amendment's Framers were aware of how, in the pre-Civil War decades, free Black Americans had responded to legal obstacles and terror by insisting that they were birthright citizens. The Framers drafted a bright-line, inclusive, national rule of birthright citizenship that responded to the longstanding claim of free Black Americans that they—like all free persons born in the United States—were citizens.

Although Appellants purport to condemn Chief Justice Roger Taney's "shameful" 1857 *Dred Scott* decision, they then reprise Taney's approach to citizenship: a consent-based citizenship model that empowered political leaders to determine which children born in this country deserved to be citizens. Taney made race and color prerequisites to citizenship and declared that even free Black Americans born in the United States could not be citizens of the United States. Immediately, he encountered opposition from dissenting Justice Benjamin Curtis, who acknowledged the injustices visited upon free Black Americans and drew upon English common law, founding documents, and the arguments of Black activists and their supporters to conclude that United States citizenship was acquired upon birth, as a natural and inalienable right.

Thus, when the Framers added birthright to the Constitution, they vindicated the claims of free Black Americans. Not only did the Amendment repudiate Taney's reasoning in *Dred Scott*; it constitutionalized what free Black Americans had long envisioned: birthright citizenship for all. Today's consideration of the Citizenship Clause must proceed from an accurate and thorough historical accounting of the obstacles faced and overcome by free Black Americans, and their vision of universal citizenship by birthright.

## ARGUMENT

**I.** **In The Antebellum Era, Free Black Activists Promoted A Broad Vision Of Birthright Citizenship In Response To Anti-Black Laws And Threats of Expulsion.**

    **A.** **Black Americans drew upon the nation's founding documents and the common law for their view of birthright citizenship, contesting attempts to denigrate and marginalize them.**

The history of Black American activism begins with the sources upon which they relied when claiming citizenship by birthright. No founding document, they acknowledged, defined who was an American citizen. Still, by the 1790s, Black Americans were studying founding texts to develop a view of citizenship as derived from birthright. They thus drew on the promise of the Declaration of Independence—which provided "[a]ll men are *created* equal"—and the Constitution's Article II reference to the President as a "natural-born citizen." The same Constitution, they observed, drew no distinctions of race or color. Universal birthright citizenship was, they concluded, the law of the land. Early state and federal courts reinforced their view, holding that the United States was subject to the universalizing principle of birthright subjecthood articulated in the English decision, *Calvin's Case*, 77 Eng. Rep. 377 (1608): "All those that were born under one natural obedience … should remain natural born subjects, and not aliens; for that naturalization due and vested by birthright, cannot by any separation of the Crowns afterward be taken away…."

By the close of the eighteenth century, states like New York, Massachusetts, and Pennsylvania gradually abolished slavery. New free Black communities established churches, schools, and mutual-aid societies, and some free Black men voted. But terror also loomed. In 1793, Congress had passed the Fugitive Slave Act,[5] authorizing the recovery of slaves who escaped into states where slavery was outlawed, a measure that led to the kidnapping of free Black people. These harrowing circumstances prompted free Black Americans to call upon Congress to protect them as citizens. In 1799, scores of Philadelphia's free Black residents, led by the Reverend Absalom Jones—head of the Free African Society and the nation's first Black Episcopal priest—petitioned Congress for redress, representing themselves as citizens "like every other class of Citizens" and claiming "the Liberties and unalienable Rights" provided for by the Constitution.[6] Congress proved indifferent to their petition.

In the early nineteenth century, members of the white political elite increasingly denied that free Black Americans could be assimilated into American society and organized to undermine their claim to citizenship. These elites insisted that the best course was to "colonize" free Black Americans beyond the territory of

---

[5] 1 Stat. 302 (1793).
[6] Martha S. Jones, *Citizenship in The 1619 Project* 223–24 (Nikole Hannah-Jones et al. eds., 2021).

the United States.[7]   That thinking was formalized with the 1816 founding of the

American Colonization Society (ACS), led by prominent men, including Speaker of

the House Henry Clay.  In its typical idiom, in 1821, the ACS urged Congress that

free Black Americans "are not, and cannot be, either useful or happy among us," and

it would be "best, for all the parties interested, that there should be a separation."[8]

The ACS established the West African colony of Liberia, outfitted ships, and

employed agents to encourage free Black Americans to relocate.  The ACS insisted

that even free Black Americans born in the United States were not really Americans

and possessed no right to remain in the United States or join its body politic.[9]

Free Black Americans, for the most part, refused to leave the United States

for Liberia.  But to remain meant a precarious and uncertain existence.  Free Black

Americans could expect their rights and privileges to vary from state to state.  Some

northern states, like Massachusetts and New York, affirmed that free Black residents

were state citizens, but most southern states and many northern ones did not.[10]  Ohio,

among others in the Northwest, passed stringent anti-Black legislation, known as

"Black Laws," to deter Black in-migration and settlement.   An 1804 Ohio law

---

[7] Martha S. Jones, *Birthright Citizens* 37 (2018); Ousmane K. Power-Greene, *Against Wind and Tide* 15–16 (2014).

[8] Fourth Annual Report of the American Society for Colonizing the Free People of Color of The United States 24 (Davis & Force 1821).

[9] Jones, *Birthright Citizens*, *supra* note 7, at 37–38; Power-Greene, *supra* note 7, at 12.

[10] Kate Masur, *Until Justice Be Done* 49–52, 56-60, 75–76, 117 (2021).

required that "black or mulatto" persons seeking to "settle or reside" in the state provide proof of their freedom to a court clerk and carry work permits.[11] Ohio and several other free states subsequently extended and reinforced such laws.[12]

When free Black Americans traveled to states where their citizenship was not recognized, they could be treated as runaway slaves and subjected to interrogation, imprisonment, and sale into slavery.[13] Free Black sailors working along the Atlantic Coast exemplified the precarity of travel. Southern state laws required them to submit to jail or "quarantine" while in port, even if they were citizens in their home states.[14] In 1822, South Carolina passed the first of these "Negro Seamen Acts," and ship captains complained immediately that Black seamen, though "native citizens of the United States," were unjustly seized and imprisoned "without a writ or any crime alleged."[15] Some authorities, including a U.S. Attorney General and a federal judge, held that the Negro Seamen Act violated Congress's treaty-making and interstate commerce powers.[16] Still, local officials enforced that law and other states adopted similar ones, leaving free Black sailors at risk of incarceration and sale into

[11] *Id*. at 16–17; *see also* Ohio Black Codes § 1 (1804).
[12] *Id*. at 114, 230–31.
[13] Jones, *Birthright Citizens*, *supra* note 7, at 30; Masur, *supra* note 10, at 27–30, 42–43, 67, 84, 99, 119–20.
[14] Jones, *Birthright Citizens*, *supra* note 7, at 52–53; *see generally*, Michael A. Schoeppner, *Moral Contagion* (2020).
[15] Masur, *supra* note 10, at 124.
[16] Jones, *Birthright Citizens*, *supra* note 7, at 42–43; Masur, *supra* note 10, at 124-126.

slavery.[17]

The deadliest slave rebellion in U.S. history, led by Nat Turner in 1831, caused many states to harden their laws inhibiting free Black Americans. State lawmakers claimed the example set by free Black people threatened to incite unrest among the enslaved.[18] One legislative response came from Octavius Taney, a member of Maryland's senate and brother of then-U.S. Attorney General Roger Taney. In early 1832, he proposed that Maryland take the lead in the wholesale removal of all "free persons of color from our state, and from the United States."[19] The state did not go as far as Octavius Taney urged, but it did enact a punishing slate of Black Laws, banning free Black people from entering the state or staying longer than ten days; branding Black residents who ventured out of the state for more than thirty days aliens without a right to return; and prohibiting Black religious meetings outside the presence of a white minister.[20]

Black Laws sent a message consistent with the view of the ACS: free Black people were unwelcome sojourners in their communities and in the nation. Black Laws confirmed that free Black Americans had little standing before the law and signaled that nothing required white Americans to tolerate their presence. Black

---

[17] Masur, *supra* note 10, at 119-120, 127, 137-143, 156-158 .

[18] Jones, *Birthright Citizens*, *supra* note 7, at 46.

[19] *Id*. at 46–47.

[20] *Id*.

entrepreneur and activist James Forten wrote from Philadelphia in 1813 that such policies invited abuse, allowing "police officers … to apprehend any black, whether a vagrant or a man of responsible character, who cannot produce a Certificate that he has been registered." Such laws encouraged mobs to harass and "hunt" random Black people, knowing that they had limited recourse before the courts. "Can any thing be done more shocking to the principles of Civil Liberty!" Forten decried.[21] Where Black Laws ruled, reports abounded of white residents preying on their Black neighbors: seizing property, demolishing homes, running them out of the community, and even engaging in kidnapping and mob assaults.[22]

**B.**      **Black Americans pushed back against the African Colonization Society and Black Laws by asserting their status as citizens by birthright.**

The ACS's colonization scheme, state Black Laws, general predation, and limited recourse in court all conspired to encourage free Black Americans to self-deport.[23] Still, most did not abandon the nation of their birth. Instead, they organized a political movement, remembered today as the Colored Convention Movement. Founded in Philadelphia in 1830, it flourished for decades as a venue in which Black Americans developed their ideas and plans of action.[24]

---

[21] Masur, *supra* note 10, at 22–23.
[22] *See, e.g.*, *id*. at 27–28, 29–30, 42–43, 61–62, 84, 102, 190–91, 243.
[23] Jones, *Birthright Citizens*, *supra* note 7, at 37–39, 107.
[24] *Id.* at 40–41.

The conventions left a voluminous published record of their proceedings which, along with Black newspapers of the period, evidence the free Black American campaign to secure universal, birthright citizenship as the law of the land.[25] Attendees at the inaugural 1830 convention resisted the ACS's colonization scheme with a claim rooted in birthright: "We who have been born and nurtured on this soil, we, whose habits, manners, and customs are the same in common with other Americans, can never consent to take our lives in our hands, and be the bearers of the redress offered by [the ACS]."[26] In subsequent years, free Black Americans continued to vigorously assert that they were citizens by birth. Facing the ACS's efforts to remove them to Liberia, they noted the removal of Cherokee "Indians" from the southeastern United States in the genocidal purge remembered as the Trail of Tears. If Indigenous peoples could be forcibly moved, free Black Americans feared, so could they.[27] A New York convention headed by Samuel Ennals and Philip Bell warned that if "a colony was formed for the blacks in the United States, they would

[25] The Colored Conventions Project (coloredconventions.org) maintains this documentary record. *See also*, P. Gabrielle Foreman, Jim Casey, and Sarah Lynn Patterson, eds., *Colored Conventions Movement* (2021); *see also* Christopher James Bonner, *Remaking the Republic* (2020) (regarding Black American claims to citizenship in conventions and newspapers).

[26] Constitution of the American Society of Free Persons of Colour (Philadelphia, Pa. 1830), *in Minutes and Proceedings of the National Negro Conventions, 1830–1864* (Howard H. Bell ed., 1969), https://omeka.coloredconventions.org/items/show/70.

[27] Jones, *Birthright Citizens*, *supra* note 7, at 43–44.

in a short time be removed, as has been the case with the poor Indians."[28]  The New York delegates understood that the ACS's anti-Black program encouraged self-deportation:  "They cannot use force; that is out of the question.  But they harp so much on 'inferiority,' 'prejudice,' 'distinction' and what not, that there will no alternative be left us but to fall in with their plans."[29]

In response to these threats, free Black Americans raised their status as citizens born in the United States as a shield against colonization.  Delegates at an 1835 Philadelphia convention published an address "To the American people" that advised:  "We claim to be American citizens, and we will not waste our time by holding converse with those who deny us this privilege, unless they first prove that a man is not a citizen of that country in which he was born and reared."[30]  Convention members appealed to the example of the American Revolution and the words of the Declaration of Independence.  For instance, led by Ohio's William Lambert, delegates to an 1843 Michigan convention declared they had studied the "fathers of '76" and failed to "discover anything like a system of exclusion." "No!" they insisted,

---

[28] *Report*, The Liberator, Mar. 12, 1831, at 54; Jones, *Birthright Citizens*, *supra* note 7, at 44–45.

[29] *An Address to the Citizens of New York*, The Liberator, Feb. 12, 1831, at 1; Jones, *Birthright Citizens*, *supra* note 7, at 44.

[30] Minutes of the Fifth Annual Convention for the Improvement of the Free People of Colour in the United States (Philadelphia, Pa., June 1-5, 1835), *in Minutes and Proceedings of the National Negro Conventions, 1830–1864* (Howard H. Bell ed., 1969), https://omeka.coloredconventions.org/items/show/277.

"there is not an expression, nor an implied sentiment to be found making a distinction in the rights and privileges of any class of American citizens." Instead, the delegates urged that, from its founding, the nation "boldly proclaim[ed] that all men are born free and equal, and that consequently life, liberty, and the pursuit of happiness, are inherent in every individual, vested inalienably by natural birth-right."[31] The same insights echoed through an 1848 Philadelphia convention, where a committee report set forth: "Let us rest our cause on the republican standard of the revolutionary Fathers, while we knock at the doors of the constitution and demand an entrance. If we are asked what evidence we bring to sustain our qualifications for citizenship, we will offer them certificates of our BIRTH and NATIVITY."[32]

Free Black Americans built up the view that with an ironclad claim to U.S. citizenship—citizenship by birthright—they could withstand inequitable and often terrifying circumstances.[33] For instance, as national citizens they could resist an 1844 Maryland statute that limited their travel.[34] Otherwise, as state residents, if

---

[31] Minutes of the State Convention of the Colored Citizens of the State of Michigan, Held in Detroit (Oct. 26-27, 1843), *in* 1 *The Proceedings of the Black State Conventions, 1840-1865* (Philip S. Foner & George E. Walker eds., 1979), https://omeka.coloredconventions.org/items/show/245.
[32] Minutes of the State Convention of Colored Citizens of Pennsylvania, Convened at Harrisburg (Philadelphia, Pa., Dec. 13–14, 1848), *in* 1 *The Proceedings of the Black State Conventions, 1840–1865* (Philip S. Foner & George E. Walker eds., 1979), https://omeka.coloredconventions.org/items/show/241; Jones, *Birthright Citizens*, *supra* note 7, at 64.
[33] Jones, *Birthright Citizens*, *supra* note 7, at 89–96.
[34] *Id*. at 96–102.

they intended to travel outside the state for more than thirty days, they were required to secure a court permit signed by three white men. Violators faced fines, imprisonment, or sale into servitude.[35] If recognized as birthright citizens, free Black Americans might better combat the well-known abuses of free Black sailors in southern ports. They and their allies did try alternatives. They pressed Congress to protect them under Article IV, sec. 2, but Congress did not act.[36] With support from the Massachusetts government, they looked to challenge the Negro Seamen Acts in federal court. But the attorneys sent to Charleston and New Orleans to bring claims under Article IV were threatened with mob violence and run out of town.[37]

Free Black Americans, when they sought passports, aimed to secure evidence that they travelled abroad as citizens of the United States. Headed to England in 1849, Henry Hambleton sought a passport and presented his birth certificate as proof of citizenship. Secretary of State John M. Clayton rejected his application, informing Hambleton that passports are "not granted by this department to persons of color." Hambleton provided Clayton's letter to newspapers that quickly picked up the story, expressing outrage at Clayton's decision.[38] Hambleton never secured a passport, but the public outcry made plain that Clayton's views were not

---

[35] *Id*. at 91–102.

[36] Masur, *supra* note 10, at 156–67.

[37] *Id*. at 176, 177–181.

[38] *Official Injustice—No Protection for Colored Men*, National Era, July 5, 1849; Elizabeth Stordeur Pryor, *Colored Travelers* 116–18, 119–20 (2016).

universally held.  Five years later, Clayton recalled that after refusing Hambleton's application, he was "assailed by a great portion of the northern press, and by many responsible persons at the North."  The outpouring, Clayton admitted, revealed that "a very respectable and considerable portion of the people of the northern states" believed "that colored persons can become citizens of the United States, and are citizens of the United States."[39]

Tensions heightened in the 1850s, in part because of a new federal Fugitive Slave Act, and some free Black Americans revisited expatriation.  Among them was journalist and abolitionist Martin Delany who explained what leaving the U.S. would cost him:  "We are Americans, having a birthright citizenship—natural claims upon the country—claims common to all others of our fellow citizens—natural rights, which may, by virtue of unjust laws, be obstructed, but never can be annulled."[40] Delany's lament was personal and political:  "Our common country is the United States.  Here were we born, here raised and educated; here are the scenes of childhood; the pleasant associations of our school going days; … and the sacred graves of our departed fathers and mothers."[41]  In Ohio, an 1854 convention echoed

---

[39] Cong. Globe, 33rd Cong., 1 Sess., 1744 (1854); Masur, *supra* note 10, at 251.
[40] Martin Robinson Delany, *The Condition, Elevation, Emigration, and Destiny of the Colored People of the United States* 49–66 (1852); Jones, *Birthright Citizens*, *supra* note 7, at 89–90; Jones, *Citizenship*, *supra* note 6, at 228.
[41] Delany, *supra* note 40, at 49–66; Jones, *Birthright Citizens*, *supra* note 7, at 89–90; Jones, *Citizenship*, *supra* note 6, at 228.

Delany's position: "We are native born inhabitants, and by our birth citizens." The "[w]ell established principle of our political creed," delegates declared, was "that natural birth gives citizenship … that those born in a country become members of the body politic on reaching the requisite age, and discharging the equal responsibilities imposed upon all."[42]

By the 1850s, free Black Americans stood firmly behind a fully-formed view of citizenship as derived from birthright. They insisted that all free persons born in the United States were citizens of the United States, and they rejected any scheme that left those holding political power with the authority to abridge that principle.[43] Birthright citizenship, they insisted, was the law of the land.

## II.   Taney's Attempt In *Dred Scott* To Undermine The Citizenship By Birthright Interpretation Of Black Activists Is Maligned By His Contemporaries.

Chief Justice Roger Taney's position in *Dred Scott*—that no Black American had ever been, or could be, a citizen of the United States—was one that Black activists had heard and rejected for years.[44] That 1857 decision was a judicial salvo in the long-brewing showdown between free Black advocates of birthright

---

[42] "Memorial of John Mercer Langston for Colored People of Ohio to General Assembly of the State of Ohio" (June 1854), *in* 1 *The Proceedings of the Black State Conventions, 1840-1865* (Philip S. Foner & George E. Walker eds., 1979), https://omeka.coloredconventions.org/items/show/251.
[43] Jones, *Birthright Citizens*, *supra* note 7, at 90.
[44] *See id*. at 128–32.

citizenship and those who aimed to deny it. Divisions on the Court reflected the broader divisions in American politics between the many who, like Taney, insisted that political leaders retained authority to decide who, among those born in the United States, was a citizen, and the many others—including Black activists along with some white legal and political authorities—who maintained that universal birthright citizenship was the law of the land.

Taney's decision is universally condemned today, but its discredited reasoning nonetheless permeates Appellants' brief. Rejecting arguments for universal birthright citizenship, Taney insisted that the Constitution granted political leaders authority to withhold citizenship from those U.S.-born free persons whom they deemed undesirable. The American political community, he claimed, had never accepted Black Americans as members, whether they were enslaved or free, whether born in the United States or elsewhere: "We think they are not, and that they are not included, and were not intended to be included, under the word 'citizens' in the Constitution, and can therefore claim none of the rights and privileges which that instrument provides for and secures to citizens of the United States."[45]

Those Black Americans who remained in the United States, Taney argued, did so without any political standing other than that granted by the good graces of the white political community—a status that white Americans could "withhold or

---

[45] *Dred Scott v. Sanford*, 60 U.S. 393, 404 (1857).

grant at their pleasure."[46]  He cited state-level Black Laws as evidence that the white

"dominant race" had not consented to the citizenship of an "inferior class."[47]  Thus,

Taney necessarily opposed any single, uniform national rule that required the

admission of free Black Americans as citizens of the United States.  For Taney,

citizenship did not derive from birthright. It derived instead from parentage and the

consent of the body politic.  Among those reassured by Taney's reasoning would

have been the colonization advocates of the ACS.  Nothing in the Constitution,

Taney assured them, stood in the way of efforts that pressed free Black Americans

to leave the country.[48]

Even before free Black Americans activists took their turn to criticize Taney's

thinking, members of his own Court dissented on the foundation of citizenship and

how Black Americans figured in that regime.[49]  Justice Curtis condemned Taney's

departure from long-accepted territorial-based citizenship.  Membership in the

nation, Curtis countered, should flow from place of birth, irrespective of parentage

or the political whims of the day.  The Constitution itself, he reasoned, employed the

phrase "a natural-born citizen" and "thus assumes that citizenship may be acquired

by birth."[50]  "Undoubtedly, this language of the Constitution was used in reference

---

[46] *Id*. at 412.

[47] *Id*. at 412–13.

[48] *See id.* at 426.

[49] Jones, *Birthright Citizens*, *supra* note 7, at 134.

[50] *Scott*, 60 U.S. at 576 (Curtis, J., dissenting).

to that principle of public law, well understood in this country at the time of the adoption of the Constitution, which referred citizenship to the place of birth."[51] Under the existing Constitution, Curtis acknowledged, state governments could affirm or deny the state citizenship of free Black residents. Contra Taney, however, Curtis hewed as much as possible to the inclusive common-law tradition, affirming that "as free colored persons born within some of the States are citizens of those States, such persons are also citizens of the United States" and should enjoy the Article IV "privileges and immunities" of citizenship "throughout the United States, under and by force of the national compact."[52]

Curtis described a history that Black activists knew well. They had lived it. He showed that Taney had given an incomplete (at best) account of history: "In five of the thirteen original States, colored persons then [at the Founding] possessed the elective franchise, and were among those by whom the Constitution was ordained and established."[53] Notwithstanding Taney's claims, there was no color line, real or implied, in the Constitution. "That the Constitution . . . was made exclusively for the white race is, in my opinion, not only an assumption not warranted by anything in the Constitution but contradicted by its opening declaration that it was ordained

---

[51] *Id.*
[52] *Id.* at 588, 580
[53] *Id.* at 582.

and established by the people of the United States, for themselves and their posterity."[54]

Taney's *Dred Scott* opinion was not the final word on citizenship, even before the Civil War. In the wake of the exchange that set Curtis against Taney, the view that free Black Americans when born in the United States were indeed citizens of the United States gained traction in state and federal courts. Justice John McLean, another dissenter at the Supreme Court, did his part to undermine the scope of *Dred Scott* in the 1857 case of *Mitchell v. Lamar* while sitting on the federal Circuit Court for Illinois, finding that Mitchell, a free black man not descended from slaves, was a citizen entitled to sue in the federal courts.[55] *Mitchell* was one among many instances in which federal and state authorities resisted the force of Taney's decision.[56]

### III. The Citizenship Clause Of The Fourteenth Amendment Constitutionalized The Universal View Of Birthright Citizenship That Free Black Americans Advanced And The Common Law Guaranteed.

The fierce and swift repudiation of *Dred Scott* culminated in the Fourteenth Amendment. The inclusive idea of birthright citizenship promoted by free Black Americans inspired the response. Black activists and their allies had captured the

---

[54] *Id.*

[55] *Important Decision in the U.S. Circuit Court*, Chicago Daily Tribune, July 15, 1857; *see also* Jones, *Birthright Citizens*, *supra* note 7, at 134.

[56] Jones, *Birthright Citizens*, *supra* note 7, at 134–36.

attention of white leaders of the new Republican Party, including Salmon Chase and John Bingham of Ohio, Henry Wilson and Charles Sumner of Massachusetts, William Seward of New York, and Abraham Lincoln and Lyman Trumbull of Illinois.[57] Those Republicans and others had encountered free Black activists' speeches, published texts, petitions, and lobbying efforts and understood the abuses and terror to which they had been subjected. On citizenship, leading Republicans became allies of Black activists and, with the opportunities opened by the Civil War and its aftermath, advanced birthright citizenship into federal policy.

A. **Black activists, and the Republicans animated by their advocacy, restore the longstanding principle of universal birthright citizenship.**

In alliance with the Black Americans whose activism informed their views, the Lincoln administration, entering office in 1861, took steps to undermine Taney's *Dred Scott* decision wherever constitutionally possible.[58] In 1862, treasury secretary Salmon Chase, who had long supported repeal of Ohio's Black Laws, saw an opportunity when a question about the citizenship of a free Black ship captain made its way up the chain of command in the Treasury Department.[59] Chase prompted U.S. Attorney General Edward Bates to publish an opinion that would clarify the

---

[57] *See, e.g.*, Masur, *supra* note 10, at 150-151, 217 (Seward); *id.* at 192-194, 199, 201–202, 211, 320 (Chase); *id*. at 202, 266 (Bingham); *id*. at 316–17 (Trumbull); *id*. at 183-184, 261 (Wilson); *id*. at 281 (Lincoln).
[58] *Id*. at 280–86, 288.
[59] *Id*. at 281–82.

Lincoln administration's position.[60]  Bates plainly restated the matter:  "Who is a citizen?  What constitutes a citizen of the United States?"[61]  Spurning Taney's *Dred Scott* decision as "an entire mistake," and echoing the claims of Black activists in the Colored Conventions, Bates declared:  "[e]very person born in the country is, at the moment of birth, *prima facie* a citizen; and he who would deny it must take upon himself the burden of proving some great disfranchisement strong enough to override the '*natural-born*' right as recognized by the Constitution in terms the most simple and comprehensive, and without any reference to race or color, or any other accidental circumstance."[62]  In further underlining why citizenship for a ***child*** must be a matter of birthright, Bates declared:  "It is an error to suppose that citizenship is ever hereditary.  It never 'passes by descent.'  It is as original in the child as it was in his parents.  It is always either born with him or given to him directly by law."[63]

Black activists were encouraged that a presidential administration affirmed their long-held position.  In the wake of the Bates opinion, John Jones, a leading Illinois activist, published a pamphlet that urged Illinois voters to repeal the state's Black Laws.  He claimed, as the Black movement had for decades, that the Declaration of Independence and the Constitution supported African Americans'

---

[60] *Id*.

[61] Opinion of Attorney General Bates on Citizenship at 1 (1863).

[62] *Id*. at 12, 24; Jones, *Citizenship*, *supra* note 6, at 231; Masur, *supra* note 10, at 283-286.

[63] Bates opinion, *supra* note 61, at 16; Jones, *Citizenship*, *supra* note 6, at 231.

claims to birthright citizenship. He also had a new authority to draw on: "I think the mere fact of mentioning the decision of Attorney General Bates upon the subject of our citizenship … establishes our point."[64] At a national convention in 1864, Ohio delegate John Mercer Langston similarly lauded Bates' opinion as "a complete answer to the arguments and cavils against us."[65]

As the Republicans of the 39th Congress considered remaking the terms of federal citizenship, they were aware of the Justices' widely divergent opinions in the *Dred Scott* case. They were also aware of the decades-long claims of free Black Americans and their demand for recognition as citizens of the United States. In the House, John Bingham declared that the Constitution contained no "guarantee more sacred, and none more vital" than the "privileges and immunities" promised to citizens in Article IV. Yet, he reminded his colleagues, South Carolina had disregarded that guarantee when its residents drove away "the honored representative of Massachusetts, who went thither upon the peaceful mission of asserting … the rights of American *citizens*."[66] Senator Lyman Trumbull stated his

---

[64] John Jones, *The Black Laws of Illinois, and a Few Reasons Why They Should be Repealed* 4, 8 (Chicago, 1864).

[65] Minutes from Proceedings of the National Convention of Colored Men, Held in Syracuse (Syracuse, N.Y., Oct. 4-7, 1864), *in Minutes and Proceedings of the National Negro Conventions, 1830–1864* (Howard H. Bell, ed., 1969), https://omeka.coloredconventions.org/items/show/282; Jones, *Citizenship*, *supra* note 6, at 232.

[66] Cong. Globe, 39th Cong., 1 sess., 158 (1866) (emphasis added).

belief that "persons of African descent, born in the United States, are as much citizens as white persons who are born in the country." By contrast, he continued, "The people of [the slaveholding] States have not regarded the colored race as citizens, and on that principle many of their laws making discriminations between the whites and the colored people are based." It was time, he asserted, "for Congress to declare, under the Constitution of the United States, who are citizens."[67] These were among the men who advanced the Fourteenth Amendment, seeking to repudiate not only Taney's *Dred Scott* decision, but also Taney's view that the citizenship status of persons born in the United States could be determined by political authorities, rather than by bedrock and inclusive constitutional principles.

### B.   The Framers of the Fourteenth Amendment constitutionalized the inclusive birthright principle advocated by free Black Americans.

Contrary to Appellants' truncated and misleading account of the *Dred Scott* decision and the Fourteenth Amendment, today's Court must examine the decades during which the Framers developed their view of citizenship. The Framers witnessed to the dilemmas faced by *free* Black Americans, dialogued with *free* Black Americans, and learned from the decades-long activism of *free* Black Americans. Only with these encounters in mind, can we understand what it meant to constitutionalize the universal, common-law understanding of citizenship. The

---

[67] *Id*. at 475; Masur, *supra* note 10, at 316-317.

Framers had the plight of free Black Americans in their sights when they set out to place the question of who is a citizen beyond the reach of politics and prejudice. When they constitutionalized birthright, they barred political actors from imposing politically-motivated exceptions, as Taney and his ilk had done when they excluded free Black Americans.

The ideas developed over the decades preceding the Fourteenth Amendment, expressed most boldly in the Colored Conventions, were heard throughout congressional debates. When proposing the birthright citizenship language of the Fourteenth Amendment, U.S. Senator Jacob Howard of Michigan confirmed that the clause codified the common law: "This amendment which I have offered is simply declaratory of what I regard as the law of the land already, that every person born within the limits of the United States, and subject to their jurisdiction, is by virtue of natural law and national law a citizen of the United States."[68] Missouri Senator John H. Henderson rebuked Taney's *Dred Scott* decision, which he argued, "abandoned the Constitution and the Declaration of Independence" and misinterpreted history. The Fourteenth Amendment, he said, "will leave citizenship where it is now. It makes plain only what has been rendered doubtful by the past action of the Government."[69]

---

[68] Cong. Globe, *supra* note 66, at 2890.
[69] *Id*. at 3031–32.

California Senator John Conness confirmed that the provision extended not only to Black Americans, formerly free and formerly enslaved. It also included the U.S.-born children of immigrants, even those of widely-denigrated Chinese immigrants. The Framers closed the door to exceptions rooted in arbitrary qualities such as parentage, privilege, status, or race, and repeatedly affirmed that birthright citizenship extended to children born among communities that were disfavored.[70] Following the thinking long advocated by free Black Americans, the Framers advanced a view of birthright citizenship that incorporated an inclusive guarantee that admitted to only minor, well-recognized exceptions, specifically for the children of ambassadors and for Native Americans on tribal land—both groups that enjoy jurisdictional immunity while physically within U.S. borders.

\*     \*     \*

The vision of birthright citizenship advocated by free Black activists extended far beyond their own circumstances and that of emancipated slaves. Frederick Douglass, an abolitionist, statesman, and veteran of the Colored Conventions, articulated as much in his circa-1867 speech "Composite Nation." Douglass presaged a next chapter in the history of citizenship, observing that the country was expanding through an "irrepressible" tide of immigration already in progress from

---

[70] *Id*. at 2891; *see also id*. at 2769 (colloquy between Senators Fessenden and Wade, affirming citizenship of "a person born here of parents from abroad temporarily in the country").

foreign countries including China and Japan.  Douglass insisted that America's ever-growing immigrant population should be welcomed and entitled to join the national body politic:

> [T]he right of locomotion; the right of migration; the right which belongs to no particular race, but belongs alike to all and to all alike.  It is the right you assert by staying here, and your fathers asserted by coming here.  It is this great right that I assert for the Chinese and the Japanese, and for all other varieties of men equally with yourselves, now and forever….  I want a home here not only for the negro, the mulatto and the Latin races, but I want the Asiatic to find a home here in the United States, and feel at home here, both for his sake and for ours….  And here I hold that a liberal and brotherly welcome to all who are likely to come to the United States is the only wise policy which this nation can adopt.[71]

Douglass and other free Black Americans knew precisely why their long-held vision for a sweeping, democratic birthright principle needed to be written into the Constitution:  without it, the whims of political authorities would govern citizenship, and large groups of American-born people might be deemed non-citizens and therefore subject to removal or banishment from the country without process or cause, to arbitrary arrests, to exclusion from courts, and other abuses.  The birthright principle that Congress constitutionalized in 1868—which Douglass and his community of free Black Americans had advocated for decades before the Civil

---

[71] Frederick Douglass, "Composite Nation," Address to the Parker Fraternity Course (Boston 1867), https://www.loc.gov/item/mss1187900407/; Martha S. Jones, *Response to Professor Blight's Frederick Douglass and the Two Constitutions*, 111 CAL. L. REV. 1929, 1937-39 (2023).

War, and which was consistent with the inclusive phrasing of the 1787 Constitution—aimed to make a nation in which *every person* born in the United States is a citizen of the United States, no matter the status, color, means of entry, or immigration status of their parents.

## <u>CONCLUSION</u>

For the foregoing reasons, the Court should affirm the orders below.

DATED:  June 4, 2025                    KENDALL BRILL & KELLY LLP


By: _____
            /s/ Richard B. Kendall

            Richard B. Kendall
            Attorney for *Amicus Curiae*

# CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rules of Appellate Procedure 29(a)(5) and 32(a)(7), I certify that the attached brief is proportionally-spaced, has a typeface of 14 points and contains 6,489 words.

DATED: June 4, 2025                KENDALL BRILL & KELLY LLP


By: _____/s/ Richard B. Kendall_____
Richard B. Kendall
Attorneys for *Amici Curiae*