No. 25-1348

## UNITED STATES COURT OF APPEALS
## FOR THE FIRST CIRCUIT

NEW HAMPSHIRE INDONESIAN
COMMUNITY SUPPORT, et al.,

*Plaintiffs-Appellees,*

v.

DONALD J. TRUMP, President of the United States,
in his official capacity, et al.,

*Defendants-Appellants.*

ON APPEAL FROM UNITED STATES DISTRICT COURT FOR THE DISTRICT OF NEW
HAMPSHIRE, CIVIL ACTION NO. 1:25-CV-00038-JL-TSM

## AMICUS CURIAE BRIEF OF SECURE FAMILIES INITIATIVE IN
## SUPPORT OF APPELLEES AND AFFIRMANCE

Angelo Ancheta
Dēmos
80 Broad Street, 4th Floor
New York, NY 10004
(212) 633-1405
Aancheta@demos.org

Anna M. Baldwin
Danielle Lang
CAMPAIGN LEGAL CENTER
1101 14th St., NW, Suite 400
Washington, DC 20005
(202) 736-2200
abaldwin@campaignlegalcenter.org
dlang@campaignlegalcenter.org

*Attorneys for Amicus Curiae*
*Secure Families Initiative*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, amicus curiae Secure Families Initiative states that it is a non-profit organization that does not have owners. As such, there is no corporation that owns stock in SFI.


Date: June 6, 2025                             s/ Anna M. Baldwin
                                               Attorney for *Amicus Curiae*
                                               Secure Families Initiative

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ............................................................... iii

BRIEF OF AMICUS CURIAE ............................................................1

INTEREST OF AMICUS CURIAE .....................................................1

SUMMARY OF ARGUMENT ...........................................................2

ARGUMENT .....................................................................................3

I.   BIRTHRIGHT CITIZENSHIP IS CENTRAL TO AMERICAN
     DEMOCRATIC EQUALITY ........................................................3

     A.   The legal principle requiring birthright citizenship has always
          governed in the United States, undercut only by the country's sordid
          history of slavery. ...........................................................4

     B.   The Fourteenth Amendment enshrined birthright citizenship to
          overturn the monstrous error of *Dred Scott*. .........................8

II.  BIRTHRIGHT CITIZENSHIP ENSURES AN EQUAL RIGHT TO
     PARTICIPATION IN THE POLITY AND GUARANTEES ALL
     AMERICANS A REPRESENTATIVE GOVERNMENT ...........10

     A.   Birthright citizenship makes equal participation
          in civic life possible............................................................10

     B.   Ending birthright citizenship would deprive millions of Americans
          of the right to a representative government........................13

CONCLUSION .................................................................................20

# TABLE OF AUTHORITIES

**Cases**                                                                 **Page**

*Afroyim v. Rusk*, 387 U.S. 253 (1967) ........................................................................ 9

*Ambach v. Norwick*, 441 U.S. 68 (1979) .................................................................... 11

*Cabell v. Chavez-Salido*, 454 U.S. 432 (1982) ......................................................... 11

*Carmell v. Texas*, 529 U.S. 513 (2000) ...................................................................... 4

*Dawson's Lessee v. Godfrey*, 8 U.S. (4 Cranch) 321 (1808) ...................................... 4

*Dred Scott v. Sanford*, 60 U.S. (19 How.) 393, 403 (1857) ......................... 5, 6, 7, 8

*Foley v. Connelie*, 435 U.S. 291 (1978) .................................................................... 11

*Gray v. Sanders*, 372 U.S. 368 (1963) ...................................................................... 15

*Harper v. Virginia Board of Elections*, 383 U.S. 663 (1966) ................................... 10

*Inglis v. Trustees of the Sailor's Snug Harbor*, 28 U.S. (3 Pet.) 99 (1830) .......... 4, 5

*INS v. Rios-Pineda*, 471 U.S. 444 (1985) ................................................................... 9

*M'Ilvaine v. Coxe's Lessee*, 6 U.S. (2 Cranch) 280 (1805) ........................................ 4

*Moore v. Ogilvie*, 394 U.S. 814 (1969) ..................................................................... 17

*Perkins v. Elg*, 307 U.S. 325 (1939) ........................................................................... 9

*Reynolds v. Sims*, 377 U.S. 533 (1964) ..................................................................... 16

*Rice v. Cayetano*, 528 U.S. 495 (2000) ..................................................................... 10

*Roman v. Sincock*, 377 U.S. 695 (1964) .................................................................... 16

*Smith v. Alabama*, 124 U.S. 465 (1888) ...................................................................... 4

*United States v. Wong Kim Ark*, 169 U.S. 649 (1898) ............................................ 2, 9

*WMCA, Inc v. Lomenzo*, 377 U.S. 633 (1964) .......................................................... 16

*Yick Wo v. Hopkins*, 118 U.S. 356 (1886) ................................................................ 10

**Statutes and Constitutional Provisions**

8 U.S.C. § 1182(d)(5)(A) ............................................................................................ 12

U.S. Const. art. I, § 2 .................................................................................................. 14

U.S. Const. art. I, §§ 1-3 .............................................................................................. 4

U.S. Const. art. II, § 1, cl. 5 ....................................................................................... 11

U.S. Const. art. IV, § 2 ................................................................................................. 4

U.S. Const. art. IV, § 4 ...........................................................................14, 15

U.S. Const. amend. XIV, § 1 ...........................................................................3

U.S. Const. amend. XVII ................................................................................14

**Other Authorities**

Cong. Globe, 39th Cong., 1st Sess. (1866)..............................................8, 9

Cong. Globe, 40th Cong., 3rd Sess. (1869) .................................................10

The Federalist No. 39 (James Madison) ......................................................14

Eric Foner, The Second Founding: How the Civil War and Reconstruction Remade the Constitution (2019) ......................................................2, 6, 7, 8

Final Report: National Advisory Committee on Racial, Ethnic, and Other Populations, Administrative Records, Internet and HTC Population Working Group," U.S. Census Bureau, (2016), *available at* https://perma.cc/L474-MC7L ..............................................................18

Gabriel J. Chin and Paul Finkelman, *Birthright Citizenship, Slave Trade Legislation, and the Origins of Federal Immigration Regulation*, 54 U.C. Davis L. Rev. 2215 (2021) ...................................................................5

James C. Ho, *Defining "American," Birthright Citizenship and the Original Understanding of the 14th Amendment*, 9 Green Bag 2d 367 (2006) .................8

James Otis, *The Rights of the British Colonies Asserted and Proved* (1763), *available at* https://perma.cc/2E7Q-LWWD. ....................................................14

Jeffrey S. Passel and D'Vera Cohn, "How removing unauthorized immigrants from census statistics could affect House reapportionment," Pew Research Center (July 24, 2020), https://perma.cc/B4BC-AXYL.................................................19

Jennifer Van Hook & Michael Fix, T*he Demographic Impacts of Repealing Birthright Citizenship*, Migration Policy Institute 1 (2010) ..................17, 18, 19

Karen Nelson Moore, *Aliens and the Constitution*, 88 N.Y.U. L.R. 801 (2013).....11

Legislation Denying Citizenship to Certain Children Born in the United States, 19 Op. O.L.C. 340 (1995)....................................................................19

Lyle Denniston, *Constitution Check: What does One Person One Vote Mean Now?*, *available at* https://perma.cc/G55Q-TK9A. .....................................................15

Margaret D. Stock, *Essential to the Fight, Immigrants in the Military Eight Years After 9/11*, American Immigration Council (2009)..........................................12

President Donald J. Trump, *Initial Rescissions of Harmful Executive Actions Executive Order*, available at https://perma.cc/QH3F-NHR7. ...........................18

*Protecting the Meaning and Value of American Citizenship*, Exec. Order No. 14,160, 90 Fed. Reg. 8449 (Jan. 20, 2025) ..........................................................3

U.S. Citizenship and Immigration Services, *Military Naturalization Statistics*, *available at* https://perma.cc/9QG6-WJK2. ......................................................12

U.S. Citizenship and Immigration Services, *Discretionary Options for Miliary Members, Enlistees, and Their Families*, *available at* https://perma.cc/4B39-95QD. ................................................................................................................13

## BRIEF OF AMICUS CURIAE

Amicus curiae files this brief without leave of court because all parties consent to its filing. Counsel for amicus curiae authored this brief in whole. No party or party's counsel authored any part of this brief, and no person, other than amicus and its counsel, contributed money to fund its preparation or submission.

## INTEREST OF AMICUS CURIAE

Secure Families Initiative (SFI) is a non-partisan, 501(c)(4) non-profit organization comprised of military spouses and family members. SFI's mission is to mobilize diverse military partners, parents, children, and veterans to vote and advocate for their communities. Recognizing that military families make enormous sacrifices to strengthen and defend our country, SFI seeks to influence issues of foreign policy and national security that especially impact SFI's members. SFI is committed to increasing the political participation of military voters and their families through educating, registering, and turning out a network of diverse and representative military voters in all elections. SFI believes that service members and their families have a deep and direct stake in having a fully representative government that is reflective of and responsive to all communities who make up the country.

SFI has a strong interest in ensuring that the birthright citizenship, which is a cornerstone of American democratic equality and vital to the existence of a

government that is fully representative of the people, remains the law of the land as required by the Fourteenth Amendment.

## SUMMARY OF ARGUMENT

The Citizenship Clause of the Fourteenth Amendment guarantees birthright citizenship to all U.S.-born children "within the dominion of the United States," regardless of their parents' citizenship status. *United States v. Wong Kim Ark*, 169 U.S. 649, 688 (1898). Enshrining birthright citizenship in the Constitution was central to re-dedicating the country to freedom and equality in the wake of the Civil War. Adopted in an "effort to purge the United States of the legacy of slavery," birthright citizenship under the Fourteenth Amendment "remains an eloquent statement about the nature of American society," a powerful force for full inclusion of the children of immigrants in the polity, "and a repudiation of a long history of racism." Eric Foner, The Second Founding: How the Civil War and Reconstruction Remade the Constitution 70-71 (2019).

Ending birthright citizenship would deprive millions of Americans of their foundational right to a representative government and would fundamentally alter and degrade the democratic equality that all citizens enjoy.

## ARGUMENT

## I.   BIRTHRIGHT CITIZENSHIP IS CENTRAL TO AMERICAN DEMOCRATIC EQUALITY

The Fourteenth Amendment to the United States Constitution sets out the defining statement of American citizenship. The Citizenship Clause of the Fourteenth Amendment declares: "All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside." U.S. Const. amend. XIV, § 1. The language of the Citizenship Clause, and its guarantee of birthright citizenship, is not qualified based on allegiance, domicile, immigration status, race, or country of origin of a person's parents.

The sweep of the Citizenship Clause is broad by design. It was meant to definitively break with prior race-based restrictions on citizenship and is consistent with the United States' common law tradition.

The Executive Order that President Trump has sought to implement, *Protecting the Meaning and Value of American Citizenship*, Exec. Order No. 14,160, 90 Fed. Reg. 8449 (Jan. 20, 2025) (Citizenship Stripping Order), would deny citizenship to children born within the United States to parents who are undocumented as well as to parents who have lawful but temporary status. As every court addressing the question has held, the Citizenship Stripping Order is a gross betrayal of the guarantees of the Fourteenth Amendment.

3

**A.    The legal principle requiring birthright citizenship has always governed in the United States, undercut only by the country's sordid history of slavery.**

From the time of the country's founding, the United States' Constitution has referenced citizenship, including citizenship by birth. U.S. Const. art. I, §§ 1-3; *id.* art. IV, § 2. But the Constitution at the founding did not expressly identify who was (or was not) a U.S. citizen. Defining the scope of that guarantee was largely left to the common law. Indeed, the Supreme Court has recognized that terms used but not defined in the Constitution should be read "in the light of" English common law because the U.S. Constitution is "framed in the language of the English common law." *Smith v. Alabama*, 124 U.S. 465, 478 (1888); *see also Carmell v. Texas*, 529 U.S. 513, 521 (2000) (finding that for an undefined term in the Constitution "the necessary explanation is derived from English common law well known to the Framers").

The relevant principle of the English common law is *jus soli*—the doctrine of citizenship by place of birth. Early American jurists noted that "nothing is better settled at the common law" than the principle of *jus soli. Inglis v. Trustees of the Sailor's Snug Harbor*, 28 U.S. (3 Pet.) 99, 164 (1830) (Story, J.); *see also Dawson's Lessee v. Godfrey*, 8 U.S. (4 Cranch) 321 (1808) (applying common law to question of citizenship); *M'Ilvaine v. Coxe's Lessee*, 6 U.S. (2 Cranch) 280 (1805) (same). U.S. courts also followed the English common law in recognizing that there were a

4

few limited categories of persons born within the United States who were not subject to its sovereign authority, and therefore not citizens: namely, children of diplomats and those born to hostile forces during an occupation. *Sailor's Snug Harbor*, 28 U.S. (3 Pet.) at 155-56. Native Americans with tribal relationships were also understood to fall outside of the United States' sovereign authority. *See* Gabriel J. Chin and Paul Finkelman, *Birthright Citizenship, Slave Trade Legislation, and the Origins of Federal Immigration Regulation*, 54 U.C. Davis L. Rev. 2215, 2218 n.5 (2021).

Of course, up to the Civil War, the common law rule of *jus soli* existed alongside the dehumanizing institution of slavery. The tension and contradiction between the two boiled over in *Dred Scott*, in which Chief Justice Roger B. Taney declared that the Constitution "expressly" protected the right of property in slaves, and that no Black person, "whose ancestors were imported into this country, and sold as slaves" could "become a member of the political community formed and brought into existence by the Constitution of the United States." *Dred Scott v. Sanford*, 60 U.S. (19 How.) 393, 403, 451 (1857). *Dred Scott* was very much a decision about who was included and excluded from the national political community and what rights flowed from such membership.

Justice Taney interpreted the words "people of the United States" and "citizens" to be "synonymous terms" that together describe "the political body who, according to our republican institutions, form the sovereignty, and who hold the

power and conduct the Government through their representatives." *Dred Scott*, 60

U.S. (19 How.) at 404. Black persons, "whether emancipated or not" were wholly

outside of Justice Taney's vision of the body politic. *Id.* at 405. Under *Dred Scott*,

Black persons "were permanent aliens," forever locked out of the national political

community. Foner, The Second Founding 14.

      While Justice Taney acknowledged that states could, if they wished, make free

Black persons citizens, the Court held that neither the federal government nor other

states were obligated to recognized that status. Justice Taney's logic was, ironically,

fueled by "his expansive understanding of what citizenship entailed." Foner, The

Second Founding 14. Granting Black persons the status United States citizen would

guarantee:

> the right to enter every other State whenever they pleased, singly or in
> companies, without pass or passport, and without obstruction, to
> sojourn there as long as they pleased, to go where they pleased at every
> hour of the day or night without molestation, unless they committed
> some violation of law for which a white man would be punished; and
> it would give them the full liberty of speech in public and in private
> upon all subjects upon which its own citizens might speak; to hold
> public meetings upon political affairs, and to keep and carry arms
> wherever they went.

*Dred Scott*, 60 U.S. (19 How.) at 417.  It was precisely because citizenship carried

with it so many precious rights—to freely travel, to assemble, to speak, and to carry

arms—that Justice Taney insisted that it must be denied to Black persons.

The shameful reasoning of the *Dred Scott* majority was fiercely and contemporaneously opposed by Black persons claiming rights for themselves based upon the principle of birthright citizenship. Thus, for example, James McCune Smith, "a black physician, author, and antislavery advocate, carefully dissected Taney's reasoning, citing legal precedents going back to 'the annals of lofty Rome' to demonstrate that all free persons born in the United States, black as well as white, 'must be citizens.'" Foner, The Second Founding 14 (citing *Anglo-African Magazine* (May 1859), 144-50). In the decades before the Civil War, Black advocates organized around and promoted the principle of birthright citizenship. *Id.* at 13-14. Free Black persons "seized upon the Constitution's requirement that the president be a 'natural born Citizen' to argue that American citizenship derived from place of birth, not ancestry or race." *Id.* at 13 (citing Donald G. Nieman, *The Language of Liberation: African Americans and Equalitarian Constitutionalism, 1830–1950*, *in* Nieman ed., The Constitution, Law, and American Life: Critical Aspects of the Nineteenth-Century Experience (1992)).

Justice Taney's reasoning was also rejected by many of his contemporaries, on and off the Court. Writing in dissent, Justice Benjamin Curtis noted that, if the guarantee of citizenship was not fixed by birth under the Constitution, Congress could "select classes of persons within the several States" for the favored status of citizen while excluding others, and in so doing, destroy the democratic and

republican character of the county. 60 U.S. (19 How.) at 577 (Curtis, J., dissenting). In another forceful dissent, Justice John McLean insisted that "birth on the soil of a country both creates the duties and confers the rights of citizenship" and that the Constitution requires that "citizenship may be acquired by birth." 60 U.S. (19 How.) at 576, 578 (McLean, J., dissenting). In response to the decision, the state legislature of Justice McLean's home state of Ohio "adopted a resolution declaring that 'every free person, born within the limits of any state of this Union, is a citizen thereof.'" Foner, The Second Founding 14.

### B. The Fourteenth Amendment enshrined birthright citizenship to overturn the monstrous error of *Dred Scott*.

Following the Civil War, the Fourteenth Amendment was ultimately adopted as a complete repudiation of the logic of *Dred Scott*. Under its Citizenship Clause, "[b]irthright citizenship is guaranteed" and "[t]hat birthright is protected no less for children of undocumented persons than for descendants of *Mayflower* passengers." James C. Ho, *Defining "American," Birthright Citizenship and the Original Understanding of the 14th Amendment*, 9 Green Bag 2d 367, 368 (2006). According to Senator Jacob Howard of Michigan, who managed the passage of the Fourteenth Amendment in the Senate, the Clause was meant to "settle the great question of citizenship" once and for all. Cong. Globe, 39th Cong., 1st Sess. 2890 (1866). As Sen. Howard explained, the framers of the Fourteenth Amendment wanted to "put this question . . . beyond the legislative power, beyond the reach of [those] who

would pull the whole system up by the roots and destroy it." Cong. Globe, 39th Cong., 1st Sess. 2896 (1866).

Indeed, the Supreme Court has long recognized that it is "undeniable" that the purpose and language of the Fourteenth Amendment "put citizenship beyond the power of any governmental unit to destroy." *Afroyim v. Rusk*, 387 U.S. 253, 263 (1967). Consistent with that recognition, the Supreme Court has correctly and repeatedly held for more than a century that the Citizenship Clause stands for "the fundamental rule of citizenship by birth within the dominion of the United States, notwithstanding alienage of parents[.]" *Wong Kim Ark*, 169 U.S. at 688; *see also, e.g.*, *INS v. Rios-Pineda*, 471 U.S. 444, 446 (1985) (recognizing that a child of two undocumented immigrants "was a citizen of this country" as a result of being "born in the United States"); *Perkins v. Elg*, 307 U.S. 325, 329 (1939) ("[A] child born here of alien parentage becomes a citizen of the United States."). That understanding remains as correct today as it was when the Court issued its decision in *Wong Kim Ark*. The unchanging meaning of the Citizenship Clause dictates that U.S.-born children of parents who lack permanent legal status in the United States, including wholly undocumented persons, are entitled to the full guarantees of United States citizenship.

II.    **BIRTHRIGHT CITIZENSHIP ENSURES AN EQUAL RIGHT TO PARTICIPATION IN THE POLITY AND GUARANTEES ALL AMERICANS A REPRESENTATIVE GOVERNMENT**

The Fourteenth Amendment's guarantee of birthright citizenship has, over generations, continued to powerfully protect the rights of all Americans. Indeed, birthright citizenship remains a key that unlocks equal membership and participation in the polity for all, regardless of parentage.

### A.    Birthright citizenship makes equal participation in civic life possible.

Citizenship brings with it the right and promise of the franchise. The right to vote is essential to our democratic system of government and is "preservative of all rights." *Harper v. Virginia Bd. of Elections*, 383 U.S. 663, 667 (1966); *see, e.g.*, *Yick Wo v. Hopkins*, 118 U.S. 356, 370 (1886). The promise of the right to vote, guaranteed to all through birthright citizenship, found its Reconstruction-era culmination in passage of the Fifteenth Amendment, which wrote into the Constitution the "fundamental principle" that state and federal governments "may not deny or abridge the right to vote on account of race." *Rice v. Cayetano*, 528 U.S. 495, 512 (2000). The Fifteenth Amendment was to be "the capstone in the great temple of American freedom," Cong. Globe, 40th Cong., 3rd Sess. 724 (1869), that would "make every citizen equal in rights and privileges." *Id.* at 672. There could be no such capstone, of course, without birthright citizenship.

Under the requirements set by the Constitution, birthright citizenship grants to U.S.-born children the possibility of becoming the head of the federal executive branch, as President of the United States. U.S. Const. art. II, § 1, cl. 5. But the participation rights unlocked by birthright citizenship are not limited to the rights to vote or run for office. As a land of immigrants, non-citizens of course enjoy many of the Constitution's core protections—including, *inter alia*, free speech and due process. But citizenship opens the door to a wide array of further opportunities for civic participation, from jury service to certain forms of employment in the public service. The Supreme Court has upheld laws that limit the employment of non-citizens in the police force, as peace officers, and as public school teachers because such public functions "go to the heart of community governance." Karen Nelson Moore*, Aliens and the Constitution*, 88 N.Y.U. L.R. 801, 811-12 (2013); *see also Cabell v. Chavez-Salido*, 454 U.S. 432, 439 (1982); *Ambach v. Norwick*, 441 U.S. 68, 75-76 (1979); *Foley v. Connelie*, 435 U.S. 291, 295 (1978).

Birthright citizenship also provides opportunities for military service. Undocumented persons generally may not serve. Those who have immigrated through regular pathways may join the U.S. armed forces, and by long tradition, military service has provided a pathway to U.S. citizenship for service members and their families. Indeed, since 2002, more than 187,000 members of the military have

become naturalized citizens.[1] This pathway to naturalization recognizes the sacrifices and contributions of immigrant service members, and ensures that their essential contributions to the country are equally recognized through full membership in the democratic polity. The military has depended on the talents of these service members. "Without the contributions of immigrants, the military could not meet its recruiting goals and could not fill its need for foreign-language translators, interpreters, and cultural experts," wrote Margaret D. Strock, a retired Lieutenant Colonel in the U.S. Army Reserve. *See* Stock, *Essential to the Fight, Immigrants in the Military Eight Years After 9/11*, American Immigration Council (2009). The Citizenship Stripping Order would ban countless children born and raised in the United States from joining the military to protect the only country they have ever known.

The U.S. Department of Homeland Security "recognize[s] the important sacrifices made by U.S. service members, veterans, enlistees, and their families" and, pursuant to authority granted to the Secretary of the U.S. Department of Homeland Security at 8 U.S.C. § 1182(d)(5)(A), may provide pathways for parole in place and deferred action for undocumented family members of active-duty,

---

[1] U.S. Citizenship and Immigration Services, *Military Naturalization Statistics*, *available at* https://perma.cc/9QG6-WJK2.

reserve, and veteran service members.[2]  Parole in place allows family member such as parents, a spouse, or children, who entered the U.S. without inspection, to remain lawfully in the country and potentially adjust their status to lawful permanent residency.[3] Deferred action is a form of prosecutorial discretion to defer removal against an individual for a certain period of time.[4] The Citizenship Stripping Order is at odds with both of these pathways that encourage stability and recognize the extraordinary sacrifices and contributions of military service in mixed-immigration status families.

**B.    Ending birthright citizenship would deprive millions of Americans of the right to a representative government.**

Just as passage of the Reconstruction Amendments unleashed fundamental changes in American democracy, so too would ending birthright citizenship, in that it would be a defining setback for democratic equality. The Citizenship Stripping Order would effectuate a return to a *Dred Scott*-like constitutional order, rendering many Americans effectively stateless, locked out of the polity, and without the right even to have rights. Indeed, ending birthright citizenship would deprive millions of Americans the foundational right to a representative government.

---

[2] U.S. Citizenship and Immigration Services, *Discretionary Options for Miliary Members, Enlistees, and Their Families*, *available at* https://perma.cc/4B39-95QD.
[3] *See id*.
[4] *See id*.

Echoed in the rallying cries that spurred the American Revolution, the right to a representative government has been a foundational aspect of the social compact between the American people and their political institutions since the founding. *See* James Otis*, The Rights of the British Colonies Asserted and Proved* (1763), *available at* https://perma.cc/2E7Q-LWWD. When James Otis decried that taxation without representation was little more than tyranny, his grievances were lodged not merely at the prospect of additional taxes, but at a system of government that had become wholly unaccountable to the people of the soon-to-be fledging nation. *Id.* His critique spurred the drumbeat of revolution and later became embedded in the very structure of American government. *Id.*

Today, the architecture of the federal Constitution is designed to ensure that *all* Americans enjoy a representative government: one that, to quote James Madison, "derives all its powers directly or indirectly from the great body of the people." The Federalist No. 39 (James Madison). At the federal level, Article I, Section 2 establishes that members of the House of Representatives shall be "chosen…by the People of the several States"; while the Seventh Amendment ensures that Senators "[shall be] elected by the people [of each state]". U.S. Const. art. I, § 2; U.S. Const. amend. XVII. At the state level, the founders drafted Article IV, Section 4 to explicitly promise the American people that "[t]he United States shall guarantee to

14

every State in this Union a Republican Form of Government." U.S. Const. art. IV, § 4.

The Reconstruction Amendments, together with the Nineteenth and Twenty-Sixth Amendments, further enshrined the core principle that the American political system is one where "the people rule and do so with equal political authority."[5] The federal judiciary has in turn guarded this precious right to representative government. This is most notable in legislative apportionment cases where the Supreme Court has time and time again upheld the principle of "one person, one vote" on the guarantee embedded within the Equal Protection Clause that every vote must be given substantially the same weight as that of any other vote in congressional, state, and local elections.

In *Gray v. Sanders*, the Supreme Court famously declared "the conception of political equality from the Declaration of Independence to Lincoln's Gettysburg Address, to the Fifteenth, Seventeenth, and Nineteenth Amendments can mean only one thing—one person, one vote." 372 U.S. 368, 381 (1963).  There, the Court evaluated Georgia's county unit system which created a voting schema that weighed rural votes more heavily than urban votes. *Id.* at 370-71. The Court struck down the system as violative of the Equal Protection Clause, noting that the Constitution

---

[5] Lyle Denniston, *Constitution Check: What does One Person One Vote Mean Now?*, *available at* https://perma.cc/G55Q-TK9A.

guaranteed equal voting power with the only permissible exceptions being the allocation of Senators irrespective of population and the use of the electoral college in presidential elections. *Id.* at 380.

Likewise, in *Reynolds v. Sims*, the Supreme Court reaffirmed the right of Americans to representative government based on "the conception of…one person, one vote." 377 U.S. 533, 558 (1964) (*quoting Gray*, 372 U.S. at 380)*.* In *Reynolds*, the Court found that the Alabama State Legislature had violated the Equal Protection Clause by failing to apportion its legislative districts on a population basis, noting that "the Equal Protection Clause guarantees the opportunity for equal participation by all voters in the election of state legislators." *Id.* at 566. To quote Chief Justice Warren, writing on behalf of the majority:

> Legislators represent people, not trees or acres. Legislators are elected by voters, not farms or cities or economic interests. As long as ours is a representative form of government, and our legislatures are those instruments of government elected directly by and directly representative of the people, the right to elect legislators in a free and unimpaired fashion is a bedrock of our political system.

*Id.* at 562; *see also, e.g.*, *Roman v. Sincock*, 377 U.S. 695 (1964) (holding that the Delaware legislative apportionment schema violated the Equal Protection Clause for failing to apportion the seats in its bicameral legislature substantially on a population basis); *WMCA, Inc v. Lomenzo*, 377 U.S. 633 (1964) (holding that New York's system of legislative apportionment violated the Equal Protection Clause because

neither house of the New York Legislature was apportioned sufficiently on a population basis); *Moore v. Ogilvie*, 394 U.S. 814, 819 (1969) (striking down an Illinois legislative apportionment plan on equal protection grounds because it "discriminate[d] against the residents of the populous counties of the State in favor of rural sections").

The changes to the nature and structure of the democratic order that the Citizenship Stripping Order aims to unleash would be devastating. The Executive Order threatens to strip millions of U.S.-born children of the right to representative government in the coming decades. *See* Jennifer Van Hook & Michael Fix, T*he Demographic Impacts of Repealing Birthright Citizenship*, Migration Policy Institute 1, 4 (2010). Stripping away citizenship means, of course, stripping away the fundamental right to vote. But the Executive Order also threatens to undermine the promise of a representative government in another major way—through apportionment.

Even though noncitizens have been counted in every single U.S. Census since the first one in 1790, there have been both legislative and executive attempts to exclude them from the apportionment count. Most recently—and on the very same day he signed the birthright citizenship executive order—President Trump signaled his intent to once again try to illegally exclude undocumented immigrants from the decennial census by rescinding a prior executive order affirming that the

Constitution requires all persons, regardless of immigration status, be counted for apportionment.[6]

Stripping people of citizenship also creates a significant risk that those affected by the Executive Order will be undercounted in the decennial census. Undocumented immigrants have long been considered a hard-to-count group by the Census Bureau.[7] A Census Bureau report found that "legal status is a key issue in many communities with larger immigrant populations" because "[n]ot only are these persons difficult to match via administrative records due to lack of social security numbers, but they are also fearful of filling out their census forms because they are afraid of detention and deportation if located by the government." *Id.* at 10.

Thus, the Executive Order creates a real risk that birthright citizens will, at worst, be entirely excluded from the apportionment population or, at best, be significantly undercounted, ultimately depriving them of a representative government in the halls of Congress. In no uncertain terms, the demise of birthright citizenship would "set in motion the creation of a self-perpetuating class of unauthorized immigrants who would be excluded from social membership for

---

[6] See President Donald J. Trump, *Initial Rescissions of Harmful Executive Actions Executive Order*, available at https://perma.cc/QH3F-NHR7.

[7] Final Report: National Advisory Committee on Racial, Ethnic, and Other Populations, Administrative Records, Internet and HTC Population Working Group," U.S. Census Bureau, (2016), *available at* https://perma.cc/L474-MC7L.

generations." *See* Van Hook & Fix, *The Demographic Impacts of Repealing Birthright Citizenship* at 1.

The harms of this exclusion would also extend beyond those directly impacted by the Executive Order. Undercounting or outright exclusion of birthright citizens from the census count would also likely cause states to lose Congressional seats.[8] When a community has fewer Congressional seats than its population deserves, everyone in that community has diminished representation.

\* \* \*

As the district court here correctly held, the Citizenship Stripping Order is patently unconstitutional. "In America, a country that rejected monarchy, each person is born equal, with no curse of infirmity, and with no exalted status, arising from the circumstance of his or her parentage." Legis. Denying Citizenship to Certain Children Born in the United States, 19 Op. O.L.C. 340, 348 (1995). The President has no power or authority to destroy this tradition and fundamentally alter our republic and its guarantees of liberty for all. The Citizenship Stripping Order illegally infringes everyone's right to representative government and must be struck down.

---

[8] Jeffrey S. Passel and D'Vera Cohn, "How removing unauthorized immigrants from census statistics could affect House reapportionment," Pew Research Center (July 24, 2020), https://perma.cc/B4BC-AXYL.

## CONCLUSION

For the foregoing reasons, this Court should affirm the district court's issuance of a preliminary injunction.

Date: June 6, 2025

Respectfully submitted,

/s/ Anna M. Baldwin

Angelo Ancheta
Dēmos
80 Broad Street, 4th Floor
New York, NY 10004
(212) 633-1405
Aancheta@demos.org

Anna M. Baldwin
Danielle Lang
Campaign Legal Center
1101 14th St. NW, Suite 400
Washington, DC 20005
(202) 736-2200
abaldwin@campaignlegalcenter.org
dlang@campaignlegalcenter.org

**CERTIFICATE OF COMPLIANCE**

1. The foregoing brief complies with the type-volume limitations of Fed. R. App. P. 29(a)(5) because this brief contains <u>4397</u> words, excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

2. This brief has been prepared in a proportionally spaced typeface using Microsoft Word 365 in Times New Roman 14-point font.

**Signature:** /s/ Anna M. Baldwin          **Date:** June 6, 2025

**CERTIFICATE OF SERVICE**

I hereby certify that, on June 6, 2025, I electronically filed the foregoing with the Clerk of the Court for the U.S. Court of Appeals for the First Circuit by using the appellate CM/ECF system.

Participants in the case are registered CM/ECF users and will be served by the appellate CM/ECF system.

<u>/s/Anna M. Baldwin</u>
Anna M. Baldwin

*Attorney for Amicus Curiae*
*Secure Families Initiative*