No. 25-1348

# UNITED STATES COURT OF APPEALS
# FOR THE FIRST CIRCUIT

NEW HAMPSHIRE INDONESIAN COMMUNITY SUPPORT; LEAGUE OF UNITED LATIN AMERICAN CITIZENS; MAKE THE ROAD NEW YORK,

Plaintiffs - Appellees,

v.

DONALD J. TRUMP, President of the United States, in their official capacity; U.S. DEPARTMENT OF HOMELAND SECURITY; KRISTI NOEM, in their official capacity as Secretary of the U.S. Department of Homeland Security; U.S. DEPARTMENT OF STATE; MARCO RUBIO, in their official capacity as Secretary of the U.S. Department of State; U.S. DEPARTMENT OF AGRICULTURE; BROOKE L. ROLLINS, in their official capacity as Secretary of the U.S. Department of Agriculture; CENTERS FOR MEDICARE AND MEDICAID SERVICES; MEHMET OZ, in their official capacity as Administrator of the Centers for Medicare and Medicaid Services,

Defendants - Appellants.

On Appeal from the United States District Court for the District of New Hampshire
Civil Action No. 1:25-cv-00038-JL-TSM

## BRIEF FOR PLAINTIFFS-APPELLEES

Grace Choi
Noor Zafar
Lee Gelernt (No. 41744)
Omar Jadwat (No. 1124751)
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION IMMIGRANTS' RIGHTS
PROJECT
125 Broad St., 18th Floor New
York, NY 10004
Tel.: (212) 549-2660

Cody Wofsy (No. 1179414)
Hannah Steinberg
Stephen Kang
Spencer Amdur
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION IMMIGRANTS' RIGHTS
PROJECT
425 California Street, Suite 700
San Francisco, CA 94104
Tel.: (415) 343-0770

*Additional Counsel on Signature Page*

**CORPORATE DISCLOSURE STATEMENT**

Pursuant to Local Rule 26.1, Appellees state that they do not have parent corporations. No publicly held corporation owns 10 percent or more of any stake or stock in any of the Appellees.

## TABLE OF CONTENTS

INTRODUCTION ..................................................................................1

BACKGROUND ..................................................................................3

  A. Legal Background .....................................................................3

  B. The Order ...............................................................................6

  C. Procedural History ...................................................................6

STANDARD OF REVIEW ......................................................................7

SUMMARY OF ARGUMENT ................................................................8

ARGUMENT .....................................................................................11

  I. THE ORDER IS UNLAWFUL...........................................................11

    A. The Order Violates the Fourteenth Amendment. ........................11

      1. The Citizenship Clause is clear. .............................................12

      2. *Wong Kim Ark* already resolved the meaning of the Citizenship Clause...12

      3. Many of Defendants' arguments were specifically rejected in *Wong Kim Ark*. ..................................................................................16

      4. The Fourteenth Amendment contains no "domicile" requirement. ...........20

      5. The Fourteenth Amendment contains no unlawful presence exception. ...31

      6. Defendants' remaining contentions lack merit...........................36

B. The Executive Order is Barred by 8 U.S.C. § 1401(a). ...............................38

1. 8 U.S.C. § 1401(a) incorporates the settled meaning of the Citizenship Clause as interpreted in *Wong Kim Ark*...........................................................39

2. Congress was specifically apprised of the settled meaning of § 1401's language. ...................................................................................................41

3. The statutory scheme bolsters this understanding. .....................................47

II. THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION IN WEIGHING THE EQUITIES. .............................................................................49

III. THE SCOPE OF THE INJUNCTION IS NOT AN ABUSE OF DISCRETION. .................................................................................................53

CONCLUSION ........................................................................................................56

# TABLE OF AUTHORITIES

## Cases

*AARP v. Trump*,
   605 U.S. ___, No. 24A1007, 2025 WL 1417281 (U.S. May 16, 2025)............52

*Afroyim v. Rusk*,
   387 U.S. 253 (1967)...................................................................... passim

*Benny v. O'Brien,*
   58 N.J.L. 36 (Sup. Ct. 1895)................................................................26

*Berenyi v. Dist. Dir., INS*,
   385 U.S. 630 (1967)...........................................................................37

*Bone v. Univ. of N.C. Health Care Sys.*,
   678 F. Supp. 3d 660 (M.D.N.C. 2023)...................................................54

*Bostock v. Clayton County*,
   590 U.S. 644 (2020)...........................................................................39

*Calvin v. Smith*,
   77 Eng. Rep. 377 (K.B. 1608) ...............................................................4

*CASA, Inc. v. Trump*,
   763 F. Supp. 3d 723 (D. Md. 2025)....................................... 11, 21, 24

*CASA, Inc. v. Trump*,
   No. 25-1153, 2025 WL 654902 (4th Cir. Feb. 28, 2025)....................16

*City of Los Angeles v. Patel*,
   576 U.S. 409 (2015)...........................................................................55

*Chae Chan Ping v. United States*,
   130 U.S. 581 (1889)...........................................................................30

*Clark v. McDonald's Corp.*,
   213 F.R.D. 198 (D.N.J. 2003)..............................................................54

*Club Madonna Inc. v. City of Miami Beach*,
   42 F.4th 1231 (11th Cir. 2022) ...........................................................34

iv

*Cochise Consultancy, Inc. v. United States ex rel. Hunt*,
  587 U.S. 262, 268 (2019) ........................................................................41

*Doe v. Trump*,
  766 F. Supp. 3d. 266 (D. Mass. 2025) ........................................... passim

*DraftKings Inc. v. Hermalyn*,
  118 F.4th 416 (1st Cir. 2024) .............................................................. 8, 53

*Dred Scott v. Sandford*,
  60 U.S. 393 (1857) .............................................................................1, 4

*Elk v. Wilkins*,
  112 U.S. 94 (1884) ................................................................ 8, 17, 28, 29

*Elrod v. Burns*,
  427 U.S. 347 (1976) ................................................................................50

*Equal Rts. Ctr. v. Abercrombie & Fitch Co.*,
  767 F. Supp. 2d 510 (D. Md. 2010) .......................................................54

*FDA v. Alliance for Hippocratic Medicine*,
  602 U.S. 367 (2024) ................................................................................55

*Fedorenko v. United States*,
  449 U.S. 490 (1981) ................................................................................50

*George v. McDonough*,
  596 U.S. 740 (2022) ................................................................................39

*Hirabayashi v. United States*,
  320 U.S. 81 (1943) ..................................................................................15

*Hunt v. Washington State Apple Advert. Comm'n*,
  432 U.S. 333 (1977) ................................................................................54

*Hyde Park Partners, L.P. v. Connolly*,
  839 F.2d 837 (1st Cir. 1988) ..................................................................52

*Inda v. United Air Lines, Inc.*,
  83 F.R.D. 1 (N.D. Cal. 1979) .................................................................55

v

*Inglis v. Trustees of Sailor's Snug Harbor*,
  28 U.S. 99 (1830).............................................................................. 4, 26

*INS v. Errico*,
  385 U.S. 214 (1966)......................................................................... 15, 32

*INS v. Rios-Pineda*,
  471 U.S. 444 (1985)......................................................................... 16, 32

*Kamakita v. United States*,
  343 U.S. 717 (1952)................................................................................37

*Kemp v. United States*,
  596 U.S. 528 (2022)...............................................................................41

*Lau Ow Bew v. United States*,
  144 U.S. 47 (1892).................................................................................27

*Lindahl v. Off. of Pers. Mgmt.*,
  470 U.S. 768 (1985)...............................................................................42

*Lorillard v. Pons*,
  434 U.S. 575 (1978)...............................................................................39

*Loughrin v. United States*,
  573 U.S. 351 (2014)...............................................................................41

*Lozano v. City of Hazleton*,
  724 F.3d 297 (3d Cir. 2013) ...................................................................34

*Lynch v. Clarke*,
  1 Sand. Ch. 583 (N.Y. Ch. 1844)...................................................... 4, 25, 37

*Mariko v. Holder*,
  632 F.3d 1 (1st Cir. 2011).......................................................................16

*McCoy v. Mass. Inst. of Tech.*,
  950 F.2d 13 (1st Cir. 1991).....................................................................31

*Morissette v. United States*,
  342 U.S. 246 (1952)......................................................................... 39, 40

*Murray v. The Schooner Charming Betsy*,
  6 U.S. 64 (1804)................................................................................23

*New Jersey v. Trump*,
  131 F.4th 27 (1st Cir. 2025)................................................ 7, 16, 52

*Nken v. Holder*,
  556 U.S. 418 (2009)..........................................................................50

*OfficeMax, Inc. v. Levesque*,
  658 F.3d 94 (1st Cir. 2011)................................................................8

*Parents Involved in Cmty. Schs. v. Seattle Sch. Dist. No. 1*,
  551 U.S. 701 (2007)..........................................................................54

*Plyler v. Doe*,
  457 U.S. 202 (1982)........................................................ 27, 32, 35, 51

*Russello v. United States*,
  464 U.S. 16 (1983)............................................................................49

*Schneiderman v. United States*,
  320 U.S. 118 (1943)..........................................................................50

*Slaughter-House Cases*,
  83 U.S. 36 (1873)..............................................................................17

*Sun Printing & Publ'g Ass'n v. Edwards*,
  194 U.S. 377 (1904)..........................................................................33

*The Pizarro,*
  15 U.S. 227 (1817)............................................................................23

*The Schooner Exchange v. McFaddon*,
  11 U.S. 116 (1812)..................................................................... passim

*Trop v. Dulles*,
  356 U.S. 86 (1958)............................................................................50

*United Sav. Ass'n of Texas v. Timbers of Inwood Forest Assocs., Ltd.*,
  484 U.S. 365 (1988)..........................................................................48

*United States v. Kozminski,*
    487 U.S. 931 (1988) ................................................................. 40, 41

*United States v. Rice,*
    17 U.S. 246 (1819) ...........................................................................22

*United States ex rel. Hintopoulos v. Shaughnessy,*
    353 U.S. 72 (1957) .................................................................. 15, 32

*United States v. Wong Kim Ark,*
    169 U.S. 649 (1898) ............................................................... passim

*Warth v. Seldin,*
    422 U.S. 490 (1975) .........................................................................54

*Washington v. Trump,*
    765 F. Supp. 3d. 1142  (W.D. Wash. 2025) ................................. 11, 12

*Washington v. Trump,*
    No. 25-807, 2025 WL 553485 (9th Cir. Feb. 19, 2025) .......................16

*Winter v. Nat. Res. Def. Council, Inc.,*
    555 U.S. 7 (2008) ...............................................................................7

*Youngstown Sheet & Tube Co. v. Sawyer,*
    343 U.S. 579 (1952) .........................................................................38

## Constitutional Provisions

U.S. Const. amend. XIV ....................................................................21

U.S. Const. amend. XIV, § 1 ...................................................... 5, 11, 12

U.S. Const. art. II, Sec. 1, cl. 5..........................................................21

## Statutes

18 U.S.C. § 1584........................................................................ 40, 41

7 U.S.C. § 2015(f)............................................................................51

8 U.S.C. § 1401 ...................................................... 2, 11, 41, 44

8 U.S.C. § 1401(a) ................................................................. passim

8 U.S.C. § 1401(b) .............................................................................37

8 U.S.C. § 1401(f) ..............................................................................48

8 U.S.C. § 1403 ..................................................................................49

8 U.S.C. § 1403(b) .............................................................................49

8 U.S.C. § 1431 ..................................................................................48

8 U.S.C. § 1433 ..................................................................................48

8 U.S.C. § 603 (1940) .........................................................................49

8 U.S.C. § 713 (1940) .........................................................................48

8 U.S.C. § 714 (1940) .........................................................................48

8 U.S.C. § 715 (1940) .........................................................................48

Nationality Act of 1940 § 201(f) ........................................................48

Nationality Act of 1940 § 203 ............................................................49

Nationality Act of 1940 § 313 ............................................................48

Nationality Act of 1940 § 314 ............................................................48

Nationality Act of 1940 § 315 ............................................................48

**Legislative Materials**

Cong. Globe, 39th Cong., 1st Sess. 1832 (1866) ................................25

Cong. Globe, 39th Cong., 1st Sess. 2768-69 (1866) ..........................36

Cong. Globe, 39th Cong., 1st Sess. 2890 (1866) ....................... 4, 33, 36

Cong. Globe, 39th Cong., 1st Sess. 2890-91 (1866) ..........................33

Cong. Globe, 39th Cong., 1st Sess. 2893 (1866).....................................................29

H. Comm on Immigration & Naturalization, 76th Cong., Nationality Laws of the United States 641-91 (Comm. Print 1939)..................................... 42, 44

H.R. Rep. No. 82-1365 (1952)......................................................... 45, 46

S. Rep. No. 81-1515 (1950).....................................................................45

*To Revise and Codify the Nationality Laws of United States into a Comprehensive Nationality Code: Hearings Before the Comm. on Immig. and Naturalization on H.R. 6127 Superseded by H.R. 9980*, 76th Cong. 37 (1940)................................45

**Regulatory Materials**

7 C.F.R. § 273.4 ...................................................................................51

Executive Order 14,160 (Jan. 20, 2025) ................................................1, 6

**Other Authorities**

10 U.S. Op. Atty. Gen. 328 (1862) .........................................................25

9 U.S. Ops. Atty. Gen. 373 (1859)..........................................................25

Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 80 (2012)............................................................................40

Clement Bouvé, A Treatise on the Laws Governing the Exclusion and Expulsion of Aliens in the United States 421 (1912) ...................................47

Gabriel Chin & Paul Finkelman, *Birthright Citizenship, Slave Trade Legislation, and the Origins of Federal Immigration Regulation*, 54 U.C. Davis L. Rev. 2215 (2021) ...................................................................................................32

Garrett Epps, *The Citizenship Clause: A "Legislative History,"* 60 Am. Univ. L. Rev. 331 (2010) ............................................................................ 18, 29

George S. Knight, *Nationality Act of 1940*, 26 A.B.A. J. 938 (1940)............. 42, 43

Gerald Neuman, *The Lost Century of American Immigration Law (1776–1875)* 93 Colum. L. Rev. 1833 (1993) ................................................................32

Green Haywood Hackworth, DIGEST OF INTERNATIONAL LAW, ch. 9, § 221 (1942) ...................................................................................................43

James C. Ho, *Defining "American" Birthright Citizenship and the Original Understanding of the 14th Amendment*, 9 Green Bag 2d 367 (2006) .................33

Joseph Story, Commentaries on the Conflict of Laws ...........................................26

Lucy Salyer, *Wong Kim Ark: The Contest Over Birthright Citizenship*, *in* IMMIGRATION STORIES 51 (David A. Martin & Peter H. Schuck eds., 2005) ......26

Michael D. Ramsey, *Originalism and Birthright Citizenship*, 109 GEO. L.J. 405 (2020) .................................................................................................... 4, 12, 25

Richard W. Flournoy, Jr., *Dual Nationality and Election*, 30 YALE L.J. 545 (1921) ........................................................................................................................43

Spanish Treaty Claims Comm'n, U.S. Dep't of Justice, *Final Report of William Wallace Brown, Assistant Attorney-General*, App'x D (1910).................... 46, 47

*The Significance of Parental Domicile Under the Citizenship Clause*, 101 Va. L. Rev. 455 (2015) .....................................................................................................34

xi

## INTRODUCTION

Birthright citizenship is foundational to who we are as a nation. Rooted in centuries-old common law, the venerable principle that everyone born in this country is an American—regardless of their parents' status or situation—has allowed the United States to become the vibrant, dynamic country that it is today. But now, because of Executive Order 14,160 (Jan. 20, 2025) (the "Order"), this principle is under assault.

It is not the first time. In the infamous case of *Dred Scott v. Sandford*, 60 U.S. 393 (1857), the Supreme Court denied citizenship to Black Americans based on their race and ancestry. Following the Civil War, the framers of the Fourteenth Amendment corrected that injustice by specifically enshrining the principle of birthright citizenship into the Constitution's text to make sure that no one—not even the President—could take it away from children born in our country. Over 125 years ago, the Supreme Court applied that constitutional protection, emphatically rejecting another effort to undercut birthright citizenship in *United States v. Wong Kim Ark*, 169 U.S. 649 (1898).

*Wong Kim Ark* held that the U.S.-born children of noncitizens, no matter how politically disfavored, were constitutionally guaranteed citizenship. The Court explained that the Clause's exception—for those not "subject to the jurisdiction" of

1

this country—excluded only particular categories of people who were either legally or practically outside of the direct regulatory power of the government, like the children of ambassadors with diplomatic immunity. That principle controls this case, and the district court thus rightly enjoined the Order.

Resisting that conclusion, Defendants offer a jumble of confused, misapplied, and inapposite concepts in an attempt to warp the plain text of the Fourteenth Amendment to match the President's political rhetoric. They contend that "jurisdiction" in the Citizenship Clause is about parental "domicile" and compliance with immigration statutes, even though neither of those concepts are found in the Clause. And they ignore the exhaustive and conclusive analysis in *Wong Kim Ark*— which specifically rejected most of their contentions, and cannot be squared with the rest. The Order blatantly violates the Clause and holding of *Wong Kim Ark*, and the district court's injunction can be affirmed on that basis alone.

But there is more. In 1940, and again in 1952, Congress also enshrined birthright citizenship in statute. 8 U.S.C. § 1401. Congress codified the understanding of universal birthright citizenship reflected in *Wong Kim Ark*— meaning that even if the Fourteenth Amendment were repealed, birthright citizenship would remain guaranteed. Indeed, there can be no doubt about Congress's understanding of the language in § 1401; the drafters extensively

2

explained its broad meaning, including *specifically* rejecting the central "domicile" argument Defendants advance here. Yet Defendants have next to nothing to say about this independent basis for voiding the Order.

Nor are the equities a close call. Plaintiffs are three organizations with hundreds of thousands of members, including parents of babies denied citizenship under the Order. Those babies and their families face a raft of grave harms, from the fundamental denial of their constitutional right to citizenship, to potential arrest and even deportation by immigration agents, to denial of access to passports, medical treatment, and early-life nutrition. By contrast, the government and public have no interest in enforcement of this wildly unlawful Order, in stripping citizenship from thousands of babies, or in upsetting the status quo of universal birthright citizenship stretching back well over a century. The Citizenship Clause was enshrined specifically to protect this vital principle from those who might seek to undermine it. And the President certainly has no authority to rewrite our citizenship laws by Executive fiat.

## BACKGROUND

### A. Legal Background

The common law rule of *jus soli* has long been the cornerstone of American citizenship. Under this rule, every child born within the sovereign's territory is a

citizen. *See, e.g.*, *Calvin v. Smith*, 77 Eng. Rep. 377 (K.B. 1608). This rule was applied in the early American republic; a child born within the United States's territory became a citizen regardless of their parents' nationality or status. *See Inglis v. Trustees of Sailor's Snug Harbor*, 28 U.S. 99, 164 (1830) ("Nothing is better settled at the common law[.]"). For example, *Lynch v. Clarke*, 1 Sand. Ch. 583 (N.Y. Ch. 1844)—a "leading judicial decision[]" on the application of the common law *jus soli* principle in the United States, Michael D. Ramsey, *Originalism and Birthright Citizenship*, 109 GEO. L.J. 405, 445 (2020) ("Ramsey")—specifically held that the child of temporary visitors was a U.S. citizen.

The glaring exception was the treatment of enslaved people. In the infamous case of *Dred Scott v. Sandford*, the Supreme Court expressly broke from the birthright citizenship principle, holding that the descendants of enslaved people who were born in the United States were nonetheless "not included, and were not intended to be included, under the word 'citizens' in the Constitution." 60 U.S. 393, 404 (1857).

After the Civil War, the Reconstruction Congress repudiated *Dred Scott* and reestablished the common law rule of effectively universal birthright citizenship. *See* Cong. Globe, 39th Cong., 1st Sess. 2890 (1866) (statement of Sen. Jacob Howard) (introducing the Citizenship Clause and explaining that it was "declaratory

4

of what I regard as the law of the land already").  In recognition that a statute alone might be insufficient protection, Congress constitutionalized the rule through the Fourteenth Amendment's Citizenship Clause.  *See, e.g.*, *Afroyim v. Rusk*, 387 U.S. 253, 262 (1967) (Clause was drafted "to provide an insuperable obstacle against every governmental effort to strip" citizenship).  The Clause declares that "[a]ll persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside."  U.S. Const. amend. XIV, § 1.

Thirty years later, in *Wong Kim Ark*, the Supreme Court considered whether a child born in California to Chinese nationals was a U.S. citizen under the Fourteenth Amendment.  169 U.S. at 652-53.  The Court concluded that he was a citizen because that Amendment codified the common law rule of universal birthright citizenship, under which—with limited, inapplicable exceptions—every child born in the United States, no matter the citizenship status of their parents, is a citizen.  *Id.* at 693.

In 1940, Congress passed—and in 1952, it reenacted—a federal statute that echoes the Fourteenth Amendment's text, declaring that "a person born in the United States, and subject to the jurisdiction thereof" is a U.S. citizen.  8 U.S.C. § 1401(a).

**B. The Order**

On January 20, 2025, President Trump signed Executive Order 14,160.  The Order purports to declare that a child born in the United States is not a citizen if, at the time of their birth: (1) either their mother was "unlawfully present in the United States" or her "presence in the United States was lawful but temporary," and (2) their father was not a U.S. citizen or lawful permanent resident.  Exec. Order No. 14,160. The Order declares that "no department or agency of the United States government shall" either issue or accept government documents recognizing the citizenship of such children, provided that the child is born after February 19, 2025.  *Id.*  The Order directs the Secretary of State, the Attorney General, the Secretary of Homeland Security, and the Commissioner of Social Security to implement its terms, and directs all other agency heads to issue guidance regarding implementation of the Order.

**C. Procedural History**

Plaintiffs are three organizations with members whose babies will be deprived of their rights and status as natural-born American citizens by the Order.  On January 20, Plaintiffs filed a complaint against President Trump, the Department of Homeland Security and its Secretary, the Department of State and its Secretary, the Department of Agriculture and its Secretary, and the Centers for Medicare and

Medicaid Services and its Administrator.  JA29-45.

The district court granted Plaintiffs' motion for a preliminary injunction on the grounds that the Order violates the Fourteenth Amendment and 8 U.S.C. § 1401(a).  Add. 13-16.  Defendants then filed a motion for clarification regarding who was protected by the injunction.  D. Ct. ECF No. 81.  At a March 14 hearing, the district court clarified that its injunction was not a nationwide or universal injunction, but applied to all of Plaintiffs' members.  JA129-30.  Defendants did not seek a stay.[1]

## STANDARD OF REVIEW

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest."  *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).  "A district court's decision to grant a preliminary injunction is reviewed for

---

[1] Defendants have sought partial stays from the Supreme Court of three injunctions issued against the Order in other cases, including *New Jersey v. Trump*, pending before this Court.  *See* 131 F.4th 27 (1st Cir. 2025) (denying stay); Nos. 24A884, 24A885, 24A886 (U.S.) (*argument held* May 15, 2025).  Because Defendants have not pressed likelihood of success on the merits in those applications, the only issue presented in those applications which Defendants also raise here is whether the district court's order improperly protects all members of the Plaintiff organizations rather than only those identified in court papers.

7

abuse of discretion." *OfficeMax, Inc. v. Levesque*, 658 F.3d 94, 97 (1st Cir. 2011).

"Within this ambit, findings of fact are reviewed for clear error and issues of law are

reviewed *de novo*." *Id.*  The "scope of injunctive relief" is reviewed "only for abuse

of discretion." *DraftKings Inc. v. Hermalyn*, 118 F.4th 416, 423 (1st Cir. 2024)

(cleaned up).

## SUMMARY OF ARGUMENT

I.A.    The Order blatantly violates the Citizenship Clause.  As *Wong Kim Ark*

held, that Clause guarantees citizenship to all persons born in this country, with

minimal exceptions.  The term "subject to the jurisdiction" excepts only a narrow

list of common law "exceptions or qualifications (as old as the rule itself)" and "the

single additional exception" of Native Americans under Tribal authority.  169 U.S.

at 693.  Because it seeks to carve out "other exceptions," Br. for Appellants 2 ("Br."),

the Order is unlawful.

In response, Defendants recycle many of the arguments that the Supreme

Court specifically rejected in *Wong Kim Ark*—including Defendants' repeated

reliance on *Elk v. Wilkins*, 112 U.S. 94 (1884), despite the author of that decision's

later statement that it has "*no tendency* to deny citizenship" to children of

noncitizens, *Wong Kim Ark*, 169 U.S. at 682 (emphasis added).

Defendants also urge the adoption of a domicile requirement, even though that

8

is nowhere reflected in the text of the Clause; conflicts with the clear analysis in *The Schooner Exchange v. McFaddon*, 11 U.S. 116, 143-44 (1812), which the Court applied to interpret the Clause in *Wong Kim Ark*, 169 U.S. at 683-86; and flouts common law principles well known to the framers of the Fourteenth Amendment.

Their effort to carve children of undocumented noncitizens out of the Clause is likewise flawed. Defendants' argument—that not only is domicile required, but that Congress's creation of immigration laws bars people who concededly "meet the [domicile] requirements factually," Br. 9, from establishing domicile—would place control over constitutional citizenship into the hands of the political branches. But that is precisely what the framers of the Fourteenth Amendment created the Clause to foreclose.

I.B.    The Order also violates the birthright citizenship statute, yet Defendants barely respond to this independent basis for the injunction. That statute codified the understanding of the Clause's language when it was enacted in 1940 and recodified in 1952. At that time, as today, *Wong Kim Ark* offered the definitive interpretation. Thus, even if the Clause were radically reinterpreted tomorrow, the statute would continue to provide universal birthright citizenship.

In many cases, courts apply this statutory interpretation principle on the *presumption* that Congress is aware of judicial rulings. But here, there is remarkable

9

direct evidence that the drafters of the Act and Congress specifically rejected Defendants' core arguments, including the notion of a domicile requirement for citizenship. Contextual evidence further confirms that Congress fully understood that everyone born here, with only the narrow exceptions in *Wong Kim Ark*, would be birthright citizens by statute.

II.    The district court did not abuse its discretion in finding that the equities strongly favor Plaintiffs. Plaintiffs face serious and undisputed harms, from constitutional injury, to exposure to immigration enforcement and denial of passports, nutrition, and healthcare. Defendants, meanwhile, have no legitimate interest in enforcing this unlawful Order, and the President has no authority to rewrite our fundamental citizenship laws.

III.    The district court did not abuse its discretion in granting relief to all members of the plaintiff organizations. Where associational standing is demonstrated—as Defendants concede it is here—such relief is common. And Defendants cannot cite a single case endorsing their contrary view, which would gut associational standing despite longstanding Supreme Court precedent permitting it.

## ARGUMENT

### I.  THE ORDER IS UNLAWFUL.

As the district court concluded, the Order is unlawful.  Add. 8-16; *see also Doe v. Trump*, 766 F. Supp. 3d. 266, 278-85 (D. Mass. 2025); *Washington v. Trump*, 765 F. Supp. 3d. 1142, 1149-52 (W.D. Wash. 2025); *CASA, Inc. v. Trump*, 763 F. Supp. 3d 723, 732-44 (D. Md. 2025).  The Order attempts to rewrite the Citizenship Clause of the Fourteenth Amendment and blatantly violates the holding of *Wong Kim Ark*.  It also independently violates 8 U.S.C. § 1401, which Defendants barely address.  Nothing Defendants offer on appeal remotely undermines the district court's holding.

### A. The Order Violates the Fourteenth Amendment.

The Order flagrantly violates the Fourteenth Amendment's Citizenship Clause, which provides that "[a]ll persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States."  U.S. Const. amend. XIV, § 1.  The Supreme Court has long held that the Citizenship Clause guarantees citizenship to all children born in the United States, including to noncitizen parents, with exceptions that are inapplicable here.  *Wong Kim Ark*, 169 U.S. at 693.  By denying citizenship to the children of numerous noncitizens, the Executive Order flatly violates this constitutional bedrock.

11

### 1. The Citizenship Clause is clear.

The children subject to this Executive Order are both "born . . . in the United States" and are "subject to the jurisdiction" of this country in every relevant sense of those words.  U.S. Const. amend. XIV, § 1.  At the time of the Amendment's framing, as now, jurisdiction meant authority—here, the authority of the United States government.  *See* Ramsey, *supra*, at 437-40.  These children are plainly subject to the national government's authority.  And while Defendants focus on the status of parents, "[t]he text is directed at the person born" and "does not mention the person's parents at all, let alone expressly condition its grant of citizenship on any characteristic of the parents."  *Doe*, 766 F. Supp. 3d at 278.  Regardless, their parents, too, are straightforwardly subject to the government's power.  In short, these U.S.-born children are birthright citizens under the plain, ordinary meaning of the constitutional text.  *Id.*; *see* Add. 13-14; *Washington*, 765 F. Supp. 3d at 1150.

### 2. *Wong Kim Ark* already resolved the meaning of the Citizenship Clause.

Importantly, though, the slate is far from blank when it comes to this question.  The Supreme Court has already definitively interpreted the Citizenship Clause, explaining exactly what the framers of the Fourteenth Amendment meant by those words.  Its interpretation, which of course binds this Court, is fundamentally incompatible with Defendants' arguments.

In *Wong Kim Ark*, the Supreme Court considered and rejected a narrow interpretation of the Citizenship Clause. The plaintiff in that case was the U.S.-born child of two Chinese nationals, who at that time were barred by statute from becoming U.S. citizens themselves under the Chinese Exclusion Acts and other laws. 169 U.S. at 650. The federal government argued that the Citizenship Clause applied only to "persons who are *completely* . . . subject to the jurisdiction of the United States, and not subject to any foreign power"; that Mr. Wong's parents were "subjects of a foreign power"; and that Mr. Wong "partook of the nationality of his father." Reply Br. for United States at 11-12, *United States v. Wong Kim Ark*, 169 U.S. 649 (1898) (No. 132). Carefully reviewing English common law, colonial and early American history, and the framing of the Fourteenth Amendment, the Court roundly rejected that argument. 169 U.S. at 654-93. Instead, the Court explained that the Citizenship Clause means what it says, providing for the citizenship of all children born in the United States, with a narrow set of exceptions grounded in common law tradition and the unique relationship of the United States to Native American Tribes. *Id*. at 693. Because Mr. Wong and his parents fell within none of those established exceptions, he was a citizen. *Id.* at 693-94. The same rule applies here.

In particular, the Court underscored that the Citizenship Clause "affirms the

13

ancient and fundamental rule of citizenship by birth within the territory, in the allegiance and under the protection of the country." *Id*. at 693.  The Court elaborated the narrow list of "exceptions or qualifications (as old as the rule itself) of children of foreign sovereigns or their ministers, or born on foreign public ships, or of enemies within and during a hostile occupation of part of our territory." *Id*.

Chief Justice Marshall had previously discussed the common law exceptions in *The Schooner Exchange*, which explained that such persons were either legally or practically immune from regulation and prosecution by the United States, and thus were "not within [its] *jurisdiction*."  11 U.S. at 138 (emphasis added).  He had been clear, however, that unlike immune persons, temporary visitors "owe temporary and local allegiance" and are "amenable to the jurisdiction of the country."  *Id*. at 144

*Wong Kim Ark* then tied the precise constitutional phrase at issue here to Marshall's analysis:

> The words 'in the United States, and subject to the jurisdiction thereof,' in the first sentence of the fourteenth amendment of the constitution, must be presumed to have been understood and intended by the congress which proposed the amendment, and by the legislatures which adopted it, in *the same sense in which the like words had been used* by Chief Justice Marshall in the well[-]known case of *The Exchange* . . .

169 U.S. at 687 (emphasis added); *see id*. at 683 (adopting Marshall's "clear and powerful train of reasoning").

*Wong Kim Ark* then noted "the single additional exception of children of

14

members of the Indian tribes owing direct allegiance to their several tribes," *id.* at 693, which (the Court explained) represented a constitutionally "anomalous" case, *id.* at 683, because they are "alien nations, distinct political communities" within the United States but separate from it, *id*. at 681.

Setting aside the common law exceptions "as old as the rule itself" and the "single additional exception" of Native American Tribes, the Court held that the Fourteenth Amendment protects all other children born in this country, because all other persons within the country have "direct and immediate" allegiance to the United States, even if that allegiance is only "local and temporary." *Id*. at 693.[2] The holding is simple: The term "subject to the jurisdiction" excludes only those specified categories; all other children born in this country are citizens.

Indeed, that has been clear for generations. *See, e.g.*, *Hirabayashi v. United States*, 320 U.S. 81, 96-97 (1943) (noting, in context of World War II, that children of "persons of Japanese descent" "are citizens because born in the United States"); *United States ex rel. Hintopoulos v. Shaughnessy*, 353 U.S. 72, 73 (1957) (child of deportable noncitizens); *INS v. Errico*, 385 U.S. 214, 215 (1966) (child of noncitizen

---

[2] Defendants assert that "the district court construed" *Wong Kim Ark* to have "adopted the traditional English common-law exceptions . . . while adding one—and only one—new exception for tribal Indians." Br. 8-9. As explained in the text, that is not the district court's construction; it is precisely what *Wong Kim Ark* said.

who fraudulently entered); *INS v. Rios-Pineda*, 471 U.S. 444, 446 (1985) (child of noncitizens who unlawfully entered); *Mariko v. Holder*, 632 F.3d 1, 8 n.4 (1st Cir. 2011) (child of unlawfully present noncitizens).  "[F]or more than a century, persons in the two categories that the Executive Order seeks to prevent from being recognized as United States citizens have been so recognized."  *New Jersey*, 131 F.4th at 35; *see CASA, Inc. v. Trump*, No. 25-1153, 2025 WL 654902, at *2 (4th Cir. Feb. 28, 2025) (similar); *Washington v. Trump*, No. 25-807, 2025 WL 553485, at *2 (9th Cir. Feb. 19, 2025) (Forrest. C.J., concurring) ("[I]t appears that the exception to birthright citizenship urged by the Government has never been recognized by the judiciary.").  This case is thus controlled by *Wong Kim Ark*, and the Court may affirm on that basis alone.

### 3.  Many of Defendants' arguments were specifically rejected in *Wong Kim Ark*.

Defendants' contrary arguments lack merit.  As a threshold matter, the Court should dispense with the various arguments and authorities which were offered by the government or the dissent in *Wong Kim Ark*, and specifically rejected by the majority—but are again advanced by Defendants here.  The Court's rejection of these arguments was central to its analysis and holding, which of course binds this Court.

For example, Defendants invoke the *Slaughter-House Cases* for the

proposition that "subject to the jurisdiction" should be read to exclude not only children of ambassadors, but also children of other "citizens or subjects of foreign States born within the United States." Br. 14 (quoting 83 U.S. 36, 73 (1873)). The dissenting opinion in *Wong Kim Ark* pointed to that same dictum from the *Slaughter-House Cases*. 169 U.S. at 723 (Fuller, J., dissenting). But the majority expressly rejected it, criticizing the passage on which Defendants rely as "wholly aside from the question in judgment, . . . unsupported by any argument, . . . and not formulated with the same care and exactness" as the Court normally provides. *Id.* at 678. Yet Defendants now recycle it without acknowledging that fact.

Likewise, Defendants extensively rely on *Elk v. Wilkins* to suggest that certain noncitizens "owe primary allegiance to a foreign sovereign" and so are not "'completely subject' to the 'political jurisdiction' of the United States." Br. 16; *see id.* at 14-15, 24. But, again, this is precisely the argument made—almost verbatim— in *Wong Kim Ark*'s *dissent*. 169 U.S. at 724-25 (Fuller, J., dissenting) (relying on *Elk*). As the majority explained, this argument misunderstood *Elk*, which was a product of the unique constitutional status of Native American Tribes. *See id*. at 680-82. Thus, the Court conclusively held, *Elk* had "*no tendency* to deny citizenship to children born in the United States of foreign parents" who are "not in the diplomatic service of a foreign country." *Id*. at 682 (emphasis added). Yet

17

Defendants do not so much as acknowledge that fact.

Likewise, Defendants offer a narrow interpretation of the citizenship provision of the Civil Rights Act of 1866—based on its caveat language, "not subject to any foreign power"—and argue that the Act served as a "blueprint" for the Clause, which therefore excludes anyone with "allegiance to any foreign sovereign."  Br. 18-20.  But, again, the *dissent* in *Wong Kim Ark* offered the same flawed syllogism.  *See* 169 U.S. at 719-21 (Fuller, J., dissenting).   The majority rejected the narrow statutory gloss, explaining that the 1866 Act was actually as broad as the Constitution.  *Id.* at 688.  And the Court further explained that, in any event, the 1866 Act was of dubious relevance because the text of the Act and the Citizenship Clause were different—and the Clause's wording "removed" "any possible doubt" about the principle of universal birthright citizenship.  *Id.*[3]

More generally, Defendants lean heavily on sources discussing the "law of nations," *i.e.* international law, in contrast to common law.  *See* Br. 21-22 (relying

---

[3] There are further reasons to discount reliance on the 1866 Act as a guide to the meaning of the Citizenship Clause.  The legislation and constitutional amendment had different authors and political dynamics.  *See* Garrett Epps, *The Citizenship Clause: A "Legislative History,"* 60 Am. Univ. L. Rev. 331, 349 (2010) ("Epps") (explaining that, unlike the 1866 Act, the Clause was drafted by "considerably more radical Joint Committee . . . on Reconstruction" which (in contrast to the Act's drafters) "made no concessions to the President's conservative views" "because a President has no veto power over a proposed constitutional amendment").

on, *inter alia*, Emmerich de Vattel); *id.* at 17 (citing cases discussing international law); *id.* at 18-19 (citing treatises discussing international law and relying on Vattel). But this once again recycles an argument advanced by Justice Fuller in dissent. 169 U.S. at 707-09 (Fuller, J., dissenting) (citing Vattel). Indeed, principles of international law were a central focus of the government's argument against Mr. Wong's citizenship. *See* 169 U.S. at 660, 666 (summarizing arguments). The majority specifically rejected those arguments, making clear that the American citizenship rule was to be found in the Fourteenth Amendment and the common law—not in international law treaties. *Id.* at 667-68 (explaining that every nation may determine citizenship rules "for itself, and according to its own constitution").

Relatedly, Defendants criticize reliance on the common law because "this nation was founded on breaking from" the idea of "unalterable allegiance to the King." Br. 40. This, again, was a central argument offered to, and rejected by, the Supreme Court. 169 U.S. at 666-75 (rejecting argument that America had broken with "the rule of the common law, depending on birth within the realm, originally founded on feudal considerations").

These were not tangential points in *Wong Kim Ark*. Each was deployed by Justice Fuller and the government to argue that the children of noncitizens are not covered by the Citizenship Clause. The rejection of these arguments in *Wong Kim*

19

*Ark* is absolutely central to the Court's holding that the plaintiff there—a child of foreign nationals—was himself a citizen.  Defendants cannot wish away the Court's analysis.

### 4.  The Fourteenth Amendment contains no "domicile" requirement.

Seeking to avoid the obvious conclusion that their position is foreclosed by *Wong Kim Ark*, Defendants invent a new Citizenship Clause test from whole cloth: "primary allegiance." Br. 12.  They suggest—struggling to accommodate *Wong Kim Ark*—that both citizens and those domiciled in this country owe "primary allegiance" to it, while temporary visitors and residents—even those living in the country for years for work or extended school programs—do not.  *Id*. at 16-17, 22-23.[4]  This amounts, in effect, to a request to read a new requirement of "domicile" into the Citizenship Clause.

There is no basis for that position in the text of the Citizenship Clause.  It requires only that a person be "born . . . in the United States" and "subject to the

---

[4] This argument seeks to draw on a range of inapposite bodies of law, including especially the law of nations.  *See* Br. 16-18, 23, 31.  As explained above, that reliance is misplaced under *Wong Kim Ark*.  Even those sources, however, do not draw the "primary allegiance" line Defendants propose.  Rather, Defendants cobble together out-of-context snippets from a range of sources that have nothing to do with this case or fail to engage with *Wong Kim Ark*'s analysis.  The result largely recycles the arguments rejected in *Wong Kim Ark*, while paying lip service to the specific outcome in that case.

jurisdiction thereof." U.S. Const. amend. XIV. Nowhere does it say that a person or their parents must be domiciled in the United States or owe the United States their "primary allegiance." *See* Add. 14-16; *Doe*, 766 F. Supp. 3d at 272 ("The text includes no domicile requirement at all."); *CASA*, 763 F. Supp. 3d at 739 (same). Certainly, had the framers of the Fourteenth Amendment intended to include that requirement, they knew how. *Cf.*, *e.g.*, U.S. Const. art. II, Sec. 1, cl. 5 (imposing residency requirement for presidential eligibility).

Nor can Defendants' view be squared with *Wong Kim Ark*. To the contrary, as explained above, *Wong Kim Ark* incorporated Chief Justice Marshall's reasoning in *The Schooner Exchange*, explaining that apart from the unique situation of Native Americans, *The Exchange* "covered the whole question of what persons within the territory of the United States are *subject to the jurisdiction thereof*." 169 U.S. at 683 (emphasis added). *The Exchange* articulated, for example, the rationale on which foreign ministers are afforded diplomatic immunity, namely "a political fiction" that they are outside the country. 11 U.S. at 138-39.[5] But Marshall explained that

---

[5] On similar reasoning, foreign military ships permitted access to U.S. ports are deemed outside of U.S. jurisdiction because the "sovereign is understood to cede a portion of his territorial jurisdiction [] where he allows the troops of a foreign prince to pass through his dominions." *Wong Kim Ark*, 169 U.S. at 684 (quoting *The Schooner Exchange*, 11 U.S. at 138). Accordingly, children "born on foreign public ships" are, like those born to foreign ministers, not U.S. citizens. *Id*. at 693. *Wong*

ordinary visitors—whether for "business or amusement"—"owe temporary and local allegiance" to the United States and are "amenable to the jurisdiction of the country." *Id.* at 143-44. Indeed, such jurisdiction—authority to regulate and punish—was critical: "it would be obviously inconvenient and dangerous to society, and would subject the laws to continual infraction, and the government to degradation, if such individuals or merchants did not owe temporary and local allegiance, and were not amenable to the jurisdiction of the country." *Id.* at 144. This understanding, that visitors are subject to the jurisdiction of the country, is squarely contrary to Defendants' entire position.

Defendants deny that temporary allegiance is sufficient, suggesting that the Citizenship Clause requires a "different" level of allegiance associated with domicile. Br. 23. But *Wong Kim Ark* endorsed and adopted Marshall's precise line in the context of birthright citizenship, explaining that noncitizens are "completely subject to the political jurisdiction" of the United States, even if their presence is "temporary," because a visitor "owes obedience to the laws of [the] government, and

---

*Kim Ark* also noted the common law exception for those children born "of enemies within and during a hostile occupation of part of our territory," *id.*, which applies only to a situation in which, because of military occupation, "[t]he sovereignty of the United States" is "suspended, and the laws of the United States c[an] no longer be rightfully enforced," *United States v. Rice*, 17 U.S. 246, 254 (1819) (addressing War of 1812); *see Wong Kim Ark*, 169 U.S. at 683 (discussing *Rice*).

may be punished for treason or other crimes" for "so long a time as he continues within the dominions" of it.  169 U.S. at 693-94.  As such, for purposes of the Clause the children of such visitors stand in exactly the same relationship to the government as those of permanent residents—namely, they are all subject to the jurisdiction of the United States.

*Wong Kim Ark* is, of course, the definitive word on the meaning of the Citizenship Clause.  But, notably, even the earlier cases on which Defendants rely reinforce the same point.  Br. 17.  For example, in *Murray v. The Schooner Charming Betsy.* Chief Justice Marshall emphasized the "local and temporary allegiance" that any American "who goes into a foreign country" owes to it, even as he considered the additional implications of specifically having "sworn allegiance" to a foreign power.   6 U.S. 64, 120 (1804).  Likewise, *The Pizarro* notes the existence of "temporary" allegiance, consistent with *Wong Kim Ark*, and—more to the point for present purposes—underscores that "by birth" one instead "contract[s] a permanent allegiance." 15 U.S. 227, 246 (1817).  That is precisely the circumstance of children subject to the Order.

Defendants emphasize that the *Wong Kim Ark* opinion "repeatedly" uses the term "domicile."  Br. 36.  That does nothing to undermine the reasoning of *The Schooner Exchange*, nor *Wong Kim Ark*'s adoption of that reasoning to interpret the

23

phrase "subject to the jurisdiction."  To the contrary, the "emphasis on domicile," *id.* at 37, merely reflects that the stipulated facts included that Mr. Wong's parents were *domiciled* in San Francisco.  169 U.S. at 651; *see CASA*, 763 F. Supp. 3d at 739.  The Court's point was that, given this stipulated fact, Mr. Wong's case followed *a fortiori* from the general principle of *The Exchange* and a wide range of other executive and common law sources: "It can hardly be denied that an alien is completely subject to the political jurisdiction of the country in which he resides," the Court observed, "*seeing that*" even "temporary" presence established the required relationship of obedience and allegiance.  169 U.S. at 693-94 (emphasis added).  That is, birthright citizenship applied "[i]ndependently of a residence with intention to continue such residence; *independently of any domiciliation*; independently of the taking of any oath of allegiance, or of renouncing any former allegiance."  *Id*. at 693 (emphasis added).  And if even a temporary visitor's child was a citizen—and, the Court was clear, he would be—then of course Mr. Wong would be one as well.

Shorn of any support in *Wong Kim Ark*, Defendants' remaining arguments fall flat.  They suggest that this country's legal tradition imposed a requirement of domicile.  Br. 22.  To the contrary, the longstanding rule under English common law was that (with only the exceptions noted in *Wong Kim Ark*) all persons born on

English soil were subjects, and that principle was carried over into the American colonies and then States. *See generally* Ramsey, *supra*, at 413-16. Indeed, even Justice Fuller in dissent recognized as much:

> The English common-law rule recognized no exception in the instance of birth during the mere temporary or accidental sojourn of the parents. As allegiance sprang from the place of birth regardless of parentage, and supervened at the moment of birth, the inquiry whether the parents were permanently or only temporarily within the realm was wholly immaterial.

*Wong Kim Ark*, 169 U.S. at 718.

For example, *Lynch v. Clarke* specifically held that the child of temporary visitors was a citizen. *Wong Kim Ark*, 169 U.S. at 664 (discussing *Lynch*). *Lynch* was a "leading judicial decision[]" on the issue, Ramsey, *supra*, at 445, and was discussed in Congress, Cong. Globe, 39th Cong., 1st Sess. 1832 (1866) (statement of Rep. Lawrence). As one indication of its prominence at the time of the Clause's framing, Attorney General Bates relied entirely on *Lynch*'s analysis in concluding, during the Civil War, that "children born in the United States of alien parents" are citizens apart from "such exceptional cases as the birth of the children of foreign ambassadors and the like." 10 U.S. Op. Atty. Gen. 328, 328-29 (1862); *see also* 9 U.S. Ops. Atty. Gen. 373, 373-74 (1859) (opinion of Attorney General Black)

(likewise relying entirely on *Lynch*).[6]

Defendants rely on Justice Story's commentary—which predated the Fourteenth Amendment—to suggest that children of temporary visitors "should" be excluded from citizenship. Br. 22 (quoting Joseph Story, Commentaries on the Conflict of Laws § 48 (1834) ("Story")). But the cited commentary was addressed not to English or American law, but rather to "*foreign* laws." Story § 39 (emphasis added); *id.* at § 42 (Roman law); § 43 (French); § 48 (repeatedly citing Vattel). When it came to the common law, Story agreed with the principles laid out in *Wong Kim Ark*. *See Inglis*, 28 U.S. at 155-56 (Story, J.) (laying out general rule of birthright citizenship, and narrow "exceptions" which "confirm the general doctrine," including "children of an ambassador" and children born in an area "occupied . . . by conquest").[7]

At most, Defendants could perhaps show some disagreement on the common

---

[6] By contrast, Defendants rely on *Benny v. O'Brien*, a New Jersey state trial court decision, but that case (which did not involve the child of visitors) is primarily based on confusion about the meaning of *Elk* among some readers—confusion that was later dispelled, as explained above, by *Wong Kim Ark*. 58 N.J.L. 36 (Sup. Ct. 1895).

[7] Some of Defendants' other treatises, Br. 27, were drafted by lawyers actively working to narrow the Fourteenth Amendment. *See, e.g.*, Lucy Salyer, *Wong Kim Ark: The Contest Over Birthright Citizenship*, *in* IMMIGRATION STORIES 51, 59 & n.28 (David A. Martin & Peter H. Schuck eds., 2005) (describing Alexander Porter Morse, who "challenged a broad reading of the Fourteenth Amendment . . . upon federalism grounds" and argued *Plessy v. Ferguson* on behalf of Louisiana).

law question prior to the ratification of the Fourteenth Amendment. But whatever debate there might have been at common law, it was "put at rest by the fourteenth amendment of the constitution." *Wong Kim Ark*, 169 U.S. at 674–75. And if the framers of the Clause wanted to limit citizenship, they could have selected language to achieve that effect. Instead, they chose expansive language that had been expressly understood, in *The Schooner Exchange*, to include temporary visitors.

Moving to thinly disguised policy arguments, Defendants suggest that those who are domiciled in this country have a different relationship to it than temporary visitors, and have more rights. Br. 27-28. But that observation does not remotely suggest that the *Fourteenth Amendment* imposes a domicile requirement found nowhere in its text.[8] To the contrary, the Supreme Court has specifically held that another provision of the same Amendment, the Equal Protection Clause, protects "anyone, citizen or stranger" within each State. *Plyler v. Doe*, 457 U.S. 202, 215 (1982); *id.* at 211-12 & n.10 (relying on *Wong Kim Ark*). And, notably, *Wong Kim Ark* cautioned against distinguishing between these two clauses, explaining that courts should not "hold that persons 'within the jurisdiction' of one of the states . . .

---

[8] None of the cases on which Defendants rely for this argument arise in the context of birthright citizenship. For example, *Lau Ow Bew v. United States*, 144 U.S. 47 (1892), Br. 37-38, addressed a statutory interpretation question regarding procedural requirements in the Chinese exclusion laws—not the meaning of the Fourteenth Amendment.

are not 'subject to the jurisdiction of the United States.'" 169 U.S. at 687. Yet Defendants' argument would have just that effect—non-domiciled noncitizens would be entitled to equal protection but not "subject to the jurisdiction" of the country under the Citizenship Clause.

Relatedly, Defendants argue (again relying on *Elk*) that the United States' connection to the children of temporarily present noncitizens is weaker than its connection to members of the Native American Tribes. Br. 24-25. But strength of connection is not the rule adopted in the Citizenship Clause. Rather, Native Americans were deemed outside the Clause based on the unique relationship the Tribes have to the National Government. *See Wong Kim Ark*, 169 U.S. at 680-82. Tribes were understood by the framers of the Fourteenth Amendment to be sovereign "alien nations, distinct political communities" within the United States but separate from it. *Id.* at 681. As such, a Native American born within the Tribe's authority was, "'although in a geographical sense born in the United States,'" not subject to jurisdiction of the United States more "'than the children of subjects of any foreign government born within the domain of that government.'" *Id.* (quoting *Elk*, 112 U.S. at 102). It was this circumstance—not weak connections between the United States and Native Americans—that explains the distinction reflected in *Elk* and *Wong Kim Ark*.

28

Defendants resist this conclusion, arguing because the United States has regulatory authority over Native American Tribes, the Court in *Elk* must have applied some kind of unstated "connections" test. Br. 14-15, 24-25. That does not follow. *Wong Kim Ark* called the status of Native Tribes "anomalous," 169 U.S. a 683, precisely because Tribes are sovereign entities within U.S. territory—a unique constitutional position tracing back to the Founding. And while Tribes were subject to federal authority, the framers of the Fourteenth Amendment—who were deeply committed to respecting Native sovereignty—envisioned the United States maintaining and supporting Tribal governments, not dissolving or replacing them. *See* Epps, *supra*, at 363-64. This unique, nation-to-nation relationship was reflected, for example, in the use of treaties between the federal government and Tribes. *See* Cong. Globe, 39th Cong., 1st Sess. 2893 (1866) (Sen. Trumbull) ("We make treaties with them, and therefore they are not subject to our jurisdiction. If they were, we would not make treaties with them."). *Elk*'s discussion of Native Americans not being "completely subject" to the "political jurisdiction" of the United States, and not owing "direct and immediate allegiance" to it, is a reference to this distinct relationship—not an invitation to exclude other groups from citizenship. 112 U.S. at 102. That is why Justice Gray, who wrote both *Elk* and *Wong Kim Ark*, explained that *Elk* had "no tendency to deny citizenship to children

29

born in the United States of foreign parents." *Wong Kim Ark*, 169 U.S. at 682.

Moreover, Defendants' proposal of an amorphous test looking to the strength of parents' "relationship" to the United States to assess their child's citizenship, Br. 5, blinkers the historical context of *Wong Kim Ark*.  Mr. Wong's parents were Chinese nationals living at a time of extraordinary anti-Chinese sentiment.  Far from embracing them as the equivalent of lawful permanent residents today, Congress had, among other things, specifically prohibited them and other Chinese nationals from naturalizing.  *Wong Kim Ark*, 169 U.S. at 699-704; *see id.* at 732 (Fuller, J., dissenting) (emphasizing that they therefore "are and must remain aliens").  Indeed, less than a decade before *Wong Kim Ark*, the Supreme Court had endorsed the view of Chinese nationals as permanent foreigners, opining that they had "remained strangers in the land" and "[i]t seemed impossible for them to assimilate with our people."  *Chae Chan Ping v. United States*, 130 U.S. 581, 595 (1889).  But even in a moment of extraordinary exclusion and discrimination against the Chinese community, the Court recognized that Mr. Wong was a citizen under the clear terms of the Fourteenth Amendment.  That context underscores the Court's holding: With only the narrow exceptions identified by the Court, *all* children born in this country

are citizens.[9]

## 5. The Fourteenth Amendment contains no unlawful presence exception.

Defendants also attempt to shoehorn the Order's exclusion of children of undocumented people into the "domicile" rubric, arguing that undocumented noncitizens lack the legal capacity to establish domicile.  Br. 29-30.  That is meritless on multiple levels.

As already explained, there is no domicile requirement under the Citizenship Clause.  And as with the children of temporarily present noncitizens, the children of undocumented noncitizens plainly "owe[] obedience to the laws of [the] government, and may be punished for treason or other crimes," and thus are "subject to the jurisdiction of the United States" under *Wong Kim Ark*'s analysis.  169 U.S. at 693-94.  Indeed, *Plyler v. Doe* specifically held that undocumented noncitizens' "presence within the State's territorial perimeter" gives rise to "the full range of obligations imposed by the State's civil and criminal laws" and thus they are "within [a State's] jurisdiction" for the purposes of the Equal Protection Clause.  457 U.S. at

---

[9] Defendants suggest that *Wong Kim Ark*'s analysis was dicta.  Br. 35-37.  That is incorrect, as explained above.  But, regardless, this Court is "bound by the Supreme Court's considered dicta almost as firmly as by the Court's outright holdings," especially where, as here, the Court has "carefully considered" it.  *McCoy v. Mass. Inst. of Tech.*, 950 F.2d 13, 19 (1st Cir. 1991).

215.  The same is true for the Citizenship Clause.  *See Wong Kim Ark*, 169 U.S. at 687 (warning against interpreting the clauses differently); *Hintopoulos*, 353 U.S. at 73 (undocumented parents); *Errico*, 385 U.S. at 215-16 (same); *Rios-Pineda*, 471 U.S. at 446 (same).

Defendants suggest that this textual coverage is irrelevant because "the Citizenship Clause was concerned" with protecting "the recently freed slaves," not "grant[ing] citizenship to illegal aliens."  Br. 1, 19.  But it could not be clearer that the Clause extends beyond the descendants of enslaved people to the children of noncitizens—from *Wong Kim Ark*'s holding as well as from the text, context, and history of the Clause.  *See Wong Kim Ark*, 169 U.S. at 698-99 (discussing debates). Defendants nevertheless suggest that undocumented individuals are different from other noncitizens because that category "did not yet exist" in 1868.  Br. 19.  That is historically inaccurate.  *See* Gabriel Chin & Paul Finkelman, *Birthright Citizenship, Slave Trade Legislation, and the Origins of Federal Immigration Regulation*, 54 U.C. Davis L. Rev. 2215, 2227-50 (2021) (discussing illegal importation of enslaved people); Gerald Neuman, *The Lost Century of American Immigration Law (1776–1875)* 93 Colum. L. Rev. 1833, 1841-80 (1993) (state laws).

In any event, as Judge James Ho has noted, "nothing in text or history suggests that the drafters intended to draw distinctions between different categories of aliens."

James C. Ho, *Defining "American" Birthright Citizenship and the Original Understanding of the 14th Amendment*, 9 Green Bag 2d 367, 374 (2006).  For example, one opponent of the Clause, Senator Edgar Cowan, gravely warned of a "flood of immigra[nts]" from China and of "Gypsies" who, he believed, "settle as trespassers where ever they go." Cong. Globe, 39th Cong., 1st Sess. 2890-91 (1866). In response, a supporter of the Amendment rose to defend it, agreeing that (notwithstanding the stated fears of immigration and trespassers) the Citizenship Clause "declare[s] that the children of all parentage whatever, . . . should be regarded and treated as citizens of the United States." *Id.* at 2891 (statement of Sen. John Conness).  This exchange underscores that the drafters of the Citizenship Clause intended the bright line of universal birthright citizenship—subject only to the well-established exceptions discussed in *Wong Kim Ark*—not a system in which parents' immigration status would be parsed and analyzed as Defendants suggest. *See* Cong. Globe, 39th Cong., 1st Sess. 2890 (1866) (Sen. Howard) (introducing Clause and explaining it "settles the great question of citizenship and removes all doubt").

In any event, even if there were some additional, atextual requirement of domicile, most undocumented families are long-term residents, and effectively all would be "domiciled" in the United States under any reasonable definition of that term. *See, e.g.*, *Sun Printing & Publ'g Ass'n v. Edwards*, 194 U.S. 377, 383 (1904)

(domicile requires residence and intention to remain); Note, *The Significance of Parental Domicile Under the Citizenship Clause*, 101 Va. L. Rev. 455, 457 (2015) (cited by Defendants) (conceding citizenship of children of undocumented noncitizens for this reason).

Defendants suggest that there could be some hypothetical undocumented visitor planning to leave after a short time, so a facial challenge must fail (assuming a domicile requirement). But courts do not reject challenges merely because a defendant can "conjure up" a "hypothetical factual scenario" in which the Order might be valid. *Club Madonna Inc. v. City of Miami Beach*, 42 F.4th 1231, 1256 (11th Cir. 2022) (citing *Lozano v. City of Hazleton*, 724 F.3d 297, 313 n.22 (3d Cir. 2013)). The line the Order draws—excluding people from citizenship based on their parents' legal status—is categorically contrary to the Fourteenth Amendment, and it has no "plainly legitimate sweep," Br. 11, so the Order is facially unlawful.[10]

Defendants also suggest that undocumented people legally cannot establish domicile in this country because Congress has "preclude[d]" them from doing so. Br. 30. But no statute actually says that, *see id.* (citing case involving statute barring domicile for other noncitizens), and the Supreme Court has already rejected the idea

---

[10] The Order is also facially invalid because the Clause has no domicile requirement, *supra*, and facially violates the citizenship statute, *infra*.

that undocumented people cannot be domiciled here, *Plyler*, 457 U.S. at 227 n.22 ("[I]llegal entry into the country would not, under traditional criteria, bar a person from obtaining domicile within a State.").

More fundamentally, that line of reasoning would place control over birthright citizenship into the hands of Congress: If domicile is a requirement for coverage by the Fourteenth Amendment, and if Congress can control the legal definition of domicile, then Congress can control who is a birthright citizen.[11]  That is antithetical to the Fourteenth Amendment.  The Clause was included in the Constitution *specifically* so that future Congresses and Presidents could *not* take citizenship away absent a constitutional amendment.  *See Afroyim*, 387 U.S. at 262 (framers "expressed fears that the citizenship so recently conferred on Negroes by the Civil Rights Act could be just as easily take[n] away from them by subsequent Congresses").  The specter of *Dred Scott*'s manipulation of citizenship rules to exclude Black Americans loomed over the framing of the Citizenship Clause, driving congressional leaders to permanently safeguard citizenship.  *See, e.g.*, Cong.

---

[11] Defendants' citations on this point, Br. 31—some written long before *Wong Kim Ark*, *see e.g.*, *The Digest of Justinian* (compilation of Roman law from the 6th century)—are not to the contrary.  For example, Defendants point to Phillimore's discussion of an exiled person's domicile, but that refers to someone physically absent from the relevant country—a far cry from undocumented people who live in this country.

Globe, 39th Cong., 1st Sess. 2768-69 (1866) (statement of Sen. Benjamin Wade). Yet on Defendants' reasoning, a post-Reconstruction Congress could have declared that formerly enslaved people were unable to obtain domicile—and hence their children would not be birthright citizens. The truth is that the framers of the Amendment sought to place universal birthright citizenship beyond ordinary legislative debate, which is why Congress's legislative choices about immigration policy, including the statutes rendering some people undocumented, are irrelevant to the question of birthright citizenship under the Constitution.

### 6. Defendants' remaining contentions lack merit.

None of Defendants' remaining arguments help their case.

Defendants suggest that *Wong Kim Ark*'s reading of the Citizenship Clause— as carving out common law exceptions and Native Americans—renders the "subject to the jurisdiction" clause "redundant." Br. 13. As explained above, that is not so. The children of ambassadors, for example, may be born in the United States but are outside of its jurisdiction under the doctrine of diplomatic immunity. *See Wong Kim Ark*, 169 U.S. at 682, 685; *The Schooner Exchange*, 11 U.S. at 138-39; Cong. Globe, 39th Cong., 1st Sess. 2890 (1866) (statement of Howard). The constitutional phrase "subject to the jurisdiction" thus does work—it is just limited work, particularly because Native Americans have now been afforded universal citizenship by statute.

*See* 8 U.S.C. § 1401(b).

Defendants posit that reading the Citizenship Clause to include the children of noncitizens temporarily or unlawfully present would "inhibit the political branches' ability to address 'problems attendant on dual nationality'" and "could . . . 'creat[e] problems for the governments involved.'"  Br. 32-33.  But dual nationality was a well-known phenomenon when the Fourteenth Amendment was drafted, as it is today.  *See Kamakita v. United States*, 343 U.S. 717, 723 & n.2 (1952) (cited by Defendants) (explaining that dual nationality is "a status long recognized in the law," and collecting cases, including *Lynch v. Clarke*).  And, of course, many undisputed citizens under *Wong Kim Ark* are dual nationals.

Defendants also posit that any ambiguity in the Clause should be read against extending citizenship.  Br. 35.  But the Clause is not ambiguous.  And, in any event, the "heavy burden" lies with Defendants when "the Government seeks to strip a person of citizenship."  *Berenyi v. Dist. Dir., INS*, 385 U.S. 630, 636 (1967) (cited by Defendants).

Finally, Defendants argue that recognizing the citizenship of the children of temporarily and unlawfully present noncitizens "would deprive the political branches of the power to address serious problems caused by near-universal citizenship at birth."  Br. 34.  But as explained above, the Citizenship Clause was

established to protect birthright citizenship *from* the political branches. *Afroyim*, 387 U.S. at 262. Moreover, Congress has *reinforced* birthright citizenship. *See infra*. The President certainly has no power to redefine who is a citizen. *See, e.g.*, *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 587 (1952) ("[T]he framework of our constitution . . . refutes the idea that [the President] is to be a lawmaker."). Thus, the Executive Order is clearly unconstitutional.

## B. The Executive Order is Barred by 8 U.S.C. § 1401(a).

There is an additional, independent reason why the Order is unlawful. 8 U.S.C. § 1401(a) provides that "person[s] born in the United States, and subject to the jurisdiction thereof" "shall be . . . citizens of the United States at birth[.]" Section 1401, like any other statute, must be interpreted in accordance with its meaning *at the time of enactment*. And there can be no doubt that at the time of 1401's enactment, that language—drawn from the Fourteenth Amendment—covered children of all noncitizens, subject to *Wong Kim Ark*'s narrow exceptions. Accordingly, even if the Fourteenth Amendment were radically reinterpreted or eliminated tomorrow, the Order is nevertheless barred by statute, as the district court correctly held. Add. 14-15; *see Doe*, 766 F. Supp. 3d at 283 ("[T]he statute supports a related but distinct claim upon which the plaintiffs are likely to succeed."). Defendants offer next to no response.

### 1. 8 U.S.C. § 1401(a) incorporates the settled meaning of the Citizenship Clause as interpreted in *Wong Kim Ark*.

A statute must be "interpret[ed] . . . in accord with the ordinary public meaning of its terms at the time of its enactment." *Bostock v. Clayton County*, 590 U.S. 644, 654 (2020). Where, as here, "Congress employs a term of art obviously transplanted from another legal source, it brings the old soil with it." *George v. McDonough*, 596 U.S. 740, 746 (2022) (cleaned up). In other words, § 1401 imported "the cluster of ideas that were attached" to "subject to the jurisdiction" in the Fourteenth Amendment by 1940 and 1952. *Morissette v. United States*, 342 U.S. 246, 263 (1952). This is because "where, as here, Congress adopts a new law incorporating . . . prior law, Congress normally can be presumed to have had knowledge of the interpretation given to the incorporated law." *Lorillard v. Pons*, 434 U.S. 575, 581 (1978).

What "subject to the jurisdiction" meant at the time of enactment could not be clearer. As discussed above, the Supreme Court had already interpreted those words in the Fourteenth Amendment. Among other things, *Wong Kim Ark*, 169 U.S. at 687, had held they were used "in the same sense" as in *The Exchange*; and *The Exchange* had made clear that temporary visitors were subject to our laws and therefore "amenable to the jurisdiction of the country." 11 U.S. at 138, 144.

When Congress adopted the same language in 1940 and 1952, it incorporated

the same "cluster of ideas that were attached" to that phrase, *Morissette*, 342 U.S. at 263, by the Supreme Court in *Wong Kim Ark*. *See Doe*, 766 F. Supp. 3d at 282-83. And that interpretation was further reinforced by subsequent decisions applying *Wong Kim Ark*'s construction of that phrase. *See id*. at 280-82 (collecting cases). The statute thus "cements the meaning of the disputed phrase" in federal law independent of the Constitution. *Id*. at 282.

Defendants barely address this independent basis for holding the Order unlawful. They merely argue that the statutory claim "fails for the same reasons as the[] constitutional claim." Br. 42. But that is simply not so. As already explained, Defendants' arguments for a constitutional sea change, *see* Br. 47 (emphasizing the need to "[a]ddress[] the Executive Branch's" supposed "prior misinterpretation of the Citizenship Clause"), are meritless. *See supra*. But even if they were accepted, it would not alter the meaning of the *statute*, the terms of which "must be given the meaning they had when the text was adopted." ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 80 (2012).

In *United States v. Kozminski*, for example, the Supreme Court found that the phrase "involuntary servitude" within 18 U.S.C. § 1584 "clearly was borrowed from the Thirteenth Amendment." 487 U.S. 931, 944-45 (1988). As here, Congress "intended the phrase to have the same meaning" as it had in the constitutional

provision. *Id.* at 945. But, critically, the Court looked to "the understanding of the Thirteenth Amendment that prevailed *at the time of § 1584's enactment*." *Id.* (emphasis added). Any later reinterpretation of the Thirteenth Amendment would not matter to the meaning of the statute. *See id.* at 948 (looking to "the scope of that constitutional provision at the time § 1584 was enacted"); *cf. id.* at 944 ("We draw no conclusions from this historical survey about the potential scope of the Thirteenth Amendment."); *see also Loughrin v. United States*, 573 U.S. 351, 359 (2014) (applying same principle, and noting the "serious chronological problem" with interpreting two provisions in lockstep rather than looking at the meaning of the relevant statute when enacted). So too, here.

Defendants cite no authority to the contrary. *Kemp v. United States* found no "well-settled" interpretation of the provision at issue, noting differences between state courts' interpretations. 596 U.S. 528, 538-39 (2022). But here, the Supreme Court itself had given the definitive interpretation of the relevant language. And *Cochise Consultancy, Inc. v. United States ex rel. Hunt*, involved two identical phrases within the same subsection and enacted at the same time. 587 U.S. 262, 268 (2019). It has no bearing on the principle applied in *Kozminski* and *Loughrin.*

### 2. Congress was specifically apprised of the settled meaning of §1401's Language.

The enactment of § 1401's language after the decision in *Wong Kim Ark* is

enough to decide the statutory issue against Defendants. Courts routinely apply similar reasoning based on the mere existence of judicial precedent interpreting particular language—even precedent decided by lower courts—on the *assumption* that Congress is aware of those decisions and intends to incorporate them. *See Lindahl v. Off. of Pers. Mgmt.*, 470 U.S. 768, 782 n.15 (1985) (collecting cases).

Here, however, there is uniquely strong evidence affirmatively demonstrating that the drafters of the statute understood that the Citizenship Clause covered all children of noncitizens—save the narrow exceptions identified in *Wong Kim Ark*; that they expressly rejected the arguments Defendants now offer; and that they and Congress codified that understanding into the statute.

In the early 1920s, Richard Flournoy, a lawyer for the State Department, suggested that the complex and scattered nationality laws be revised and consolidated. *See* George S. Knight, *Nationality Act of 1940*, 26 A.B.A. J. 938, 938 (1940) (listing Flournoy as one of the drafters of the 1940 Act).[12] As a result, the Secretary of State solicited suggestions from American consular officers in 1927 and created an interdepartmental committee (including Flournoy) to research potential legislation. *See id.* In the same period, Flournoy authored an article explaining,

---

[12] *See* H. COMM ON IMMIGRATION & NATURALIZATION, 76TH CONG., NATIONALITY LAWS OF THE UNITED STATES 641-91 (Comm. Print 1939) (listing all of the U.S. immigration and nationality laws enacted up until that point).

*inter alia*, that under *Wong Kim Ark* "persons born in the United States of aliens who are mere sojourners or transients are citizens of this country" by birth. Richard W. Flournoy, Jr., *Dual Nationality and Election*, 30 YALE L.J. 545, 552-53 (1921) (noting *Wong Kim Ark*'s reliance on *Lynch v. Clarke*, in which the citizen was born to "sojourner" parents).

By the 1930s, the draft Act was circulated to the broader Executive Branch. In 1933, President Franklin D. Roosevelt directed the Secretary of State, the Secretary of Labor, and the Attorney General to review the draft and recommend revisions for Congress. *See* Knight, *supra*, at 938. Flournoy continued to lead drafting efforts, joined by this time by Green Haywood Hackworth. *See id.* (listing Hackworth as one of the drafters of the 1940 Act). Shortly after the 1940 Act, Hackworth would author a State Department publication in which he reported a 1930 State Department decision clarifying that an individual "born at Ellis Island" to an "alien mother [who] was never admitted into the United States" was nevertheless a citizen at birth. 3 Green Haywood Hackworth, DIGEST OF INTERNATIONAL LAW, ch. 9, § 221, at 9-10 (1942) (explaining that child was a citizen because mother did not "belong[] to any one of the classes of aliens referred to by [*Wong Kim Ark*] as enjoying immunity from the jurisdiction of the United States").

In 1938, President Roosevelt transmitted the draft 1940 Act to Congress with

explanatory notes. The notes confirmed that what would later become § 1401 codified the Fourteenth Amendment and the common-law rule in *Wong Kim Ark* and *Lynch v. Clarke*, and that the term "subject to the jurisdiction" had "the effect of barring certain classes of persons, including children born in the United States to parents in the diplomatic service of foreign states." NATIONALITY LAWS OF THE UNITED STATES, *supra*, at 418. Crucially, the notes explained that under the constitutional rule to be codified, "a child born in the United States of parents residing therein temporarily" was also entitled to citizenship. *Id.*

This point bears emphasis. Defendants' core argument is that the Citizenship Clause should be read to include a "domicile" requirement, and that both temporary visitors and undocumented noncitizens lack domicile in this country. *See supra*. Yet the report to Congress could not have been clearer in rejecting *precisely* this view: "In other words, it is the fact of birth within the territory and jurisdiction, and *not the domicile of the parents*, which determines the nationality of the child." NATIONALITY LAWS OF THE UNITED STATES, *supra*, at 418 (emphasis added).

The subsequent enacting history of the 1940 Act confirms the understanding that the children of noncitizens—including "unlawful" or "temporary" noncitizens—were U.S. citizens by birth. In hearings before the House Committee on Immigration and Naturalization, Flournoy testified about what would become

44

§ 1401. He confirmed that the language "[wa]s taken . . . from the fourteenth amendment to the Constitution" that "all persons born in the United States are citizens thereof" and that "[n]o one proposes to change the constitutional provision[]." *To Revise and Codify the Nationality Laws of United States into a Comprehensive Nationality Code: Hearings Before the Comm. on Immig. and Naturalization on H.R. 6127 Superseded by H.R. 9980*, 76th Cong. 37, 38 (1940). Members endorsed the interpretation of the critical "subject to the jurisdiction" language. *See id.* at 246 (confirming that child of tourists would be a citizen). In October 1940, what would become § 1401 was enacted with no change from the original draft.

Finally, the history of the 1952 Act—which reenacted § 1401 nearly verbatim—further confirms the same understanding. A 1950 Senate Judiciary Report recognized that "[b]y common law and court decision" the term "subject to the jurisdiction" had "been interpreted to exempt children born in the United States to parents in the diplomatic service of a foreign state." S. Rep. No. 81-1515, at 685 (1950) (citing *Wong Kim Ark*). A 1952 House Judiciary Committee report on the proposed bill endorsed the same reading of *Wong Kim Ark* that the 1940 Nationality Act's drafters embraced. H.R. Rep. No. 82-1365, at 25 (1952). The Committee explained: "In sustaining Ark's citizenship the Court held that the fourteenth

amendment . . . is but declaratory of the common[]law principle unreservedly accepted in England since Calvin's case . . . and in the United States since the Declaration of Independence, that all persons, regardless of the nationality of their parents born within the territorial limits of a State are ipso facto citizens of that State." *Id.*

In response, Defendants point to outlier sources that pre-dated the enactment of the statute by at least a generation. Most of these commentaries are, as Flournoy himself explained, "clearly contrary to the decisions of our courts." Flournoy, *Dual Nationality and Election*, 30 YALE L.J. at 552 (refuting Taylor, Wharton, and Westlake).[13] For example, one (cited at 29, 39) is an appendix to a government report, apparently representing the views of an "assistant attorney." Spanish Treaty Claims Comm'n, U.S. Dep't of Justice, *Final Report of William Wallace Brown, Assistant Attorney-General*, App'x D at 111 (1910). It reflects remarkable hostility to the Fourteenth Amendment and the holding of *Wong Kim Ark*. *See id.* at 124 ("we must abandon so much of the fourteenth amendment as by construction may be held

---

[13] These outdated treatises largely predate *Wong Kim Ark*, or parrot pre-*Wong Kim Ark* sources. *See* Br. 27 (citing, for example, Morse, which relied on *The Slaughterhouse Cases*, rejected in *Wong Kim Ark*). They have no bearing on what Congress, fully apprised of that decision, understood the statutory language to mean. Meanwhile, Sidney Kansas's unexplained and unjustified annotation of the birthright statute, Br. 42, post-dates the statute's recodification and so is likewise irrelevant.

to undertake to make an American citizen out of children born to foreign parents on American soil").  It also primarily recommends taking away citizenship without affirmative consent, *id*. at 125, an outcome the Supreme Court has since specifically rejected under the Fourteenth Amendment, *Afroyim*, 387 U.S. at 257, 268.[14]

In any event, the most persuasively reasoned of the sources cited by Defendants directly contradicts their position.  Clement Bouvé, on whom Defendants rely (at 38, 42), specifically explained that under *Wong Kim Ark* the children of the "strangers sojourning" and "aliens unlawfully residing in the United States" are citizens by birth.  A TREATISE ON THE LAWS GOVERNING THE EXCLUSION AND EXPULSION OF ALIENS IN THE UNITED STATES 421-27 (1912).  That is the correct understanding of *Wong Kim Ark*, and the one Congress codified.

### 3.  The statutory scheme bolsters this understanding.

Moreover, this understanding of 8 U.S.C. § 1401(a) is the only construction that coheres with the rest of the 1940 Act, when read as a whole.

> Statutory construction . . . is a holistic endeavor.  A provision . . . is often clarified by the remainder of the statutory scheme . . . because only one of the permissible meanings produces a substantive effect that is compatible with the rest of the law . . . .

---

[14] Defendants also point to certain Executive decisions that pre-date *Wong Kim Ark*.  Br. 28-29.  This was, of course, the era in which the government was arguing as a litigant for narrow birthright citizenship rules—arguments the Supreme Court rejected.

*United Sav. Ass'n of Texas v. Timbers of Inwood Forest Assocs., Ltd.*, 484 U.S. 365, 371 (1988) (collecting cases).

Defendants' interpretation of § 1401(a)—as excluding children of visitors and undocumented people—is inconsistent with other provisions of the 1940 Act. Consider, for example, another subsection within § 1401: "A child of unknown parentage found in the United States" "shall be [a] national[] and [a] citizen[] of the United States at birth" "until shown not to have been born in the United States." Nationality Act of 1940 § 201(f), 8 U.S.C. § 601(f) (1940); *see also* 8 U.S.C. § 1401(f) (similar). If, as Defendants would have it, the immigration status of the child's parents were critical to their citizenship under § 1401, this provision would have been drafted quite differently. For example, the evidence to rebut that presumption would not be only "until shown not to have been born in the United States[,]" but rather also until shown evidence about the parents' immigration status.

Likewise, § 313 to § 315 of the 1940 Act provide a process for the naturalization of children born abroad. *See* Nationality Act of 1940 §§ 313-15, 8 U.S.C. § 713-15 (1940); 8 U.S.C. §§ 1431, 1433 (similar). However, there are no analogous provisions for the naturalization of children born in the United States. Congress viewed such naturalization provisions as *unnecessary*, because it understood those children would already be citizens by birth.

48

Finally, Congress plainly knew how to draft a statute that would have the effect that Defendants claim—namely of tying citizenship to the status of one's parents. For example, other provisions refer to a child "whose father or mother or both at the time of the birth of such person was or is a citizen of the United States." Nationality Act of 1940 § 203, 8 U.S.C. § 603 (1940); *see also* 8 U.S.C. § 1403(b). Had Congress intended for the parents' immigration status to factor into whether a child born in the United States is a citizen by birth, 8 U.S.C. § 1401(a) would have been drafted like 8 U.S.C. § 1403. "Where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Russello v. United States*, 464 U.S. 16, 23 (1983) (cleaned up).

The foregoing provisions evince a fundamental assumption in the statute—both as it existed in 1940 and as it exists today—that children born in the United States are citizens by birth, regardless of the status of their parents. To assume 8 U.S.C. § 1401(a) says otherwise, as Defendants would have it, would render the statute incoherent.

## II. THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION IN WEIGHING THE EQUITIES.

The district court had "little difficulty concluding that the denial of citizenship

49

status to newborns, even temporarily, constitutes irreparable harm," and concluded that "the defendants have no interest in executing [the Order] during the resolution of the litigation." Add. 16-18. This was no abuse of discretion.

Defendants do not contest Plaintiffs' showing on the equities. For good reason: The denial of constitutional rights "unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976). The Order will strip the "priceless treasure" of citizenship from members' children, *Fedorenko v. United States*, 449 U.S. 490, 507 (1981), which the Supreme Court has described as "more serious than a taking of one's property," *Schneiderman v. United States*, 320 U.S. 118, 122 (1943); *see also Trop v. Dulles*, 356 U.S. 86, 102 (1958) (loss of citizenship results in "a fate of ever-increasing fear and distress").

The Order also makes them subject to immigration enforcement and even deportation to countries they may have never even visited, JA48; JA60, and where they may "face substantial harm," *Nken v. Holder*, 556 U.S. 418, 436 (2009). Likewise, Plaintiffs' members will not be able to obtain passports for their babies. This threatens to prevent travel abroad to, for example, visit ailing relatives or celebrate a wedding. JA58; JA60; *see also* JA48; JA58 (passports needed as identification). And babies could be rendered stateless as parents navigate the complex processes of transferring nationality to their U.S.-born children. JA48-49;

JA58; JA62; *see Afroyim*, 387 U.S. at 268 ("loss of citizenship" can render one "a man without a country").  The Order will also impair babies' access to critical early-life nutrition and healthcare.  *See, e.g.*, 7 U.S.C. § 2015(f); 7 C.F.R. § 273.4; JA49; JA58; JA60-61.

Further, the Order would "promot[e] the creation and perpetuation of a subclass" of children who were born in the United States but lack legal recognition and face stigma, the inability to work, and the risk of removal to countries they've never known.  *Plyler*, 457 U.S. at 230; *see* JA59; D. Ct. ECF No. 24-17 & 24-18. The Order would also "impose[] [this] discriminatory burden on the basis of a legal characteristic over which children can have little control," offending "fundamental conceptions of justice."  *Plyler*, 457 U.S. at 220; *see* D. Ct. ECF No. 24-12 to 24-16.[15]

By contrast, as the district court found, Defendants have advanced no substantial interest in enforcing an unconstitutional and unlawful Order and upending a constitutional status quo that dates back over a century.  Add. 18 ("As

---

[15] By attacking the principle that all children born in this country are citizens, the Order would invite persistent questioning of the citizenship of children of immigrant communities—particularly children of color—broadly imposing both stigma and the expense of proving not just that a child was born in the U.S., but also the citizenship and immigration status of the child's parents.  *See* D. Ct. ECF No. 24-22.

the Executive Order appears to this court to violate both constitutional and statutory law, the defendants have no interest in executing it during the resolution of this litigation."); *see also Hyde Park Partners, L.P. v. Connolly*, 839 F.2d 837, 842-43 (1st Cir. 1988) (similar).  The government's interest merges with the public interest, and "the public has a substantial interest in ensuring that those entitled to be recognized as U.S. citizens under the criteria on which officials at all levels of government have long relied are not unlawfully deprived of that recognition." *New Jersey*, 131 F.4th at 41.

Defendants argue that without being able to implement the Order, President Trump will be "powerless to address" immigration concerns.  Br. 2, 47.  But Congress and the Executive have a wide range of tools available to them to address immigration matters, and the public has a strong interest in the government respecting constitutional rights and the separation of powers.  *See AARP v. Trump*, 605 U.S. ___, No. 24A1007, 2025 WL 1417281, at *2 (U.S. May 16, 2025) (citing "necessity that [national security] interests be pursued in a manner consistent with the Constitution").

To the extent the President complains about his inability to strip Americans of citizenship, that is just the point.  "Citizenship is no light trifle to be jeopardized any moment [a President] decides to do so," and "[t]he very nature of our free

government" rebuts the notion that those "temporarily in office can deprive another group of citizens of their citizenship." *Afroyim*, 387 U.S. at 267-68. Indeed, the Citizenship Clause was included in the Constitution specifically so that future Congresses and Presidents could not take it away absent a constitutional amendment. *See id.* at 262. Moments like this show how wise that was. Thus, the district court did not abuse its discretion in concluding that the equities and public interest favor an injunction.

## III. THE SCOPE OF THE INJUNCTION IS NOT AN ABUSE OF DISCRETION.

The injunction "is . . . neither universal nor nationwide" but protects "all members of the plaintiff organizations, not just those referred to in the papers." JA129-30. Defendants concede Plaintiffs established associational standing, but argue that the injunction should have been limited to only members specifically identified in the papers. Br. 44-45. Their argument is contrary to settled law, and the District Court did not abuse its discretion in rejecting it. *DraftKings*, 118 F.4th at 423.

It is well established that, "when an organization has already satisfied the *Hunt* test and established associational standing as to some members, it may also assert claims on behalf of unnamed members." *Equal Rts. Ctr. v. Abercrombie & Fitch Co.*, 767 F. Supp. 2d 510, 526 (D. Md. 2010), *on reconsideration in part* (Jan. 31,

2011) (citing *Hunt v. Washington State Apple Advert. Comm'n*, 432 U.S. 333 (1977)); *see id.* (courts have "flatly rejected" the contrary argument) (citing *Clark v. McDonald's Corp.*, 213 F.R.D. 198, 215-16 (D.N.J. 2003)) (cleaned up). Simply put, "an entity with associational standing can . . . seek broad injunctive relief that would inure to the benefit of . . . that entity's members[] that are not before the court." *Bone v. Univ. of N.C. Health Care Sys.*, 678 F. Supp. 3d 660, 703 n.33 (M.D.N.C. 2023); *see Warth v. Seldin*, 422 U.S. 490, 515 (1975) (the organization may "invoke the court's remedial powers on behalf of its members" to obtain an injunction that "will inure to the benefit of those members of the association actually injured").

Defendants fail to cite *any* authority holding that relief in associational standing cases is limited to identified members. Instead, they cite (at 43) inapposite cases addressing the need for individualized showings as to *damages* in *class actions*. But here the organizations seek "declaratory and injunctive relief" which does not require "individualized proof" and is "properly resolved in a group context." *Hunt*, 432 U.S. at 344-45 (affirming broad injunction); *Parents Involved in Cmty. Schs. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 718 (2007) (similar).

In truth, Defendants' argument is a thinly veiled argument to overrule the Supreme Court's many associational standing precedents, but that is both unjustified

and unavailable to this Court. *See FDA v. All. for Hippocratic Medicine*, 602 U.S. 367, 399 (2024) (Thomas, J., concurring) (criticizing precedents permitting associational standing, but agreeing that, under longstanding law, once standing is established, the "doctrine permits that association to seek relief for its entire membership").

Defendants suggest that only a portion of Plaintiffs' members will have babies in any given year. But by their own calculation (at 44), their proposal would expose thousands of babies to harm each year, and it would require endless logistical burdens on the parties and the district court to update running lists of pregnancies and births. By contrast, Defendants are not remotely harmed by the Order being enjoined as to members who do not currently have or expect children subject to it. *Cf. City of Los Angeles v. Patel*, 576 U.S. 409, 418 (2015) (the "proper focus" is what the challenged law "actually authorizes," not what is "irrelevant").

Defendants also contend that an injunction extending to all members is "inequitable" because those members may also be members of other organizations challenging the Executive Order in other litigation. Br. 45. If some theoretical danger of conflicting judgments were to emerge, district courts are well equipped to address it. *See, e.g.*, *Inda v. United Air Lines, Inc.*, 83 F.R.D. 1, 6, 14 (N.D. Cal. 1979) (inviting parties to brief options). But such speculation cannot justify leaving

hundreds of thousands of members unprotected.[16]

## CONCLUSION

The Court should affirm.

Dated: June 9, 2025

SangYeob Kim (No. 1183553)
Gilles R. Bissonnette (No. 123868)
Henry Klementowicz (No. 1179814)
Chelsea Eddy (No. 1213964)
AMERICAN CIVIL LIBERTIES UNION
OF NEW HAMPSHIRE
18 Low Avenue
Concord, NH 03301
Tel.: (603) 224-5591
sangyeob@aclunh.org
gilles@aclu-nh.org
henry@aclu-nh.org
chelsea@aclu-nh.org

Morenike Fajana (No. 1216639)
Ashley Burrell (No. 1216634)
Elizabeth Caldwell (No. 1190161)
NAACP LEGAL DEFENSE &
EDUCATIONAL FUND, INC.
40 Rector St., FL 5,
New York, NY 10006
Tel.: (212) 217-1690
mfajana@naacpldf.org

Respectfully submitted,

/s/ *Cody Wofsy*
Cody Wofsy (No. 1179414)
Hannah Steinberg
Stephen Kang
Spencer Amdur
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION IMMIGRANTS' RIGHTS
PROJECT
425 California Street, Suite 700
San Francisco, CA 94104
Tel.: (415) 343-0770
cwofsy@aclu.org
hsteinberg@aclu.org
skang@aclu.org
samdur@aclu.org

Grace Choi
Noor Zafar
Lee Gelernt (No. 41744)
Omar Jadwat (No. 1124751)
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION IMMIGRANTS'
RIGHTS PROJECT
125 Broad St., 18th Floor New

---

[16] Defendants contest the power to enjoin the President. Br. 46. Because, as they concede, injunctive relief may be entered against subordinate officers, Plaintiffs have no objection to lifting the injunction as to the President. *See Doe*, 766 F. Supp. 3d at 288-89.

aburrell@naacpldf.org
bcaldwell@naacpldf.org

Morgan Humphrey
Mide Odunsi
NAACP LEGAL DEFENSE &
EDUCATIONAL FUND, INC.
700 14th Street NW, Suite 600
Washington, DC 20005
Tel.: (202) 249-2193
mhumphrey@naacpldf.org
modunsi@naacpldf.org

Carol Garvan (No. 1145471)
Zachary L. Heiden (No. 99242)
AMERICAN CIVIL LIBERTIES UNION OF
MAINE FOUNDATION
P.O. Box 7860
Portland, Maine 04112
Tel.: (207) 619.8687
cgarvan@aclumaine.org
heiden@aclumaine.org

Adriana Lafaille (No. 1150582)
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF MASSACHUSETTS,
INC.
One Center Plaza
Suite 850
Boston, MA 02108
Tel.: (617) 482-3170
alafaille@aclum.org

York, NY 10004
Tel.: (212) 549-2660
gchoi@aclu.org
nzafar@aclu.org
lgelernt@aclu.org
ojadwat@aclu.org

Christopher M. Lapinig
Kimberly Wei Leung
Winifred Kao
ASIAN LAW CAUCUS
55 Columbus Ave
San Francisco, CA 94111
Tel.: (415) 896-1701
christopherl@asianlawcaucus.org
kimberlyl@asianlawcaucus.org
winifredk@asianlawcaucus.org

Norm Eisen†
Tianna Mays†
DEMOCRACY DEFENDERS FUND
600 Pennsylvania Avenue SE, #15180
Washington, D.C. 20003
Tel.: (202) 594-9958
norman@statedemocracydefenders.org
tianna@statedemocracydefenders.org

*Counsel for Plaintiffs*
*†Counsel for LULAC only*

## CERTIFICATE OF SERVICE

I certify that, on June 9, 2025, a true and correct copy of this document was transmitted to the Clerk of the United States Court of Appeals for the First Circuit via the Court's CM/ECF document filing system, and on all counsel of record.

/s/ *Cody Wofsy*
Cody Wofsy (No. 1179414)

## CERTIFICATE OF COMPLIANCE

I certify that this document complies with the type-volume limitation of Rule 32(a)(7)(B)(i) because, excluding the parts of the document exempted by Rule 32(f), it contains 12,912 words, and complies with the typeface and style requirements of Rule 32(a)(5) and (a)(6) because it was prepared in Microsoft Word using 14-point Times New Roman typeface.

/s/ *Cody Wofsy*
Cody Wofsy (No. 1179414)