# United States Court of Appeals
### *for the*
# First Circuit

Case No. 25-1348

NEW HAMPSHIRE INDONESIAN COMMUNITY SUPPORT; LEAGUE OF UNITED LATIN AMERICAN CITIZENS; MAKE THE ROAD NEW YORK,

*Plaintiffs-Appellees,*

v.

DONALD J. TRUMP, President of the United States, in their official capacity; U.S. DEPARTMENT OF HOMELAND SECURITY; KRISTI NOEM, in their official capacity as Secretary of the U.S. Department of Homeland Security; U.S. DEPARTMENT OF STATE; MARCO RUBIO, in their official capacity as Secretary of the U.S. Department of State; U.S. DEPARTMENT OF AGRICULTURE; BROOKE L. ROLLINS, in their official capacity as Secretary of the U.S. Department of Agriculture; CENTERS FOR MEDICARE AND MEDICAID SERVICES; MEHMET OZ, in their official capacity as Administrator of the Centers for Medicare and Medicaid Services,

*Defendants-Appellants.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF NEW HAMPSHIRE, CONCORD, IN CASE NO. 1:25-CV-00038-JL, HONORABLE JOSEPH N. LAPLANTE, U.S. DISTRICT JUDGE

## BRIEF FOR *AMICUS CURIAE* BLACK ALLIANCE FOR JUST IMMIGRATION, HAITIAN BRIDGE ALLIANCE AND UNDOCUBLACK NETWORK IN SUPPORT OF PLAINTIFFS-APPELLEES

DEANNA D. ALLEN
COOLEY LLP
1299 Pennsylvania Avenue, NW
   Suite 700
Washington, DC 20004
(202) 842-7800

KRISTEN A. JOHNSON
ERINMA E. MAN
ARISTIDES I. HADJIPANTELI
COOLEY LLP
55 Hudson Yards
New York, New York 10001
(212) 479-6000

*Attorneys for Amicus Curiae*

*(For Continuation of Appearances See Inside Cover)*

TSION GURMU
BLACK ALLIANCE FOR JUST IMMIGRATION
1368 Fulton Street, Suite 311
Brooklyn, NY 11216
(347) 464-5422

NACHIKETA BARU
COOLEY LLP
10265 Science Center Drive
San Diego, California 92121
(858) 550-6000

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rules of Appellate Procedure 26.1 and 29(a)(4)(a), *amici curiae* the Black Alliance for Just Immigration, the Haitian Bridge Alliance, and the UndocuBlack Network each has no parent corporation and issues no stock.

# TABLE OF CONTENTS

**Page**

INTEREST OF AMICI......................................................................... 1

INTRODUCTION ............................................................................... 2

ARGUMENT ....................................................................................... 3

    I.    HISTORY REVEALS THE LONGSTANDING
         EXCLUSION OF BLACK PEOPLE FROM U.S.
         CITIZENSHIP AND LEGAL PERSONHOOD........................ 3

         A.    In the early United States, immigration was largely
             unregulated by the federal government—with the
             exception of slavery. ........................................................ 4

         B.    The Fourteenth Amendment was a monumental step
             toward remedying Black people's exclusion from
             the American polity. ........................................................ 7

         C.    Despite enactment of the Fourteenth Amendment,
             race-based exclusion remained a feature of the U.S.
             immigration system........................................................... 9

         D.    Although racially discriminatory enforcement of
             U.S. immigration laws persisted in the mid-20th
             century, the Fourteenth Amendment's Citizenship
             Clause has remained a critical remedy. .......................... 12

    II.    THE EXECUTIVE ORDER WILL EXACERBATE AND
         ADD TO THE DISPROPORTIONATE HARMS THAT
         BLACK IMMIGRANTS—PARTICULARLY
         PREGNANT WOMEN AND THEIR U.S.-BORN
         CHILDREN—ALREADY FACE. ......................................... 14

         A.    Black immigrants disproportionately face negative
             immigration consequences in connection with
             racially discriminatory enforcement of criminal law. .... 15

         B.    Due to anti-Blackness within the immigration
             system, Black immigrants face systemic barriers to
             immigration relief, and would therefore suffer
             irreparable harm if the Executive Order is
             implemented.................................................................... 17

# TABLE OF CONTENTS
(continued)

Page

C.   The Executive Order would irreparably harm pregnant Black immigrants and their U.S.-born children. ........................................................................ 21

   1.   The Executive Order would exacerbate the acute disparities in health outcomes that pregnant Black immigrants and their infants suffer. .................................................................. 22

      a.   The Executive Order would rescind access to government-sponsored early life necessities. ........................................... 24

      b.   The Executive Order would heighten maternal stress levels, jeopardizing maternal and infant health. ......................... 26

   2.   The Executive Order would increase the exposure of pregnant Black immigrants and their infants to the harms that stem from U.S. immigration enforcement. ................................... 27

   3.   By depriving infants of citizenship, even temporarily, the Executive Order would inflict dignitary harm that cannot be undone. ...... 29

III.   CONCLUSION ........................................................................ 31

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Chalk v. Cent. Dist. of California,*
  840 F.2d 701 (9th Cir. 1988) ........................................................30

*Chy Lung v. Freeman,*
  92 U.S. 275 (1875)............................................................... 9, 10

*Dep't of State v. Muñoz,*
  602 U.S. 899 (2024).....................................................................5

*Dep't of State v. Muñoz,*
  No. 23-334, 2024 WL 1420708 (U.S. Mar. 28, 2024) ...............................5

*Dred Scott v. Sandford,*
  60 U.S. 393 (1857)....................................................................7, 8

*Elkison v. Deliesseline,*
  8 F. Cas. 493 (C.C.D.S.C. 1823) ....................................................6

*Fedorenko v. United States,*
  449 U.S. 490 (1981)...................................................................29

*Heckler v. Mathews,*
  465 U.S. 728 (1984)...................................................................30

*Inner City Contracting, LLC v. Charter Twp. of Northville,*
  87 F.4th 743 (6th Cir. 2023) ........................................................31

*Lynch v. Clarke,*
  1 Sand. Ch. 583 (N.Y. Ch. 1844) ...................................................8

*Moore v. People of State of Ill.,*
  55 U.S. 13 (1852)........................................................................6

*New Hampshire Indonesian Cmty. Support v. Trump,*
  765 F. Supp. 3d 102 (D.N.H 2025) ................................................3

*Ozawa v. United States,*
  260 U.S. 178 (1922)...................................................................10

# TABLE OF AUTHORITIES
## (Continued)

Page(s)

*People v. Hall*,
4 Cal. 399 (1854) ....................................................................7

*Schneiderman v. United States*,
320 U.S. 118 (1943)...............................................................29

*State v. Claiborne*,
19 Tenn. 331 (1838) ............................................................6, 8

*Trop v. Dulles*,
356 U.S. 86 (1958).................................................................30

*United States v. Thind*,
261 U.S. 204 (1923)...............................................................11

*United States v. Wong Kim Ark*,
169 U.S. 649 (1898)..............................................................8, 9

**Statutes**

8 U.S.C. § 1401(a) .................................................................12

42 U.S.C. § 18032(f)(3) ..........................................................25

1790 Naturalization Act, ch. 3, 1 Stat. 103 (1790)................. 4, 8, 10

1875 Page Act, ch. 141, 18 Stat. 477 (1875) ......................................9

1882 Chinese Exclusion Act, ch. 126, 22 Stat. 58 (1882)..............................10

1924 Johnson-Reed Act, 43 Stat. 153 (1924).................................11

1965 Immigration and Naturalization Act, 79 Stat. 911 (1965)......................12

Act of July 14, 1870, ch. 254 § 7, 16 Stat. 254, 256 .........................................8

Act of Mar. 3, 1875, ch. 141, 18 Stat. 477 (1875)............................................9

Fugitive Slave Act of 1793, 1 Stat. 302 (1793)................................................5

Fugitive Slave Act of 1850, 9 Stat. 462 (1850)................................................5

# TABLE OF AUTHORITIES
## (Continued)

**Page(s)**

Illegal Immigration Reform and Immigrant Responsibility Act of 1996 § 287(g)..................................................................16

Naturalization Act of 1790, ch. 3, 1 Stat. 103 (repealed 1795)........................4

Negro Seaman Act ..............................................................5, 6

2 Stat. 205, ch. 10 (1803)..................................................4

79 Stat. 911 (1965)..........................................................12

## Other Authorities

7 C.F.R. § 273.4(a)..........................................................24

42 C.F.R.
§ 435.406(a) .................................................................25
§ 435.956 ...................................................................25
§ 457.320(d).................................................................25

*The 287(g) Program: An Overview*, American Immigration Council (2025), https://www.americanimmigrationcouncil.org/research/287g-program-immigration..................................................................16

Alina Das, *Inclusive Immigrant Justice: Racial Animus and the Origins of Crime-Based Deportation*, 52 U.C. Davis L. Rev. 171 (2018)..................................................................14

Alina Das, *No Justice in the Shadows: How America Criminalizes Immigrants* 43 (2020).................................. 5, 6, 8

Allana T. Forde et al., *The Weathering Hypothesis as an Explanation for Racial Disparities in Health: A Systematic Review*, 33 Annals of Epidemiology 1 (2019)..........................26

Amir J. Lueth et al., *Allostatic Load and Adverse Pregnancy Outcomes*, 140 Obstetrics & Gynecology 974 (2022) ..............................26

# TABLE OF AUTHORITIES
## (Continued)

Page(s)

*Anti-Black Discrimination within US Immigration, Detention, and Enforcement Systems*, Human Rights First (Aug. 8, 2022), https://humanrightsfirst.org/library/cerd-anti-black-discrimination-within-us-immigration-detention-and-enforcement-systems/ ...............................................................20

*Black migrants caught in the crossfire of birthright citizenship battle*, Afro News, https://afro.com/black-migrants-threatened-citizenship-trump-executive-order/ ..........................................17

Brent A. Langellier, *Allostatic Load Among U.S.- and Foreign-Born Whites, Blacks, and Latinx*, 60 Am. J. Preventive Med. 159 (2021)...................................................................................26

Camilo Montoya-Galvez, *Investigation finds women detained by ICE underwent "unnecessary gynecological procedures" at Georgia facility*, CBS News (Nov. 15, 2022) ............................28

Carl Lindskoog, *Detain and Punish: Haitian Refugees and the Rise of the World's Largest Immigration Detention System* (2018)...................................................................................13

Carl Lindskoog, *How the Haitian refugee crisis led to the indefinite detention of immigrants*, Wash. Post (Apr. 9, 2018).................13

*CHIP Eligibility & Enrollment*, Medicaid.gov, https://www.medicaid.gov/chip/chip-eligibility-enrollment; ....................25

*Coverage for lawfully present immigrants*, HealthCare.gov, https://www.healthcare.gov/immigrants/ lawfully-present-immigrants/ ..................................................................................25

Daniel Kanstroom, *Deportation Nation: Outsiders in American History* (2007)............................................................................5

Dedrick A. Muhammad & Janessa Chu, *Racial Wealth Snapshot: Immigration and the Racial Wealth Divide*, National Community Reinvestment Coalition (Feb. 3, 2023) ...................................19

# TABLE OF AUTHORITIES
## (Continued)

Page(s)

Ed Pilkington, *Outcry as more than 20 babies and children deported by US to Haiti*, The Guardian (Feb. 8, 2021) .............................28

Ehiremen Adesua Azugbene et al., *African Immigrant Women's Maternal Health Experiences in Clarkston, Georgia: A Qualitative Study*, 4.1 Women's Health Reports 603 (2023) ....................22

Eileen Sullivan, *After Del Rio, Calls for Fairer Treatment of Black Migrants*, N.Y. Times (Oct. 21, 2021) ............................19

Eileen Sullivan, *U.S. Accelerated Expulsions of Haitian Migrants in May*, N.Y. Times (June 9, 2022) ...........................19

Elizabeth Keyes, *Race and Immigration, Then and Now: How the Shift to "Worthiness" Undermines the 1965 Immigration Law's Civil Rights Goals*, at 57 Howard L.J. 899 (2014).....................5, 12

Executive Order 14160 ...............................................................3

Fed. R. App. P. 29(a)(4)(E) .............................................................1

Gerald Neuman, The Lost Century of American Immigration Law (1776-1875), 93 Colum. L. Rev. 1833 (1993)..........................6, 7, 10

Jacob Hamburger, *The Consequences of Ending Birthright Citizenship,* https://papers.ssrn.com/sol3/papers.cfm?abstract_id=510602 ..................................................................................9

Jeanne L. Alhusen et al., *Racial Discrimination and Adverse Birth Outcomes: An Integrative Review*, 61 J. Midwifery & Women's Health 707 (2016)......................................................26

Juliana Morgan-Trostle et al., *The State of Black Immigrants: Part II*, Black Alliance for Just Immigration, https://baji.org/wp-content/uploads/2020/03/sobi-fullreport-jan22.pdf ..........................................................................16, 17

Karla M. McKanders, *Immigration and Racial Justice: Enforcing the Borders of Blackness*, 37 Ga. St. U. L. Rev. 1139 (2021)................................................................15

# TABLE OF AUTHORITIES
## (Continued)

**Page(s)**

Karla McKanders, *Politics of Belonging: Anti-Black Racism, Xenophobia, and Disinformation*, Harv. L. Rev. Blog (Nov. 18, 2024) ....................................................................................10

Kelly Lytle Hernandez, *The Whites-Only Immigration Regime*, 56 The Western Historical Quarterly (Oxford Univ. Press 2024) ........................................................................................4

Kerry Abrams, *Polygamy, Prostitution, and the Federalization of Immigration Law*, 105 Colum. L. Rev. 641 (2005)............................... 5, 10

Lauren Villagran, *Immigrant women describe 'hell on earth' in ICE detention*, USA TODAY (Mar. 23, 2025) .........................................28

Mariah Jiles et al., *Maternal and Infant Health Outcomes in US-Born and Non-US-Born Black Pregnant People in the US*, JAMA Network Open (2024) ....................................................................23

Maxine Goodman, *Human Dignity in Supreme Court Constitutional Jurisprudence*, 84 Neb. L. Rev. 740 (2005).......................30

Michael L. Wells, *Compensatory Damages and Dignitary Harm in the Upcoming Restatement of Constitutional Torts*, 62 Hous. L. Rev. 115 (2024) ..........................................................................30

*Migrant children in U.S. detention face physical, mental harms: report*, Harvard T.H. Chan School of Public Health (Jan. 22, 2024), https://hsph.harvard.edu/news/migrant-children-in-u-s-detention-face-physical-mental-harms-report/ ........................................27

Muzaffar Chishti & Julia Gelatt, *A Century Later, Restrictive 1924 U.S. Immigration Law Has Reverberations in Immigration Debate*, Migration Policy Institute (May 15, 2024), https://www.migrationpolicy.org/article/1924-us-immigration-act-history .............................................................................11

# TABLE OF AUTHORITIES
## (Continued)

Page(s)

Naureen Shah, *License to Abuse: How ICE's 287(g) Program Empowers Racist Sheriffs and Civil Rights Violations*, Am. Civ. Liberties Union, at 32 (2022), https://www.aclu.org/report/license-abuse-how-ices-287g-program-empowers-racist-sheriffs.............................................................16

Nora Ellmann, Center for American Progress, *Immigration Detention Is Dangerous for Women's Health and Rights* (Oct. 21, 2019) .......................................................................................28

*Policy Basics: Temporary Assistance for Needy Families*, Center on Budget & Pol'y Priorities (Mar. 1, 2022), https://www.cbpp.org/research/family-income-support/policy-basics-an-introduction-to-tanf ....................................................25

Peniel Ibe, *Immigration is a Black Issue*, Am. Friends Serv. Comm., https://afsc.org/news/immigration-black-issue...... 4, 15, 17, 18, 21

*Partial Vacatur of 2024 Temporary Protected Status Decision for Haiti*, Department of Homeland Security (Feb. 24, 2025), https://www.federalregister.gov/documents/2025/02/24/2025-02970/partial-vacatur-of-2024-temporary-protected-status-decision-for-haiti..........................................................................20

Reema Ghabra, *Black Immigrants Face Unique Challenges*, HUMAN RIGHTS FIRST (Feb. 17, 2022), https://humanrightsfirst.org/library/black-immigrants-face-unique-challenges/ ......................................................................18

S. Priya Morley et al., *There is a Target On Us: The Impact of Anti-Black Racism on African Migrants at Mexico's Southern Border,* Black Alliance for Just Immigration (2021), https://baji.org/wp-content/uploads/2021/01/The-Impact-of-Anti-Black-Racism-on-African-Migrants-at-Mexico.pdf .........................18

Sarah Miller & Laura Wherry, *The Long-Term Effects of Early Life Medicaid Coverage*, 54(3) J. Hum. Res. (2019) .................................24

# TABLE OF AUTHORITIES
## (Continued)

Page(s)

*SNAP Eligibility for Non-Citizens*, USDA Food and Nutrition Service, https://www.fns.usda.gov/snap/recipient/eligibility/non-citizen ...................................................................................24

*SNAP Eligibility*, USDA Food & Nutrition Serv., https://www.fns.usda.gov/snap/recipient/eligibility ...................................24

Steven Carlson & Joseph Llobrera, Center on Budget & Pol'y Priorities, *SNAP Is Linked with Improved Health Outcomes and Lower Health Care Costs* 1 (2022) .....................................................24

Stewart Chang, *Feminism in Yellowface*, 38 Harv. J.L. & Gender 235 (2015)................................................................................................9

Tejumola M. Adegoke et al., *Inequities in Adverse Maternal and Perinatal Outcomes: The Effect of Maternal Race and Nativity*, Maternal and Child Health Journal, 823 (2022) .........................23

Tessa Peredy et al., *Maternal Mortality Rates among Im/Migrant Populations in the United States*, Open Journal of Obstetrics and Gynecology, 1161 (2024) ........................................................... 22, 27

Theresa Andrasfay & Noreen Goldman, *Intergenerational Change in Birthweight: Effects of Foreign-born Status and Race/Ethnicity*, Epidemiology, 649 (2020) ................................................23

Tiffany L. Green, *Black and Immigrant: Exploring the Effects of Ethnicity and Foreign-Born Status on Infant Health*, Migration Policy Institute (2012) ..............................................................23

Timothy Goff, et al., *Criminalizing Blackness*, https://m4bl.org/wp-content/uploads/2022/12/CB_REPORT.pdf ...............................................16

Tom Dreisbach, *Government's own experts found 'barbaric' and 'negligent' conditions in ICE detention*, NPR (Aug. 16, 2023).................27

U.S. Const. amend. XIV ......................................................................... *passim*

**TABLE OF AUTHORITIES**
**(Continued)**

**Page(s)**

U.S. Constitution ................................................................................7

*US Discrimination Against Black Migrants, Refugees and
Asylum Seekers at the Border and Beyond*, Human Rights
First (Aug. 8, 2022), https://humanrightsfirst.org/library/cerd-
us-discrimination-against-black-migrants-refugees-and-
asylum-seekers-at-the-border-and-beyond/ ................................................18

U.S. Comm. for Refugees & Immigrants (Sept. 13, 2024), *What
is Statelessness?*, https://refugees.org/what-is-statelessness/ ....................29

World Health Organization, *Nearly 30 million sick and
premature newborns in dire need of treatment every year*
(Dec. 13, 2018), https://www.who.int/news/item/13-12-2018-
nearly-30-million-sick-and-premature-newborns-in-dire-need-
of-treatment-every-year ..............................................................................24

Zeba Warsi, *Hundreds of immigrants have reported sexual abuse
at ICE facilities. Most cases aren't investigated*, PBS News
(July 21, 2023) ...........................................................................................28

# INTEREST OF AMICI[1]

*Amici curiae* Black Alliance for Just Immigration ("BAJI"), the Haitian Bridge Alliance ("HBA"), and the UndocuBlack Network work on behalf of Black immigrant communities to advance racial, social, political, and economic justice in the United States. BAJI fights for the rights of Black migrants and African Americans through organizing, legal advocacy, research, policy, and narrative building to improve the conditions of Black communities. HBA is a grassroots and community-based nonprofit organization that provides migrants and immigrants with humanitarian, legal, and social services, with a particular focus on Black immigrants, the Haitian community, women and girls, LGBTQIA+ individuals, and survivors of torture and other human rights abuses. The UndocuBlack Network connects undocumented Black people with critical resources. Based on their extensive experience, *Amici* have a unique perspective on how discrimination has historically infected U.S. immigration policy, and how Black immigrant communities are particularly vulnerable to the harms arising from the challenged Executive Order.

---

[1] All parties have consented to the filing of this brief. No counsel for a party authored this brief in whole or in part and no person other than *amici* or their counsel made a monetary contribution to the preparation or submission of this brief. *See* Fed. R. App. P. 29(a)(4)(E).

## **INTRODUCTION**

Unless enjoined, the Executive Order will jeopardize over a century of progress toward securing the entitlement to birthright citizenship guaranteed by the Fourteenth Amendment.  That progress is part of an ongoing evolution of this country's approach to immigration, in which the experience of Black people—both immigrant and non-immigrant—has been a bellwether.  The country must continue to move toward rather than retreat from the Fourteenth Amendment's vision that "[a]ll persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States."  U.S. Const. amend. XIV.

The Government argues this language was originally understood to "secure citizenship for the newly freed slaves—not to grant citizenship to illegal aliens (a group that did not yet exist, given the absence of federal laws restricting immigration)."  Appellants' Br. at 19.  But this narrative is incomplete and misaligned with the history of U.S. immigration policy before and after the Fourteenth Amendment's enactment.

In the antebellum period, movement of enslaved and free Black people was heavily regulated by a patchwork of draconian state laws—essentially the precursor to our modern federal immigration system—that excluded Black people from U.S. citizenship and personhood.  The Government is therefore wrong to suggest that the Framers of the Fourteenth Amendment did not intend the Citizenship Clause to

2

benefit the children of undocumented immigrants. The Framers confronted a system that excluded children from our political community based on prejudicial beliefs about their parents' worthiness. That is precisely why they incorporated race-neutral language into the Fourteenth Amendment to underscore the principle that all people born on U.S. soil, including Black people, are citizens upon birth.

Executive Order 14160 would undermine this bedrock constitutional principle. The District Court had "little difficulty concluding that the denial of citizenship status to newborns, even temporarily, constitutes irreparable harm." *New Hampshire Indonesian Cmty. Support v. Trump*, 765 F. Supp. 3d 102, 111 (D.N.H 2025). As this Brief explains, that harm is heightened for Black immigrants, particularly pregnant Black immigrants and their infants. The historical experience of Black people in the immigration system warns us all of the impropriety and threat posed by the Executive Order. Given the profound impact the Order would have, the District Court's Order must be affirmed.

## **ARGUMENT**

## I.  **HISTORY REVEALS THE LONGSTANDING EXCLUSION OF BLACK PEOPLE FROM U.S. CITIZENSHIP AND LEGAL PERSONHOOD.**

Anti-Blackness has been a hallmark of federal, state, and local regulation of migration that the nation must continue to combat. The Fourteenth Amendment constitutionalized the principle of birthright citizenship and was an important step

toward correcting the longstanding exclusion of Black people from citizenship. If implemented, the Executive Order would seriously undermine the Fourteenth Amendment's protections and amplify racial discrimination in the U.S. immigration system.

### A. In the early United States, immigration was largely unregulated by the federal government—with the exception of slavery.

Exclusion of Black people from U.S. citizenship was fundamental to the nation's pre-Civil War approach to immigration. The right to be present in the United States was governed by a patchwork of common-law doctrines, state-based regulation, and limited federal regulation—all rooted in race-based exclusion. The 1790 Naturalization Act, the nation's first naturalization law, created a pathway to citizenship solely for "free white person[s]," thus making clear that free Black immigrants would never be citizens. *See* The Naturalization Act of 1790, ch. 3, 1 Stat. 103 (repealed 1795); *see also* Peniel Ibe, *Immigration is a Black Issue*, Am. Friends Serv. Comm., https://afsc.org/news/immigration-black-issue. Congress then enacted the first immigration ban in 1803, which barred ship captains from bringing free Black persons or persons of color into any state that prohibited their entry. 2 Stat. 205, ch. 10 (1803); *see also* Kelly Lytle Hernandez, *The Whites-Only Immigration Regime*, 56 W. Hist. Q., at 6 (Oxford Univ. Press 2024); Gerald Neuman, *The Lost Century of American Immigration Law (1776-1875)*, 93 Colum. L. Rev. 1833, 1869 (1993).

But unlike in our modern system, the federal government played only a minor role in immigration enforcement before the Civil War,[2] with one conspicuous exception—slavery. *See* Elizabeth Keyes, *Race and Immigration, Then and Now: How the Shift to "Worthiness" Undermines the 1965 Immigration Law's Civil Rights Goals*, 57 Howard L.J. 899, 903 (2014). The "[g]overnment saw free movement of Black people as a threat to the institution of slavery and to . . . Whiteness." Alina Das, *No Justice in the Shadows: How America Criminalizes Immigrants* 43 (2020). Congress enacted the Fugitive Slave Laws, which authorized slaveowners to arrest runaway slaves and mandated state and federal officials to return them. *See* Fugitive Slave Act of 1793, 1 Stat. 302 (1793); Fugitive Slave Act of 1850, 9 Stat. 462 (1850). By giving federal teeth to discriminatory state laws controlling migration of Black people, these laws acted as the "antecedents of American deportation policy." Daniel Kanstroom, *Deportation Nation: Outsiders in American History* 21–90 (2007).

This federal framework buttressed a patchwork of similarly exclusionary state laws. Several state constitutions banned the settlement of Black people. *See* Das, *No Justice in the Shadows*, at 43. In 1822, South Carolina passed the Negro Seaman

---

[2] *See* Brief of Immigration Law and History Scholars as Amici Curiae in Support of Respondents, *Dep't of State v. Muñoz*, No. 23-334, 2024 WL 1420708, at *5 (U.S. Mar. 28, 2024) ("Until the late nineteenth century, immigration was largely unrestricted at the federal level.") (*Dep't of State v. Muñoz*, 602 U.S. 899 (2024)) (hereinafter "Br. of Immig. Law and History Scholars").

5

Act, which barred free Black sailors from entering state ports. *See Elkison v. Deliesseline*, 8 F. Cas. 493 (C.C.D.S.C. 1823) (deeming the Negro Seaman Act unconstitutional).[3]  By 1832, several other Southern states had adopted analogous laws; by the Civil War, Southern officials had closed the coast bordering the Caribbean to free Black migrants, "criminalizing free Black migration." *See* Hernandez, *The Whites-Only Immigration Regime*, at 6–7.  During this period, "states vigorously regulated the behavior and movement of Black people in ways that foreshadowed the regulation of immigrants today," such as requiring Black people to carry proof of whether they were free or enslaved. Das, *No Justice in the Shadows*, at 43.[4]

Early judicial decisions on immigration affirmed a racial hierarchy that deemed Blackness incongruous with citizenship and lawful status. *See, e.g.*, *Moore v. People of State of Ill.*, 55 U.S. 13, 18 (1852) (affirming states could bar entry of persons to "protect themselves against the influx either of liberated or fugitive slaves"); *State v. Claiborne*, 19 Tenn. 331, 341 (1838) (upholding indictment of emancipated Black man for moving from Kentucky to Tennessee, because he was not a citizen, and "every free State has a right to prevent foreigners going to it);

---

[3] State officials continued to enforce the Act even after the South Carolina Supreme Court declared it unconstitutional.  Neuman, *The Lost Century*, at 1875.

[4] "[I]t was the states' desire to control Black people, free and enslaved, that legitimated the concept of borders and the regulation of undesirable presence in the United States in the first place."  Das, *No Justice in the Shadows*, at 42.

*People v. Hall*, 4 Cal. 399, 403–04 (1854) (affirming exclusion of a Chinese man's testimony against a white miner, because he was "not of white blood," and thus lacked "equal rights of [federal] citizenship"). As these decisions reflect, state and federal courts acquiesced in the "antebellum habit of subsuming control over the movement of blacks, slave or free." Neuman, *The Lost Century*, at 1880.

Most notably, in *Dred Scott v. Sandford*, the Supreme Court instituted the highest form of *de jure* exclusion, expressly rejecting Black people from inclusion as "citizens" under the U.S. Constitution. 60 U.S. 393 (1857). The Court discussed the unique status of freed slaves as the children of involuntary immigrants: "No one of [the African] race had ever migrated to the United States voluntarily." *Id.* at 411. While the Court acknowledged those who were "born in the country, did owe allegiance to the Government, whether they were slave or free," *id.* at 420, it held that Black people were nevertheless excluded from citizenship. *Dred Scott* thus further entrenched the notion that the boundary of a migrant's legal status is racialized: whiteness was a prerequisite for rightful citizenship, and Blackness, a disqualifier.

### B. The Fourteenth Amendment was a monumental step toward remedying Black people's exclusion from the American polity.

Congress ratified the Fourteenth Amendment shortly after the Civil War, altering U.S. immigration law by guaranteeing universal birthright citizenship. U.S. Const. amend. XIV, § 1. The Citizenship Clause constitutionalized the ancient

7

principle of *jus soli*, ensuring that formerly enslaved Black people were citizens from birth, thereby directly overruling *Dred Scott* and resolving a split between state courts—some of which had recognized the common law principle that entitled birthright citizenship to persons born within U.S. territory and others of which did not. *See, e.g.*, *Lynch v. Clarke*, 1 Sand. Ch. 583, 663 (N.Y. Ch. 1844). *But see State v. Claiborne*, 19 Tenn. 331, 335–36 (1838).

The Clause's force as a constitutional guarantee of citizenship for those born on U.S. soil cannot be overstated. Congress' 1870 amendment to the 1790 Naturalization Act accorded with the Fourteenth Amendment's spirit of dismantling the historical exclusion of Black people from U.S. political personhood. The 1870 amendment expanded the right to naturalize to "aliens of African nativity and [] persons of African descent."[5] Act of July 14, 1870, ch. 254 § 7, 16 Stat. 254, 256.

In interpreting the Citizenship Clause, *United States v. Wong Kim Ark* reinforced birthright citizenship as a bedrock constitutional right. 169 U.S. 649 (1898). *Wong Kim Ark* held that birthright citizenship under the Citizenship Clause, applied to everyone born on U.S. soil, irrespective of parental citizenship status. The

---

[5] The 1870 Amendment was an important step toward racial inclusion in U.S. immigration policy, but it neither dismantled the fundamentally anti-Black U.S. immigration apparatus nor prevented its application to other demographics. Notably, Asians and indigenous people were intentionally excluded from the amendments to the 1790 Naturalization Act. *See* Das, *No Justice in the Shadows*, at 39.

resounding "judicial and scholarly consensus" since *Wong Kim Ark* is that "the Fourteenth Amendment's grant of citizenship . . . applies regardless of the citizenship or status of one's parents."  Jacob Hamburger, *The Consequences of Ending Birthright Citizenship*, 103 Wash. U. L. Rev. (forthcoming 2025) (manuscript at 2) (on file at https://papers.ssrn.com/sol3/papers.cfm?abstract_id=5106022).

### C.    Despite enactment of the Fourteenth Amendment, race-based exclusion remained a feature of the U.S. immigration system.

From the 1870s to the 1920s, the federal government took a more active role in immigration enforcement.  *See* Br. of Immig. Law and History Scholars at 6. While the power of the Citizenship Clause persisted, racial animus rooted in the foundations of U.S. immigration law continued to surface.

During this period, anti-Asian immigration policies characterized the federal immigration regime.  *See* Hernandez, *The Whites-Only Immigration Regime*, at 1–2. Prohibiting the entry of any persons from "China, Japan, or any Oriental country" for "lewd and immoral purposes," the 1875 Page Act stood as a marker of the federal government's newly asserted authority over immigration regulation.  Act of Mar. 3, 1875, ch. 141, 18 Stat. 477 (1875).  The Act "was discriminatorily applied and aimed to exclude all Chinese women based on a constructed stereotype that Chinese women had a cultural inclination toward prostitution."  Stewart Chang, *Feminism in Yellowface*, 38 Harv. J.L. & Gender 235, 242 (2015).  In *Chy Lung v. Freeman*, the

9

U.S. Supreme Court ruled unconstitutional a California statute restricting Chinese immigration, reasoning that the federal government had exclusive power over immigration.  92 U.S. 275 (1875).  *Chy Lung* and the Page Law signaled the sunset of state control over immigration.  Afterwards, "federal immigration law burgeoned into a vast system, with regulation of race and nationality at its heart."  Kerry Abrams, *Polygamy, Prostitution, and the Federalization of Immigration Law*, 105 Colum. L. Rev. 641, 706 (2005).  Moreover, the 1882 Chinese Exclusion Act, which restricted entry of Chinese migrants for ten years, further reinforced a dominant federal immigration system and reflected the system's deep-seated racial animus.  *See* Chinese Exclusion Act, ch. 126, 22 Stat 58 (repealed 1943); Neuman, *The Lost Century*, at 1872.

Federal judicial decisions from this period demonstrated ongoing racial exclusion.  Between 1878 and 1952, courts developed jurisprudence around the 1790 Naturalization Act.  Non-citizens sought pathways to naturalization based on being "free white persons."  In these cases, the U.S. Supreme Court and federal courts drew on the common understanding of "the white ruling class in 1790."  Karla McKanders, *Politics of Belonging: Anti-Black Racism, Xenophobia, and Disinformation*, Harv. L. Rev. Blog (Nov. 18, 2024); *see, e.g.*, *Ozawa v. United States*, 260 U.S. 178 (1922) (denying citizenship application of Japanese man because the law's purpose was to grant citizenship only to those with white fathers);

*see also United States v. Thind*, 261 U.S. 204 (1923) (ruling that man of Indian descent who was "ethnologically" white was not eligible for naturalization because he was not white under popular perception).

Federal legislation from the early twentieth century demonstrated enduring tension between the promise of the Citizenship Clause and longstanding racial animus in immigration governance. For example, the 1924 Johnson-Reed Act "bann[ed] entry to all persons ineligible to become citizens" and "reserved 84 percent of the quota slots for countries in northwestern Europe." *See* Hernandez, *The Whites-Only Immigration Regime*, at 3. The Act effectively banned Asian immigration, *see id*. at 2–3, and imposed a new visa requirement that radically slashed Black immigration. *See id*. at 8. It capped immigration from any one country in the Eastern Hemisphere to 2% of the number of foreign-born residents of that country in the United States in 1890, effectively rolling back immigration trends to when most immigrants were western Europeans. *See* Muzaffar Chishti & Julia Gelatt, *A Century Later, Restrictive 1924 U.S. Immigration Law Has Reverberations in Immigration Debate*, Migration Pol'y Institute (May 15, 2024), https://www.migrationpolicy.org/article/1924-us-immigration-act-history.

**D.** **Although racially discriminatory enforcement of U.S. immigration laws persisted in the mid-20[th] century, the Fourteenth Amendment's Citizenship Clause has remained a critical remedy.**

In 1940, Congress codified the Citizenship Clause through Section 1401, which recognized birthright citizenship for "person[s] born in the United States, and subject to the jurisdiction thereof[.]"  8 U.S.C. § 1401(a).  Section 1401 is notable because it provided a statutory basis for Black people and other communities of color to claim birthright citizenship.

Moreover, the 1965 Immigration and Naturalization Act ("INA") removed the national origins quota, creating formal equality in immigration.  *See* 79 Stat. 911 (1965); Keyes, *Race and Immigration*, at 906.  The Act's legacy is "one [of] diversifying legal migration from historically under-represented countries," *id.* at 907, and it remains noteworthy for "set[ting] in motion significant demographic changes across the nation." *Id.* at 908.  Nevertheless, the Act was notably flawed: it still limited Black and Asian migrants' entry by prioritizing family reunification, which tended to benefit white non-citizens, who were more likely to have family in the United States.  *See* Hernandez, *The Whites-Only Immigration Regime*, at 14. Thus, even after the 1965 Act, *de facto* inequality endured in immigration enforcement. *See id.* at 18.

Other post-1965 federal immigration policies exemplify the residual anti-Blackness within the contemporary immigration system.  The modern detention

policy integral to today's immigration system developed in response to Haitian migrants fleeing a repressive nation to seek refuge in the United States beginning in the 1970s. *See* Carl Lindskoog, *How the Haitian refugee crisis led to the indefinite detention of immigrants*, Wash. Post (Apr. 9, 2018). Previously, detention was not a major feature of U.S. immigration policy. *Id.* From 1954 to 1981, the federal government relied on parole; detention was deemed inhumane and unwarranted. *See generally* Carl Lindskoog, *Detain and Punish: Haitian Refugees and the Rise of the World's Largest Immigration Detention System* (2018).

But U.S. asylum policy devolved significantly as waves of asylum seekers began arriving in the 1970s. *Id.* Starting in 1972, Haitian migrants seeking political asylum fled the Duvalier dictatorship. *Id.* at 14. A sharply xenophobic response to "the arrival of . . . poor and [B]lack migrants" led the federal government to respond by categorically denying asylum to Haitian migrants. *Id.* at 17–18. From 1981 onward, "[d]etention became the new immigration policy" as the federal government "detain[ed] all undocumented Haitians without the possibility of bond." *Id.* at 62–70. Ultimately, the government ushered in a universal detention apparatus, transforming an anti-Haitian measure into one that included other refugees. *See* Lindskoog, *How the Haitian refugee crisis led to the indefinite detention of immigrants*.

Today, as discussed *infra*, the U.S. immigration system is an apparatus of criminalization and mass deportation, entrenching age-old practices of targeting Black people and other communities of color for exclusion, surveillance, detention, and removal. *See* Alina Das, *Inclusive Immigrant Justice: Racial Animus and the Origins of Crime-Based Deportation*, 52 U.C. Davis L. Rev. 171, 176 (2018).

While more progress is needed to eradicate anti-Blackness and racial animus from U.S. immigration law, the Fourteenth Amendment's entitlement of birthright citizenship is a meaningful corrective. Any policy—including the Executive Order—seeking to eliminate birthright citizenship would erode the Fourteenth Amendment's protections and intensify present-day racial inequalities in U.S. immigration enforcement.

## II. THE EXECUTIVE ORDER WILL EXACERBATE AND ADD TO THE DISPROPORTIONATE HARMS THAT BLACK IMMIGRANTS— PARTICULARLY PREGNANT WOMEN AND THEIR U.S.-BORN CHILDREN—ALREADY FACE.

Instead of shoring up the protections the Fourteenth Amendment guarantees, the Executive Order erodes them. The existing federal immigration system disproportionately subjects Black immigrants to unjust treatment. The Executive Order would increase opportunities for such unjust treatment and amplify negative outcomes for Black immigrants—especially pregnant Black immigrants—by depriving their U.S.-born children of birthright citizenship.

A.  **Black immigrants disproportionately face negative immigration consequences in connection with racially discriminatory enforcement of criminal law.**

Black immigrants are unjustly subject to overly aggressive immigration enforcement including arrests, over-detention, and deportation.  *See* Karla M. McKanders, *Immigration and Racial Justice: Enforcing the Borders of Blackness*, 37 Ga. St. U. L. Rev. 1139, 1160–69 (2021) (describing "prison-to-deportation pipeline" facing Black immigrants).  This inequitable treatment reveals two-fold discrimination Black immigrants are subject to through disproportionate immigration law enforcement and unjust criminal law enforcement.  *See* Ibe, *Immigration is a Black Issue*.  Black people in America, both immigrant and non-immigrant, are over-policed and face higher levels of state surveillance than other groups.  For example, Black people are more likely to be detained in traffic and street stops than white or Hispanic individuals.  *See* McKanders, *Enforcing the Borders of Blackness*, at 1160.  Black immigrants are therefore more likely to be swept into the criminal justice system, exposing them to harsh immigration penalties.  *See id.* at 1160–61 ("[E]xposure to the criminal legal system . . . is the primary way . . . Black immigrants are placed in deportation proceedings.").

Immigration enforcement data reflects these racial disparities.  From 2003 to 2015, despite comprising only around 5 percent of the unauthorized immigrant population and 7 percent of all non-citizens, Black immigrants made up over 10

percent of all immigrants in removal proceedings. Juliana Morgan-Trostle et al., Black All. for Just Immigr., *The State of Black Immigrants: Part II* 20 (2020), https://baji.org/wp-content/uploads/2020/03/sobi-fullreport-jan22.pdf. In 2019, 66 percent of Black immigrants deported were removed on criminal grounds, compared to 43 percent of all immigrants. *Haitians see history of racist policies in migrant treatment*, PBS News (Sept. 24, 2021).

Unequal policing and unequal immigration treatment are linked. Most apprehensions Immigration and Customs Enforcement ("ICE") makes occur because a non-citizen encounters local police, and that is largely facilitated via Section 287(g) of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("Section 287(g)"). *See Criminalizing Blackness*, at 9. Section 287(g) allows the Department of Homeland Security to enter formal agreements with state or local law enforcement, deputizing those agencies to perform certain immigration functions including questioning arrestees regarding immigration status and accessing federal databases. *The 287(g) Program: An Overview*, Am. Immigr. Council (2025), https://www.americanimmigrationcouncil.org/research/287g-program-immigration. However, at least 65 percent of the agencies participating in the 287(g) program have established histories of racial profiling and other civil rights violations, including racialized violence against Black and Brown individuals. Naureen Shah et al., ACLU, *License to Abuse: How ICE's 287(g) Program*

16

*Empowers Racist Sheriffs and Civil Rights Violations* 32 (2022), https://www.aclu.org/report/license-abuse-how-ices-287g-program-empowers-racist-sheriffs. Accordingly, Black immigrants are disproportionately subject to removal on criminal grounds. *See* Morgan-Trostle et al., *The State of Black Immigrants: Part II*, at 20.

These discriminatory federal and local authorities would likely play a heavy role in administering the Executive Order, including determining whether newborns are eligible for citizenship based on parent status. Considering the inequities discussed *infra*, Black immigrants would face disproportionate risk of being deemed non-citizens, meaning a higher proportion of Black children will lack the protections and opportunities of citizenship—"reinforcing the marginalization of [Black] communities." Ashlee Banks, *Black migrants caught in the crossfire of birthright citizenship battle*, Afro News (Jan. 31, 2025), https://afro.com/black-migrants-threatened-citizenship-trump-executive-order/.

**B.    Due to anti-Blackness within the immigration system, Black immigrants face systemic barriers to immigration relief, and would therefore suffer irreparable harm if the Executive Order is implemented.**

When Black immigrants seeking immigration-related relief encounter enforcement authorities, they are more likely to encounter mistreatment, abuse, and discrimination. For instance, Black immigrants are subject to solitary confinement at a rate six times higher than other immigrant groups. *See* Ibe, *Immigration is a*

17

*Black Issue*.   Certain subgroups of Black immigrants receive especially harsh treatment: Black African migrants suffered the longest periods of ICE detention in 2019, *id.*, and as of 2022, Haitian migrants paid an average ICE release bond of $16,700—a startling 54 percent higher than average for other migrants.   Reema Ghabra, *Black Immigrants Face Unique Challenges*, Hum. Rts. First (Feb. 17, 2022), https://humanrightsfirst.org/library/black-immigrants-face-unique-challenges/. From 2012 to 2017, "Haitians had the second-highest denial rate at 86% for asylum . . . ."  Ibe, *Immigration is a Black issue*.

Black immigrants who attempt to utilize legal immigration mechanisms encounter uniquely unfair challenges.  Black asylum seekers are disproportionately harmed by policies that externalize the U.S. border, such as the "Remain in Mexico" policy, which forces asylum seekers to stay outside the United States while their claims are processed.  *US Discrimination Against Black Migrants, Refugees and Asylum Seekers at the Border and Beyond*, Hum. Rts. First (Aug. 8, 2022), https://humanrightsfirst.org/library/cerd-us-discrimination-against-black-migrants-refugees-and-asylum-seekers-at-the-border-and-beyond/.     Such     indefinite displacement leaves Black migrants targeted for crime: Black migrants in Mexico are singled out for extortion, murder, rape, and other violence, often at the hands of corrupt law enforcement, cartels, and human traffickers.  *See id.*; *see generally* S. Priya Morley et al., Black All. for Just Immigr., *There is a Target On Us: The Impact*

*of Anti-Black Racism on African Migrants at Mexico's Southern Border* (2021),
https://baji.org/wp-content/uploads/2021/01/The-Impact-of-Anti-Black-Racism-
on-African-Migrants-at-Mexico.pdf.

Black immigrants who cross the U.S.-Mexico border face inhumane treatment
and are grossly overrepresented in expulsion.  For example, during the coronavirus
pandemic, President Biden's administration relied on the Title 42 public health rule
to accelerate mass expulsion of Haitian migrants as Haiti's civil and political
collapse unfolded.  Eileen Sullivan, *U.S. Accelerated Expulsions of Haitian
Migrants in May*, N.Y. Times (June 9, 2022).  In May 2022, "Haitians represented
about 6 percent of the migrants crossing the border with Mexico but occupied 60
percent of expulsion flights . . . ." *Id.*  During President Biden's tenure, Border Patrol
"corrall[ed]" Haitian migrants arriving at Del Rio, Texas in ways that mirrored the
government's historical cruelty toward fugitive slaves.  Eileen Sullivan, *After Del
Rio, Calls for Fairer Treatment of Black Migrants*, N.Y. Times (Oct. 21, 2021).

Structural inequalities continue to manifest at later stages of the asylum
process.  Black immigrants often lack resources for meaningful defense in
immigration proceedings.  As of 2019, the median household income of Black
immigrants was lower than the national median and the median for immigrant
households.  *See* Dedrick A. Muhammad & Janessa Chu, *Racial Wealth Snapshot:
Immigration and the Racial Wealth Divide*, Nat'l Cmty. Reinv. Coal. (Feb. 3, 2023),

19

https://ncrc.org/racial-wealth-snapshot-immigration-and-the-racial-wealth-divide/.

This relative lack of resources means many Black immigrants struggle to obtain legal

assistance for asylum proceedings, leaving them vulnerable to unjust treatment. *See*

*Anti-Black Discrimination within US Immigration, Detention, and Enforcement*

*Systems*, Hum. Rts. First (Aug. 8, 2022), https://humanrightsfirst.org/library/cerd-

anti-black-discrimination-within-us-immigration-detention-and-enforcement-

systems/ (noting how "Black asylum seekers . . . face disparate treatment in

immigration court removal proceedings, including denials of adequate

interpretation, lack of access to counsel, intentionally rushed proceedings, and

adjudicator bias, which result in wrongful denials of asylum").

Even in the context of temporary immigration relief, Black immigrants face

barriers. The Secretary of Homeland Security grants immigrants from Secretary-

designated countries Temporary Protected Status ("TPS"), which allows individuals

to live and work in the United States temporarily. Many immigrants from

predominantly Black countries, like Haiti, benefit from the TPS program. The

duration of Haiti's TPS designation was recently shortened by President Donald

Trump's administration, and its fate remains uncertain with expiration upcoming in

August 2025. *See Partial Vacatur of 2024 Temporary Protected Status Decision for*

*Haiti*, Dep't of Homeland Sec. (Feb. 24, 2025), https://www.federalregister.gov/

documents/2025/02/24/2025-02970/partial-vacatur-of-2024-temporary-protected-

status-decision-for-haiti.  Black immigrants have also been significantly impacted by President Trump's "deep cuts to refugee admissions, and efforts to end Deferred Action for Childhood Arrivals (DACA)."  Ibe, *Immigration is a Black Issue*; *see* Ali Vitali et al., *Trump referred to Haiti and African nations as 'shithole' countries*, NBC News (Jan. 11, 2018).

Given these realities, Black children born either as undocumented non-citizens or completely stateless under the Executive Order would lack meaningful opportunities to obtain U.S. citizenship.  This would leave them in a devastating legal limbo, leading to consequences including indefinite detention, deprivation of certain early-childhood benefits such as healthcare and food assistance, and even removal to countries where they have no ties.  These harms—caused by an Executive Order that squarely contravenes the constitutional and statutory entitlement of birthright citizenship—would be near impossible for courts to adequately redress.

## C. The Executive Order would irreparably harm pregnant Black immigrants and their U.S.-born children.

The Executive Order would inflict especially devastating harms against pregnant Black immigrants and their infants.  Pregnant Black immigrants and their infants disproportionately experience adverse maternal and infant health outcomes compared to their non-Black counterparts.  The Executive Order would exacerbate these disparities, stripping away access to government-sponsored necessities and

heightening maternal stress levels and pregnancy risks. It would also increase exposure to the harms stemming from immigration enforcement.

Moreover, the Executive Order would inflict severe dignitary harm. Citizenship is life-defining. Permitting the Executive Order to strip the essential entitlement of citizenship, even momentarily, would permanently violate the dignity of affected infants and families.

> 1. **The Executive Order would exacerbate the acute disparities in health outcomes that pregnant Black immigrants and their infants suffer.**

Maternal and infant mortality rates of Black immigrants are among the highest in the United States. Maternal mortality research finds "Black women consistently have the highest maternal mortality, regardless of immigration status." Tessa Peredy et al., *Maternal Mortality Rates among Im/Migrant Populations in the United States*, Open J. Obstetrics & Gynecology, 1161, 1170 (2024). Some studies show that African immigrant women suffer especially high rates of infant death late in pregnancy or shortly after birth. *See, e.g.*, Ehiremen Adesua Azugbene et al., *African Immigrant Women's Maternal Health Experiences in Clarkston, Georgia: A Qualitative Study*, 4.1 Women's Health Reps. 603, 604 (2023).

During birth, pregnant Black immigrants disproportionately sustain medical complications. Across all 2021 U.S. births to Black women, a Black mother born abroad faced increased odds of many morbidities, including unplanned hysterectomy

and ICU admission.  *See* Mariah Jiles et al., *Maternal and Infant Health Outcomes in US-Born and Non–US-Born Black Pregnant People in the US*, JAMA Network Open, at 1–2 (2024); *see also* Tejumola M. Adegoke et al., *Inequities in Adverse Maternal and Perinatal Outcomes: The Effect of Maternal Race and Nativity*, Maternal & Child Health J., 823 (2022).

Black immigrant women's infants also face  diminished health outcomes.  A study of metropolitan areas along the U.S. East Coast found that, compared to infants born to both foreign- and native-born mothers of other racial groups, infants born to Black immigrant mothers have higher rates of preterm birth, low birth weight, and small birth size for gestational age.  *See* Tiffany L. Green, *Black and Immigrant: Exploring the Effects of Ethnicity and Foreign-Born Status on Infant Health*, Migration Pol'y Institute, at 10–12 (2012); *see also* Theresa Andrasfay & Noreen Goldman, *Intergenerational Change in Birthweight: Effects of Foreign-born Status and Race/Ethnicity*, Epidemiology, 649, 653 (2020).

The Executive Order would deepen the adverse health outcomes of pregnant Black immigrants and their infants through two primary mechanisms.  First, it will strip away infant access to government-sponsored early-life necessities.  Second, it will raise maternal stress loads, jeopardizing the health of expectant mothers and their infants.

### a. The Executive Order would rescind access to government-sponsored early life necessities.

Early-life nutrition and medical support for infants confer significant long-term developmental advantages. *See* Steven Carlson & Joseph Llobrera, Center on Budget & Pol'y Priorities, *SNAP Is Linked with Improved Health Outcomes and Lower Health Care Costs* 1–2 (2022); Sarah Miller & Laura Wherry, *The Long-Term Effects of Early Life Medicaid Coverage*, 54(3) J. Hum. Res. (2019). The absence of such care may be fatal. World Health Organization, *Nearly 30 million sick and premature newborns in dire need of treatment every year* (Dec. 13, 2018), https://www.who.int/news/item/13-12-2018-nearly-30-million-sick-and-premature-newborns-in-dire-need-of-treatment-every-year.

According to the U.S. Department of Agriculture, the federal Supplemental Nutrition Assistance Program ("SNAP"), which helps low-income persons buy food, "has never been extended to undocumented non-citizens." *SNAP Eligibility*, USDA Food & Nutrition Serv., https://www.fns.usda.gov/snap/recipient/eligibility. By depriving U.S.-born infants of citizenship, the Executive Order would prevent them from qualifying for SNAP. *See* 7 C.F.R. § 273.4(a); *SNAP Eligibility for Non-*

24

*Citizens*, USDA Food & Nutrition Serv., https://www.fns.usda.gov/snap/recipient/eligibility/non-citizen.[6]

The Executive Order would similarly eliminate infant access to Medicaid and the Children's Health Insurance Program ("CHIP"), programs generally available to both citizens and "lawfully present" immigrants, including "qualified non-citizens." *CHIP Eligibility & Enrollment*, Medicaid.gov, https://www.medicaid.gov/chip/chip-eligibility-enrollment; *Coverage for lawfully present immigrants*, HealthCare.gov, https://www.healthcare.gov/immigrants/lawfully-present-immigrants/. Infants without birthright citizenship because of the Executive Order would be ineligible for these government-sponsored health programs as they would neither be citizens nor "lawfully present" immigrants. *See* 42 C.F.R. § 435.406(a) (designating only certain citizens, nationals, and qualified non-citizens as Medicaid eligible); 42 C.F.R. § 457.320(d) (requiring, by reference to 42 C.F.R. § 435.956, verification of citizenship or satisfactory immigration status for CHIP eligibility).[7]

---

[6] Similarly, many infants will likely lose access to federal Temporary Assistance for Needy Families funds that alleviate poverty. *See Policy Basics: Temporary Assistance for Needy Families*, Center on Budget & Pol'y Priorities (Mar. 1, 2022), https://www.cbpp.org/research/family-income-support/policy-basics-an-introduction-to-tanf.

[7] Nor could these infants receive private coverage through an exchange established by the Affordable Care Act. *See* 42 U.S.C. § 18032(f)(3).

### b.    The Executive Order would heighten maternal stress levels, jeopardizing maternal and infant health.

Researchers have found that high allostatic load—an estimate for chronic stress exposure—is associated with adverse pregnancy outcomes. *See* Amir J. Lueth et al., *Allostatic Load and Adverse Pregnancy Outcomes*, 140 Obstetrics & Gynecology 974 (2022). Minority women may experience notably greater exposure to chronic stressors that diminish pregnancy outcomes and contribute to racial disparities in health conditions generally. *See* Jeanne L. Alhusen et al., *Racial Discrimination and Adverse Birth Outcomes: An Integrative Review*, 61 J. Midwifery & Women's Health 707 (2016); Allana T. Forde et al., *The Weathering Hypothesis as an Explanation for Racial Disparities in Health: A Systematic Review*, 33 Annals of Epidemiology, 1, 5 (2019). The rate of increase in allostatic load for foreign-born Black women in the United States outpaces that of nearly all other demographic groups. *See* Brent A. Langellier, *Allostatic Load Among U.S.- and Foreign-Born Whites, Blacks, and Latinx*, 60 Am. J. Preventive Med. 159, 159, 161 (2021).

The Executive Order would elevate stress levels of Black immigrant mothers and negatively affect their pregnancy outcomes. It is hard to imagine that the specter of one's infant being deprived of early-life necessities and placed on a deportation flight could do anything less. As nearly half of maternal deaths take place during the year after birth, the stress implications of the Executive Order do not bode well

for the health of Black immigrant mothers, even after birth. Peredy et al., *Maternal Mortality Rates*, at 1161–75.

>    **2.    The Executive Order would increase the exposure of pregnant Black immigrants and their infants to the harms that stem from U.S. immigration enforcement.**

The Executive Order would expose newborn children it deprives of citizenship and their families to the pernicious conditions and outcomes of U.S. immigration enforcement.

The U.S. immigration system has a track-record of detaining immigrants under appalling conditions. Inspectors of ICE facilities housing detainees from 2017 to 2019 found numerous instances of unsafe and unsanitary conditions, racial abuse, inappropriate pepper-spraying, negligent medical care, and other problems that at times contributed to detainee deaths. *See* Tom Dreisbach, *Government's own experts found 'barbaric' and 'negligent' conditions in ICE detention*, NPR (Aug. 16, 2023, 5:01AM).

Women and children are not spared these kinds of harms. Medical records of children in ICE detention facilities reflect substandard and inappropriate medical care, including inadequate treatment for malnutrition, tuberculosis, and mental health conditions. *See Migrant children in U.S. detention face physical, mental harms: report*, Harvard T.H. Chan Sch. of Pub. Health (Jan. 22, 2024), https://hsph.harvard.edu/news/migrant-children-in-u-s-detention-face-physical-

27

mental-harms-report/.  Women in ICE facilities also face abominable conditions, including inhumane sleeping and sanitary conditions, sexual abuse, and severe medical neglect such as invasive and unnecessary gynecological procedures.  *See* Lauren Villagran, *Immigrant women describe 'hell on earth' in ICE detention*, USA TODAY (Mar. 23, 2025); Zeba Warsi, *Hundreds of immigrants have reported sexual abuse at ICE facilities. Most cases aren't investigated*, PBS News (July 21, 2023, 6:05AM); Camilo Montoya-Galvez, *Investigation finds women detained by ICE underwent "unnecessary gynecological procedures" at Georgia facility*, CBS News (Nov. 15, 2022); *see also* Nora Ellmann, Ctr. for Am. Progress, *Immigration Detention Is Dangerous for Women's Health and Rights* (Oct. 21, 2019).

Deportation would likewise cause irreversible harm to Black immigrant mothers and their infants.  For starters, deportation risks sending infants and their families to countries that may be unstable, jeopardizing their safety—a key point of discussion when the government deported over twenty babies and children to Haiti in 2021.  *See* Ed Pilkington, *Outcry as more than 20 babies and children deported by US to Haiti*, Guardian (Feb. 8, 2021).  It would likely take substantial resources for the deported families to resituate themselves abroad.  It is dubious that the government would compensate for those costs, were the Executive Order stricken as unconstitutional and those infants allowed to return to the United States as citizens. Indeed, deportation costs may deprive families of the resources necessary to return.

28

And to the extent that the deportation of infants fractures and separates families that are eventually reunited, the socioemotional harm that follows cannot be undone.

### 3. By depriving infants of citizenship, even temporarily, the Executive Order would inflict dignitary harm that cannot be undone.

The significance of U.S. citizenship cannot be overstated, nor can the risk of being left stateless. The U.S. Supreme Court has "recognized that the right to acquire American citizenship is a precious one and . . . its loss can have severe and unsettling consequences." *Fedorenko v. United States*, 449 U.S. 490, 505 (1981); *see also Schneiderman v. United States*, 320 U.S. 118, 122 (1943) (observing that "priceless benefits . . . derive from [citizenship] status. . . . By many it is regarded as the highest hope of civilized men"). The Executive Order would withhold U.S. citizenship from Black immigrants' infants, leaving many stateless. The resulting parade of injuries would include no legal protections, no rights, no ability to politically participate or travel, and limited access to education and work. *See What is Statelessness?*, U.S. Comm. for Refugees & Immigrants (Sept. 13, 2024), https://refugees.org/what-is-statelessness/.

By depriving infants of citizenship, the Executive Order would irreparably inflict dignitary harm. Even if the Executive Order is effective only briefly and ultimately stricken as unconstitutional, it would create a class of Americans who would grow up knowing they were denied citizenship at birth. They will learn that

they were the object of a moment in which the openness of American society was at its lowest ebb. Consequently, these Americans may be perceived by others or themselves as second-class citizens, violating their dignity. *Cf. Heckler v. Mathews*, 465 U.S. 728, 739 (1984). Wholesale deprivation of citizenship and its attendant rights could do no less. *See Trop v. Dulles*, 356 U.S. 86, 99–102 (1958) (holding that forfeiture of citizenship is an unconstitutional punishment, and taking citizenship away "is a form of punishment more primitive than torture"); *see also* Maxine Goodman, *Human Dignity in Supreme Court Constitutional Jurisprudence*, 84 Neb. L. Rev. 740, 743 (2005) ("[T]he [U.S. Supreme] Court has repeatedly treated human dignity as a value underlying, or giving meaning to, existing constitutional rights and guarantees."). Nor could such an injury be repaired or compensated. *See Chalk v. Cent. Dist. of California*, 840 F.2d 701, 710 (9th Cir. 1988) (concluding a possibility of irreparable injury where injury is emotional and psychological, and eludes monetary compensation).[8]

Such dignitary harm would be compounded by the likelihood that the Executive Order would be enforced against Black immigrants and their infants more fervently than others. Racial bias in the Executive Order's implementation would

---

[8] Though the U.S. Supreme Court has not rejected the notion that a violation of constitutional rights creates dignitary harm, it has not set forth a clear framework for remediating such harm. *See* Michael L. Wells, *Compensatory Damages and Dignitary Harm in the Upcoming Restatement of Constitutional Torts*, 62 Hous. L. Rev. 115, 133, 136 (2024).

amplify the fundamental dignitary harm associated with its denial of citizenship. *See Inner City Contracting, LLC v. Charter Twp. of Northville*, 87 F.4th 743, 751–52 (6th Cir. 2023) (recognizing "dignitary harm inherent in racial discrimination").

## III.   CONCLUSION

For the foregoing reasons, *amici* respectfully ask this Court to affirm the preliminary injunction issued by the District Court.

Dated: June 6, 2025                    Respectfully submitted,

                                       /s/  *DeAnna D. Allen*

*Counsel for Amici Curiae*

**CERTIFICATE OF COMPLIANCE**

I, DeAnna Allen, hereby certify that:

1.      This brief complies with the type-volume limitation of Fed. R. App. P. 29(a)(5) and 32(a)(7)(B) because it contains 6,492 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2.      This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman, size 14.


*/s/  DeAnna D. Allen*

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the First Circuit by using the appellate CM/ECF system. I further certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

*/s/ DeAnna D. Allen*