No. 25-1348

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIRST CIRCUIT

NEW HAMPSHIRE INDONESIAN COMMUNITY SUPPORT;
LEAGUE OF UNITED LATIN AMERICAN CITIZENS; MAKE THE
ROAD NEW YORK,

Plaintiffs-Appellees,

v.

DONALD J. TRUMP, President of the United States, in their official
capacity; U.S. DEPARTMENT OF HOMELAND SECURITY; KRISTI
NOEM, in their official capacity as Secretary of the U.S. Department of
Homeland Security; U.S. DEPARTMENT OF STATE; MARCO RUBIO,
in their official capacity as Secretary of the U.S. Department of State;
U.S. DEPARTMENT OF AGRICULTURE; BROOKE L. ROLLINS, in
their official capacity as Secretary of the U.S. Department of
Agriculture; CENTERS FOR MEDICARE AND MEDICAID
SERVICES; MEHMET OZ, in their official capacity as Administrator of
the Centers for Medicare and Medicaid Services,

Defendants-Appellants.

On Appeal from the U.S. District Court for the
District of New Hampshire

## BRIEF OF *AMICI CURIAE* IMMIGRATION LAW SCHOLARS
## KRISTIN COLLINS, GERALD NEUMAN, AND RACHEL
## ROSENBLOOM IN SUPPORT OF PLAINTIFFS-APPELLEES
## AND AFFIRMANCE

KAUFMAN LIEB LEBOWITZ &
FRICK LLP
Douglas E. Lieb
18 East 48th Street, Suite 802
New York, New York 10017
dlieb@kllf-law.com

# TABLE OF CONTENTS

**TABLE OF AUTHORITIES** .......................................................ii

**INTRODUCTION**.............................................................. 1

**INTEREST OF *AMICI CURIAE* AND DISCLOSURES** ..................... 2

**SUMMARY OF THE ARGUMENT** ...................................... 3

**ARGUMENT** ................................................................. 5

   I.   "SUBJECT TO THE JURISDICTION" IS A TERM OF
ART, TO BE GIVEN ITS CONSENSUS LEGAL
MEANING AS OF THE TIME OF ENACTMENT ...................... 5

   II.   CONGRESS CODIFIES THE CONSENSUS MEANING IN
1940 AS AN INTEGRAL PART OF A LARGER SCHEME ........ 7

      A.  The Statutory Scheme ................................................. 10

      B.  Prior Consistent Acts of Congress............................. 13

      C.  Drafters' Understanding of Judicial Precedent........................ 18

      D.  Consistency with Agency Regulations and Practices.............. 22

   III.   CONGRESS RECODIFIES THE CONSENSUS
MEANING IN 1952 ...................................................... 26

      A.  Congressional Approval of Suspensions of Deportation
from 1940-52.......................................................... 27

      B.  Legislative History of the Recodification................................. 30

**CONCLUSION**.......................................................... **33**

i

# TABLE OF AUTHORITIES

## CASES

*Ashwander v. Tenn. Valley Auth.*, 297 U.S. 288 (1936)............................ 5

*Comcast Cable Commc'ns v. FCC*, 717 F.3d 982 (D.C. Cir. 2013)
(Kavanaugh, J., concurring) ............................................................ 6

*Downes v. Bidwell*, 182 U.S. 244 (1901)..................................................... 9

*Ex parte Lopez*, 6 F. Supp. 342 (S.D. Tex. 1934).................................... 19

*FAA v. Cooper*, 566 U.S. 284, 292 (2013) ........................................... 6, 27

*George v. McDonough*, 596 U.S. 740 (2022) ......................... 4, 5, 6, 7, 22

*Lynch v. Clarke*, 1 Sand Ch. 583 (N.Y. Ch. 1844)................................... 19

*Matter of T--*, 3 I&N Dec. 707 (BIA 1949) ............................................ 30

*McDermott Int'l, Inc. v. Wilander*, 498 U.S. 337 (1991) ......................... 6

*Merrell Dow Pharm. v. Thompson*, 478 U.S. 804 (1986) ......................... 7

*Morrison v. California*, 291 U.S. 82 (1934) ............................................ 18

*Sekhar v. United States*, 570 U.S. 729 (2013) ..................................... 5, 6

*Taggart v. Lorenzen*, 587 U.S. 554 (2019) ........................................... 5, 6

*United States ex rel. Hintopoulos v. Shaughnessy*,
353 U.S. 72 (1957) .................................................................. 32, 33

*United States v. Wong Kim Ark*, 169 U.S. 649 (1898) ................. 1, 18, 25

## CONSTITUTIONAL PROVISIONS

U.S. Const. amend. XIV, § 1 ..................................................................... 1

## STATUTES

8 U.S.C. § 1229b(b)................................................................................. 16

8 U.S.C. § 1401(a).............................................................................. 1, 6

Alien Registration Act of 1940, Pub. L. No. 76-670,
    54 Stat. 670 (1940) .................................................................. 15, 16

Deportation Suspensions, S. Con. Res. 21, 86th Cong.,
    73 Stat. B12 (1959). ....................................................................... 32

Immigration Act of 1917, Pub. L. No. 301, 39 Stat. 874 (1917) ............. 13

Immigration Act of 1924, Pub. L. No. 68-139, 43 Stat. 153 (1924) ........ 14

Immigration and Nationality Act of 1952, Pub. L. No. 82-414,
    66 Stat. 163 (1952). ......................................................................... 26

Nationality Act of 1940, Pub. L. No. 76-853,
    54 Stat. 1137 (1940) .................................................... 3, 9, 10, 11, 12

Priv. L. No. 76-340, 54 Stat. 1267 (1940). ............................................... 17

## REGULATIONS

22 C.F.R. § 79.137 (1938) ........................................................................ 23

## LEGISLATIVE MATERIALS

80 Cong. Rec. 5952 (1936) ........................................................................ 15

86 Cong. Rec. 11,944-46 (1940) ............................................................... 21

*Deportation of Criminals, Preservation of Family Units, Permit
    Noncriminal Aliens to Legalize Their Status, Hearing on
    S. 2969 Before the S. Comm. on Immigr. & Naturalization,*
    74th Cong. 16 (1936) .................................................................... 15

Facts and Pertinent Provisions of Law in Cases of Certain
    Aliens: Letter from the Attorney General,
    H.R. Doc. No. 77-47 (1st Sess. 1941) ............................................ 28

Facts and Pertinent Provisions of Law in Cases of Certain
    Aliens: Letter from the Attorney General,
    H.R. Doc. No. 77-541 (2d Sess. 1942) ........................................... 29

Facts in Cases of Certain Alien Deportations: Letter from the
    Attorney General, H.R. Doc. No. 78-92 (1st Sess. 1943) ......... 28, 29

iii

H. Comm. on Immigr. & Naturalization, 76th Cong.,Nationality Laws of the United States (Comm. Print 1939) .....................*passim*

H.R. Rep. No. 2396 (1940)......................................................... 21

H.R. Rep. No. 76-773 (1940) ................................................... 17

S. Rep. No. 81-1515 (1950)................................................. 30, 31

*To Revise and Codify the Nationality Laws of the United States into a Comprehensive Nationality Code: Hearing Before the H. Comm. on Immigr. & Naturalization,* 76th Cong. 241 (1940) ............................................. 21, 22

**EXECUTIVE BRANCH MATERIALS**

U.S. Dep't of Labor & Commerce, Doc. No. 54, Treaty, Laws, and Regulations Governing the Admission of Chinese (1907)............. 25

U.S. Dep't of Labor, Treaty, Laws, and Rules Governing the Admission of Chinese (1914)................................................................ 26

U.S. Dep't of State, Regulations Governing the Consular Service of the United States, para. 137 (1926) ....................................... 23

U.S. Dep't of State, Regulations Prescribed for the Use of the Consular Service, para. 137 (1896) ................................................. 23

**TREATISES**

3 Hackworth, Digest of International Law (1942)............................ 23, 24

8 Whiteman, Digest of International Law (1967).................................. 24

**OTHER AUTHORITIES**

Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 320-22 (2012) ................................................. 7

Brief for United States, *Wong Kim Ark*, 169 U.S. 649 (No. 449) ........... 25

Harvey C. Mansfield, *The Legislative Veto and the Deportation of Aliens*, 1 Pub. Admin. Rev. 281 (1941) .......................................... 14

Richard W. Flournoy, *Dual Nationality and Election*, 30 Yale L.J. 545, (1921). ................................................................. 26

**INTRODUCTION**

The United States has followed a rule of territorial birthright citizenship since the early days of the republic, first as a matter of common law and then as a matter of statutory and constitutional law. In *United States v. Wong Kim Ark*, 169 U.S. 649 (1898), the Supreme Court recognized the expansive reach of the Fourteenth Amendment's Citizenship Clause, which provides that "[a]ll those born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the state wherein they reside." U.S. Const. amend. XIV, § 1. For well over a century, federal courts have regularly applied *Wong Kim Ark* irrespective of the immigration status or domicile of a child's parents.

Today, birthright citizenship is guaranteed not only by the Fourteenth Amendment but also by the Immigration and Nationality Act ("INA"), which provides that "a person born in the United States, and subject to the jurisdiction thereof," shall be a "citizen[] of the United States at birth." 8 U.S.C. § 1401(a). The Executive Branch officials who drafted this language and the legislators who enacted it, first in the Nationality Act of 1940 and then in 1952 in the INA, did so

1

with a clear understanding that they were codifying near-universal birthright citizenship, subject only to a few narrowly defined exceptions. Congressional actions, Executive Branch practice, and legislative history all show that the statute codified this consensus meaning.

Executive Order No. 14,160 purports to deny birthright citizenship to children born in the United States who, at the time of their birth, lack a parent who is a United States citizen or lawful permanent resident. In doing so, the Executive Order conflicts with the Citizenship Clause of the Fourteenth Amendment and Section 1401. Because this case can be resolved under Section 1401, this Court need not determine the scope of the Citizenship Clause. Section 1401(a) provides an independent basis to affirm the District Court's conclusion that Plaintiffs are likely to succeed on the merits in challenging Executive Order No. 14,160.

## INTEREST OF *AMICI CURIAE* AND DISCLOSURES

*Amici* Kristin Collins, Gerald Neuman, and Rachel Rosenbloom are legal scholars with expertise in U.S. citizenship and immigration law. *Amici* have a professional interest in ensuring that the Court is properly informed with respect to the history and meaning of the

2

birthright citizenship statute, 8 U.S.C. § 1401(a), and its importance to this case. Kristin Collins is the James E. and Sarah A. Degan Professor of Law at the University of Michigan Law School; Gerald Neuman is the J. Sinclair Armstrong Professor of International, Foreign, and Comparative Law at Harvard Law School; and Rachel Rosenbloom is Professor of Law at Northeastern School of Law.[1]

All parties consent to the filing of this brief.

## SUMMARY OF THE ARGUMENT

In the Nationality Act of 1940 (the "1940 Act"), Congress provided that "a person born in the United States, and subject to the jurisdiction thereof," shall be a "national[] and citizen[] of the United States at birth." 1940 Act § 201(a), Pub. L. No. 76-853, 54 Stat. 1137, 1138 (1940). Twelve years later, Congress reenacted this provision as part of the INA of 1952, codified at 8 U.S.C. § 1401(a).

---

[1] *Amici* submit this brief as individuals. Their institutional affiliation is noted for informational purposes only and does not indicate any institutional endorsement of the positions advocated in the brief. No party or its counsel authored this brief in whole or in part. Fed. R. App. P. 29(a)(4)(E)(i). No person other than *amici* and their counsel contributed money intended to fund the preparation or submission of this brief, including the parties or their counsel. Fed. R. App. P. 29(a)(4)(E)(ii), (iii).

"Subject to the jurisdiction thereof" is a term of art. Under well-established principles of statutory interpretation, it must be given its settled historical meaning as of the time Congress enacted it. *E.g.*, *George v. McDonough*, 596 U.S. 740, 752-53 (2022). "The real question is . . . what was the prevailing understanding of this term of art under the law that Congress looked to when codifying it." *Id.* at 752 (cleaned up).

This brief draws on *amici*'s scholarly expertise to answer that question. We consider the text, structure, purpose, and legislative histories of the 1940 and 1952 statutes; other relevant Congressional enactments; the regulations and practices of the relevant Executive Branch agencies; and other pertinent sources of "the law the Congress looked to" in enacting the birthright citizenship statute. *Id.* In particular, we highlight Congress's extensive familiarity with relief from deportation granted to parents without lawful immigration status on the basis of harm to their U.S.-born citizen children.

Taken together, these sources reflect a prevailing whole-of-Government understanding, as of 1940-52, that the children of temporary visitors and unauthorized immigrants were U.S. citizens at birth. By codifying the term "subject to the jurisdiction thereof" as an

integral part of the 1940 Act's larger scheme, Congress adopted this consensus meaning. It further reinforced that consensus by recodifying the same provision in 1952.

Section 1401(a) provides an independent basis to affirm the District Court's holding that Plaintiffs are likely to succeed on the merits in challenging Executive Order No. 14,160. An Executive Order cannot repeal that statutory guarantee. Thus, this Court need not conclusively interpret the scope of the Fourteenth Amendment's Citizenship Clause to affirm the decision below. *Ashwander v. Tenn. Valley Auth.*, 297 U.S. 288, 346-47 (1936).

## ARGUMENT

## I. "SUBJECT TO THE JURISDICTION" IS A TERM OF ART, TO BE GIVEN ITS CONSENSUS LEGAL MEANING AS OF THE TIME OF ENACTMENT

Where "Congress employs a term of art obviously transplanted from another legal source, it brings the old soil with it." *George*, 596 U.S. at 746 (cleaned up); *accord Taggart v. Lorenzen*, 587 U.S. 554, 560 (2019); *Sekhar v. United States*, 570 U.S. 729, 732-33 (2013). In construing such a term, a reviewing court presumes that Congress "knows and adopts the cluster of ideas that were attached to each

borrowed word in the body of learning from which it was taken." *FAA v. Cooper*, 566 U.S. 284, 292 (2013); *accord Comcast Cable Commc'ns v. FCC*, 717 F.3d 982, 989 (D.C. Cir. 2013) (Kavanaugh, J., concurring).

As is clear on the statute's face, the use of the term "subject to the jurisdiction thereof" reflects its inclusion in the Fourteenth Amendment's Citizenship Clause. 8 U.S.C. § 1401(a). In construing the meaning of "subject to the jurisdiction thereof" in 8 U.S.C. § 1401(a), the Court must examine the "law Congress looked to" to ascertain "the cluster of ideas" that attached to the term *at the time of enactment*. Thus, for instance, because the Hobbs Act borrows from the New York Penal Law, the Supreme Court has interpreted the Hobbs Act according to the "consistent[]" holdings of "New York courts" "[a]t the time of the borrowing (1946)." *Sekhar*, 570 U.S. at 735. "In the absence of contrary indication," the term should be given the prevailing borrowed meaning. *McDermott Int'l, Inc. v. Wilander*, 498 U.S. 337, 342 (1991).

The relevant body of "law Congress looked to" can, of course, include judicial decisions. *See, e.g.*, *Taggart*, 587 U.S. at 561. It can also include regulations and other Executive agency materials. *See George*, at 596 U.S. at 746-49 (relying on a "robust regulatory backdrop" and a

"mainstream of agency practice," including agency regulations and decisions, to interpret a statute concerning disability determinations); *see also* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 320-22 (2012) (borrowed language may be interpreted according to its "uniform construction by . . . a responsible administrative agency").

That the phrasing of Section 1401(a) originated in the Constitution does not preclude it from having independent force and meaning. *See, e.g.*, *Merrell Dow Pharm. v. Thompson*, 478 U.S. 804, 807-08 (1986) (different meanings of "arising under" in Article III, section 2 of the Constitution and in 28 U.S.C. § 1331). Plaintiffs' understanding of Section 1401(a) is wholly consistent with longstanding judicial construction of the Citizenship Clause, *see infra* § II.C, and the Court should give the statute full effect in any event.

## II. CONGRESS CODIFIES THE CONSENSUS MEANING IN 1940 AS AN INTEGRAL PART OF A LARGER SCHEME

What was "the law that Congress looked to," *George*, 596 U.S. at 752, in 1940 when it codified the principle that children born in the United States and "subject to the jurisdiction thereof" are citizens at birth?

The 1940 Act was initially drafted by a committee of representatives of three Executive agencies: the Department of State, the Department of Labor (which at the time housed the Immigration and Naturalization Service), and the Department of Justice.[2] H. Comm. on Immigr. & Naturalization, 76th Cong., Nationality Laws of the United States, pt. 1 at v (Comm. Print 1939) (hereinafter "Transmittal"). The Secretaries of State and Labor and the Attorney General submitted the proposed legislation to Congress in June 1938 with the committee's explanatory comments. *See id.* at vii.

One of the statute's objectives was to gather the "scattered" provisions of nationality law into a comprehensive code governing nationality by birth, naturalization qualifications and procedure, and loss of nationality. *Id.* at v. These issues were complicated by the United States' acquisition of overseas territories, some of which were treated as not fully incorporated into the United States under the Insular Cases,

---

[2]    President Roosevelt established the committee by executive order. Exec. Order. No. 6115, Revision and Codification of the Nationality Laws of the United States (Apr. 25, 1933).

*see Downes v. Bidwell*, 182 U.S. 244 (1901); Transmittal pt. 1 at 2, 11-13.

The statute also aimed to address the consequences of dual nationality, which was then regarded as problematic. Transmittal pt. 1 at v. It included new provisions for involuntary expatriation of American citizenship. 1940 Act §§ 401-03, 54 Stat. at 1168-70. It also created new and, in some respects, more stringent standards and procedures for the naturalization of foreign nationals. *See id.* §§ 301-47, 54 Stat. at 1140-68; *see also* Transmittal pt. 1 at v (discussing "the need for an accurate, comprehensive, and detailed Code by which naturalization is to be conferred" in light of "problems").

In drafting and enacting these provisions, neither the interdepartmental committee nor Congress understood itself to be acting on a blank slate. Rather, they understood themselves to be constrained by the "cluster of ideas" dating back to English common law in the colonial period, elaborated upon by the Supreme Court in *Wong Kim Ark*, and reinforced by decades of legislation and agency regulations and practices. These sources all reflected a broad conception of birthright citizenship—one recognizing that children born in the

9

United States to temporary visitors and immigrants without lawful status were born "subject to the jurisdiction" of the United States.

## A.    The Statutory Scheme

We begin with the statute itself. Section 201(a) of the 1940 Act, which would later be reenacted in the INA in 1952, was not an empty gesture that transplanted the Citizenship Clause into the United States Code for symbolic effect. Section 201(a) replaced the birthright citizenship provision of the 1866 Civil Rights Act. Transmittal pt. 2 at 3. It was an integral part of the 1940 Act's comprehensive scheme for regulating citizenship at birth in the continental United States and various territories; naturalization; expatriation; and the new status of noncitizen "nationals" residing in certain unincorporated territories.[3] Careful delineation of these different modes of gaining and losing citizenship was essential to the operation of the statute as a whole, and to the functioning of American nationality law more generally.

This statutory scheme exercised Congress's authority to grant citizenship beyond the constitutional requirements of the Citizenship

---

[3]    "Nationals" included both U.S. citizens and other inhabitants of unincorporated territories who were not aliens but rather owed permanent allegiance to the United States. 1940 Act §§ 101(b), 204, 54 Stat. at 1137, 1139.

Clause. For example, Section 101(d) defined the "United States" to include the unincorporated territories of Puerto Rico and the Virgin Islands. 54 Stat. at 1137. Thus, in declaring persons "born in the United States and subject to the jurisdiction thereof" to be citizens, Section 201(a) addressed not only the continental United States and the incorporated territories of Alaska and Hawaii, to which the Citizenship Clause was understood to apply, but also Puerto Rico and the Virgin Islands. 54 Stat. at 1138. This extension of birthright citizenship to Puerto Rico was one of several extensions of birthright citizenship *beyond* the constitutional floor in the 1940 Act. Some of these extensions were novel, and some recodified previously enacted statutes.[4] *See* Transmittal pt. 1 at 4.

---

[4]    The Supreme Court had indicated that the Citizenship Clause did not extend to the unincorporated territories. *Downes*, 182 U.S. at 251 (opinion of Brown, J.); *Gonzales v. Williams*, 192 U.S. 1 (1904). With respect to Puerto Rico, the general birthright citizenship rule codified in Section 201(a) was new. Separately, the 1940 Act declared the citizenship of members of "an Indian, Eskimo, Aleutian or other aboriginal tribe," § 201(b), which was not constitutionally required under *Elk v. Wilkins*, 112 U.S. 94 (1884). *See* 54 Stat. at 1138. In Section 201(f), the Act extended the broad conception of citizenship based on birth in the United States to "foundlings," children of unknown parentage found in the United States, and presumed to be born there. 54 Stat. at 1138.

The 1940 Act also contained several sections outlining how citizenship could be acquired at birth by American parentage (*jus sanguinis*) for children born "outside the United States." 1940 Act §§ 201(c)-(e), (g), (h), 54 Stat. at 1138-39. In addition, the Act included an entire chapter setting out the substantive and procedural laws governing naturalization, often creating stricter standards. *Id.* §§ 301-47, 54 Stat. at 1140-68.

Clarifying how individuals acquired U.S. citizenship—at birth and by naturalization—was important to the functioning of the 1940 Act as a whole, including its provisions concerning loss of nationality, or expatriation. The Act significantly expanded the grounds on which a U.S. citizen could be involuntarily expatriated. *See id.* § 401, 54 Stat. at 1169 (establishing voting in foreign election, serving in foreign army, and working for foreign government as grounds for expatriation in some instances); Transmittal pt. 2 at 66-72 (comparing preexisting provisions of expatriation law with proposed new ones). The 1940 Act's expanded grounds for involuntary expatriation also differed somewhat for at-birth and naturalized citizens. *See* 1940 Act §§ 402, 404, 54 Stat. 1169-70. A clear and comprehensive statutory delineation of who acquired

citizenship at birth and who was required to naturalize was therefore essential.

In short, the 1940 Act's broad grant of birthright citizenship for children born in the United States was an integral part of an intricate set of provisions that clarified the rules governing the acquisition and loss of U.S. citizenship.

## B.    Prior Consistent Acts of Congress

Congress's use of "subject to the jurisdiction" in the 1940 Act and the expansive understanding of birthright citizenship it connoted were consistent with prior Congressional enactments treating birth in the United States as dispositive of citizenship, irrespective of parental status.

For example, section 12 of the Immigration Act of 1917 imposed requirements on the commanding officers of ships traveling abroad to collect information about departing citizens. Immigration Act § 12, Pub. L. No. 301, 39 Stat. 874 (1917). For "native citizens"—that is, birthright citizens—the only information Congress deemed relevant was "the place and date of birth." *Id.*

Similarly, the Immigration Act of 1924 imposed quotas on immigration but gave non-quota status to noncitizen children and wives of U.S. citizens, permitting them to obtain visas even if all visas for their country of origin had been taken. *See* Immigration Act of 1924, Pub. L. No. 68-139, § 4(a), 43 Stat. 153, 155 (1924). It allowed any citizen claiming a relative as a non-quota immigrant to file a sworn petition to that effect. *Id.* § 9(b), 43 Stat. at 157. If the petitioning citizen was "a citizen by birth," the only information required was "the date and place of his birth." *Id.* § 9(b)(2), 43 Stat. at 157. As it did in 1917, Congress treated birthplace—and nothing more—as proof of birthright citizenship.

From 1934 to 1940, the Roosevelt Administration repeatedly sought statutory authorization to grant relief from deportation, particularly to avoid separating mixed-status families where the deportation was based upon an unlawful entry or visa overstay. *See* Harvey C. Mansfield, *The Legislative Veto and the Deportation of Aliens*, 1 Pub. Admin. Rev. 281 (1941). Congress sometimes intervened

in particular cases by enacting private bills of relief,[5] but the Executive Branch argued for a more regular administrative process.

As the INS advocated for the authority to suspend deportation, it made clear to Congress that this authority would benefit parents who unlawfully entered or overstayed to avoid deporting both parents of a citizen child. INS Commissioner Daniel MacCormack told a Senate Committee that deportations of both parents of citizen children were "not an uncommon thing." *Deportation of Criminals, Preservation of Family Units, Permit Noncriminal Aliens to Legalize Their Status, Hearing on S. 2969 Before the S. Comm. on Immigr. & Naturalization*, 74th Cong. 16 (1936); *see also* 80 Cong. Rec. 5952 (1936) (describing specific example of illegal entry by a couple who then had "four native-born American citizen children").

The Executive Branch's advocacy efforts culminated in Congress's passage of the "suspension of deportation" provision of the Alien Registration Act in 1940. Pub. L. No. 76-670, § 20, 54 Stat. 670, 671-73 (1940), just a few months before the 1940 Act. This provision—a

---

[5]    A private bill grants relief—here, from deportation—to specific individuals. Congress has enacted them in the immigration context.

precursor of today's cancellation of removal, *see* 8 U.S.C. § 1229b(b)—authorized the Attorney General to suspend the deportation of a deportable alien "if he finds that such deportation would result in serious economic detriment to a citizen or legally resident alien who is the spouse, parent, or minor child of such deportable alien." Alien Registration Act § 20, 54 Stat. at 672.

The Alien Registration Act required the Attorney General to report the facts for each suspension to Congress. *Id.* If Congress passed a resolution of disapproval, the Attorney General would be required to deport the alien. *See id.* If Congress did not disapprove, the Attorney General would cancel the deportation proceedings and grant lawful permanent residence. *See id.* The actual practice of suspension after 1940 accords with the original understanding that it would protect the unlawfully present parents of native-born citizen children. *See infra* § III.A.

Finally, one of the private bills essentially contemporaneous with the 1940 Act confirms Congress's view that children of persons without lawful status were born "subject to the jurisdiction" of the United States. In May 1940, Congress passed a private bill granting legal

permanent residency to Morris, Lena, Doris, and Ruth Hoppenheim. Priv. L. No. 76-340, 54 Stat. 1267 (1940). Morris and Lena were born in Europe and emigrated to Canada as children, where they met, married, became naturalized citizens, and had two daughters, Doris and Ruth. *See* H.R. Rep. No. 76-773 at 1 (1940). In November 1924, the four Hoppenheims came to New York for a visit but never left, settling in Brooklyn without obtaining immigration visas. *Id.* Morris and Lena had a third child, Bernice, in 1927. *Id.* at 2. As the House Committee on Immigration and Naturalization described the facts: "*The United States citizen daughter*, Bernice, 11, attends public school." *Id.* (emphasis added). Given the "distinct hardship" that departure from the country would cause, *id.*, Congress granted the Hoppenheims private relief.

In October 1940, that same Congress enacted the Nationality Act. The Trump Administration's assertion that the 1940 Act and the INA extend birthright citizenship only to the children of lawfully present domiciliaries is difficult to square with Congress's grant of relief to the family of Bernice Hoppenheim, the "United States citizen daughter," in May 1940.

## C.    Drafters' Understanding of Judicial Precedent

Congress and the interdepartmental committee that wrote the birthright citizenship statute also intended to adopt the broad meaning of "subject to the jurisdiction" that federal courts employed.

In *Wong Kim Ark*, the Supreme Court characterized the intent of the drafters of the Citizenship Clause as being "to exclude, by the fewest and fittest words (besides children of members of the Indian tribes, standing in a peculiar relation to the national government, unknown to the common law), the two classes of cases,—children born of alien enemies in hostile occupation, and children of diplomatic representatives of a foreign state," recognized in English and American common law. 169 U.S. at 682. As to all other persons, the Court explained, "the fundamental rule of citizenship by birth within the dominion of the United States, notwithstanding alienage of parents," applied. *Id.* at 689.

In the decades leading up to the passage of the 1940 Act, federal courts routinely described the Citizenship Clause without regard to parental immigration status or domicile. *See, e.g.*, *Morrison v. California*, 291 U.S. 82, 85 (1934) ("A person of the Japanese race is a

18

citizen of the United States if he was born within the United States.");

*Ex parte Lopez*, 6 F. Supp. 342, 344 (S.D. Tex. 1934) (commenting, with regard to a person born in Texas of Mexican parents whose status and length of residence was unknown, "[t]hat persons born in the United States (as was petitioner) are citizens of the United States need not be discussed").

These cases formed part of the backdrop against which the interdepartmental committee drafted the 1940 Act. So did cases from prior to the Fourteenth Amendment's ratification. The interdepartmental committee explained that the proposed Section 201(a) was "in effect a statement of the common-law rule, which has been in effect in the United States from the beginning of its existence as a sovereign state, having previously been in effect in the colonies." Transmittal pt. 1 at 7.

The interdepartmental committee based this view in part on the Supreme Court's decision in *Wong Kim Ark* and the 1844 opinion in *Lynch v. Clarke*, 1 Sand Ch. 583 (N.Y. Ch. 1844). It explained those opinions' significance:

> [*Wong Kim Ark*] relates to a person born to parents who
> were domiciled in the United States but, according to the

> reasoning of the court, which was in agreement with the
> decision of the Court of Chancery of New York in the year
> 1844 in *Lynch v. Clarke*, . . . the same rule is also applicable
> to a child born in the United States of parents residing
> therein temporarily.

Transmittal pt. 1 at 7. Thus, while the Trump Administration now

claims that the colonial-era understanding of "subject to the

jurisdiction" did not survive the Founding, *see* Opening Br. 40-41, the

Executive officials who drafted Section 201(a) expressly understood

otherwise.

The Trump Administration also questions the distinction between

holding and dicta in *Wong Kim Ark*. *See* Opening Br. 9, 36-39 (asserting

that the holding is "carefully cabined" to the children of domiciliaries).

But regardless of where exactly one draws that line, the "*reasoning* of

the court" in *Wong Kim Ark*, as the interdepartmental committee

described it above, is indisputably part of the law Congress looked to in

enacting § 201(a). Transmittal pt. 1 at 7 (emphasis added). In adopting

this reasoning, the interdepartmental committee expressly rejected the

notion that "subject to the jurisdiction thereof" effectively meant

"domiciled in." *Id.* As it explained: "[I]t is the fact of birth within the

territory and jurisdiction, *and not the domicile of the parents*, which determines the nationality of the child." *Id.* (emphasis added).

The House Committee on Immigration and Naturalization held extensive hearings on the bill over the course of several months in 1940. *See To Revise and Codify the Nationality Laws of the United States into a Comprehensive Nationality Code: Hearing Before the H. Comm. on Immigr. & Naturalization*, 76th Cong. 241 (1940) (hereinafter "Revise"). The interdepartmental committee's Transmittal Report was submitted to Congress with the proposed bill and was reproduced in the legislative record. *See, e.g.*, Transmittal pt. 1 at 1; Revise at 404-692; 86 Cong. Rec. 11,944-46 (1940); H.R. Rep. No. 2396 (1940). Agency representatives testified in committee hearings, discussing and debating every proposed provision. When discussing Section 201(a), Executive officials and Members of Congress alike understood that citizenship for children born in the continental United States and "subject to the jurisdiction thereof" was nonnegotiable. *See, e.g.*, Revise at 37-38, 48, 52, 98, 246.

The legislative history also reveals that they shared the broad, consensus understanding of that term of art. For example, when one Member of Congress asked whether the U.S.-born child of a French

couple in the U.S. on visitor's visas would be a U.S. citizen, others answered in the affirmative. *Id.* at 246; *see also* Transmittal pt. 1 at 16 (quoting Justice Gray's explanation in *Wong Kim Ark* that the phrase "subject to the jurisdiction thereof" was meant to except only "children of foreign sovereigns or their ministers, or born on foreign public ships, or of enemies within and during a hostile occupation of part of our territory, and the single additional exception of children of members of the Indian tribes owing direct allegiance to their several tribes").

### D.    Consistency with Agency Regulations and Practices

It makes sense that the Executive officials and legislators who drafted and debated the birthright citizenship statute would have a broad understanding of who was born "subject to the jurisdiction" of the United States. Federal agencies' regulations and practices had long done the same. *See George*, 596 U.S. at 746-49 (considering "regulatory backdrop" and "agency practice" of the relevant agency as part of the "old soil" transplanted into a statute).

In 1896, the State Department adopted consular regulations governing the issuance of U.S. passports. Those regulations provided: "The circumstance of birth within the United States makes one a citizen

thereof, even if his parents were at the time aliens, provided they were not, by reason of diplomatic character or otherwise, exempted from the jurisdiction of its laws." U.S. Dep't of State, Regulations Prescribed for the Use of the Consular Service, para. 137 (1896). The State Department repeated this explanation in its revised consular regulations in the 1920s, *see* U.S. Dep't of State, Regulations Governing the Consular Service of the United States, para. 137 (1926), and again in the first codification of the Code of Federal Regulations in 1938, *see* 22 C.F.R. § 79.137 (1938).

The State Department's actions on individual citizenship issues during this period were also consistent with this understanding. In 1930, for example, an issue arose concerning the citizenship of a child born on Ellis Island to a mother who had not been admitted under the immigration laws. The State Department's legal opinion observed that the mother was physically present in the United States and that the child was born subject to its jurisdiction under *Wong Kim Ark* because the mother did not belong "to any one of the classes of aliens referred to by Mr. Justice Gray as enjoying immunity from the jurisdiction of the United States." 3 Hackworth, Digest of International Law, at 10 (1942)

(State Department digest, quoting from memorandum of the Office of the Solicitor for the Department of State). The State Department reasoned that the mother would have been subject to prosecution for any crime committed on the island, and "while she was on the island, she owed the same 'temporary allegiance' which is required of aliens generally while they are in this country." *Id.* Here again, the Executive Branch adopted the broad, traditional meaning of "jurisdiction" as legal jurisdiction and did not impose any additional requirement relating to domicile.[6]

To be sure, at various junctures, Executive officials have advanced an alternative understanding of birthright citizenship, just as the Trump Administration has attempted to do in Executive Order No. 14,160. Most notably, in *Wong Kim Ark* itself, the Department of Justice pressed an interpretation of the phrase "subject to the jurisdiction" that would have excluded U.S.-born children of nondomiciled noncitizen parents. Brief for United States at 9-11, *Wong*

---

[6]    *Accord* 8 Whiteman, Digest of International Law, at 125 (1967) (quoting 1938 State Department correspondence explaining that French consul's child born in New York was a U.S. citizen because consuls lacked diplomatic status and were "subject to the jurisdiction, civil and criminal, of the courts of the country in which they reside" (quoting *Wong Kim Ark*, 169 U.S. at 679)).

24

*Kim Ark*, 169 U.S. 649 (No. 449). But when the Court decided *Wong Kim Ark*, only the dissenters embraced this theory. 169 U.S. at 708-09, 718-19, 721, 732 (Fuller, J., dissenting).

For some time after *Wong Kim Ark*, a Bureau of Immigration manual concerning the Chinese exclusion laws attempted to add a parental domicile qualification for the U.S.-born children of Chinese noncitizen parents to obtain citizenship at birth.[7] Some treatises published after *Wong Kim Ark* also continued to include discussion of a parental domicile requirement for birthright citizenship. *See, e.g.*, Hannis Taylor, *A Treatise on International Public Law* 220 (1901); John Westlake, *International Law* 220 (1904). But these theories were outliers from the general understanding that U.S.-born children obtained citizenship at birth regardless of their noncitizen parents' domicile or residence.

By 1914, the Bureau of Immigration had removed the references to parent domicile and residence from its manual. U.S. Dep't of Labor,

_____

[7]    The manual's 1907 edition stated narrowly that the U.S.-born child of Chinese parents who had "a permanent domicile and residence" in the United States at the time of his birth was exempt from the Chinese exclusion laws. U.S. Dep't of Labor & Commerce, Doc. No. 54, Treaty, Laws, and Regulations Governing the Admission of Chinese 33 (1907).

Treaty, Laws, and Rules Governing the Admission of Chinese 37 (1914) (listing "Chinese persons shown to have been born in the United States" as exempt from the Chinese exclusion law). In 1921, Richard Flournoy, an eminent State Department citizenship law expert, published an article in the *Yale Law Journal* discussing the erroneous idea that a U.S.-born child's citizenship turned on whether his parents were "domiciled in this country at the time of his birth." Richard W. Flournoy, *Dual Nationality and Election*, 30 Yale L.J. 545, 552 (1921). Flournoy observed that neither the Citizenship Clause nor the common law sources it built upon distinguished "between persons born in the country of alien sojourners and those born of domiciled aliens." *Id.* at 553. Flournoy later became the State Department's lead representative on the interdepartmental committee that drafted what ultimately became the Nationality Act of 1940.

## III.   CONGRESS RECODIFIES THE CONSENSUS MEANING IN 1952

In 1952, Congress enacted the Immigration and Nationality Act (INA), an omnibus immigration statute. Pub. L. No. 82-414, 66 Stat. 163 (1952). It recodified verbatim the birthright citizenship provision originally enacted in 1940. *Id.* § 301(a)(1), 66 Stat. at 235.

Congressional and Executive Branch actions from 1940-52 and the legislative history of the INA further confirm the whole-of-Government consensus that birthright citizenship extended to the children of temporary visitors and unauthorized immigrants. Congress again borrowed this "cluster of ideas" when it recodified the birthright citizenship statute in 1952. *Cooper*, 566 U.S. at 292.

### A. Congressional Approval of Suspensions of Deportation from 1940-52

Congress's approval of suspensions of deportation from 1940-52 confirms its understanding that the children of temporary visitors and unauthorized immigrants were "subject to the jurisdiction" of the United States. *See supra* § II.B (explaining suspension of deportation under the 1940 Alien Registration Act). From 1940-52, Congress reviewed and regularly allowed the Attorney General's suspension of deportation for temporary visitors and unauthorized immigrants based upon economic harm to their citizen children. In these cases, the Executive Branch and Congress demonstrated their shared understanding that such persons were born "subject to the jurisdiction" of the United States and entitled to citizenship by birthplace alone.

To take some illustrative examples:

27

In 1941, the Attorney General reported the suspension of deportation of Jan and Mary Zarycki, a married Polish couple who "entered the United States unlawfully near Niagara Falls" in 1930. Facts and Pertinent Provisions of Law in Cases of Certain Aliens: Letter from the Attorney General, H.R. Doc. No. 77-47, at 24 (1st Sess. 1941). "A child was born to them in New York City . . . [in] 1933." *Id.* The Attorney General suspended deportation to avoid hardship to their "*citizen minor child.*" *Id.* at 25 (emphasis added).

Also in 1941, the Attorney General reported on the case of Dimytro Iwasiuk, a Polish citizen who entered the United States without a visa in 1924. *Id.* at 82. His wife was "also an illegally resident alien." *Id.* The Attorney General suspended deportation to prevent "serious economic detriment to his three children, all minors and native-born citizens of the United States." *Id.*

Similarly, in 1943, the Attorney General reported on the case of Benjamin Blum, a Polish citizen who entered the U.S. in 1924 "as a stowaway on a small boat without an immigration visa." Facts in Cases of Certain Alien Deportations: Letter from the Attorney General, H.R. Doc. No. 78-92, at 18 (1st Sess. 1943). His wife, whom he married in

28

Poland, was also "illegally living in the United States and . . . subject to deportation." *Id.* They had a "a child born in this country, now aged 10 years." *Id.* The Attorney General suspended deportation on the basis of hardship to the "citizen minor child." *Id.* at 18-19.

The list goes on.[8] In each of these cases involving persons who entered without inspection or otherwise lacked a claim to lawful presence in the country, Congress allowed the suspension of deportation based on harm to an American-born citizen child. In each case, Congress adopted the Attorney General's conclusion that birth on U.S. soil, standing alone, made these children "subject to the jurisdiction" of the United States.

---

[8]    *See, e.g., id.* at 51-52 (suspension of deportation of Haralambos and Efterip Sklavos, "who entered the United States at the port of New York during June 1934, as stowaways . . . not in possession of immigration visas," based on hardship to 5½-year-old "minor citizen child," having presented "[p]roof of the birth of the child in this country"); Facts and Pertinent Provisions of Law in Cases of Certain Aliens: Letter from the Attorney General, H.R. Doc. No. 77-541, at 58 (2d Sess. 1942) (suspension of deportation of Trinidad Lopez and Petra Gonzalez de Lopez, Mexican citizens who "last entered the United States February 1, 1927, by crossing the Rio Grande in a skiff, at which time they were not inspected," on the basis of hardship to their four children, "all of whom are American citizens"); *id.* at 364 (suspension of deportation of Charles and Jean Haker, who entered from Manitoba without visas in 1925 and "[s]ince their arrival in the United States . . . have had born to them six children, native citizens of this country"). *See also Matter of T--,* 3 I&N Dec. 707 (BIA 1949) (describing suspension of deportation of noncitizen mother of U.S.-born citizen child, where mother had overstayed her visitor's visa and father's presence in the United States was unauthorized at time of child's birth).

### B.    Legislative History of the Recodification

As with the birthright citizenship provision in the 1940 Act, the legislative materials associated with the 1952 recodification of that birthright citizenship statute endorse the broad, traditional meaning of "subject to the jurisdiction" and an accordingly capacious view of birthright citizenship.

In 1950, the Senate Judiciary Committee reported on its "general investigation of our immigration system," a precursor to the passage of the INA of 1952. S. Rep. No. 81-1515, at 1 (1950). The Committee characterized parents' national origin and immigration status as "immaterial" to citizenship at birth. *Id.* at 685. "The only exception, of course, is that the person must be subject to the jurisdiction of the United States," which has been "interpreted to exempt children born in the United States to parents in the diplomatic service of a foreign state." *Id.* While this exception "[f]ormerly . . . included" the children of tribal members, "these persons are now by law citizens at birth." *Id.* In short, the Committee endorsed a "broad common law, constitutional, and statutory provision that all native-born persons, except those born

of parents who are in the diplomatic service of foreign states, are citizens at birth." *Id.*

A 1952 House Judiciary Committee report on the proposed bill endorsed the same reading of *Wong Kim Ark* that the 1940 Nationality Act's drafters embraced. H.R. Rep. No. 82-1365, at 25 (1952). The Committee explained: "In sustaining Ark's citizenship the Court held that the fourteenth amendment . . . is but declaratory of the common-law principle unreservedly accepted in England since Calvin's case . . . and in the United States since the Declaration of Independence, that all persons, regardless of the nationality of their parents born within the territorial limits of a State are *ipso facto* citizens of that State." *Id.*

In sum, when Congress recodified the birthright citizenship statute in 1952, it "looked to" decades' worth of legislation, Executive Branch practice, and judicial precedent demonstrating a broad understanding of birthright citizenship for children born in the United States—one that did not depend on their parents' immigration status, residence, or domicile. This understanding was reflected in common-law and constitutional rulings on birthright citizenship that legislators consulted, in contemporaneous regulations, and in the practices of

immigration officials that Congress oversaw in suspension of deportation cases in the 1940s.

Perhaps no case better illustrates the consensus understanding around the time Congress enacted Section 1401(a) than that of Anastasios and Elizabeth Hintopoulos. The Hintopouloses, a married couple from Greece who were temporarily admitted as alien seamen in 1951, overstayed their period of admission after discovering Elizabeth was pregnant. *United States ex rel. Hintopoulos v. Shaughnessy,* 353 U.S. 72, 73 (1957). After their child was born, the couple voluntarily disclosed their unlawful presence to authorities in 1952 and sought suspension of deportation to avoid "serious economic detriment" to their minor U.S. citizen child. *Id.* at 73-74 (citing 8 U.S.C. § 155(c) (1946)). The Attorney General and Congress ultimately granted them relief in 1959. *See* Deportation Suspensions, S. Con. Res. 21, 86th Cong., 73 Stat. B12 (1959).

The Hintopouloses' case was typical in its resolution. Many noncitizen parents of U.S.-born citizen children were spared deportation in this manner in the 1940s and 1950s. Their case also was typical in another way: over the course of eight years' worth of federal

proceedings, their child was unquestioningly regarded as a U.S. citizen even though their unauthorized presence in the United States was central to the case. The Supreme Court's 1957 opinion in *Hintopoulos* took the child's citizenship as a given: "[T]he child is, of course, an American citizen by birth." 353 U.S. at 73. This was the consensus understanding of birthright citizenship that all three branches of government shared in the 1950s and that Congress codified in 1952.

## CONCLUSION

Standing alone, 8 U.S.C. § 1401(a) provides an independent basis to affirm the District Court's conclusion that Plaintiffs are likely to succeed on the merits in challenging Executive Order No. 14,160.

Dated:        June 6, 2025              Respectfully submitted,

                                        _____*/s/ Douglas E. Lieb*___
                                        Douglas E. Lieb
                                        First Circuit Bar No. 1217516
                                        KAUFMAN LIEB LEBOWITZ &
                                        FRICK LLP
                                        18 East 48th Street, Suite 802
                                        New York, New York 10017
                                        dlieb@kllf-law.com
                                        (212) 660-2332 phone
                                        (646) 933-1148 fax

                                        *Counsel for* Amici Curiae *Immigration*
                                        *Law Scholars Kristin Collins, Gerald*
                                        *Neuman, and Rachel Rosenbloom*

34

## CERTIFICATE OF COMPLIANCE

This brief complies with the word limit of Federal Rule of Appellate Procedure 29(a)(5) because it contains 6,496 words, less than half the applicable limitation of Rule 32(a)(7)(B). This brief complies with the typography requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared in 14-point Century Schoolbook, a proportionally spaced font, using Microsoft Word.

*/s/ Douglas E. Lieb*
DOUGLAS E. LIEB

## CERTIFICATE OF SERVICE

I certify that on June 6, 2025, I electronically filed the foregoing Brief of *Amici Curiae* Immigration Law Scholars Kristin Collins, Gerald Neuman, and Rachel Rosenbloom in Support of Plaintiffs-Appellees and Affirmance with the United States Court of Appeals for the First Circuit by using the CM/ECF system. I certify that all parties or their counsel are registered as ECF Filers and will be served by the CM/ECF system.

*/s/ Douglas E. Lieb*
DOUGLAS E. LIEB