**No. 25-1348**

IN THE

# United States Court of Appeals for the First Circuit

NEW HAMPSHIRE INDONESIAN COMMUNITY SUPPORT; LEAGUE OF UNITED LATIN AMERICAN CITIZENS; MAKE THE ROAD NEW YORK,

PLAINTIFFS-APPELLEES,

v.

DONALD J. TRUMP, PRESIDENT OF THE UNITED STATES, IN THEIR OFFICIAL CAPACITY; US DEPT. OF HOMELAND SECURITY; KRISTI NOEM, IN THEIR OFFICIAL CAPACITY AS SECRETARY OF THE U.S. DEPARTMENT OF HOMELAND SECURITY; US DEPARTMENT OF STATE; MARCO RUBIO, IN THEIR OFFICIAL CAPACITY AS SECRETARY OF U.S. DEPARTMENT OF STATE; US DEPARTMENT OF AGRICULTURE; BROOKE L. ROLLINS, IN THEIR OFFICIAL CAPACITY AS SECRETARY OF THE U.S. DEPARTMENT OF AGRICULTURE; CENTERS FOR MEDICARE AND MEDICAID SERVICES; MEHMET OZ, IN THEIR OFFICIAL CAPACITY AS ADMINISTRATOR OF THE CENTERS FOR MEDICARE AND MEDICAID SERVICES,

DEFENDANTS-APPELLANTS.

*On Appeal from the United States District Court*
*for the District of New Hampshire*

## BRIEF *AMICUS CURIAE* OF FORMER
## NATIONAL SECURITY OFFICIAL JOSHUA STEINMAN
## IN SUPPORT OF DEFENDANTS-APPELLANTS AND REVERSAL

DANIEL Z. EPSTEIN
AMERICA FIRST
  LEGAL FOUNDATION
611 Pennsylvania Ave. SE
  #231
Washington, DC 20003
daniel.epstein@aflegal.org
(202) 964-3271

JUDD E. STONE II
CHRISTOPHER D. HILTON
ARI CUENIN
STONE HILTON PLLC
600 Congress Ave., Ste. 2350
Austin, Texas 78701
judd@stonehilton.com
(737) 465-7248

*Counsel for Amicus Curiae*

## RULE 26.1 DISCLOSURE STATEMENT

Per Rule 26.1 of the Federal Rules of Appellate Procedure, *amicus curiae* is a natural person and thus lacks a parent corporation or any shares that could be owned by a publicly held corporation.

/s/ *Judd E. Stone II*
Judd E. Stone II

## TABLE OF CONTENTS

Rule 26.1 Disclosure Statement..................................................i

Table of Contents ....................................................ii

Table of Authorities................................................. iii

Identity and Interest of *Amicus Curiae*....................................1

Summary of Argument...................................................2

Argument...............................................................3

   I.   The EO Is Faithful to the Constitution and Serves the Interests of National Security. ...........................................5

   II.  National-Security Concerns Also Support the Executive in the Irreparable-Harm Analysis.........................................17

Conclusion ...........................................................21

Certificate of Compliance................................................22

Certificate of Service ..................................................22

# TABLE OF AUTHORITIES

## Cases

*Boumediene v. Bush*,
  553 U.S. 723 (2008) ......................................................................... 4, 19

*Crosby v. National Foreign Trade Council*,
  530 US 363 (2000) ................................................................................ 20

*Dep't of State v. Munoz*,
  602 U.S. 899 (2024) .............................................................................. 11

*Harisiades v. Shaughnessy*,
  342 U.S. 580 (1952) .............................................................................. 20

*Henderson v. Shinseki*,
  562 U.S. 428 (2011) .............................................................................. 21

*Holder v. Humanitarian L. Project*,
  561 U.S. 1 (2010) ............................................................................ 11, 12

*INS v. Legalization Assistance Project of the L.A. Cty. Fed'n of Labor*,
  510 U.S. 1301 (1993) ............................................................................ 17

*Mathews v. Diaz*,
  426 U.S. 67 (1976) ................................................................................ 12

*Nken v. Holder*,
  556 U.S. 418 (2009) ......................................................................... 4, 17

*Reno v. Flores*,
  507 U.S. 292 (1993) .............................................................................. 18

*Trump v. Hawaii*,
  585 U.S. 667 (2018) ........................................................ 11, 12, 16, 17, 18

*U.S. Dep't of Labor v. Triplett*,
  494 U.S. 715 (1990) .............................................................................. 18

*United States v. Wong Kim Ark*,
  169 U.S. 649 (1898) ................................................................................ 7

*Ziglar v. Abbasi*,
  582 U.S. 120 (2017) .............................................................................. 17

*Zivotofsky ex rel. Zivotofsky v. Kerry*,
  576 U.S. 1 (2015) ............................................................... 20

**Statutes**

8 U.S.C. § 1401(a) ....................................................... 6, 7, 8

**Other Authorities**

2 Farrand's Records 68 (Gouveneur Morris) ............................ 9

Alexander Hamilton, *Speech at the Constitutional Convention*,
  *in* James Madison's Notes of Debates in the Federal Convention
  (June 8, 1787) ............................................................. 8

Amy Swearer, *Subject to the (Complete) Jurisdiction Thereof: Salvaging
  the Original Meaning of the Citizenship Clause*,
  24 Tex. Rev. L. & Pol. 135 (2019) ....................................... 7

Attorney General Prepared Remarks on the National-Security Entry-
  Exit Registration System (June 6, 2002) ............................... 10

*How the FBI Busted Anna Chapman and the Russian Spy Ring*,
  ABC News (Nov. 1, 2011) .................................................. 14

James T. Kimer, *Landmarks in US Immigration Policy*,
  NACLA.org (Sept. 25, 2007) .............................................. 10

Kevin J. Fandl, *Immigration Posses: U.S. Immigration Law and Local
  Enforcement Practices*,
  34 J. Legis. 16 (2008) .................................................. 11

Kevin P. Riehle, *Russia's Intelligence Illegals Program:
  An Enduring Asset*,
  35 Intelligence & Nat'l Sec. 385, 386 (2020) ..................... 15, 16

Kristin A. Vara, *Espionage: A Comparative Analysis*,
  22 ILSA J. Int'l & Comp. L. 61 (2015) .................................. 15

Shaun Walker, *"I Thought I Was Smarter Than Almost Everybody": My
  Double Life as a KGB Agent*, The Guardian (Feb. 11, 2017) ........ 15, 16

The Federalist No. 68
  (Clinton Rossiter, ed. 1961) (Alexander Hamilton) ...................... 8

Timothy Meyer & Ganesh Sitaraman, *The National Security Consequences of the Major Questions Doctrine*, 122 Mich. L. Rev. 55 (2023) .................................................. 19

## Constitutional Provisions

U.S. Const. amend. XIV ........................................................... 3

U.S. Const. amend. XIV, § 1 ..................................................... 6

U.S. Const. art, II, § 3 ............................................................ 4

U.S. Const. art. IV, § 4 ......................................................... 9, 13

## Executive Orders & Proclamations

Exec. Order No. 14,159,
90 Fed. Reg. 8443 (Jan. 20, 2025) ......................................... 10, 13, 16

Exec. Order No. 14,160,
90 Fed. Reg. 8449 (Jan. 20, 2025) ........................................... 2, 6

Exec. Order No. 14,165,
90 Fed. Reg. 8467 (Jan. 20, 2025) ............................................. 13

Proclamation No. 10,886,
90 Fed. Reg. 8327 (Jan. 20, 2025) ............................................. 13

Proclamation No. 10,888,
90 Fed. Reg. 8333 (Jan. 20, 2025) ............................................. 13

## IDENTITY AND INTEREST OF *AMICUS CURIAE*[1]

*Amicus curiae* Joshua Steinman is a former national security official and the Co-founder and CEO of Galvanick, a cybersecurity firm specializing in securing industrial facilities. Prior to that role, Mr. Steinman served on the White House National Security Council Staff from 2017 to 2021 as Deputy Assistant to the President and Senior Director for Cyber. In that role, his duties included oversight of all cyber and telecommunications policy for the federal government. Mr. Steinman has also served as a naval officer, serving in the United States and abroad, and in the private sector as a senior executive in Silicon Valley. While assigned to an emerging technologies task force answering to the Chief of Naval Operations, he successfully advocated for the creation of the Defense Innovation Unit, an entity formed to help the Department of Defense integrate emerging technology and national security.

*Amicus* has worked at the most senior levels of the federal government and with the highest-level security clearance. He has

---

[1] No counsel for any party has authored this brief in whole or in part, and no entity or person other than *amicus* and his counsel made any monetary contribution intended to fund this brief's preparation or submission. All parties consent to the filing of this brief.

devoted his career to combating complex security threats to the United States. These threats are perhaps no more complex and consequential than those involving the United States's assessment of and response to foreign intelligence assets in an increasingly globalized, interconnected geopolitical landscape. Such threats include the exploitation of vulnerabilities in United States citizenship requirements on the part of foreign adversaries.

*Amicus* respectfully submits this brief to offer the Court a perspective on the national-security contours of this case. In particular, *amicus* writes to describe the implications of place-of-birth and citizenship derived therefrom for national security, and why interference with the President's Executive Order (the "EO") giving effect to the Constitution's citizenship provisions may leave the United States vulnerable to harm from its enemies abroad. *See* Exec. Order No. 14,160, 90 Fed. Reg. 8449 (Jan. 20, 2025).

## SUMMARY OF ARGUMENT

I.     The Fourteenth Amendment of the Constitution provides, in relevant part, that a person attains U.S. citizenship if he is both "born or naturalized in the United States" and "subject to the jurisdiction thereof."

U.S. Const. amend. XIV. As the Executive has argued, the EO rightly recognizes that the automatic grant of birthright citizenship to a child born on U.S. soil regardless of whether his parents are lawfully and permanently in the United States is not required by the Fourteenth Amendment. The district court's ruling was not in keeping with the text of the Constitution and the national-security interests it serves.

II.    The foregoing principles also support the Executive's argument that the district court abused its discretion because the remaining factors needed for a preliminary injunction favor the Executive. The injunction harms the Executive by interfering in the President's management of foreign affairs and national security. And because of the unique challenges posed by U.S.-born foreign-intelligence assets, courts are ill-suited to redress threats to national security from potential U.S.-born foreign intelligence assets that would have been stymied by the EO.

## ARGUMENT

The district court erred in granting a preliminary injunction, which foreclosed the EO's treatment of birthright citizenship on Fourteenth Amendment grounds. This Court has recognized that constitutional

liberties must coexist with longstanding national-security interests. "Established legal doctrine must be consulted for its teaching. Remote in time it may be; irrelevant to the present it is not. . . . Security subsists, too, in fidelity to freedom's first principles." *Boumediene v. Bush*, 553 U.S. 723, 797 (2008) (cleaned up). *Amicus* agrees that the district court's preliminary injunction is not in keeping with those principles. The injunction misunderstands the Fourteenth Amendment, raising needless conflict with the United States's national-security interests and the President's obligation to see the Constitution faithfully executed. *See* U.S. Const. art. II, § 3. *Amicus* thus focuses on two showings necessary to establish that the district court abused its discretion in granting a preliminary injunction: likelihood of success on the merits and irreparable harm. *See Nken v. Holder*, 556 U.S. 418, 426 (2009).

*First*, the Executive and others have highlighted flaws in the constitutional analysis of Fourteenth Amendment challenges to the EO. *Amicus*, being well-versed in the complex national-security challenges facing the United States, is uniquely situated to shed further light on the conflict between unbounded birthright citizenship and our constitutional system. As a former national security official, *amicus* has diligently

worked to uphold constitutional values like those embraced in the Fourteenth Amendment while also balancing the national-security interests vital to the continued safety and security of the United States.

*Second*, regarding irreparable harm, the EO's national-security implications cut against the preliminary injunction. Because the Constitution does not confer citizenship in the manner claimed by plaintiffs, this case poses important questions about the separation of powers. Vacating the preliminary injunction allows the President to exercise his lawful authority to faithfully execute the law without undue interference from the courts, which are particularly ill-suited to second-guess the political branches on national security.

## I.    The EO Is Faithful to the Constitution and Serves the Interests of National Security.

The district court's preliminary injunction should be reversed because it errs as to the scope of citizenship guaranteed by the Fourteenth Amendment. Moreover, the EO's interpretation of the Constitution aligns with important national-security aims.

**A.** Under the text of the Fourteenth Amendment's Citizenship Clause, citizenship is not automatically conferred to all persons born in the United States. The Citizenship Clause of the Fourteenth Amendment

provides that "[a]ll persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside." U.S. Const. amend. XIV, § 1.

The EO addresses what it means to be "subject to the jurisdiction" of the United States. Exec. Order No. 14,160, § 1. The EO examines the Citizenship Clause in reference to the applicable statutory text accompanying it, which extends U.S. citizenship to "a person born in the United States, and subject to the jurisdiction thereof." 8 U.S.C. § 1401(a). The EO recognizes that the Constitution and Congress do not automatically extend citizenship to a person born in the United States whose: (1) mother was unlawfully present and father was not a citizen or lawful permanent resident or (2) mother was present lawfully but only temporarily and father was not a citizen or lawful permanent resident. Exec. Order No. 14,160, § 1. The EO instructs relevant federal authorities with respect to documentation policies and regulations consistent with those narrow limitations. *Id.* §§ 2-3.

There is no dispute that there are limitations on deriving U.S. citizenship solely from the geographic place of one's birth. *See generally* Amy Swearer, *Subject to the (Complete) Jurisdiction Thereof: Salvaging*

*the Original Meaning of the Citizenship Clause*, 24 TEX. REV. L. & POL. 135, 143 (2019). Moreover, no one challenges other well-established exceptions for geographically derived birthright citizenship, such as for children of foreign diplomats, whose "exclusion from birthright citizenship is uncontested." *Id.* at 149 & n.35. Even the Supreme Court in *United States v. Wong Kim Ark*, 169 U.S. 649, 652-53 (1898), spoke in limited terms when it examined how the Citizenship Clause applied to a child born in the United States to parents who were lawfully present Chinese aliens permanently domiciled in the United States. The Court reasoned that "[e]very citizen or subject of another country, while domiciled here, is within the allegiance and the protection, and consequently subject to the jurisdiction, of the United States" for purposes of the Citizenship Clause. *Id.* at 693. As the Executive argues, a contrary understanding "leaves Congress and the Executive Branch powerless to address concerns about individuals manipulating or flouting the nation's immigration laws" to derive geographically derived birthright U.S. citizenship. Appellants' Br. 2.[2]

---

[2] Because the EO addresses citizenship under 8 U.S.C. § 1401(a), this brief does not address the other avenues to U.S. citizenship that Congress has or could have provided elsewhere. *Amicus* takes no position on U.S.

*Amicus* respectfully submits that national-security implications should be considered when interpreting the Constitution, especially when such concerns were known to its Framers. For instance, Alexander Hamilton warned, "foreign powers" would "not be idle spectators" in American affairs: "They will interpose, the confusion will increase, and a dissolution of the Union ensue." Alexander Hamilton, *Speech at the Constitutional Convention*, *in* JAMES MADISON'S NOTES OF DEBATES IN THE FEDERAL CONVENTION (June 8, 1787). Hamilton elsewhere insisted that the Constitution must give "provident and judicious attention" to addressing "the desire in foreign powers to gain an improper ascendant in our councils." THE FEDERALIST NO. 68, at 412-13 (Alexander Hamilton) (Clinton Rossiter, ed. 1961).

Indeed, concerns about foreign influence provided powerful motivation to enshrine other constitutional protections. For instance, foreign influence motivated the express inclusion of an impeachment mechanism in the Constitution:

> [The Executive] may be bribed by a greater interest to betray
> his trust; and no one would say that we ought to expose

---

citizenship in this brief beyond the narrow issue of geographically derived birthright U.S. citizenship under Section 1401(a) as it relates to the EO.

> ourselves to the danger of seeing the first Magistrate in foreign pay without being able to guard against by displacing him. One would think the King of England well secured against bribery. Yet Charles II was bribed by Louis XIV.

2 FARRAND'S RECORDS 68-69 (Gouverneur Morris). And the addition of the Foreign Emoluments Clause followed after Charles Pinckney had "urged the necessity of preserving foreign Ministers & other officers of the U.S. independent of external influence." *Id.* at 389. The Constitution elsewhere provides that, in "guarantee[ing] to every State in this Union a Republican Form of Government," the United States would "protect each of them against Invasion." U.S. Const. art. IV, § 4.

Finally, as the Executive's example of the War of 1812 illustrates, concerns about conflicting claims of allegiances can create real-world "problems for the governments involved." Appellants' Br. 33 (cleaned up). As the Executive notes (at 33), the Citizenship Clause itself "was ratified at a time when the focus [of Congress and the Executive] was on avoiding dual nationality." Given this context, it is especially appropriate for requirements for U.S. citizenship in the Constitution to be read in harmony with concerns about national security.

**B.** The EO's faithful reading of the Fourteenth Amendment's text is confirmed by the important national-security interests it serves. *See*

Appellants' Br. 35 (citing Exec. Order No. 14,159, § 1, 90 Fed. Reg. 8443 (Jan. 20, 2025)). Specifically, the EO tracks the reality that some illegal aliens enter the United States to engage in "hostile activities, including espionage, economic espionage, and preparations for terror-related activities," and that such aliens "present significant threats to national security and public safety." Exec. Order No. 14,159, § 1, 90 Fed. Reg. 8443. Concerns about illegal immigration and national security have long shaped federal policy. For instance, Congress passed the Immigration Reform and Control Act of 1986 a year after President Ronald Reagan described illegal immigration as a "threat to national security." James T. Kimer, *Landmarks in US Immigration Policy*, NACLA.ORG (Sept. 25, 2007), https://nacla.org/article/landmarks-us-immigration-policy. Former Attorney General John Ashcroft likewise announced national-security reforms after the 9/11 hijackers were "easily able to avoid contact with immigration authorities and violate the terms of their visas with impunity." Attorney General Prepared Remarks on the National-Security Entry-Exit Registration System (June 6, 2002), https://www.justice.gov/archive/ag/speeches/2002/060502agpreparedrem arks.htm. Other scholarship has explained that modern anti-illegal-alien

enforcement policy is grounded in national security concerns. *See, e.g.*, Kevin J. Fandl, *Immigration Posses: U.S. Immigration Law and Local Enforcement Practices*, 34 J. LEGIS. 16, 18-20 (2008). As the Executive argues (at 35), the Constitution leaves room for Congress and the Executive Branch to respond to such threats with respect to geographically derived birthright U.S. citizenship. As explained below, the EO's national-security aims are consistent with the Constitution.

The Supreme Court has recognized national security as a governmental interest of the highest order. *See Holder v. Humanitarian L. Project*, 561 U.S. 1, 28 (2010). And it has consistently ruled that national-security interests and constitutional rights form an interconnected framework of carefully balanced policy considerations regarding issues of immigration. *See, e.g.*, *Trump v. Hawaii*, 585 U.S. 667, 702 (2018). By necessary implication, the EO affects such decisions because a child born to parents covered by the EO who then returns from abroad will have to seek admission as a non-citizen if and when he chooses to return to the United States. *See, e.g.*, *Dep't of State v. Munoz*, 602 U.S. 899, 907 (2024) ("For more than a century, this Court has recognized that the admission and exclusion of foreign nationals is a

fundamental sovereign attribute exercised by the Government's political departments largely immune from judicial control." (cleaned up)). "Because decisions in these matters may implicate relations with foreign powers, or involve classifications defined in the light of changing political and economic circumstances, such judgments are frequently of a character more appropriate to either the Legislature or the Executive." *Hawaii*, 585 U.S. at 702 (quoting *Mathews v. Diaz*, 426 U.S. 67, 81 (1976)).

Of course, an executive official invoking national security alone does not suffice; courts do not "abdicat[e] the judicial role" in the face of the executive asserting such an interest. *Humanitarian L. Project*, 561 U.S. at 34. Rather, the Supreme Court gives "respect" to the Government's conclusions regarding national security while maintaining the "obligation to secure the protection that the Constitution grants." *Id.* Importantly, the Court does not "substitute [its] own evaluation" of "serious threats to our Nation and its people." *Id.*

Here, the Executive has explained why the EO forms an integral part of President Trump's efforts to repair the American immigration system and respond to the urgent national-security crisis of unchecked

migration at the Southern Border. *See* Exec. Order No. 14,159, § 1, 90 Fed. Reg. 8443 (explaining that President Trump's immigration policy is designed to fight the threat to "national security and public safety" from unlawful immigration); *see also* Exec. Order No. 14,165, 90 Fed. Reg. 8467 (Jan. 20, 2025); Proclamation No. 10,886, 90 Fed. Reg. 8327 (Jan. 20, 2025) (declaring a national emergency at the southern border); Proclamation No. 10,888, 90 Fed. Reg. 8333 (Jan. 20, 2025) (explaining the President's actions to protect the border under Article IV, Section 4 of the Constitution). As the Executive has explained, executing federal policy consistent with the correct reading of the Citizenship Clause is a key component of the President's national-security efforts because it removes incentives for unlawful immigration and closes loopholes that can be exploited by foreign adversaries. *See* Appellant's Br. 47.

Notably, the EO addresses a vulnerability in citizenship derivation that is well-known to the intelligence community. *See generally* Appellants' Br. 35. Birthright citizenship creates opportunities for dual loyalty that can be exploited by malign foreign actors to cultivate intelligence assets. Conferring U.S. citizenship at birth begins a long

13

timeline that is difficult to track on an individual level, let alone counteract or prosecute if it materializes into criminal espionage activity.

From the standpoint of a foreign adversary, an individual who appears to be a citizen of the target country is an ideal intelligence asset. In the intelligence community, these assets known as "illegals" masquerade as American citizens when in fact they are not. Foreign actors deploy significant resources to create such assets, often by stealing or assuming another's identity. But that approach is costly and time-consuming for the foreign adversary, with attendant risks for detection and traceability. Well-publicized examples have come to light in recent years. For example, a network of 10 Russian sleeper agents, including Anna Chapman, was exposed in 2010 after a decade-long FBI investigation. *How the FBI Busted Anna Chapman and the Russian Spy Ring*, ABC NEWS (Nov. 1, 2011), https://abcnews.go.com/blogs/politics/2011/11/how-the-fbi-busted-anna-chapman-and-the-russian-spy-ring. The program, known as the "Illegals Program," involved individuals living in the U.S. under deep cover for many years, using stolen identities to pose as ordinary citizens while gathering intelligence. *See* Kristin A. Vara, *Espionage: A Comparative*

*Analysis*, 22 ILSA J. INT'L & COMP. L. 61, 68-70 (2015); *see also, e.g.*, Shaun Walker, *"I Thought I Was Smarter Than Almost Everybody": My Double Life as a KGB Agent*, THE GUARDIAN (Feb. 11, 2017), https://www.theguardian.com/world/2017/feb/11/thought-smarter-everybody-kgb-spy-jack-barsky (interviewing Jack Barsky, an ex-KGB spy who lived a double life in the U.S. under an assumed identity).

But birthright U.S. citizenship lets foreign adversaries avoid many of those pitfalls. With a round-trip plane ticket, a malign actor can send an expecting mother to the United States, receive mother and baby on return, indoctrinate and train the child, and then send the individual back to the United States to engage in espionage activity. That mechanism, for instance, stymies major advances in digital surveillance and biometric technologies that make it harder for undercover agents to remain anonymous and operate in the target country under a false identity. *See* Kevin P. Riehle, *Russia's Intelligence Illegals Program: An Enduring Asset*, 35 INTELLIGENCE & NAT'L SEC. 385, 386 (2020). Thus, with an extremely modest financial investment and the passage of time, a foreign adversary can use geographically derived birthright citizenship to create a nearly undetectable human intelligence asset with no bonds

of affection for his country of birth and carte blanche access to the United States. And as the example of Russia's "Illegals Program" shows, malign foreign actors are perfectly willing to make such long-term plays. *See, e.g.*, Riehle, *supra*, 386 ("Russian intelligence services remain proud of their intelligence illegals program, claiming it is an object of envy for Western intelligence services.").

The EO thus forms an important part of President Trump's efforts to improve national security. For example, many high-value foreign officials cannot travel without advance permission, and law enforcement at the U.S. border increases risks of apprehension for foreign adversaries seeking to infiltrate the country. *See, e.g.*, Walker, *supra* (describing the "complex passport switches and documents left via dead drop" necessary for a deep-cover Soviet spy to travel between the U.S. and Europe). The Executive has taken significant steps to secure the border and deter threats from unlawful immigration. *See, e.g.*, Exec. Order No. 14,159, § 1, 90 Fed. Reg. 8443. And as noted in Part II, *infra*, the EO provides additional avenues for screening potential malign actors from entering the United States as non-citizens. *Cf. Hawaii*, 585 U.S. at 689 (describing the system for "vetting" aliens seeking admission to the United States).

The EO not only removes an incentive for illegal immigration, it removes birthright citizenship as an attractive alternative for American adversaries seeking to easily cultivate intelligence assets.

## II. National-Security Concerns Also Support the Executive in the Irreparable-Harm Analysis.

Enjoining the EO threatens irreparable injury to the Executive and the public, whose interests "merge." *Nken*, 556 U.S. at 435. As the Executive argues, an "injunction that prevents the President from carrying out his broad authority and constitutional responsibility" for immigration matters "is 'an improper intrusion by a federal court into the workings of a coordinate branch of the Government.'" Appellants' Br. 47 (quoting *INS v. Legalization Assistance Project of the L.A. Cty. Fed'n of Labor*, 510 U.S. 1301, 1305-06 (1993) (O'Connor, J., in chambers)).

Preserving Executive authority to function properly within the national-security and foreign-affairs realm is of the highest importance. *See Hawaii*, 585 U.S. at 704. "Judicial inquiry into the national-security realm raises concerns for the separation of powers by intruding on the President's constitutional responsibilities in the area of foreign affairs." *Id.* (quoting *Ziglar v. Abbasi*, 582 U.S. 120, 142 (2017)) (cleaned up). And there is a "heavy presumption of constitutionality to which a carefully

considered decision of a coequal and representative branch of our Government is entitled." *U.S. Dep't of Labor v. Triplett*, 494 U.S. 715, 721 (1990) (cleaned up); *see also Hawaii*, 585 U.S. at 704 ("Any rule of constitutional law that would inhibit the flexibility of the President to respond to changing world conditions should be adopted only with the greatest caution, and our inquiry into matters of entry and national security is highly constrained." (cleaned up)).

Granting citizenship to an individual is a profoundly consequential action of sovereignty—after all, "in the exercise of its broad power over immigration and naturalization, Congress regularly makes rules that would be unacceptable if applied to citizens." *Reno v. Flores*, 507 U.S. 292, 305-06 (1993) (cleaned up). That distinction is perhaps no clearer than in cases touching on aliens and immigration. As this Court recognized in upholding other national-security Executive actions, "Congress designed an individualized vetting system that places the burden on the alien to prove his admissibility." *Hawaii*, 585 U.S. at 689. Rules governing the conferral of citizenship thus implicate the "vetting" of individuals who are or may become intelligence assets of a foreign adversary by virtue of advantageously derived U.S. citizenship. *Cf.* Appellants' Br. 35.

Reversing the district court's preliminary injunction helps alleviate any irreparable harm from interfering with such Executive functions.

Moreover, the injunction can have serious foreign-affairs consequences regardless of the raw number of births involved or U.S. citizenships conferred while this case is litigated on the merits. The EO expresses President Trump's position on a matter of domestic policy with foreign-relations implications. It is beyond serious dispute that judicial action can have profound effects on foreign policy and the range of options available to the Executive in responding to national-security threats. *Cf., e.g.*, Timothy Meyer & Ganesh Sitaraman, *The National Security Consequences of the Major Questions Doctrine*, 122 MICH. L. REV. 55, 61, 80 (2023) ("Judicial action [in restraint of domestic Executive action] can thereby weaken the executive branch's hand on the international plane").

Courts are ill-suited to interfere with such matters of national security and foreign affairs, let alone remedy them. After all, "[u]nlike the President and some designated Members of Congress, neither the Members of [the Supreme] Court nor most federal judges begin the day with briefings that may describe new and serious threats to our Nation and its people." *Boumediene*, 553 U.S. at 797. The Supreme Court has

emphasized that "[i]t is pertinent to observe that any policy toward aliens is vitally and intricately interwoven with contemporaneous policies in regard to the conduct of foreign relations, the war power, and the maintenance of a republican form of government." *Harisiades v. Shaughnessy*, 342 U.S. 580, 588-89 (1952). Matters like these, which involve complex national-security and foreign-affairs considerations, "are so exclusively entrusted to the political branches of government as to be largely immune from judicial inquiry or interference." *Id.* at 589.

The United States should "speak with one voice" on matters affecting the nation's foreign affairs. *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 381 (2000). The President has "a unique role in communicating with foreign governments," as "only the Executive has the characteristic of unity at all times" that is necessary for diplomacy. *Zivotofsky ex rel. Zivotofsky v. Kerry*, 576 U.S. 1, 14, 21 (2015). While the Supreme Court has declined to recognize an unbounded Executive power over foreign affairs in the face of contrary Congressional action, *see id.* at 20, the President here has chosen to exercise his authority in furtherance of the Constitution of the United States. The district court's preliminary injunction interferes with the crucial "one voice" of the United States in

matters of sovereignty and foreign affairs. Had Congress intended to countenance such interference, it would be expected to "speak clearly" and indicate as much. *Cf., e.g.*, *Henderson v. Shinseki*, 562 U.S. 428, 436-38 (2011) (explaining that Congress would have cast a deadline in different language if it had intended the provision to be jurisdictional). Congress has not done so here.

## CONCLUSION

The Court should reverse the preliminary injunction.

Respectfully submitted.

June 3, 2025                              /s/ *Judd E. Stone II*

DANIEL Z. EPSTEIN                 JUDD E. STONE II
AMERICA FIRST                        CHRISTOPHER D. HILTON
  LEGAL FOUNDATION            ARI CUENIN
611 Pennsylvania Ave. SE        STONE HILTON PLLC
  #231                                    600 Congress Ave., Ste. 2350
Washington, DC 20003            Austin, Texas 78701
daniel.epstein@aflegal.org        judd@stonehilton.com
(202) 964-3271                         (737) 465-7248

                                              *Counsel for Amicus Curiae*

21

## CERTIFICATE OF COMPLIANCE

I certify that this document complies with the typeface requirements of Rule 32(a)(5) and the typestyle requirements of Rule 32(a)(6) because this document was prepared in 14-point Century Schoolbook, a proportionally spaced typeface, using Microsoft Word. *See* Fed. R. App. P. 29(a), 32(g)(1). This document complies with the type-volume limitation under Rule 29(a)(5) because it contains 3945 words excluding the parts exempted under Rule 32(f).

*/s/ Judd E. Stone II*
Judd E. Stone II

## CERTIFICATE OF SERVICE

I certify that on June 3, 2025, an electronic copy of the foregoing corrected document was served via CM/ECF on all registered counsel and transmitted to the Clerk of the Court.

*/s/ Judd E. Stone II*
Judd E. Stone II