No. 25-1348

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIRST CIRCUIT

NEW HAMPSHIRE INDONESIAN COMMUNITY SUPPORT; LEAGUE OF UNITED LATIN AMERICAN CITIZENS; MAKE THE ROAD NEW YORK,

*Plaintiffs - Appellees*,

v.

DONALD J. TRUMP, President of the United States, in their official capacity; U.S. DEPARTMENT OF HOMELAND SECURITY; KRISTI NOEM, in their official capacity as Secretary of the U.S. Department of Homeland Security; U.S. DEPARTMENT OF STATE; MARCO RUBIO, in their official capacity as Secretary of the U.S. Department of State; U.S. DEPARTMENT OF AGRICULTURE; BROOKE L. ROLLINS, in their official capacity as Secretary of the U.S. Department of Agriculture; CENTERS FOR MEDICARE AND MEDICAID SERVICES; MEHMET OZ, in their official capacity as Administrator of the Centers for Medicare and Medicaid Services,

*Defendants - Appellants.*

On Appeal from the United States District Court
for the District of New Hampshire
Civil Action No. 1:25-cv-00038-JL-TSM

## BRIEF OF *AMICI CURIAE* LOCAL GOVERNMENTS
## AND LOCAL GOVERNMENT OFFICIALS IN SUPPORT OF
## PLAINTIFFS-APPELLEES AND AFFIRMANCE

Jonathan B. Miller
Elaine Poon
Katherine Courtney
Zarah Rahman
PUBLIC RIGHTS PROJECT
490 43rd Street, #115
Oakland, CA 94609
(510) 738-6788

Henry Quillen
WHATLEY KALLAS, LLP
159 Middle Street, Suite 2C
Portsmouth, NH 03801

## TABLE OF CONTENTS

STATEMENT OF INTEREST ............................................................ 1

SUMMARY OF ARGUMENT............................................................ 2

ARGUMENT ...................................................................................... 4

I.  PLAINTIFFS ARE HIGHLY LIKELY TO SUCCEED ON
    THE MERITS .................................................................................. 4

    A. The Order Violates the Citizenship Clause of the
       Fourteenth Amendment.................................................................4

    B. The Order Violates the Immigration and Nationality Act..........6

II. A PRELIMINARY INJUNCTION IS NECESSARY TO
    PROTECT THE PUBLIC INTEREST .......................................... 7

    A. Enforcement of an Unconstitutional Order Is Contrary to
       the Public Interest ...................................................................... 7

    B. Citizenship Stripping Will Reduce Resident Eligibility for
       Critical Public Services, Threatening Public Health and
       Increasing Poverty .................................................................... 8

       1. The Order Will Deny Citizenship to a Large Number
          of *Amici*'s Residents ............................................................. 8

       2. Citizenship Stripping Will Result in Lost Access to
          Social Safety Nets for Children, Causing Severe Ripple
          Effects ............................................................................... 10

          i.   Citizenship Stripping Will Result in Increased
               Public Health Threats Due to Declines in Insurance
               Rates and Access to Health Care................................. 11

          ii.  Citizenship Stripping Will Increase Hunger and
               Threaten School Performance by Limiting the
               Reach of Childhood Nutrition Programs..................... 14

          iii. Federal Funding for Schooling-Related Services
               and Foster Care Will Decrease .................................... 16

iv.  The Order will Strain Local and County Safety-Net Services ........................................................................ 17

C.  Citizen Stripping Will Strain Community Cohesion .............. 17

D.  The Order Will Hamper Recruitment Efforts, Undermining Academic Excellence and Economic Growth ..................................................................................... 19

E.  The Order Will Upend Established Practices of Using Birth Certificates to Demonstrate Citizenship, Jeopardizing Access to Public Benefits, Passports, and Other Privileges for Citizens .................................................. 20

CONCLUSION ................................................................................... 23

APPENDIX A – List of *Amici Curiae* ............................................... 29

# TABLE OF AUTHORITIES

### CASES

*Centro Tepeyac v. Montgomery Cnty.*,
  722 F.3d 184 (4th Cir. 2013) ............................................................ 7

*George v. McDonough*,
  596 U.S. 740 (2022) ......................................................................... 6

*I.N.S. v. Rios-Pineda*,
  471 U.S. 444 (1985) ......................................................................... 5

*Karem v. Trump*,
  960 F.3d 656 (D.C. Cir. 2020) ......................................................... 8

*Mariko v. Holder*,
  632 F.3d 1 (1st Cir. 2011) ................................................................ 5

*Plyler v. Doe*,
  457 U.S. 202 (1982) ....................................................................... 18

*Schneiderman v. United States*,
  320 U.S. 118 (1943) ....................................................................... 18

*Schrader v. Dist. Att'y of York Cnty.*,
  74 F.4th 120 (3d Cir. 2023) ............................................................. 8

*Trump v. Int'l Refugee Assistance Project*,
  582 U.S. 571 (2017) ......................................................................... 7

*United States v. Wong Kim Ark*,
  169 U.S. 649 (1898) ........................................................... 2, 4, 5, 6

### STATUTES

8 U.S.C. § 1159(a) .............................................................................. 9

8 U.S.C. § 1159(b) .............................................................................. 9

8 U.S.C. § 1401(a) .............................................................................. 6

8 U.S.C. § 1611(a) ........................................................................ 10, 11

8 U.S.C. § 1611(c)(1)(B) ....................................................................... 10

8 U.S.C. § 1621 .................................................................................. 12

8. U.S.C. § 1641 ................................................................................ 17

8 U.S.C. § 1641(b)............................................................................. 11

42 U.S.C. § 18032(f)(3)...................................................................... 12

CAL. WELF & INST. CODE § 14007.8 .................................................. 12

## REGULATIONS

7 C.F.R. § 273.2(f)(1)(vii) .................................................................. 21

7 C.F.R. § 273.11(c)(3) ...................................................................... 16

20 C.F.R. § 422.107(d)....................................................................... 21

22 C.F.R. § 51.42................................................................................ 21

22 C.F.R. § 51.42(a) ........................................................................... 22

34 C.F.R. § 300.154(d)....................................................................... 16

42 C.F.R. §  435.406........................................................................... 11

42 C.F.R. § 457.320(d)....................................................................... 12

42 U.S.C. § 1396b(x)(3)(C)................................................................ 21

## CONSTITUTIONAL PROVISIONS

U.S. Const. amend. XIV, § 1 ................................................................ 4

## EXECUTIVE ORDERS

Exec. Order No. 14160, 90 Fed. Reg. 8449 (Jan. 20, 2025) ................ 9

## OTHER AUTHORITIES

Airin Martinez, *Household fear of deportation in relation to
   chronic stressors and salivary proinflammatory cytokines in*

*Mexican-origin families post-SB 1070*, 5 SSM Population Health 188 (2018) ............................................................. 19

Angela R. Remus, *Caught Between Sovereigns: Federal Agencies, States, and Birthright Citizens*, 34 Stan. L. & Pol'y Rev. 225 (2023). ............................................................... 21

Anna Gassman-Pines & Laura Bellows, *Food Instability and Academic Achievement: A Quasi-Experiment Using SNAP Benefit Timing*, 55 Am. Educ. Rsch. J., 897 (2018) ...................... 15

Brookings Institute, *Visa Outlook Explorer* ........................................ 20

Center on Budget and Policy Priorities, *Policy Basics: The Supplemental Nutrition Assistance Program (SNAP)* (Nov. 24, 2025) ......................................................................... 15

Department of Homeland Security, *Statement from DHS Spokesperson on Directives Expanding Law Enforcement and Ending Abuse of Humanitarian Parole* (Jan. 21, 2025) .......... 14

Holly A. Hill et al., *Vaccination Coverage by Age 24 Months Among Children Born in 2017 and 2018 - National Immunization Survey-Child, United States, 2018-2020*, 70 Morb. Mortal. Wkly Rep., 1435 (2021). ....................................... 13

Jacob Hamburger, *The Consequences of Ending Birthright Citizenship*, Wash. U. L. Rev. (forthcoming 2025) ....................... 23

Jean C. Williams, *"It's Always with You, that You're Different": Undocumented Students and Social Exclusion*, 20 J. of Poverty, 168 (2015) ................................................... 19

John Creamer, United States Census Bureau, G*overnment Assistance Lifts 45.4 Million Out of Poverty in 2021* (Sept. 13, 2022) ....................................................................... 11

Kaiser Family Foundation, *Key Facts on Health Coverage of Immigrants* (Jan. 15, 2025) ............................................. 13

Lisa A. Gennetian et al., *Supplemental nutrition assistance program (SNAP) benefit cycles and student disciplinary infractions*, 90 Social Service Rev., 403 (2016) ........................... 15

Mark D. Piehl et al., *Narrowing the gap: decreasing emergency department use by children enrolled in the Medicaid program by improving access to primary care*, 154 Archives Pediatrics Adolescent Med. 791 (2000). ........................................ 14

National Association of Counties, *Policy Brief: Supplemental Nutrition Assistance Program (SNAP) Reauthorization and Appropriations* (Feb. 13, 2025) ....................................................... 22

National Immigration Law Center, *Health Care Coverage (Maps)* .............................................................................................. 12

Office of the Texas Governor, *Governor Abbott Issues Executive Order Requiring Texas Hospitals to Collect, Report Healthcare Costs for Illegal Immigrants* (Aug. 8, 2024) .............................................................................................. 15

Patricia Gándara et al., *The Impact of a Broken Immigration System on U.S. Students and Schools*, Latino Policy & Politics Institute, Univ. Of Cal., Los Angeles (2023) ..................... 17

Paul J. Chung et al., *Preventive care for children in the United States: quality and barriers*, 27 Ann. Rev. Public Health 491 (2006) .............................................................................................. 13

Rebecca Davis O'Brien & Miriam Jordan, *A Chill Sets in for Undocumented Workers, and Those Who Hire Them*, N.Y. Times (Mar. 10, 2025) ..................................................................... 14

Roberto G. Gonzales et al., *No Place to Belong: Contextualizing Concepts of Mental Health Among Undocumented Immigrant Youth in the United States*, 57 Am. Behavioral Scientist, 1174 (2013) .................................................. 19

Romina Tome et al., *Heightened immigration enforcement impacts US citizens' birth outcomes: Evidence from early ICE interventions in North Carolina*, 16 PLoS ONE (Feb. 3, 2021) .............................................................................................. 14

Social Security Administration, *How long does it take to get my child's Social Security number?*, SSA.GOV (Apr. 28, 2025) ......... 21

Steven Carlson, Center on Budget and Policy Priorities, *SNAP is Linked with Improved Health Outcomes and Lower Health Care Costs* (Dec. 14, 2022) ........................................................... 16

U.S. STANDARD CERTIFICATE OF LIVE BIRTH, CENTERS FOR DISEASE CONTROL (Nov. 2003) ................... 22

United States Citizenship and Immigration Services, *H-1B Specialty Occupations* ....................................................... 9

## STATEMENT OF INTEREST

*Amici* are local governments and local government officials from across the nation representing one hundred and seven jurisdictions in twenty-three states.[1] *Amici* write in furtherance of their shared interest in protecting the health and welfare of their residents and the cohesion of their communities. Children who would be deprived of citizenship under President Trump's Executive Order "Protecting the Meaning and Value of American Citizenship" ("Citizenship Stripping Order" or "Order") are valued members of *amici's* communities. Children born on our soil attend our schools. When they are sick, they obtain services through local health care providers. Local hospitals register the births of children born in our localities, and local administrators determine their eligibility for public benefits. When these children grow older, they are our frontline workers, medical providers, and law enforcement personnel. They start businesses, teach schoolchildren, and contribute to our local and national economies. And when they have their own children, they pass American values on to the next generation.

If the district court's preliminary injunction is lifted or narrowed while this case is pending, children born in *amici's* jurisdictions will face immediate

---

[1] No party or party's counsel authored this brief in whole or in part. No party or party's counsel contributed money intended to fund preparation or submission of this brief. A list of all *amici* is provided at Appendix A. Pursuant to Fed. R. App. P. 29(a)(2), all parties have consented to the filing of this brief.

irreparable harm. Children stripped of citizenship will be excluded from crucial public benefits, undermining their ability to thrive. *Amici* themselves will also be harmed, as local governments will be on the frontlines of confronting the downstream results, including spikes in poverty, disease, and crime. *Amici* will also be charged with adapting local processes for determining public benefits eligibility and may have to overhaul the process for issuing birth certificates to conform with the Order.

## SUMMARY OF ARGUMENT

The district court did not abuse its discretion when it issued a preliminary injunction blocking the implementation of President Trump's Citizenship Stripping Order as to the members of Plaintiff organizations while this litigation proceeds through the courts. The Citizenship Stripping Order conflicts with the plain text of the Fourteenth Amendment as definitively interpreted by the Supreme Court in *United States v. Wong Kim Ark*, 169 U.S. 649 (1898). *Amici* write separately to emphasize the strong public interest supporting the district court's issuance of the preliminary injunction. Reversing or narrowing the district court's injunction would have immediate and dire consequences for affected children and their families.

If allowed to go into effect, the Citizenship Stripping Order would restrict many of *amici*'s residents from fully participating in the community. Infants who, but for the Order, would be U.S. citizens will become ineligible for federally funded benefits programs, including nutrition assistance and health insurance, putting their

health and safety at risk. They will grow up under the specter of deportation and be subjected to stigma and discrimination, undermining their sense of belonging. If implemented, the Order will undercut the social fabric and cohesion of communities by creating a permanent underclass of people with unequal rights. Denying citizenship to the children of lawful immigrants will also hamper our universities' and businesses' efforts to recruit international talent, stunting economic growth and innovation. The Order will affect not only the targeted children but will also jeopardize access to public benefits and identification documents for *citizen* children, because a U.S. birth certificate will no longer serve as proof of citizenship.

The broad harm to local economies, education rates, and public health outcomes will be immediate and irreversible. Even if courts ultimately hold the Order unconstitutional, stripping those born on U.S. soil of citizenship while litigation is ongoing will cause, for example, children to miss critical early-childhood vaccinations and families to be denied income support necessary to keep them safely housed. Moreover, state and local governments charged with issuing birth certificates and determining their residents' eligibility for federally funded benefits will face administrative upheaval, and they will likely have to promptly invest significant resources to overhaul administrative processes.

These harms will undeniably be felt in every corner of the nation, warranting the maintenance of injunctive relief for all of Plaintiffs' members, not just for the

Plaintiffs identified in the papers. For these reasons, *amici* join in respectfully requesting that this Court affirm the district court's preliminary injunction.

## ARGUMENT

## I. PLAINTIFFS ARE HIGHLY LIKELY TO SUCCEED ON THE MERITS

The Citizenship Stripping Order is a flagrant attack on a pillar of American law and an attempt by the Executive Branch to rewrite the Constitution as well as federal statute. It contradicts the plain text of the Fourteenth Amendment and the Immigration and Nationality Act. The Order also runs headlong into the Supreme Court's decision over a century ago in *Wong Kim Ark*, rejecting categorically the proposition that the citizenship of children born in the United States depends on their parents' immigration status.

### A. The Order Violates the Citizenship Clause of the Fourteenth Amendment

The Citizenship Clause of the Fourteenth Amendment provides that "[a]ll persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside." U.S. Const. amend. XIV, § 1. The Citizenship Clause "affirms the ancient and fundamental rule of citizenship by birth within the territory, in the allegiance and under the protection of the country, including *all children* here born of resident aliens […]," subject to only very narrow exceptions. *Wong Kim Ark*, 169 U.S. at 693 (emphasis added). That inescapable conclusion has been affirmed by the Supreme

Court and lower courts in the more than 125 years since the decision in *Wong Kim Ark*. *See, e.g.*, *I.N.S. v. Rios-Pineda*, 471 U.S. 444, 446 (1985) (noting that undocumented resident "had given birth to a child, who, born in the United States, was a citizen of this country"); *Mariko v. Holder*, 632 F.3d 1, 8 n.4 (1st Cir. 2011) ("Because [the child] was born in the United States, she—unlike her parents—is a United States citizen.").

Appellants argue that the phrase "subject to the jurisdiction thereof" significantly limits the Constitutional grant of birthright citizenship. This argument has no basis in the text of the Fourteenth Amendment, lacks historical support, and conflicts with binding Supreme Court precedent. In *Kim Wong Ark*, the Supreme Court held that the phrase "subject to the jurisdiction thereof" reflects four finite and exceptional categories of children excluded from birthright citizenship: children born to foreign sovereigns or their ministers, children born on foreign public ships, children born to enemies during a hostile occupation, and Native American children.[2] 169 U.S. at 693. These common-law exceptions, the Court explained, are "as old as the rule [of birthright citizenship] itself," and the Court carefully detailed the historical, political, and practical basis for each one. *See id.* at 657–58, 683–685. Apart from these narrow exceptions, the Court affirmed that "the amendment in clear words and in manifest intent, includes the children born within the territory of

---

[2] Congress subsequently provided for Native American birthright citizenship by statute. 8 U.S.C. § 1401(b) (1924).

the United States of *all other persons*, of whatever race or color, domiciled within the United States." *Id.* at 693 (emphasis added). Appellants' attempt to import "domicile" and "allegiance" requirements onto the *parents* of children born in the United States is thus at odds with the Supreme Court's holding and reasoning in *Wong Kim Ark* and ignores the plain language of the Fourteenth Amendment.

### B.    The Order Violates the Immigration and Nationality Act

Appellees are also likely to succeed on their independent claim that the Order violates the statutory grant of birthright citizenship in section 1401(a) of the Immigration and Nationality Act, which provides for birthright citizenship for persons "born in the United States, and subject to the jurisdiction thereof." 8 U.S.C. § 1401(a). By adopting the verbatim language of the Fourteenth Amendment, Congress enshrined the contemporaneous meaning of birthright citizenship into federal immigration law. *See George v. McDonough*, 596 U.S. 740, 746 (2022) (explaining that when Congress adopts language "obviously transplanted from another legal source it brings the old soil with it." (citation omitted) (cleaned up)). Accordingly, in adopting section 1401, Congress imported the Supreme Court's authoritative interpretation of the Citizenship Clause in *Wong Kim Ark* into the statutory meaning, which was universally accepted at the time. Accordingly, for the same reasons Appellees are likely to succeed on their Constitutional claim, so too are they likely to succeed on their statutory claim.

## II.    A PRELIMINARY INJUNCTION IS NECESSARY TO PROTECT THE PUBLIC INTEREST

The district court properly considered the public interest in exercising its discretion to craft injunctive relief and correctly held that the public interest weighs strongly in favor of entering a preliminary injunction that protects all of Appellee organizations' members. "Crafting a preliminary injunction is an exercise of discretion and judgment, often dependent as much on the equities of a given case as the substance of the legal issues it presents." *Trump v. Int'l Refugee Assistance Project*, 582 U.S. 571, 579 (2017). The interests of the public in this case weigh definitively in favor of maintaining injunctive relief while the merits are being litigated. Not only is enforcement of an unconstitutional order contrary to the public interest generally, but the consequences if the Citizenship Stripping Order goes into effect, even temporarily, will be severe and widespread.

### A.    Enforcement of an Unconstitutional Order Is Contrary to the Public Interest

As an initial matter, the public interest weighs in favor of upholding the preliminary injunction because Appellees are likely to succeed on the merits of their constitutional claim and "upholding constitutional rights surely serves the public interest." *Centro Tepeyac v. Montgomery Cnty.*, 722 F.3d 184, 191 (4th Cir. 2013) (quoting *Giovani Carandola, Ltd. v. Bason*, 303 F.3d 507, 521 (4th Cir. 2002)); *accord Karem v. Trump*, 960 F.3d 656, 668 (D.C. Cir. 2020) ("'[E]nforcement of an

unconstitutional law is always contrary to the public interest.'") (quoting *Gordon v. Holder*, 721 F.3d 638, 653 (D.C. Cir. 2013); *Schrader v. Dist. Att'y of York Cnty.*, 74 F.4th 120, 128 (3d Cir. 2023) ("'[T]he enforcement of an unconstitutional law vindicates no public interest.'") (quoting *K.A. ex rel. Ayers v. Pocono Mountain Sch. Dist.*, 710 F.3d 99, 114 (3d Cir. 2013)). Guided by this principle, the district court properly concluded that the public interest weighs in favor of preliminarily enjoining the Order, which plainly violates the Fourteenth Amendment as interpreted by this Court in *United States v. Wong Kim Ark*.

### B. Citizenship Stripping Will Reduce Resident Eligibility for Critical Public Services, Threatening Public Health and Increasing Poverty

The interests of the public weigh in favor of the injunction because any implementation of the Order would strip children of eligibility for essential public benefits, leading to rippling harms in *amici*'s communities.

#### 1. The Order Will Deny Citizenship to a Large Number of *Amici*'s Residents

The broad scope of the Order must first be emphasized to frame the grave impacts that will be felt across the nation if the district court's preliminary injunction order is reversed or narrowed. Though political rhetoric surrounding President Trump's issuance of the Order has focused on children born to newly arrived, undocumented parents, the Order applies much more broadly. It excludes from citizenship children born in the United States to any mother whose presence is

"lawful but temporary," if their fathers are also not citizens or legal permanent residents. *See* Exec. Order No. 14160, § 1, 90 Fed. Reg. 8449 (Jan. 20, 2025). The Order thus denies citizenship to children whose parents hold long-term work and student visas. Many of these visa holders have lived in the United States for years and are on a pathway to permanent residency.[3]

The Order is ambiguous as to its broader application, as there are other statuses that could also be considered "lawful but temporary."[4] It thus potentially also denies citizenship to children born to Deferred Action for Childhood Arrivals (DACA) recipients who, by definition, themselves came to the United States as young children and have resided here continuously since. The Order may likewise apply to children of residents who have been granted asylum or are awaiting an asylum determination, and to refugees, all of whom may apply for legal permanent residency after being in the United States for one year. *See* 8 U.S.C. §§ 1159(a),(b).

Overall, thousands of children born in the United States each year will likely be rendered ineligible for citizenship under the Order. Here, Plaintiffs have organizational members who were expecting children when the Order was issued

---

[3] For example, H1-B specialized occupation visas are initially valid for three years and extendable to six years, and H1-B visa holders can apply for legal permanent residency. *See* United States Citizenship and Immigration Services, *H-1B Specialty Occupations,* https://www.uscis.gov/working-in-the-united-states/h-1b-specialty-occupations (last visited June 6, 2025).

[4] The Order describes "lawful but temporary" status as including persons "such as, *but not limited to*, [those] visiting the United States under the auspices of the Visa Waiver Program or visiting on a student, work, or tourist visa." *See* 90 Fed. Reg. at 8449 (emphasis added).

and who have applied for asylum, are DACA recipients, or are otherwise on a pathway to permanent legal status. JA 47–48, ¶¶ 7–9; JA 51–52 ¶¶ 9, 11, 13; JA 58–59, ¶¶ 15–19. These children would likely be covered by the Order. The broad scope of the Order and significant number of children that will be affected are especially salient because neither the Order nor current federal immigration law provide any alternative legal immigration status to a child denied birthright citizenship. If this Court grants the government's request to reverse the district court's order, the immediate effect will be that children denied citizenship under the Order would lack legal immigration status in the United States upon birth.

### 2. Citizenship Stripping Will Result in Lost Access to Social Safety Nets for Children, Causing Severe Ripple Effects

In denying citizenship to thousands of children born in the United States, the Order will render those children ineligible for essential public benefits. Doing so will severely impact public health and community well-being both in the short and long terms. Numerous federally funded public benefits programs targeted at low-income families are available only to citizens and to limited categories of "qualified" resident aliens. *See* 8 U.S.C. §§ 1611(a) ("an alien who is not a qualified alien . . . is not eligible for any Federal public benefit"), (c)(1)(B) (defining "Federal public benefit" as "any retirement, welfare, health, disability, public or assisted housing, postsecondary education, food assistance, unemployment benefit, or any other similar benefit"). While lawful permanent residents, refugees, and asylum recipients

10

are "qualified" immigrants for the purpose of these benefits, work and student visa holders are not. 8 U.S.C. § 1641(b). Nor are individuals who lack legal status. *Id.*

Overall, federally funded public benefits help keep tens of millions of families out of poverty nationwide.[5] By denying children birthright citizenship and rendering them ineligible for federal public assistance, the Order will increase hunger, poverty, and preventable disease across the nation. Even families with citizen children will face significant barriers to accessing the public benefits that they *are* eligible for because, as discussed below, *infra,* Part II.E, regularly issued birth certificates will no longer suffice to demonstrate citizenship.

> ### i.     Citizenship Stripping Will Result in Increased Public Health Threats Due to Declines in Insurance Rates and Access to Health Care

Children denied citizenship under the Order will have very limited health insurance options because of their exclusion from federal benefits. They will be unable to receive subsidized insurance through Medicaid or the Children's Health Insurance Program (CHIP). *See* 8 U.S.C. § 1611(a); 42 C.F.R. § 435.406 (Medicaid); 42 C.F.R. § 457.320(d) (CHIP). They will also be ineligible to enroll in private insurance through health insurance marketplaces. *See* 42 U.S.C. § 18032(f)(3).

---

[5] John Creamer, United States Census Bureau, G*overnment Assistance Lifts 45.4 Million Out of Poverty in 2021* (Sept. 13, 2022), https://www.census.gov/library/stories/2022/09/government-assistance-lifts-millions-out-of-poverty.html.

Some states have elected to extend subsidized insurance coverage under state programs to individuals whose immigration status bars them from federally funded benefits. *See, e.g.*, CAL. WELF & INST. CODE § 14007.8 (expanding California's Medicaid coverage to all children and adults regardless of immigration status); JA 62, ¶ 26 (explaining that in New York state all children under 19 regardless of immigration status are eligible for health insurance through state funded programs, though coverage is less extensive than under Medicaid); *see also* 8 U.S.C. § 1621 (providing that non-qualified immigrants are not eligible for state and local public benefits unless a state otherwise provides). These states, however, are in the minority: only thirteen states provide medical insurance coverage to all children irrespective of immigration status, and only seven states provide any form of subsidized health care to adults who are ineligible for federal Medicaid because of immigration status.[6] The limited options for health insurance for immigrants without legal status is reflected in insurance coverage rates: in 2023, 50% of undocumented immigrants and 18% of lawfully present immigrants were uninsured, compared to only 8% of U.S.-born citizens and 6% of naturalized citizens.[7]

Children who lack health insurance are much less likely to receive

---

[6] National Immigration Law Center, *Health Care Coverage (Maps)*, https://www.nilc.org/resources/healthcoveragemaps/ (last updated Feb.18, 2025).

[7] Kaiser Family Foundation, *Key Facts on Health Coverage of Immigrants* (Jan. 15, 2025), https://www.kff.org/racial-equity-and-health-policy/fact-sheet/key-facts-on-health-coverage-of-immigrants/.

preventative care, including vaccinations, health screenings, and wellness visits, making them more vulnerable to preventable diseases.[8] A decline in preventative health care at the individual level increases public health risks in a community. Obtaining high vaccination rates, for example, is essential to prevent the spread of communicable diseases among children. Yet uninsured children are less likely to receive vaccines than their insured peers. A recent study found uninsured children to be 9.2% to 37.8% less likely to receive vaccines, varying by vaccine type, and 3.3% of the uninsured children in the study had received *no* vaccinations.[9] Any increase in the rate of unvaccinated children would increase the risks of disease spread and even death from preventable childhood illnesses. Preventative health care also reduces hospitalizations and emergency department use, thus saving health care providers and the government money.[10]

Additionally, the Order will likely have a chilling effect on health care access for families with non-citizen children that *do* have health insurance because of increased fear of immigration enforcement. The Trump administration's

---

[8] Paul J. Chung et al., *Preventive care for children in the United States: quality and barriers*, 27 Ann. Rev. Public Health 491, 491–515 (2006).

[9] Holly A. Hill et al., *Vaccination Coverage by Age 24 Months Among Children Born in 2017 and 2018 - National Immunization Survey-Child, United States, 2018-2020*, 70 Morb. Mortal. Wkly Rep., 1435, 1435–1440 (2021).

[10] *See, e.g.,* Mark D. Piehl et al., *Narrowing the gap: decreasing emergency department use by children enrolled in the Medicaid program by improving access to primary care*, 154 Archives Pediatrics Adolescent Med. 791, 791–95 (2000).

prioritization of mass deportation has already led immigrant families to avoid even necessary outings,[11] and with federal immigration enforcement officials newly permitted to detain patients in sensitive areas, including hospitals,[12] families whose children are denied citizenship at birth may choose to avoid any non-emergency healthcare.[13] *See* JA 60, ¶ 23. The impact on health care access would likely be most acute in states like Texas, which since 2024 requires public hospitals to collect and report patient data on immigration status.[14] Overall, reversing or narrowing district court's injunctions will have the predictable effect of jeopardizing access to health care for some of our nation's most vulnerable residents.

> ### ii. Citizenship Stripping Will Increase Hunger and Threaten School Performance by Limiting the Reach of Childhood Nutrition Programs

If not preliminarily enjoined, the Order will further undermine public health

---

[11] Rebecca Davis O'Brien & Miriam Jordan, *A Chill Sets in for Undocumented Workers, and Those Who Hire Them*, N.Y. Times (Mar. 10, 2025), https://www.nytimes.com/2025/03/09/business/economy/immigrant-workers-deportation-fears.html.

[12] Department of Homeland Security, *Statement from DHS Spokesperson on Directives Expanding Law Enforcement and Ending Abuse of Humanitarian Parole* (Jan. 21, 2025), https://www.dhs.gov/news/2025/01/21/statement-dhs-spokesperson-directives-expanding-law-enforcement-and-ending-abuse.

[13] For example, a 2004 study found increased immigration enforcement caused expectant mothers to seek prenatal care later and less frequently. *See* Romina Tome et al., *Heightened immigration enforcement impacts US citizens' birth outcomes: Evidence from early ICE interventions in North Carolina*, 16 PLoS ONE (Feb. 3, 2021), https://pmc.ncbi.nlm.nih.gov/articles/PMC7857575/.

[14] *See* Office of the Texas Governor, *Governor Abbott Issues Executive Order Requiring Texas Hospitals to Collect, Report Healthcare Costs for Illegal Immigrants* (Aug. 8, 2024), https://gov.texas.gov/news/post/governor-abbott-issues-executive-order-requiring-texas-hospitals-to-collect-report-healthcare-costs-for-illegal-immigrants.

by reducing the number of families eligible for federal nutrition assistance benefits through the Supplemental Nutrition Assistance Program (SNAP) program. SNAP is considered "the nation's most important anti-hunger program."[15] An average of 41 million people received benefits through SNAP each month in 2024.[16] Proper early-life nutrition is essential for young children and adults to thrive. SNAP benefits improve school performance: they are correlated with higher test scores and fewer disciplinary issues.[17] SNAP also has lifelong impacts: adults who received SNAP benefits as children have a lower risk of heart disease and obesity.[18] Critically, SNAP benefits are available to mixed-status families containing citizen children and non-citizen parents. *See* 7 C.F.R. § 273.11(c)(3) (eligibility determined for each household member). In these cases, stripping children of citizenship means parents will lose support for their children's nutritional needs, increasing the family's overall financial burden.

---

[15] Center on Budget and Policy Priorities, *Policy Basics: The Supplemental Nutrition Assistance Program (SNAP)* (Nov. 24, 2025), https://www.cbpp.org/research/food-assistance/the-supplemental-nutrition-assistance-program-snap.

[16] *Id.*

[17] Anna Gassman-Pines & Laura Bellows, *Food Instability and Academic Achievement: A Quasi-Experiment Using SNAP Benefit Timing*, 55 Am. Educ. Rsch. J., 897, 897–927 (2018); Lisa A. Gennetian et al., *Supplemental nutrition assistance program (SNAP) benefit cycles and student disciplinary infractions*, 90 Social Service Rev., 403, 403–433 (2016).

[18] Steven Carlson, Center on Budget and Policy Priorities, *SNAP is Linked with Improved Health Outcomes and Lower Health Care Costs* (Dec. 14, 2022), https://www.cbpp.org/research/food-assistance/snap-is-linked-with-improved-health-outcomes-and-lower-health-care-costs.

### iii.    Federal Funding for Schooling-Related Services and Foster Care Will Decrease

Access to certain schooling-related and foster care services that are administered at the local level will also be impacted by the Order. Federal law requires school districts to provide services to students with disabilities under the Individuals with Disabilities in Education Act and partially reimburses districts for providing those services to citizens and qualified immigrants. *See* 34 C.F.R. § 300.154(d) (federal reimbursement under IDEA based on Medicaid eligibility). Under the Order, school districts would lose this funding for impacted students. Additionally, policies hostile to immigrants deter parents from sending their children to school due to fear of deportation or other concern for their families.[19] When that happens, schools lose attendance-based federal funding.

Similarly, many *amici* localities administer foster care programs that rely on federal Title IV-E funds that are only available for citizen and "qualified alien" children. *See* 8. U.S.C. § 1641. Reduced funding for these foster care programs would limit their effectiveness and the number of children they can serve. In both the schooling and foster care contexts, localities will have to bear the full financial burden of program operations if they are to continue to provide life-altering services

---

[19] A 2017–18 national survey of educators found a 58% increase in absenteeism associated with increased immigration enforcement. *See* Patricia Gándara et al., *The Impact of a Broken Immigration System on U.S. Students and Schools*, Latino Policy & Politics Institute, Univ. Of Cal., Los Angeles (2023).

to all children that need them.

### iv.    The Order will Strain Local and County Safety-Net Services

Inevitably it will be states, cities, and counties that must deal with the on-the-ground consequences of reduced federally funded health and welfare benefits for children and families. In our federal system, counties and cities provide safety-net services to uninsured, low-income, and vulnerable populations. County governments generally run public hospitals, community health centers, and free health clinics. Cities, counties, and states collaborate to provide homelessness services. Local education departments provide resources to high-needs students in schools. And law enforcement officials address public safety issues that rise in correlation with increases in poverty. *Amici* local governments do not have the resources to absorb the anticipated spike in demand for these services that would follow implementation of the Order. Upholding the district court's injunction strongly serves the public interest because it will prevent a flood of demand, and an inevitable strain, on local safety-net services.

### C.    Citizen Stripping Will Strain Community Cohesion

In addition to impacting health, nutrition, and economic security, stripping U.S. born children of citizenship will also damage community cohesion and cause immense mental and social strain on affected families. To start, the Order creates the dire immediate possibility that a baby born to lawfully present parents would be at

risk of deportation. The resulting family separation would inevitably wreak untold havoc on families and communities. What's more, children targeted by the Order who remain in the United States will be excluded from the "priceless benefits" of citizenship. *Schneiderman v. United States*, 320 U.S. 118, 122 (1943). Over forty years ago, the Supreme Court cautioned against the creation of "a permanent caste of undocumented resident aliens . . . denied the benefits that our society makes available to citizens and lawful residents." *Plyler v. Doe*, 457 U.S. 202, 218–19 (1982). By unilaterally seeking to rewrite the Constitution, the Order would do exactly that. Children born as non-citizens will exist as an "underclass"—and denying them full participation in our communities will fray "the fabric of our society." *Id*. at 219, 221.

Children denied citizenship that grow up in our communities will experience stigma and social exclusion, undermining their ability to integrate. Although these children will, like their citizen peers, go to local schools, learn to speak English, internalize U.S. values, and envision their futures here, they will at the same time be excluded from core aspects of American life, including voting and, in some states, getting drivers' licenses. Scholars have documented the severe negative impacts of social exclusion and discrimination on undocumented youth in the United States,

including persistent feelings of fear, stress, and shame.[20] These children will also face the threat of deportation, despite knowing no other home, the stress of which itself causes negative health outcomes.[21] When residents experience social isolation, exclusion, and constant stress, local governments are left to deal with the consequences, like poor educational outcomes, increased crime, and unemployment.

### D.    The Order Will Hamper Recruitment Efforts, Undermining Academic Excellence and Economic Growth

Not only will the Order have devastating impacts on children born to non-citizens, but it will also likely have the intended effect of deterring at least some immigrants from coming to or remaining the United States. The Order risks imposing a "brain drain" on localities that rely on international recruitment and retention to thrive. Any international applicant considering a job offer or an acceptance to a university in the United States may rightfully be wary of moving, even temporarily, to a country where their child would be denied benefits and potentially face harm. Local economies are bolstered by robust, competitive universities and corporations that recruit and produce great talent. According to the Brookings Institute, "The U.S. is grappling with growing labor shortages across

---

[20] *See, e.g.*, Jean C. Williams, *"It's Always with You, that You're Different": Undocumented Students and Social Exclusion*, 20 J. of Poverty, 168, 168–193 (2015); Roberto G. Gonzales et al., *No Place to Belong: Contextualizing Concepts of Mental Health Among Undocumented Immigrant Youth in the United States*, 57 Am. Behavioral Scientist, 1174, 1174–1199 (2013).

[21] *See* Airin Martinez, *Household fear of deportation in relation to chronic stressors and salivary proinflammatory cytokines in Mexican-origin families post-SB 1070*, 5 SSM Population Health 188, 188–200 (2018).

various industries [...] [i]mmigrant labor plays a pivotal role, stabilizing our workforce and driving economic growth."[22] The Order would make it more difficult to address these needs in the labor market.

###### E.    The Order Will Upend Established Practices of Using Birth Certificates to Demonstrate Citizenship, Jeopardizing Access to Public Benefits, Passports, and Other Privileges for Citizens

On a practical level, the Order will throw into disarray the administration of public benefits programs and the provision of identity documents, and burden local governments with having to adopt new administrative systems. Over the last 150 years, federal, state, and local governments have built an administrative structure centered around the accepted fact that birth in the United States is a guarantee of citizenship.[23] The U.S. has no federal birth registry or national identification document granted at birth. Instead, states and local governments (often county health departments and recorders, in coordination with state agencies) register local births and issue birth certificates. In most cases, these local administrators forward birth registry information for U.S. born citizens to federal agencies to generate social security numbers.[24]

---

[22] Brookings Institute, *Visa Outlook Explorer*, https://brooking-wof-immigration-8h3.pages.dev/ (last visited June 6, 2025).

[23] *See generally* Angela R. Remus, *Caught Between Sovereigns: Federal Agencies, States, and Birthright Citizens*, 34 Stan. L. & Pol'y Rev. 225 (2023).

[24] *See* Social Security Administration, *How long does it take to get my child's Social Security number?*, SSA.GOV (Apr. 28, 2025), https://www.ssa.gov/faqs/en/questions/KA-01969.html.

The administration of federally funded health and welfare benefits relies on locally issued birth certificates to demonstrate citizenship. *See, e.g.*, 7 C.F.R. § 273.2(f)(1)(vii) (birth certificates can prove identity for SNAP benefits, among other acceptable identity documents such as a driver's license); 42 U.S.C. § 1396b(x)(3)(C) (birth certificates can be submitted to prove Medicaid eligibility when documentary evidence of citizenship is required). Similarly, U.S. born citizens must also submit birth certificates when applying for a passport. 22 C.F.R. § 51.42. A birth certificate is also a primary form of evidence accepted to prove U.S. citizenship when applying for a social security card. 20 C.F.R. § 422.107(d).

Under current regulations, birth certificates submitted for federal purposes are not required to contain any information about a newborn child's parents' immigration status. *See, e.g.,* 22 C.F.R. § 51.42(a) (specifying the information that must be included on a birth certificate submitted by a U.S. born passport applicant as proof of citizenship). [25] Local agencies involved in registering births and issuing birth certificates thus have no reason to, and do not, collect information about parents' immigration status.

Accordingly, if the Executive Order goes into effect, birth certificates as

---

[25] Similarly, the U.S. Standard Certificate of Live Birth, a template provided by the Center for Disease Control, does not contain fields for parents' immigration status. U.S. STANDARD CERTIFICATE OF LIVE BIRTH, CENTERS FOR DISEASE CONTROL (Nov. 2003), https://www.cdc.gov/nchs/data/dvs/birth11-03final-acc.pdf.

currently issued will no longer be adequate for demonstrating federal benefits eligibility or entitlement to federal identity documents. With respect to benefits administration, states and localities will be left to grapple with the administrative consequences, given that the federal government delegates the administration of most federally funded public benefits programs to the states, which in turn delegate to counties in some cases.[26] States and local governments will struggle to administer benefits programs under the Order, having no immediate means of determining and demonstrating the U.S. citizenship of babies born in their jurisdictions.

The consequences will be two-fold. First, at least initially, benefits administrators will be *unable* to prove newborn residents' eligibility for programs and citizens may be denied essential benefits. Second, whatever new systems are established for determining eligibility, a substantial administrative burden will surely fall on states and local governments.[27] Local governments will likely need to develop new processes and procedures to comply with new federal rules. Although the Order provides no information about how citizenship will be confirmed for U.S.

---

[26] For example, ten states delegate to counties responsibility for administering SNAP benefits, representing 34.3% of program participants. National Association of Counties, *Policy Brief: Supplemental Nutrition Assistance Program (SNAP) Reauthorization and Appropriations* (Feb. 13, 2025), https://www.naco.org/resources/supplemental-nutrition-assistance-program-snap-reauthorization-and-appropriations.

[27] *See generally* Jacob Hamburger, *The Consequences of Ending Birthright Citizenship*, Wash. U. L. Rev. (forthcoming 2025), *available at* SSRN: https://ssrn.com/abstract=5106022 (discussing the "bureaucratic consequences" of the Executive Order as related to the issuance of passports, social security numbers, and federal and state benefits).

born children, it is plausible that the process for issuing a birth certificate itself will need to be overhauled. State and local agencies involved in newborn birth registration may be called upon to verify and substantiate information about parents' citizenship and/or immigration status. The burden of designing and implementing any such reforms, and dealing with pitfalls that inevitably emerge, will be immense. Whatever form the administrative changes take, they will require significant time and expense at every stage, including design, training, and implementation. The practical consequences of upending benefits determinations will be felt without delay across the country if the preliminary injunction is reversed, starting with the first baby born on U.S. soil, whether to citizen parents or not. With nearly 10,000 children born each day in the United States, chaos will rapidly snowball.

## CONCLUSION

President Trump's Citizenship Stripping Order brazenly violates the Fourteenth Amendment and threatens to unleash turmoil in *amici*'s communities, injuring countless children and families. For these reasons and for the reasons provided by Appellees, *Amici* Local Governments and Government Officials respectfully request that this Court affirm the district court's injunction in full.

Respectfully submitted,

Jonathan B. Miller
Elaine Poon
Katherine Courtney
Zarah Rahman
PUBLIC RIGHTS PROJECT
490 43rd Street, #115
Oakland, CA 94609
(510) 738-6788
jon@publicrightsproject.org

Henry Quillen
WHATLEY KALLAS, LLP
159 Middle Street, Suite 2C
Portsmouth, NH 03801

*Attorneys for Amici Curiae*

Dated: June 17, 2025

**ADDITIONAL COUNSEL**

YIBIN SHEN
City Attorney
2263 Santa Clara Avenue, Room 280
Alameda, CA 94501
*Attorney for the City of Alameda,*
  *California*

DONNA R. ZIEGLER
County Counsel
1221 Oak Street
Oakland, CA 94612
*Attorney for the County of Alameda,*
  *California*

ROSALYN GUY-MCCORKLE
Allegheny County Solicitor
445 Fort Pitt Boulevard, Suite 300
Pittsburgh, PA 15219
*Attorney for Allegheny County,*
  *Pennsylvania*

ATLEEN KAUR
City Attorney
Guy C. Larcom City Hall
301 East Huron, 3rd Floor
Ann Arbor, MI 48104
*Attorney for the City of Ann Arbor,*
  *Michigan*

EBONY M. THOMPSON
City Solicitor
Baltimore City Department of Law
100 North Holliday Street
Baltimore, MD 21202
*Attorney for the City of Baltimore,*
  *Maryland*

ADAM CEDERBAUM
Corporation Counsel
One City Hall Square, Room 615
Boston, MA 02201
*Attorney for the City of Boston,*
  *Massachusetts*

MARY B. RICHARDSON-LOWRY
Corporation Counsel of the City of
  Chicago
121 North LaSalle Street, Room 600
Chicago, IL 60602
*Attorney for the City of Chicago,*
  *Illinois*

ZACHARY M. KLEIN
Columbus City Attorney
77 N. Front Street, 4th Floor
Columbus, OH 43215
*Attorney for the City of Columbus,*
  *Ohio*

CARLOS PABELLON
Corporation Counsel
DAVID R. GAULT
Deputy Corporation Counsel
Room 419, City-County Building
210 Martin Luther King, Jr.,
  Boulevard
Madison, WI 53703
*Attorneys for County of Dane,*
  *Wisconsin*

KATIE MCLOUGHLIN
Acting City Attorney
1437 Bannock Street
Denver, CO 80202
*Attorney for the City and County of
Denver, Colorado*

KIMBERLY M. REHBERG
City Attorney
101 City Hall Plaza, Suite 2200
Durham, NC 27701
*Attorney for the City of Durham,
North Carolina*

CHRISTINA SANCHEZ
El Paso County Attorney
320 South Campbell Street, Suite 200
El Paso, TX 79901
*Attorney for the County of El Paso,
Texas*

CHRISTIAN D. MENEFEE
Harris County Attorney's Office
1019 Congress Street
Houston, TX 77002
*Attorney for Harris County, Texas*

LEESA MANION
Prosecuting Attorney
Chinook Building
401 Fifth Avenue Suite 800
Seattle, WA 98104
*Prosecuting Attorney for Martin
Luther King, Jr. County,
Washington*

MICHAEL HAAS
City Attorney
210 Martin Luther King Jr. Blvd.,
Room 401
Madison, WI 53703
*Attorney for the City of Madison,
Wisconsin*

BRIAN E. WASHINGTON
County Counsel
3501 Civic Center Drive,
San Rafael, CA 94903
*Attorney for the County of Marin,
California*

KRISTYN ANDERSON
City Attorney
350 South Fifth Street
Minneapolis, MN 55415
*Attorney for the City of Minneapolis,
Minnesota*

SUSAN K. BLITCH
County Counsel
188 West Alisal Street, 3rd Floor
Salinas, CA 93901
*Attorney for the County of Monterey,
California*

JOHN P. MARKOVS
Montgomery County Attorney
101 Monroe Street
Rockville, MD 20850
*Attorney for Montgomery County,
Maryland*

PATRICIA KING
Corporation Counsel
Office of New Haven Corporation
    Counsel
165 Church Street, 4th Floor
New Haven, CT 06510
*Attorney for the City New Haven,*
    *Connecticut*

MURIEL GOODE-TRUFANT
Corporation Counsel
100 Church Street
New York, NY 10007
*Attorney for the City of New York,*
    *New York*

ALAN SEEWALD
City Solicitor
One Roundhouse Plaza, Suite 304
Northampton, MA 01060
*Attorney for the City of*
    *Northampton, Massachusetts*

LAURA CONOVER
County Attorney
Pima County Attorney's Office
32 North Stone Avenue
Tucson, AZ 85745
*Attorney for Pima County, Arizona*

KRYSIA KUBIAK
City Solicitor and Chief Legal Officer
414 Grant Street
Pittsburgh, PA 15219
*Attorney for the City of Pittsburgh,*
    *Pennsylvania*

ROBERT TAYLOR
City Attorney
1221 SouthWest Fourth Avenue,
    Room 430
Portland, OR 97204
*Attorney for the City of Portland,*
    *Oregon*

JEFFREY DANA
City Solicitor
444 Westminster Street, Suite. 220
Providence, RI 02903
*Attorney for the City of Providence,*
    *Rhode Island*

SUSANA ALCALA WOOD
City Attorney
915 I Street
Sacramento, CA 95814
*Attorney for City of Sacramento,*
    *California*

LYNDSEY M. OLSON
City Attorney
400 City Hall & Court House
15 West Kellogg Boulevard
Saint. Paul, MN 55102
*Attorney for the City of St. Paul,*
    *Minnesota*

HEATHER FERBERT
San Diego City Attorney
1200 Third Ave., Suite 1100
San Diego, CA 92101
*Attorney for the City of San Diego,*
    *California*

TONY LOPRESTI
County Counsel
70 West Hedding Street East Wing,
    9th Floor
San José, CA 95110
*Attorney for the County of Santa*
    *Clara, California*

ERIN K. MCSHERRY
City Attorney
200 Lincoln Avenue
Santa Fe, NM 87501
*Attorney for the City of Santa Fe, New*
    *Mexico*

DOUGLAS T. SLOAN
City Attorney
1685 Main Street, Room 310
Santa Monica, CA 90401
*Attorney for the City of Santa Monica,*
    *California*

MIKE RANKIN
City Attorney
P.O. Box 27210
Tucson, AZ 85726-7210
*Attorney for the City of Tucson,*
    *Arizona*

LAUREN LANGER
City Attorney
Best Best & Krieger LLP
300 South Grand Avenue, 25th Floor
Los Angeles, CA 90071
*Attorney for City of West Hollywood,*
    *California*

**APPENDIX A – List of *Amici Curiae***

**Local Governments**

City of Alameda, California

County of Alameda, California

Allegheny County, Pennsylvania

City of Ann Arbor, Michigan

City of Austin, Texas

City of Baltimore, Maryland

City of Boston, Massachusetts

City of Chicago, Illinois

City of Columbus, Ohio

Dane County, Wisconsin

City and County of Denver, Colorado

City of Durham, North Carolina

El Paso County, Texas

City of Evanston, Illinois

Harris County, Texas

King County, Washington

City of Madison, Wisconsin

Marin County, California

City of Minneapolis, Minnesota

County of Monterey, California

Montgomery County, Maryland

City of New Haven, Connecticut

City of New York, New York

City of Northampton, Massachusetts

Pima County, Arizona

City of Pittsburgh, Pennsylvania

City of Portland, Oregon

City of Providence, Rhode Island

City of Sacramento, California

City of St. Paul, Minnesota

City of San Diego, California

County of Santa Clara, California

City of Santa Fe, New Mexico

City of Santa Monica, California

City of Tucson, Arizona

City of West Hollywood, California

## Local Government Leaders

Josh Acevedo
*District 2 City Representative, City of El Paso, Texas*

Brenda Adams
*Supervisor, Town of Canaan, New York*

Elizabeth Alcantar
*Mayor, City of Cudahy, California*

Luis Alejo
*Supervisor, Monterey County, California*

Soli Alpert
*Rent Stabilization Board Chair, City of Berkeley, California*

Miguel Arredondo
*Consolidated Independent School District Trustee At-Large,
City of San Marcos, Texas*

Valarie Bachelor
*Unified School District Board Director, City of Oakland, California*

Nikki Fortunato Bas
*Supervisor, Alameda County, California*

Brian Beck
*Councilmember, City of Denton, Texas*

Sarah Benatar
*Treasurer, Coconino County, Arizona*

Celina Benitez
*Mayor, City of Mount Rainier, Maryland*

Ravinder Bhalla
*Mayor, City of Hoboken, New Jersey*

Justin Bielinski
Supervisor, Milwaukee County, Wisconsin

Xouhoa Bowen
*Vice Mayor, City of San Leandro, California*

Lisa Brown
*Clerk/ Register of Deeds, Oakland County, Michigan*

Lisa Brown
*Mayor, City of Spokane, Washginton*

Bill Burgess
*Clerk, Marion County, Oregon*

Jackie Butler
*Precinct 1 Commissioner, El Paso County, Texas*

Barb Byrum
*Clerk, Ingham County, Michigan*

Chris Canales
*Councilmember, City of El Paso, Texas*

Michael Chameides
*Supervisor, Columbia County, New York*

John Clark
*Mayor, Town of Ridgway, Colorado*

Domonique Clemons
*Clerk and Register of Deeds, Genesee County, Michigan*

Jeff Corpora
*Councilmember, Northampton County, Pennsylvania*

Christine Corrado
*Councilmember, Town of Brighton, New York*

Becky Corran
*Councilmember, City of Las Cruces, New Mexico*

Mindy Cuppy
*Clerk, City of Sacramento, California*

Kara Davis
*District Attorney, Wasco County, Oregon*

Olgy Diaz
*Councilmember, City of Tacoma, Washington*

Roger Dickinson
*District 2 Councilmember, City of Sacramento, California*

Jilline Dobratz
*Clerk, City of West Bend, Wisconsin*

Michael Dougherty
*District Attorney, Boulder County, Colorado*

Dennis Michael Dvorchak
*Supervisor, Town of Hillsdale, New York*

Jack Eckblad
*District 4 Board Supervisor, Milwaukee County, Wisconsin*

Saundra Edwards
*School Committee Member, City of Lawrence, Massachusetts*

Diane M. Ellis-Marseglia
*Commissioner and Vice-Chair, Bucks County, Pennsylvania*

Scott Esserman
*At-Large Public School Board Member, City of Denver, Colorado*

Johnny Flores
*School Board Trustee, City of Hays, Texas*

Brenda Gadd
*Councilmember, Metropolitan Nashville & Davidson County, Tennessee*

Ed Gainey
*Mayor, City of Pittsburgh, Pennsylvania*

Adrian Garcia
*Precinct 2 Commissioner, Harris County, Texas*

Heidi Garrido
*Councilmember, City of Hopkins, Minnesota*

Alyssa Garza
*Deputy Mayor Pro Tem, City of San Marcos, Texas*

Caroline Gomez-Tom
*District 14 Board Supervisor, Milwaukee County, Wisconsin*

Lorenzo Gonzalez
*Place 5 Councilmember, City of San Marcos, Texas*

Eric Guerra
*District 6 Councilmember, City of Sacramento, California*

Jonathan Guzmán
*School Committee Vice-Chair, City of Lawrence, Massachusetts*

Beau Harbin
*Legislator and Democratic Minority Leader, Cortland County, New York*

Robert J. Harvie, Jr.
*Commissioner and Chair, Bucks County, Pennsylvania*

Bear Heiser
*Mayor Pro Tem, City of Kyle, Texas*

Michele Hirsch
*Adlerperson, City of Kingston, New York*

Jani Hitchen
*Councilmember, Pierce County, Washington*

Iliana Holguin
*Commissioner, El Paso County, Texas*

Stephanie Howse-Jones
*Councilmember, City of Cleveland, Ohio*

Susan Hughes-Smith
*Legislator, Monroe County, New York*

Debbie Ingalsbe
*Precinct 1 Commissioner, Hays County, Texas*

Christopher Jaramillo
*School Board President, Norristown Area School District, Pennsylvania*

Clay Lewis Jenkins
*Judge, Dallas County, Texas*

Lisa Kaplan
*Councilmember, City of Sacramento, California*

Lawrence Kestenbaum
*Clerk and Register of Deeds, Washtenaw County, Michigan*

Lisa Lawitzke
*Clerk, Township of Bellevue, Michigan*

Drew Lawrence
*Councilmember, New Cumberland County, New Jersey*

Jerald Lentini
*Director, Town of Manchester, Connecticut*

Sarah Leonardi
*School Board Member, Broward County,* Florida

Jessie Lopez
*Councilmember, City of Santa Ana, California*

Stephanie Loredo
*Governing Board Member, Culver City Unified School District, California*

Quinton D. Lucas
*Mayor, City of Kansas City, Missouri*

Joseph Makhlouf
*Alderperson, City of Wauwatosa, Wisconsin*

Caity Maple
*District 5 Councilmember, City of Sacramento, California*

Adrian Mapp
*Mayor, City of Plainfield, New Jersey*

Alexander Marion
*Auditor, City of Syracuse, New York*

Randall Martin
*1st Ward Supervisor, City of Hudson, New York*

Juan Miguel Martinez
*Supervisor, Milwaukee County, Wisconsin*

Josh Maxwell
*Commissioner and Board Chair, Chester County, Pennsylvania*

Yasmine-Imani McMorrin
*Councilmember, City of Culver, California*

Jessica McParlin
*Chief Deputy Treasurer, Sandoval County, New Mexico*

Carolina Mejia
*Commissioner, Thurston County, Washington*

Ryan Mello
*Executive, Pierce County, Washington*

William Moehle
*Supervisor, Town of Brighton, New York*

Marian Moskowitz
*Commissioner, Chester County, Pennsylvania*

Steve Mulroy
*District Attorney, County of Shelby, Tennessee*

Jessee Muñiz-Poland
*Director, Town of Manchester, Connecticut*

Omar Narvaez
*District 6 Councilmember, City of Dallas, Texas*

Anne O'Connor
*Board Supervisor, Milwaukee County, Wisconsin*

Myra Ortiz
*School Committee Member, City of Lawrence, Massachusetts*

Sean Parker
*Councilmember, Metropolitan Nashville & Davidson County, Tennessee*

Dontae Payne
*Mayor, City of Olympia, Washington*

Isabel Piedmont-Smith
*Councilmember, City of Bloomington, Indiana*

Veronica Pillar
*Legislator, Tompkins County, New York*

Phil Pluckebaum
*District 4 Councilmember, City of Sacramento, California*

Jacqueline "Jack" Porter
*Commissioner, City of Tallahassee, Florida*

Delishia Porterfield
*Councilmember At Large, Metropolitan Nashville & Davidson County, Tennessee*

Zohaib "Zo" Qadri
*Councilmember, City of Austin, Texas*

Jaime Resendez
*Councilmember, City of Dallas, Texas*

Satya Rhodes-Conway
*Mayor, City of Madison, Wisconsin*

Ryan Richardson
*City Attorney, City of Oakland, California*

Lenin Roa
*School Committee Member, City of Lawrence, Massachusetts*

Michael Rodriguez
*22nd Ward Alderperson, City of Chicago, Illinois*

Miguel Sanchez
*Councilmember, City of Providence, Rhode Island*

Jasmin Santana
*Councilmember, City of Cleveland, Ohio*

Dawn Marie Sass
*Clerk/Deputy Treasurer, Town of Exeter, Wisconsin*

Eli Savit
*Prosecuting Attorney, Washtenaw County, Michigan*

Gina-Louise Sciarra
*Mayor, City of Northampton, Massachusetts*

Sandra Sepulveda
*Councilmember, Metropolitan Nashville & Davidson County, Tennessee*

Kony Serrano Portillo
*Councilmember, Town of Edmonston, Maryland*

David Stout
*Precinct 2 Commissioner, El Paso County, Texas*

Zulfat Suara
*Councilmember at Large, Metropolitan Nashville & Davidson County, Tennessee*

Clifford Thompson
*Unified School Board Director, City of Oakland, California*

Terry Vo
*Councilmember, Metropolitan Nashville & Davidson County, Tennessee*

Anissa Welch
*Mayor, City of Milton, Wisconsin*

Ginny Welsch
*Councilmember, Metropolitan Nashville & Davidson County, Tennessee*

Braxton White
*Commissioner, Clarion County, Pennsylvania*

Robin Wilt
*Councilmember, Town of Brighton, New York*

Gregory Young
*Supervisor, Fulton County, New York*

Estevan Zarate
*Independent School District Trustee, City of Round Rock, Texas*

## CERTIFICATE OF COMPLIANCE

I, Jonathan Miller, hereby certify that:

1.   This brief complies with the type-volume limitation of Fed. R. App. P. 29(a)(5) and 32(a)(7)(B) because it contains 5,504 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2.   This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman, size 14.

*/s/ Jonathan B. Miller*
Jonathan B. Miller

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the First Circuit by using the appellate CM/ECF system. I further certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

*/s/ Jonathan B. Miller*
Jonathan B. Miller

Dated: June 17, 2025