No. 25-1348

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIRST CIRCUIT

NEW HAMPSHIRE INDONESIAN COMMUNITY SUPPORT; LEAGUE OF UNITED LATIN AMERICAN CITIZENS; MAKE THE ROAD NEW YORK,

*Plaintiffs-Appellees,*

v.

DONALD J. TRUMP, President of the United States, in their official capacity; U.S. DEPARTMENT OF HOMELAND SECURITY; KRISTI NOEM, in their official capacity as Secretary of the U.S. Department of Homeland Security; U.S. DEPARTMENT OF STATE; MARCO RUBIO, in their official capacity as Secretary of the U.S. Department of State; U.S. DEPARTMENT OF AGRICULTURE; BROOKE L. ROLLINS, in their official capacity as Secretary of the U.S. Department of Agriculture; CENTERS FOR MEDICARE AND MEDICAID SERVICES; MEHMET OZ, in their official capacity as Administrator of the Centers for Medicare and Medicaid Services,

*Defendants-Appellants.*

On Appeal from the United States District Court
for the District of New Hampshire

## REPLY BRIEF FOR APPELLANTS

BRETT A. SHUMATE
  *Assistant Attorney General*

ERIC D. McARTHUR
  *Deputy Assistant Attorney General*

MARK R. FREEMAN
SHARON SWINGLE
BRAD HINSHELWOOD
DEREK WEISS
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7230*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 616-5365*

# TABLE OF CONTENTS

**Page**

INTRODUCTION ...................................................................................................1

ARGUMENT .........................................................................................................3

I.     Plaintiffs Are Not Likely to Succeed on the Merits ..................................3

    A. Political Jurisdiction Is Not Merely Regulatory Jurisdiction ............4

    B. Domiciled Aliens Are Subject to the Complete Political
       Jurisdiction of the United States.......................................................7

    C. The Citizenship Clause Adapted the Common Law to
       American Views, Departing from the English Rule.........................12

    D. Plaintiffs' Statutory Claim Fails Because the Statute Has the
       Same Meaning as the Citizenship Clause .......................................17

II.    Many of the Members Who Received Injunctive Relief Lack
      Standing.................................................................................................24

CONCLUSION .....................................................................................................26

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

**Cases:** **Page(s)**

*Benny v. O'Brien,*
  58 N.J.L. 36, 32 A. 696 (N.J. 1895) ......................................................... 16, 17

*Bernardo ex rel. M & K Eng'g, Inc. v. Johnson,*
  814 F.3d 481 (1st Cir. 2016) ............................................................... 17, 18, 19

*Case v. Clarke,*
  5 F. Cas. 254 (C.C.D.R.I. 1828) ................................................................. 9

*Coddington v. Coddington,*
  20 N.J. Eq. 263 (Ch. 1869) ........................................................................ 8

*Elk v. Wilkins,*
  112 U.S. 94 (1884) ........................................................................... 2, 5, 7

*Fong Yue Ting v. United States,*
  149 U.S. 698 (1893) ............................................................................. 7, 8

*Girouard v. United States,*
  328 U.S. 61 (1946) .............................................................................. 21

*Goodell v. Jackson ex dem. Smith,*
  20 Johns. 693 (N.Y. 1823) .................................................................... 12, 15

*Hodgson v. De Beauchesne* [1858],
  14 Eng. Rep. 920 ................................................................................. 7

*Jackson ex dem. Smith v. Goodell,*
  20 Johns. 188 (N.Y. Sup. Ct. 1822) ............................................................. 12

*Jama v. I.C.E.,*
  543 U.S. 335 (2005) ............................................................................. 18

*Kaplan v. Tod,*
  267 U.S. 228 (1925) ............................................................................. 23

*Lau Ow Bew v. United States,*
  144 U.S. 47 (1892) ............................................................................... 7

*Lorillard v. Pons,*
  434 U.S. 575 (1978) ............................................................................. 19

*Loughrin v. United States*,
 573 U.S. 351 (2014) ............................................................... 22

*Ludlam v. Ludlam*,
 31 Barb. 486 (N.Y. Gen. Term. 1860),
 *aff'd*, 26 N.Y. 356 (1863) ........................................................ 15

*Lynch v. Clarke*,
 1 Sand. Ch. 583 (N.Y. Ch. 1844) ...................................... 14, 15

*M.M.V. v. Garland*,
 1 F.4th 1100 (D.C. Cir. 2021) ............................................... 25

*Nishimura Ekiu v. United States*,
 142 U.S. 651 (1892) ............................................................... 23

*O'Brien v. Benny*,
 58 N.J.L. 189, 33 A. 380 (N.J. 1895) ..................................... 17

*Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No. 1*,
 551 U.S. 701 (2007) ............................................................... 25

*Schooner Exch. v. McFaddon*,
 11 U.S. (7 Cranch) 116 (1812) ................................................. 9

*Thenault, In re*,
 47 F. Supp. 952 (D.D.C. 1942) .............................................. 23

*United States v. Board of Comm'rs of Sheffield*,
 435 U.S. 110 (1978) ............................................................... 20

*United States v. Gould*,
 25 F. Cas. 1375 (S.D. Ala. 1860) .............................................. 4

*United States v. Ju Toy*,
 198 U.S. 253 (1905) ............................................................... 23

*United States v. Kozminski*,
 487 U.S. 931 (1988) ............................................................... 21

*United States v. Rahimi*,
 602 U.S. 680 (2024) ............................................................... 12

*United States v. Rogers,*
45 U.S. (4 How.) 567 (1846) ................................................................... 6

*United States v. Wong Kim Ark,*
169 U.S. 649 (1898) ................................................... 2, 5, 7, 10, 11, 16

*United States ex rel. Mackey v. Coxe,*
59 U.S. (18 How.) 100 (1855) ................................................................ 6

*Warth v. Seldin,*
422 U.S. 490 (1975) ........................................................................... 24

*Wikimedia Found. v. National Sec. Agency,*
857 F.3d 193 (4th Cir. 2017) .............................................................. 25

*Wildes v. Parker,*
29 F. Cas. 1224 (C.C.D. Mass. 1839) ................................................. 10

**Treaty:**

*Convention on Certain Questions Relating to the Conflict of Nationality Laws,*
art. 14, 179 L.N.T.S. 89, 103 (1930) ...................................................22

**Statutes:**

Act of July 27, 1868, ch. 249, § 1, 15 Stat. 223, 223.............................16

Nationality Act of 1940, ch. 876, 54 Stat. 1137, 1137 .........................22

Slave Trade Act of 1819, ch. 101, 3 Stat. 532 ....................................... 4

8 U.S.C. § 1401 ................................................................................... 17

8 U.S.C. § 1401(a) .............................................................................. 24

8 U.S.C. § 1401(b)-(h) .......................................................................... 1

**Legislative Materials:**

Cong. Globe, 35th Cong. 1st Sess. 210 (1858) ....................................13

Cong. Globe, 39th Cong., 1st Sess. 2893 (1866) ............................. 6, 14

H.R. Rep. No. 82-1365, at 76 (1952).....................................................21

*Rep. of H. Comm. on Foreign Affairs Concerning the Rights of American Citizens in Foreign States*, *in* Cong. Globe, 40th Cong., 2nd Sess. app. (1868) ..................................................................15

*To Revise and Codify the Nationality Laws of United States into a Comprehensive Nationality Code: Hearings Before the H. Comm. on Immigr. and Naturalization on H.R. 6127 Superseded by H.R. 9980*, 76th Cong. 37 (1940) .............................................. 20, 21

## Other Authorities:

Clement L. Bouvé, *A Treatise on the Laws Governing the Exclusion and Expulsion of Aliens in the United States* (1912) ....................................19

1 William Burge, *Commentaries on Colonial and Foreign Laws* (1838) ....................................8

Gabriel J. Chin & Paul Finkelman, *Birthright Citizenship, Slave Trade Legislation, and the Origins of Federal Immigration Regulation*, 54 U.C. Davis L. Rev. 2215 (2021) .............................................. 4

Frederick A. Cleveland, *American Citizenship as Distinguished from Alien Status* (1927) ..............................................8

Alex Cockburn, *Nationality or the Law Relating to Subjects and Aliens* (1869)....................22

Comm'rs of the Code, *The Political Code of the State of New York* (1860)..........................13

David Dudley Field, *Outlines of an International Code* (2d ed. 1876) ..................................15

Richard W. Flournoy, *Dual Nationality and Election* 30 Yale L.J. 545 (1921) .............................................. 11

*Richard W. Flournoy, Dual Nationality and Election*, 30 Yale L.J. 693 (1921) .............................................. 20

2 Charles Cheney Hyde, *International Law* (2d rev. ed. 1947) ..........................................19

M.W. Jacobs, *A Treatise on the Law of Domicil* (1887) ..........................................11

Sidney Kansas, *Immigration and Nationality Act Annotated* (4th ed. 1953)..........................18

2 James Kent, *Commentaries on American Law* (10th ed. 1860) ..........................................11

Kurt T. Lash, *Prima Facie Citizenship* (Apr. 17, 2025),
    https://perma.cc/ARN2-5CSJ ............................................................... 5-6, 13, 15

Letter from Sen. Lyman Trumbull to President Andrew
    Johnson (in Andrew Johnson Papers, Reel 45, Manuscript Div.,
    Library of Cong.).................................................................................................14

Alexander Porter Morse, *The Citizen in Relation to the State* (1884) ......................9

Note, *The Nationality Act of 1940*,
    54 Harv. L. Rev. 860 (1941) ............................................................... 24

Philemon Bliss, *Citizenship* (1858)...........................................................13

4 Robert Phillimore, *Commentaries Upon International Law* (2d ed. 1874)............8

Antonin Scalia & Bryan A. Garner, *Reading Law* (2012)...................................21

Mark Shawhan, Comment, *The Significance of Domicile in Lyman
    Trumbull's Conception of Citizenship*,
    119 Yale L.J. 1351 (2010) ............................................................... 13-14

Joseph Story, *Commentaries on the Conflict of Laws* (3rd ed. 1834) .......................8

Joseph Story, *Commentaries on the Conflict of Laws* (6th ed. 1865) ................. 7, 12

1 Henry St. George Tucker, *Commentaries on the Laws of Virginia*
    (3d ed. 1846) ...........................................................................................13

1 Travers Twiss, *The Law of Nations Considered as Independent
    Political Communities* (1861)...........................................................8

John Westlake, *A Treatise on Private International Law* (1858) ............................22

Francis Wharton, *A Treatise on the Conflict of Laws* (1872) ...................................9

Ilan Wurman, *Jurisdiction and Citizenship* (Apr. 18, 2025),
    https://perma.cc/5DFJ-Z9BN ............................................................... 6, 15

**INTRODUCTION**

To receive birthright citizenship under the Citizenship Clause, an individual must be not only born in the United States, but also "subject to the jurisdiction thereof." This language rightly ensured citizenship for the freed slaves—the primary purpose of the Clause—as well as the children of others subject to the United States' complete political jurisdiction. But this constitutional floor lets Congress decide whether to confer citizenship on all other children, including those of tribal Indians and aliens here temporarily or illegally. While Congress has conferred citizenship on many categories of people who fall outside the Citizenship Clause, *see* 8 U.S.C. § 1401(b)-(h), children of aliens here temporarily or illegally are not among them.

Plaintiffs lack a coherent theory of the Citizenship Clause, instead advancing a series of contradictions. They claim the Clause does not depend on "any characteristic of the parent[]," Br. 12, but recognize that a child's citizenship depends on whether their parent was an ambassador or tribal Indian, Br. 14-15. They agree the Clause was declaratory of existing law, Br. 4-5, but argue the Civil Rights Act—a statute the same Congress had enacted months earlier—is of "dubious relevance" and should be "discount[ed]," Br. 18 & n.3. They criticize the government for not focusing on the "historical context of *Wong Kim Ark*," Br. 30, but object when that context illustrates the importance of domicile, Br. 20 n.4, 27 n.8. And they urge that all children born in the United States and subject to the government's authority are

citizens under the Clause, Br. 12, 20, but concede that tribal Indian children are "subject to federal authority" and yet are not citizens under the Clause, Br. 29.

That tribal Indians were subject to the United States' authority and owed a duty to obey the laws that Congress imposed on them shows that being "subject to the jurisdiction thereof" clearly requires more than being subject to the United States' regulatory power. As the government explained and the Supreme Court has held, the Clause requires being "completely subject to the political jurisdiction of the country." *United States v. Wong Kim Ark*, 169 U.S. 649, 693 (1898). A country has complete political jurisdiction over individuals who owe it sufficient allegiance, such as children of citizens and aliens lawfully "domiciled here," *id.*, but not over those who owe only the lesser allegiance of merely obeying the law, such as children of tribal Indians, *Elk v. Wilkins*, 112 U.S. 94, 102 (1884). This distinction reflects principles that were well recognized when the Fourteenth Amendment was ratified: domicile was understood to confer a more substantial allegiance than mere presence, an allegiance akin to citizenship that subjected an individual to the complete jurisdiction of the country of domicile with corresponding rights and duties. Children of aliens here temporarily or illegally, whose only allegiance is the duty to obey the laws while here, lack sufficient allegiance to come within the United States' complete political jurisdiction.

This historically grounded explanation reconciles the Supreme Court's cases, explains the substantial focus on domicile in the debates leading up to the Citizenship Clause, and comports with Executive Branch practice and legal scholarship in the

years thereafter.  Plaintiffs offer no interpretation of the Citizenship Clause that explains that history or reconciles the Supreme Court's decisions in *Elk* and *Wong Kim Ark*.  Text and historical context thus confirm that the Executive Order's interpretation of the Citizenship Clause is correct.  The preliminary injunction should be reversed.

## ARGUMENT

### I.    Plaintiffs Are Not Likely to Succeed on the Merits.

The Civil Rights Act of 1866 and the Citizenship Clause of the Fourteenth Amendment repudiated *Dred Scott* and confirmed that freed slaves and their children were citizens of the United States.  Plaintiffs' efforts to paint this case as a modern-day analogue to that odious decision are mistaken.  No one disputes that *Dred Scott* is deservedly overruled—or that fixing the citizenship status of freed slaves and their children was the central purpose of the Citizenship Clause.  Nor does the Executive Order create any classifications based on race—what matters is not one's race, but whether one has the requisite relationship of allegiance and protection.

Nothing about the historical context of the Clause suggests that it extended to the children of foreigners who are present here temporarily or unlawfully.  On the contrary, the history of the Clause's adoption shows that the Framers did not intend to grant birthright citizenship to the children of "temporary sojourners."  And it is entirely devoid of concern for illegal aliens, a group that did not yet exist given the

absence of federal immigration restrictions.[1]  Instead, Congress chose language that would encompass freed slaves but still limited citizenship to individuals who are completely subject to the political jurisdiction of the United States—a category that excludes children of both transient visitors and illegal aliens.

## A. Political Jurisdiction Is Not Merely Regulatory Jurisdiction.

All agree the jurisdictional clause excludes the children of (1) foreign ambassadors, (2) persons on foreign public ships, (3) invading armies, and (4) members of Indian tribes.  These exceptions share a single common feature: the child's parents do not fall within the "political jurisdiction" of the United States because they lack sufficient allegiance to the United States and owe primary allegiance

---

[1] Plaintiffs suggest (at 32) that illegally imported slaves were akin to illegal aliens, citing Gabriel J. Chin & Paul Finkelman, *Birthright Citizenship, Slave Trade Legislation, and the Origins of Federal Immigration Regulation*, 54 U.C. Davis L. Rev. 2215, 2236-37 (2021) (focusing on the Slave Trade Act of 1819, ch. 101, 3 Stat. 532).  But the Slave Trade Act did not require removal of illegally imported slaves.  While sections 1 and 2 required any slaves interdicted on the high seas while being imported to be brought into port and then sent "beyond the limits of the United States," 3 Stat. at 533, section 4—which addressed illegally imported slaves found in the U.S.— contained no comparable provision, providing merely that they would be held "subject to the orders" of the President, *id.* at 533-34.  The article identifies no instance of the President ordering removals under section 4, and one of the few sources it relies upon, *United States v. Gould*, 25 F. Cas. 1375 (S.D. Ala. 1860), contradicts the argument by holding that someone illegally imported who "has been mingled with the mass of the population in a state" would be "a free negro alien, resident in the state, and like any other free negro in the state, his status, his rights, and his remedies for injuries, are subjects of state jurisdiction and regulation," even if he "may" be subsequently removable.  *Id.* at 1378.

4

to another sovereign. *Elk*, 112 U.S. at 102. That understanding of the Clause squares with its text and history, and the Supreme Court's precedents.

Relying on *Wong Kim Ark*'s discussion of *The Schooner Exchange*, plaintiffs instead argue that all children born in the United States and subject to its regulatory jurisdiction are birthright citizens. Br. 9, 14, 21-22, 23-24, 27. But *Wong Kim Ark* did not deem mere regulatory jurisdiction sufficient; otherwise, the domicile requirement the Court included in its statement of its holding would be inexplicable. *See* 169 U.S. at 693; *see also id.* at 687 (concluding that "jurisdiction" in the Citizenship Clause must be presumed to have been used in the same sense as the term was used in early naturalization laws, under which "aliens *residing in this country*" were deemed "under the jurisdiction of the United States" (emphasis added)). And plaintiffs' articulation of the legal standard is clearly incompatible with the Supreme Court's treatment of tribal Indians, who plaintiffs concede are subject to the government's regulatory jurisdiction, Br. 29, but are nonetheless not "subject to the jurisdiction" of the United States for the Citizenship Clause, *Elk*, 112 U.S. at 102.

Plaintiffs' attempt to argue that "jurisdiction" means something other than regulatory jurisdiction for Indians but means regulatory jurisdiction for everyone else disregards the Clause's historical context and lacks any textual support. As their own amici acknowledge, "the debate" about the phrase subject to the jurisdiction thereof "predominantly focused on whether [it] included Native Americans." Constitutional Law Scholars Amicus Br. 13; *accord* Kurt T. Lash, *Prima Facie Citizenship* 49-53 (Apr.

5

17, 2025), https://perma.cc/ARN2-5CSJ. In crafting the Citizenship Clause, Congress eschewed the Indian-specific language of the Civil Rights Act of 1866— "born in the United States and not subject to any foreign power, excluding Indians not taxed"—and adopted a general test for all persons: "born … in the United States and subject to the jurisdiction thereof." The change appears to have been motivated by concerns that "Indians not taxed" might be interpreted literally (as a property test) rather than as a constitutional term of art (referring to Indians who were excluded from the apportionment base). *See* Ilan Wurman, *Jurisdiction and Citizenship* 70-71 (Apr. 18, 2025), https://perma.cc/5DFJ-Z9BN. To avoid that potential confusion, Congress adopted a different formulation to ensure that citizenship would not be extended to tribal Indians. Nobody disputes that Indians were understood not to be citizens under that test. Accordingly, any interpretation of the phrase "subject to the jurisdiction thereof" needs a coherent account of why tribal Indians are subject to the jurisdiction of the United States less completely than individuals who are granted citizenship under the Clause.

It was well settled when the Citizenship Clause was ratified that the United States could exercise regulatory power over Indian tribes. *See, e.g.*, *United States ex rel. Mackey v. Coxe*, 59 U.S. (18 How.) 100, 104 (1855) ("Cherokee country … is within our jurisdiction and subject to our laws."); *United States v. Rogers*, 45 U.S. (4 How.) 567, 572 (1846); Cong. Globe, 39th Cong., 1st Sess. 2893 (1866) (Senator—and former Attorney General—Johnson stating that "the courts would have no doubt" about

Congress's "authority to legislate"). "Jurisdiction" in the Citizenship Clause thus cannot mean regulatory jurisdiction, and the Clause does not cover all individuals who have a duty to obey the laws. It requires something more.

### B. Domiciled Aliens Are Subject to the Complete Political Jurisdiction of the United States.

**1.** "The evident meaning" of the phrase "subject to the jurisdiction thereof," the Supreme Court has explained, "is, not merely subject in some respect or degree to the jurisdiction of the United States, but completely subject to their political jurisdiction, and owing them direct and immediate allegiance." *Elk*, 112 U.S. at 102; *accord Wong Kim Ark*, 169 U.S. at 693.

The nineteenth-century legal community understood the relationship between allegiance and jurisdiction, as well as the ways domicile affected both. Aliens who had established domicile developed a degree of "allegiance to the country, very different from a mere obedience to its laws during a temporary residence." *Hodgson v. De Beauchesne* [1858] 14 Eng. Rep. 920, 932 (Privy Council); *see* Joseph Story, *Commentaries on the Conflict of Laws* § 49a, at 48 (6th ed. 1865) (discussing *Hodgson* as a "very extensiv[e] and learne[d] discuss[ion]" by "counsel of great eminence" and a "judge of very great learning"). Domiciled aliens "acquire rights and must discharge duties in many respects the same as possessed by and imposed upon the citizens of that country." *Lau Ow Bew v. United States*, 144 U.S. 47, 62 (1892); *Fong Yue Ting v. United States*, 149 U.S. 698, 734 (1893) (Brewer, J., dissenting) (similar). And unlike

temporarily present aliens—whose obligation to, and protection by, the United States ends on their departure—domiciled aliens could call on the United States for diplomatic protection. *Fong Yue Ting*, 149 U.S. at 724.

Domicile was "one of the fundamental considerations in controversies over citizenship" because it was "so closely related to matters of civil jurisdiction." Frederick A. Cleveland, *American Citizenship as Distinguished from Alien Status* 35 (1927). As a matter of comity, the nation where an individual was domiciled had jurisdiction to determine the "numerous civil rights of the person." 1 William Burge, *Commentaries on Colonial and Foreign Laws* 32 (1838); *accord, e.g.*, *Coddington v. Coddington*, 20 N.J. Eq. 263, 264 (Ch. 1869) (explaining that it was "well settled" that the government of a person's domicile "regulated" "the positive and relative status of [the] person"); *see* Joseph Story, *Commentaries on the Conflict of Laws* §§ 39-40, at 39 (3rd ed. 1834) (explaining that "the operation and effect of foreign laws" upon "persons, their capacity, state, and condition" will frequently depend upon domicile).

It was this relationship between domicile and jurisdiction over personal or civil rights that caused treatise writers to describe domicile as "the foundation of jurisdiction over persons" "under the Law of Nations," 1 Travers Twiss, *The Law of Nations Considered as Independent Political Communities* § 164, at 239 (1861), and a "caus[e]" which subject[s] the individual to the jurisdiction of a particular territory," 4 Robert Phillimore, *Commentaries Upon International Law* 32 (2d ed. 1874); *see* Cleveland, *supra*, at 34 ("In dealing with domicil we are dealing with the question of jurisdiction—the

8

right of the government to exercise control over the social population, and the rights of individuals to claim protection or to enjoy the benefits which are attached to residence."); Francis Wharton, *A Treatise on the Conflict of Laws* § 708 (1872) ("Domicil, of course, implies a voluntary submission to the local law, and invests the courts of the domicil with jurisdiction over the party thus domiciled."). Alien visitors were only "subject to the jurisdiction of the State when in foreign territory in a much-qualified sense." Alexander Porter Morse, *The Citizen in Relation to the State* 10-11 (1884).[2]

**2.** Before the Fourteenth Amendment, citizenship for Article III of the Constitution was already understood to relate to domicile. Whether someone was a "citizen" of a "state" for diversity jurisdiction depended on their domicile. *See, e.g.*, *Case v. Clarke*, 5 F. Cas. 254, 254 (C.C.D.R.I. 1828) (Story, J.) (No. 2490). Plaintiffs are thus plainly mistaken when they argue that domicile is irrelevant to the Citizenship Clause. State citizenship was long-established to require domicile; the dispute is whether federal birthright citizenship does as well. Federal citizenship was also understood to relate to domicile. In the 1830s, Justice Story explained that a U.S. citizen domiciled in the United Kingdom "would be deemed an alien enemy" in the event of war and thought it an open question whether such an individual would qualify as a "foreign … citizen[] or subject[]" for purposes of diversity jurisdiction,

---

[2] Plaintiffs criticize (at 18-20, 20 n.4) the government's use of jurisdictional concepts influenced by international law principles, but their concept of jurisdiction is also derived from the "law of nations," *Schooner Exch. v. McFaddon*, 11 U.S. (7 Cranch) 116, 123 (1812).

given the oddity of treating a U.S. citizen domiciled abroad "as a foreign merchant and foreign subject" for "all purposes, except of suits in the courts of the United States." *Wildes v. Parker*, 29 F. Cas. 1224, 1225-26 (C.C.D. Mass. 1839) (Story, J.) (No. 17,652) (certifying the question to the Supreme Court and noting the divided but unreported outcome).

**3.** *Wong Kim Ark* likewise reflects the significance of domicile. The Supreme Court repeatedly emphasized that Wong's parents, though "subjects of the Emperor of China," had "a permanent domicil and residence in the United States." 169 U.S. at 653; *accord id.* at 652, 693, 696, 705. Indeed, the Court's paragraph announcing its "conclusions" from its analysis of the common law and other antecedents, *id.* at 693-94, underscores the importance of domicile: "Every citizen or subject of another country, *while domiciled here*, is within the allegiance and the protection, and consequently subject to the jurisdiction, of the United States," and thus that the Citizenship Clause "includes the children born within the territory of the United States of all other persons … *domiciled within the United States*." *Id.* at 693 (emphases added). And echoing the language of *Elk*, the Court concluded by noting that those domiciled here are "*completely* subject to the political jurisdiction" of the United States by comparing them to those temporarily present: "seeing that" even a temporary visitor to "the dominions of a foreign government" has a duty of "obedience to the laws of that government" during his presence "independently" of any "domiciliation," the Court explained that it "can hardly be denied that an alien is *completely* subject to

10

the political jurisdiction of the country in which he resides." *Id.* at 693-94 (emphases added) (quotation marks omitted); *see* M.W. Jacobs, *A Treatise on the Law of Domicil* § 75, at 123 & n.2 (1887) (collecting cases equating residence and domicile); 2 James Kent, *Commentaries on American Law* 576 n.(c) (10th ed. 1860) (similar).

The Supreme Court's repeated emphasis on domicile in its holding is properly understood as reflecting the limits of that holding, not a mere description of the facts or rejection of domicile's relevance. Wong Kim Ark's lawyer understood the potential relevance of domicile to citizenship, devoting an entire section of his brief to whether an individual's "citizenship" "depend[ed] … upon the 'domicile' of their parents." Brief for the Appellee 87-89 (No. 132) (Mar. 3, 1897). In the years after *Wong Kim Ark*, treatises and Executive Branch practice regularly recognized that the children of those temporarily present in the United States were *not* citizens at birth. Gov't Br. 27-29. Indeed, the State Department official whose testimony to Congress the plaintiffs rely upon, acknowledged the consensus of treatise-writers that "in order that a person born in the United States of alien parents may have American citizenship, his parents must have been domiciled in this country at the time of his birth," and admits that *Wong Kim Ark* "did not directly decide the precise point" because the "parents were domiciled in the United States." Richard W. Flournoy, *Dual Nationality and Election*, 30 Yale L.J. 545, 552 (1921).

### C. The Citizenship Clause Adapted the Common Law to American Views, Departing from the English Rule.

Plaintiffs attempt to draw support from English common law and early American sources, but these cannot overcome the Citizenship Clause itself. The Constitution "did not purport to take English law or history wholesale and silently download it into" American law. *United States v. Rahimi*, 602 U.S. 680, 722 n.3 (2024) (Kavanaugh, J., concurring). While the English common law regarded children even of transients as citizens at birth, there is no dispute that the Citizenship Clause departed from English common law in some respects. As early as the 1820s, American courts rejected the suggestion that members of Indian tribes were born citizens, even though they satisfied the English common-law rule. When the New York Supreme Court of Judicature applied the English common-law rule to conclude that tribal Indians were "born in allegiance to the government of this state, for [New York's] jurisdiction extends to every part of the state; they receive protection from [New York], and are subject to [New York's] laws," *Jackson ex dem. Smith v. Goodell*, 20 Johns. 188, 192-93 (N.Y. Sup. Ct. 1822), Chancellor Kent reversed its decision because Indians had "never been regarded as citizens or members of [New York's] body politic," *Goodell v. Jackson ex dem. Smith*, 20 Johns. 693, 710 (N.Y. 1823).

Moreover, as noted, Justice Story explained that citizenship at birth required more than temporary physical presence. Story, *supra*, § 48, at 46. Plaintiffs' mistaken suggestion that Story was describing "foreign law" misreads his treatise (and once

again fails to engage with the historical importance of domicile).  Story was explaining that "foreign law[]" "operat[ed]" and had an "effect" within U.S. territory because it determined many rights of *nondomiciled* aliens, *see supra* p. 8.  Story's view of citizenship requiring more than temporary presence was also shared by other American authorities.  *See, e.g.*, 1 Henry St. George Tucker, *Commentaries on the Laws of Virginia* 56 (3d ed. 1846) (describing the conclusion as "sufficiently obvious").

Importantly, by Reconstruction, the Republicans championing the Civil Rights Act of 1866 and the Citizenship Clause had adopted this American position.  In 1858, Representative Philemon Bliss gave a floor speech criticizing the *Dred Scott* decision— later reprinted as a pamphlet—where he explained "[t]he few exceptions" to citizenship at birth as "children of foreign ministers or temporary sojourners."  Cong. Globe, 35th Cong. 1st Sess. 210 (1858); Philemon Bliss, *Citizenship* 3 (1858). Prominent Civil War Republican lawyer David Dudley Field led a New York commission to codify laws that in 1860 proposed a citizenship provision that excluded "the children of transient aliens and of alien public ministers and consuls." Comm'rs of the Code, *The Political Code of the State of New York* § 5(1) (1860). Representative Bingham and Senator Trumbull—sponsors of the Fourteenth Amendment—both emphasized the importance of domicile to citizenship at birth. *See* Lash, *supra*, at 18 (noting speech by Representative Bingham declaring that "all free persons born and *domiciled* within the United States" are citizens (emphasis added) (quotation marks omitted)); Mark Shawhan, Comment, *The Significance of Domicile in*

13

*Lyman Trumbull's Conception of Citizenship*, 119 Yale L.J. 1351, 1352-53 (2010) (quoting Letter from Sen. Lyman Trumbull to President Andrew Johnson (in Andrew Johnson Papers, Reel 45, Manuscript Div., Library of Cong.)).

The Civil Rights Act of 1866—the predecessor to the Citizenship Clause—was drafted with this difference between American and English law in mind.  Senator Trumbull explained that in drafting the Act he faced a "difficulty"; namely, he initially considered using the phrase "all persons born in the United States and owing allegiance thereto" but rejected that approach because "upon investigation it was found that a sort of allegiance was due to the country from persons temporarily resident in it."  Cong. Globe, 39th Cong., 1st Sess. at 572 (quotation marks omitted).  The Act's eventual language—persons were citizens if they were "not subject to any foreign power"—addressed this concern.  The Citizenship Clause's use of affirmative language—being subject to the jurisdiction of the United States—was not intended to alter this result.  *See, e.g.*, *id.* at 2890 (Senator Howard proposing language he described as "declaratory of … the law of the land already"); *id.* at 2894 (Senator Trumbull saying "[t]he object to be arrived at" by the language in the Act and the Clause was "the same").

Against this background, plaintiffs rely heavily on *Lynch v. Clarke*, 1 Sand. Ch. 583 (N.Y. Ch. 1844), but overstate its importance.  Julia Lynch was born during the four years her parents spent in the U.S.; a low-ranking judge in New York's chancery court, *see Preface*, 1 Sand. Ch. iii, iii-iv (1845), concluded she was a citizen at birth under

the English common-law rule.  1 Sand. Ch. at 587, 640-46, 655.  But there is little

indication that *Lynch* reflected a universal view, much less one incorporated wholesale

into the Citizenship Clause.  As David Dudley Field observed, *Lynch* "seems not to be

entirely approved" and "probably would at the most be considered as authority only

in regard to the right of succession to real property within that State."  David Dudley

Field, *Outlines of an International Code* 132 n.1 (2d ed. 1876).  When New York judges

were later faced with the inverse of *Lynch*—a child born to Americans temporarily

abroad—they divided on whether the child was also a citizen of the foreign country.

Wurman, *supra*, at 28-29 (discussing *Ludlam v. Ludlam*, 31 Barb. 486, 503 (N.Y. Gen.

Term. 1860), *aff'd*, 26 N.Y. 356 (1863)).  Nor was *Lynch* the test that New York

applied to all of its inhabitants, notably tribal Indians.  *See Goodell*, 20 Johns. 693.

Given that the debates about the jurisdictional clause focused on Indians, *Lynch*

unsurprisingly played almost no role in those debates, being mentioned only once, by

a "minor player" who mischaracterized the decision, Lash, *supra*, at 20-21, 44-45.

　　Moreover, when the Citizenship Clause was being ratified, Congress was

criticizing the mode of reasoning employed in *Lynch*—that "everything that was law in

England before, was law in America after the Revolution"—as having "no just

foundation," and in particular objecting to American courts' acceptance of the

English common law's "obsolete claim of inalienable allegiance."  *Rep. of H. Comm. on*

*Foreign Affairs Concerning the Rights of American Citizens in Foreign States*, *in* Cong. Globe,

40th Cong., 2nd Sess. app. at 94, 99 (1868).  Just weeks after the Fourteenth

Amendment was ratified, Congress passed the Expatriation Act of 1868, forcefully repudiating the English doctrine of inalienable allegiance to one's birth country as incompatible with "the enjoyment of the rights of life, liberty, and the pursuit of happiness." Act of July 27, 1868, ch. 249, § 1, 15 Stat. 223, 223.

Courts in the decades after ratification also understood the Citizenship Clause to depart from the English common-law rule. *Elk* and *Wong Kim Ark* acknowledged that the Clause departed from the English rule in how it treated Indians. The New Jersey Supreme Court in *Benny v. O'Brien*, 58 N.J.L. 36, 32 A. 696 (N.J. 1895)—which *Wong Kim Ark* quoted favorably, 169 U.S. at 692-93—similarly recognized that America departed in how it treated nondomiciled aliens. The court reasoned that the Civil Rights Act and Citizenship Clause make clear that some aliens' children are not citizens because they are "subject to [a] foreign power." *Benny*, 32 A. at 697. The "[p]ersons intended to be excepted," the court explained, are "those born in this country of foreign parents who are temporarily traveling here" because "[s]uch children are, in theory, born within the allegiance of the sovereign power to which they belong…." *Id.* By contrast, for people who settled here and raised their children here—*i.e.*, became "domiciled here"—"it is clear that it will never be conceded by our government that such persons are subject to any foreign power" because they are instead "subject to the jurisdiction of the United States." *Id.* at 697-98.

16

The plaintiffs respond to *Benny* mostly by ignoring it, suggesting (at 26 n.6) that *Benny*'s emphasis on domicile was "confusion" later "dispelled" by *Wong Kim Ark*, despite *Wong Kim Ark* quoting *Benny*'s domicile language favorably.[3]

### D. Plaintiffs' Statutory Claim Fails Because the Statute Has the Same Meaning as the Citizenship Clause.

Plaintiffs argue the Executive Order independently violates 8 U.S.C. § 1401 because the 1940 enactment and 1952 recodification of the precursor to § 1401 adopted the Supreme Court's holding in *Wong Kim Ark*. Much of this argument relies on plaintiffs' misinterpretation of *Wong Kim Ark*, *see supra* p. 10-11, and therefore rises and falls with their constitutional argument. To the extent plaintiffs advance the more sweeping argument that even though the Supreme Court had never decided the issue, Congress should nonetheless be assumed to have adopted the Roosevelt Administration's misreading of *Wong Kim Ark* rather than adopting the meaning of the Fourteenth Amendment, their argument is mistaken.

**1.** This mode of argument—which this Court has called the "legislative ratification canon," *Bernardo ex rel. M & K Eng'g, Inc. v. Johnson*, 814 F.3d 481, 488 (1st Cir. 2016)—requires both a broad unquestioned consensus and evidence of

---

[3] Plaintiffs also incorrectly call the New Jersey Supreme Court a "state trial court," Br. 26 n.6, despite the published report clearly showing it was an appeal, 32 A. at 696, and the Supreme Court being the state's highest court with jurisdiction over the case, *see O'Brien v. Benny*, 58 N.J.L. 189, 33 A. 380, 380 (N.J. 1895).

Congressional intent to affirmatively ratify that consensus, neither of which is present here.

**a.** There was no contemporaneous settled meaning of the Citizenship Clause, much less the required "consensus … so broad and unquestioned that we must presume Congress knew of and endorsed it." *Bernardo*, 814 F.3d at 488 (quoting *Jama v. I.C.E.*, 543 U.S. 335, 349 (2005)).  In contrast to the numerous authorities advancing the government's reading between 1898 and 1952, *see* Gov't Br. 28-29, 41, plaintiffs identify few authorities—and no judicial decisions—adopting their view during the relevant time period. *See* Br. 42-46.  The main authorities for their position are the statements of one State Department official, Richard Flournoy, and a Roosevelt administration report he authored.  But Flournoy, of course, had previously written about how the consensus of treatise-writers disagreed with his view, *see* Flournoy, *supra*, at 552, and plaintiffs fail to show that his once-minority view had become a well-settled consensus to the contrary.

After enactment of the statutes, treatises continued to explain that children of temporary visitors were not citizens.  Sidney Kansas, *Immigration and Nationality Act Annotated* 183 (4th ed. 1953) (explaining that the INA's statutory provision excluded "transients or visitors").  Even treatises that agreed with the Roosevelt administration's contrary interpretation acknowledged the unsettled nature of the issue, with one stating that "*at the present time*" "the State Department is not" "disposed to raise a distinction based upon the domicile of the parents," while acknowledging

that all of the case law involved aliens domiciled here.  2 Charles Cheney Hyde,

*International Law* § 344 & n.7 (2d rev. ed. 1947) (emphasis added).

Moreover, plaintiffs misstate Bouvé's treatise when they suggest (at 47) he

viewed children born to temporarily present aliens as citizens; he repeatedly made

clear that "residence" or "domicile" was required.  Clement L. Bouvé, *A Treatise on the*

*Laws Governing the Exclusion and Expulsion of Aliens in the United States* 424 (1912) (not all

"presence" "constitute[s] residence" sufficient for the child to be a citizen); *id.* at 426

(explaining that the citizenship of illegal aliens' children turned on whether the

immigration laws "prevent the parents from acquiring a residence or domicile").[4]

**b.**  As this Court has held, "it is generally inappropriate to apply the doctrine of

legislative ratification without some evidence that Congress affirmatively sought to

ratify the interpretation of a statute."  *Bernardo*, 814 F.3d at 490.  The standard for

ratifying an interpretation of a *constitutional* provision should be more demanding;

ratification is based on the implied intent of Congress in choosing not to modify the

language, *see, e.g.*, *Lorillard v. Pons*, 434 U.S. 575, 582-83 (1978), but unlike statutes,

Congress cannot unilaterally modify the text or meaning of a constitutional provision.

---

[4] Plaintiffs, citing *Plyler*, place too much reliance (at 31-35) on Bouvé's discussion of illegal aliens' ability to establish domicile.  Bouvé cites no authorities for his views, and modern courts (including the Supreme Court) have accepted that Congress can limit aliens' ability to establish domicile.  *See* Gov't Br. 30-32 (collecting cases).  In any event, the record does not support plaintiffs' assertion that nearly all illegal aliens have an intent to remain in this country, as would be necessary for their facial challenge.

When Flournoy described his mistaken view of the effects of the Citizenship Clause during the Congressional hearings, a committee member aptly responded that the effect of the Citizenship Clause was "not a matter [they] ha[d] any control over." *To Revise and Codify the Nationality Laws of United States into a Comprehensive Nationality Code: Hearings Before the H. Comm. on Immigr. and Naturalization on H.R. 6127 Superseded by H.R. 9980*, 76th Cong. 37 (1940).

While the legislative history shows that some members of Congress were aware of the Roosevelt administration's misinterpretation, it does not evidence an affirmative intent to ratify that interpretation. *Cf. United States v. Board of Comm'rs of Sheffield*, 435 U.S. 110, 134 (1978) (asking whether the "Congress that re-enacts a statute voices *its approval* of an administrative or other interpretation" (emphasis added)). If anything, the committee members disapproved of the interpretation's consequences. *See To Revise and Codify, supra*, at 37 (Rep. Rees responding to Flourney's explanation of birthright citizenship by asking whether "there is anything in this measure before us to change that situation?"). Richard Flournoy, the Executive Branch official explaining the interpretation, had previously raised questions about its desirability, instead describing the domicile-based approach as "very desirable" because "[t]here is no reason, in principle, for granting citizenship to children born in the territory of a country to mere sojourners therein." Richard W. Flournoy, *Dual Nationality and Election*, 30 Yale L.J. 693, 707 (1921).

20

The legislative history of both the 1940 and 1952 acts shows Congress incorporating the Fourteenth Amendment into a comprehensive nationality code rather than any intent to adopt a meaning that departed from the original public meaning of the Citizenship Clause. *To Revise and Codify*, *supra*, at 38 (Flournoy describing the 1940 Act's provision as "taken of course from the [F]ourteenth [A]mendment"); H.R. Rep. No. 82-1365, at 76 (1952) ("The bill carries forward substantially those provisions of the Nationality Act of 1940 which prescribe who are citizens by birth.").

There is little reason to think that Congress sought to ratify any different interpretation. *See, e.g.*, *Girouard v. United States*, 328 U.S. 61, 70 (1946) (declining to interpret the reenactment in the Nationality Act of 1940 of unchanged provisions to adopt the Supreme Court's previous interpretation of those provisions). While using language with an existing meaning in a new statute sometimes adopts that meaning, that "presumption" is "reverse[d]" in a recodification, because such recodifications do not "result from legislative reconsideration of the substance of codified statutes." *See* Antonin Scalia & Bryan A. Garner, *Reading Law* § 40 (2012).

Plaintiffs' reliance on *United States v. Kozminski*, 487 U.S. 931 (1988), is misplaced because it did not involve a codification. There, Congress created a new criminal offense, serving a new purpose, and defined the newly prohibited acts by using terminology borrowed from the Thirteenth Amendment. That differs significantly from here, where § 1401 was intended to serve the same purpose as the

Citizenship Clause—describing who was a citizen at birth—and was included so that the statute could be a "comprehensive nationality code," Nationality Act of 1940, ch. 876, 54 Stat. 1137, 1137.  Under such circumstance, the natural presumption is that Congress intended the identical text serving an identical purpose to bear an identical meaning.

Plaintiffs' reliance (at 41) on *Loughrin v. United States*, 573 U.S. 351 (2014), further undermines their argument.  The "serious chronological problem" in *Loughrin* was the attempt to rely on judicial decisions that post-date a statute, *id.* at 359-60, rendering plaintiffs' repeated references to post-enactment sources inapplicable.

**2.**  Plaintiffs' arguments from statutory structure also fall flat.  Contrary to their assertion (at 48), the foundling provision says little about birthright citizenship.  Even before the Fourteenth Amendment, "[f]oundlings of course belong[ed] everywhere to the country where they [we]re found,"  John Westlake, *A Treatise on Private International Law* 19 (1858), even in countries with no jus soli birthright citizenship, Alex Cockburn, *Nationality or the Law Relating to Subjects and Aliens* 25 (1869); *accord Convention on Certain Questions Relating to the Conflict of Nationality Laws*, art. 14, 179 L.N.T.S. 89, 103 (1930).  Further, given that the statutory provision addressed children of "unknown parentage," no reasonable inference can be drawn from not asking about the parents' characteristics.

The lack of naturalization provisions for children born in the United States reflects the rarity of that occurrence, not its impossibility.  Even under plaintiffs'

22

theory there are noncitizen children born in the U.S.—such as children of ambassadors—who may later want to naturalize, a situation quickly resolved by the courts in the aftermath of the 1940 act by concluding that although such children were "in a geographical sense … born within the United States," they are subject to foreign jurisdiction and therefore "may be said to have been 'born outside of the United States' within the meaning of the statute." *See In re Thenault*, 47 F. Supp. 952, 953 (D.D.C. 1942).

Finally, other statutory provisions referencing whether a child's parent was a citizen are doubly irrelevant. Section 1401 does not turn on whether a child's parents are citizens but rather whether the child and parent are completely subject to the jurisdiction of the United States. And the use of language directly from the Citizenship Clause does not provide a reason to assume Congress meant to depart from the original meaning of the Clause.

**3.** Even if plaintiffs were able to show legislative ratification of their meaning of "subject to the jurisdiction thereof," their facial claim would fail because legislative ratification would mean many individuals covered by the Executive Order would not be "in the United States" as that phrase was understood in 1940. The Supreme Court's decisions in *Kaplan v. Tod*, 267 U.S. 228, 230 (1925); *United States v. Ju Toy*, 198 U.S. 253, 263 (1905); and *Nishimura Ekiu v. United States*, 142 U.S. 651, 661 (1892), had created a well-understood rule that parents who had not been legally admitted "were not within the United States" but were legally treated as "still [being] at the frontier."

Note, *The Nationality Act of 1940*, 54 Harv. L. Rev. 860, 861 n.8 (1941). Therefore, even if the midcentury understanding of 8 U.S.C. § 1401(a)'s requirement to be born "subject to the jurisdiction" of the United States could help plaintiffs, the midcentury understanding of the second requirement of being "born in the United States" would defeat their facial challenge.

## II. Many of the Members Who Received Injunctive Relief Lack Standing.

The injunction also impermissibly grants relief to individuals who lack Article III standing. The organizations do not dispute that many of their members lack Article III standing; nor could they, as the vast majority likely are not expecting a child and have no plans to have a child. They instead argue (at 53-56) that even though an Article III court would lack power to provide a remedy to those members if they brought their claims directly, the court can nonetheless grant relief as long as the individuals are represented by an organization.

Plaintiffs misread the Supreme Court's associational-standing cases, which do not exempt individuals from normal Article-III-standing scrutiny merely by having their claim brought by an association. To the contrary, the Supreme Court has made clear that associational standing "does not eliminate or attenuate" the requirements of standing. *Warth v. Seldin*, 422 U.S. 490, 511 (1975).

The cases where the Supreme Court has considered the standing of only a few members do not imply that the other members' standing is never relevant.

24

Associations will frequently be able to obtain all the relief they seek while establishing the standing of a single member because that single member would themselves be entitled to the full scope of relief.  Broad, systematic relief is sometimes necessary to provide complete relief to a single individual with standing, such as in school segregation or redistricting cases.  *See, e.g.*, *Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 718 (2007).  If one affected member is entitled to relief that benefits all the members, then only that one member's standing needs to be established.

But the rule that only one individual's standing matters "does not apply if each plaintiff seeks 'additional' individualized relief." *M.M.V. v. Garland*, 1 F.4th 1100, 1110 (D.C. Cir. 2021).  Therefore, when a broader injunction would be necessary to provide complete relief to each additional individual, courts require each individual to establish standing.  *Id.*; *Wikimedia Found. v. National Sec. Agency*, 857 F.3d 193, 216 (4th Cir. 2017).  That is plainly true here: each additional person asserting citizenship adds new individualized relief to the case.

## CONCLUSION

The preliminary injunction should be reversed, or at a minimum narrowed.[5]

Respectfully submitted,

BRETT A. SHUMATE
  *Assistant Attorney General*

ERIC D. MCARTHUR
  *Deputy Assistant Attorney General*

MARK R. FREEMAN
SHARON SWINGLE
BRAD HINSHELWOOD

  *s/ Derek Weiss*
DEREK WEISS
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7230*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 616-5365*
  *derek.l.weiss@usdoj.gov*

JUNE 2025

---

[5] Plaintiffs "have no objection" to reversing the injunction insofar as it applies to the President.  Br. 56 n.16.

**CERTIFICATE OF COMPLIANCE**

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 6,497 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in Garamond 14-point font, a proportionally spaced typeface.

*s/ Derek Weiss*
Derek Weiss